IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
LCI HOLDING COMPANY, INC., et al.,        :    Case No. 12-13319 (___)
                                          :
            Debtors.[1]                   :    Joint Administration Pending
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DECLARATION OF PHILLIP B. DOUGLAS IN SUPPORT OF CHAPTER 11
PETITIONS AND FIRST DAY PLEADINGS**

I, Phillip B. Douglas, being duly sworn, deposes and says:

1.      I am the Chairman and Chief Executive Officer of LCI Holding Company,

Inc. ("LCI"), a corporation organized under the laws of the state of Delaware and the ultimate

parent of LifeCare Holdings, Inc. ("LifeCare") and the other debtors and debtors in possession in

the above captioned chapter 11 cases (collectively, the "Debtors" and, together with the non-

debtor affiliates and subsidiaries of LCI, the "Company").  I am also the Chairman and Chief

Executive Officer of LifeCare, the direct parent to the several operating entities that comprise the

---

[1]     The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: LCI
Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279),
Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI
Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company
of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare
Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc.
(2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957),
LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare
Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals
of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San
Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc.
(5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management
Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty
Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE
Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty
Hospital, Ltd. (5386). The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 –
Suite 150, Plano, TX 75024.

Company.  To enable the Debtors to minimize the adverse effects of these Chapter 11 Cases (as

defined below) on their business, the Debtors intend to request various types of relief in "first

day" applications and motions (collectively, the "First Day Pleadings").[2]  I submit this

declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title

11 of the United States Code (the "Bankruptcy Code") and (b) First Day Pleadings.  I am

authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

       2.      I have held my current positions with the Company since March 3, 2011.

I previously served as President of the Company from April 2008 through March 2011 and Chief

Financial Officer of the Company from January 2006 through March 2008.  As a result of my

tenure with the Debtors, my review of relevant documents, and my discussions with other

members of the Debtors' management teams, I am familiar with the Debtors' day-to-day

operations, business affairs, and books and records.  Except as otherwise noted, I have personal

knowledge of the matters set forth herein and, if called as a witness, would testify competently

thereto.  Except as otherwise stated, all facts set forth in this Declaration are based on my

personal knowledge, my discussions with other members of the Debtors' senior management, my

review of relevant documents, or my opinion, based on my experience and knowledge of the

Debtors' operations and financial conditions.  In making this Declaration, I have relied in part on

information and materials that the Debtors' personnel and advisors have gathered, prepared,

verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or

for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter,

I would testify competently to the facts set forth herein.

---

[2]    Unless otherwise defined herein, capitalized terms used herein shall have the meanings ascribed to them in the
relevant First Day Pleadings.

3.      This Declaration is divided into two parts.  Part I of this Declaration provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of these Chapter 11 Cases. Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## PART I

## BACKGROUND

**A.      The Debtors' Business**

4.      The Debtors are a leading operator of long-term acute care ("LTAC") hospitals in the United States.  Through its operating subsidiaries, the Company provides a full range of clinical services to patients with serious and complicated illnesses or injuries requiring extended hospitalization.  Patients are admitted to the Company's facilities primarily from general acute care hospitals.  Many of its patients suffer from one or more respiratory, neuromuscular, circulatory, renal, hepatic, cardiac and/or oncologic conditions.  These conditions require a high level of monitoring and specialized care yet may not necessitate the continued services of an intensive care unit.  The Company's hospitals are designed to accommodate such patients and provide them with a higher level of care than a skilled nursing facility or an inpatient rehabilitation facility.  Substantially all of the Company's revenue derives from the provision of patient services and is received through Medicare and Medicaid reimbursements and payments from private payors.

5.      As of the Petition Date, the Company operated 27 hospitals located in 10 states, consisting of eight "hospital within hospital" facilities (approximately 20% of beds) and 19 freestanding facilities (approximately 80% of beds).  Through these hospitals, the Company operates 1,390 licensed LTAC beds and 40 transitional care beds.  In addition, through its wholly owned subsidiary LifeCare Holdings Michigan, Inc., the Company owns a 50% interest in Select

LifeCare Western Michigan, LLC, a joint venture with Select Medical. LifeCare Holdings Michigan, Inc., Select LifeCare Western Michigan, LLC and its subsidiaries are not Debtors in these Chapter 11 Cases.  The Company employs approximately 4,500 people, all but approximately 150 of whom are employed at the hospital level and the majority of whom are registered or licensed nurses and respiratory therapists.  While the Company employs several physicians, including its National Medical Director, it does not employ the doctors that render services to its patients.  These doctors are independent practitioners and, other than physicians who are compensated at an hourly rate for providing overnight coverage and other regular administrative services for the Company's hospitals, generally provide care to the Company's patients on a fee for service basis billing third party payors directly for their services.

6.    The Company was founded in 1992 and began its operations in 1993 with the opening of its first hospital in Shreveport, Louisiana.  Founded by a clinician who recognized an opportunity to provide patients requiring acute care with better treatment than was available in general acute care hospitals, the Company expanded operations over the course of the next decade by adding facilities in Texas, Pennsylvania, Ohio and Nevada, as well as additional hospitals in Louisiana.  On August 11, 2005, the Company was acquired by investment funds associated with The Carlyle Group ("Carlyle") for a total purchase price of approximately $570.0 million (the "2005 Transaction").  In addition to Carlyle's equity, the 2005 Transaction was financed through borrowings under a $255.0 million secured credit facility and a $150.0 million of senior subordinated notes issued by LifeCare.

7.    The Company has engaged in two notable acquisitions since the 2005 Transaction.  On August 1, 2011, the Company acquired substantially all of the assets associated with five (5) LTAC facilities located owned by HealthSouth Corporation (the "HealthSouth

4

Acquisition") in exchange for a cash purchase price of approximately $120 million.  On

December 1, 2011, pursuant to an asset purchase agreement by and between Vibra Specialty

Hospital of Dallas, LLC ("Vibra") and LifeCare Hospitals of North Texas, LP, the Company

acquired selected assets of Vibra's long-term acute care hospital operation located in Dallas,

Texas (the "Vibra Acquisition").  After the Vibra Acquisition, the Company's existing

operations in Dallas were consolidated into the facility acquired from Vibra.  The total

consideration for the Vibra Acquisition was approximately $10.9 million, with approximately

$2.5 million of that amount yet to be paid and evidenced by the Vibra Note (discussed below).

**B.      The Debtors' Corporate and Capital Structure**

8.      A corporate organization chart depicting the ownership structure of the

Debtors is attached hereto as Exhibit A.  Substantially all of the common stock of LCI is owned

by investment funds affiliated with Carlyle.

9.      As of the Petition Date, the Company's total consolidated long-term debt

obligations were approximately $484.2 million and consisted of, among other things,

institutional loans and unsecured subordinated notes.  The primary components of the

Company's consolidated funded debt obligations are described in greater detail below.

10.      The Prepetition Credit Agreement. As noted, in connection with the 2005

Transaction, the Company borrowed $255.0 million under a secured credit facility.  That debt

matured by its terms in August 2012. In addition, the Company had entered into a revolving

credit facility, which matured in August 2011.  In February 2011, LifeCare refinanced the debt

under the original credit agreement and revolving credit facility by entering into a Credit

Agreement dated as of February 1, 2011 (as amended, supplemented or otherwise modified, the

"Prepetition Credit Agreement"), by and among LifeCare, LCI Holdco, LLC, JPMorgan Chase

Bank, N.A., as Administrative Agent and Collateral Agent (the "Prepetition Agent"), and the

Lenders party thereto (the "Prepetition Lenders"). The Prepetition Credit Agreement originally provided for a $257.5 million senior secured term loan and a $30.0 million senior secured revolving credit facility. The Prepetition Credit Agreement provided the Company with the option to request additional term loan commitments of up to $50.0 million. The Company exercised this option to finance the HealthSouth Acquisition.

11.     As of the Petition Date, there was approximately $353.4 million outstanding under the Prepetition Credit Agreement, plus issued but undrawn letters of credit of $9.2 million. These obligations are secured by substantially all of the Debtors' assets, other than assets held by certain subsidiaries designated as non-guarantor subsidiaries under the Prepetition Credit Agreement.[3]

12.     Senior Subordinated Notes. In connection with the 2005 Transaction, LifeCare also issued senior subordinated notes in the principal amount of $150.0 million (the "Senior Subordinated Notes") pursuant to an Indenture, dated as of August 11, 2005, between Rainier Acquisition Corp. and U.S. Bank, N.A., as trustee (the "Indenture"). Each of LifeCare's subsidiaries (other than certain subsidiaries designated as non-guarantor subsidiaries under the Indenture[4]) guaranty LifeCare's obligations under the Senior Subordinated Notes. The obligations of LifeCare and its subsidiary guarantors under the Senior Secured Notes are unsecured. As of the Petition Date, there was approximately $128.4 million outstanding under the Senior Subordinated Notes.

---

[3]     The following Debtors are not party to the Prepetition Credit Agreement: Boise Intensive Care Hospital, Inc., CareRehab Services, L.L.C., LCI Healthcare Holdings, Inc., LCI Holding Company, Inc., LCI Intermediate Holdco, Inc., LifeCare Ambulatory Surgery Center, Inc., LifeCare Hospitals of San Antonio, LLC, LifeCare Investments 2, LLC.

[4]     The following Debtors are not party to the Senior Subordinated Notes: Boise Intensive Care Hospital, Inc., LCI Healthcare Holdings, Inc., LCI Holdco, LLC, LCI Holding Company, Inc., LCI Intermediate Holdco, Inc., LifeCare Ambulatory Surgery Center, Inc., LifeCare Hospitals of San Antonio, LLC, LifeCare Investments 2, LLC.

13.     Vibra Note. On December 1, 2011, in connection with the Vibra

Acquisition, LifeCare Hospitals of North Texas, LP issued a promissory note in original

principal amount of $5.0 million to Vibra (the "Vibra Note"), to be paid in six (6) quarterly

installments beginning on March 1, 2012.  The Vibra Note is guaranteed by LifeCare. The

obligations under the Vibra Note and the LifeCare guaranty are unsecured.  As of the Petition

Date, there was approximately $2.4 million outstanding under the Vibra Note.

**C.     Events Leading to the Chapter 11 Cases**

14.     Shortly following the 2005 Transaction, the Company suffered a

significant and unforeseen setback. Hurricane Katrina destroyed the Company's three (3)

facilities located in New Orleans, Louisiana, causing untold human suffering to patients and staff

and significant economic damage to the enterprise. These facilities contributed $29.5 million of

the Company's net revenues (or 12.4% of the Company's consolidated net patient revenue) in

the eight months ended August 31, 2005.  As a result of the losses incurred in connection with

Hurricane Katrina, we recorded impairment charges on long-lived assets, identifiable intangible

assets and goodwill for the twelve (12) months ended December 31, 2005 of $74.2 million. Only

a small fraction of this sum was recovered through our insurance coverage.  The loss of its New

Orleans facilities and the revenue and profits they provided materially and unexpectedly altered

the Company's financial condition.

15.     The effect of the Katrina disaster on the Company was compounded by

regulations promulgated by the Centers for Medicare and Medicaid Services ("CMS") and other

regulators that substantially reduced reimbursement rates for the services the Company provides.

In 2006 and 2007, CMS imposed a series of cutbacks that effected a total reduction in

reimbursement rates of roughly 6.2%. Because the Company derives approximately 75% of its

revenues from Medicare reimbursements, these reductions had a materially negative impact on

the Company's revenues and operating profit.  Additionally, post-2007 reimbursement rates have failed to keep pace with inflation.

16.    The Company's efforts to replace the revenue lost through the Katrina disaster and as a result of decreased reimbursement rates through growth initiatives were frustrated by a series of regulations adopted to control health care spending in the LTAC space. In 2007, Congress imposed a three (3) year moratorium on the construction or expansion of LTAC facilities.  The moratorium was originally to expire on December 28, 2010, but was subsequently extended for an additional two years.  It is now scheduled to expire on December 28, 2012. In addition to the moratorium, the LTAC industry is subject to various regulations that effectively restrict revenue growth.  For example, Medicare regulations set a maximum threshold of 25% for admissions to an LTAC facility from any single hospital (the "25% Rule").  Although an LTAC can admit patients from a hospital in excess of this threshold, reimbursement rates for these additional patients are substantially reduced.  As a result of the moratorium, the 25% Rule and other regulatory uncertainties, the Company's ability to grow its way back into its capital structure was, and continues to be, meaningfully limited.

17.    The Company also implemented cost reduction measures and programs to increase census and revenue per patient day.  While successful, these strategies did not provide sufficient incremental revenue and profitability to offset the Katrina-related losses, the lost growth opportunities in the New Orleans market and the broader setbacks that Katrina had delivered, and the substantial decrease in reimbursement rates experienced by the Company.

18.    The 2011 refinancing was another step in the effort to create the opportunity for the growth by facilitating the HealthSouth Acquisition and the Vibra Acquisition. These acquisitions were accretive and have provided the Company a broader platform to

8

compete and grow, subject to resolution of the moratorium and other proposed regulations. However, over the course of the first quarter of 2012, it became evident to the Board and management that the hoped-for growth and greater regulatory certainty would not materialize in a timeframe that worked for the Company. The stated maturity of the Senior Subordinated Notes is August 11, 2013. That fact compelled the Prepetition Lenders to insist on a "springing maturity" as a condition to closing the 2011 refinancing if the Company did not pay or refinance the Senior Subordinated Notes in full by May 15, 2013, the maturity date of the Prepetition Credit Agreement would accelerate to this date (from its stated May 2015 maturity). As a result, the Board determined to retain a financial advisor to help the Company work through various strategic alternatives. After considering several candidates and interviewing two, the Company retained Rothschild, Inc. ("Rothschild").

19.    The Company, with Rothschild's guidance and advice of counsel, developed a multi-track process to evaluate and consider strategic alternatives, including a sale of the business and engagement with the Company's existing creditors around a stand-alone restructuring. There were no realistic prospects for refinancing the Senior Subordinated Notes or attracting new equity capital without first reducing total indebtedness.

20.    Rothschild developed a list of potentially interested parties and solicited initial interest in a sale transaction. Thereafter, the Debtors signed non-disclosure agreements with, and provided a confidential information memorandum to, seven parties. However, the only indication of interest received by the Debtors reflected an enterprise value less than the amount of the debt under the Prepetition Credit Agreement (not to mention the Senior Subordinated Notes and the Vibra Note). Nonetheless, the Company continued to engage with interested parties and to solicit interest from additional parties excluded from the first round of the sale

9

process, including competitors.  Rothschild attempted to persuade one of the Debtors'

competitors—an LTAC operator owned by the largest holder of the Senior Subordinated

Notes—to engage in the sale process.  Although this attempt was not successful, another

competitor, after receiving a confidential information memorandum and conducting preliminary

due diligence, submitted a potentially viable indication of interest.  The bidder was provided

access to a virtual data room and opportunities to conduct in-person due diligence with the

Debtors' management team.

      21.    After conducting preliminary due diligence, the potential purchaser

submitted a bid that reflected a recovery to the Prepetition Lenders of approximately 80-85%.

Additional negotiations and counterproposals produced a series of follow-on bids, some of which

included a portion of the equity of the combined business as additional consideration.  However,

none of the bids provided total consideration equal to the obligations outstanding under the

Prepetition Credit Agreement.

      22.    At the same time, the Company engaged with the Prepetition Secured

Lenders and the holders of its Senior Subordinated Notes to try to effect a consensual

restructuring of its balance sheet.  The Debtors met with representatives of and/or advisors to the

Prepetition Secured Lenders and the holders of the Senior Subordinated Notes in July 2012 to

initiate this process.  In August 2012, the Debtors presented an initial restructuring proposal to

all parties.  The holders of the Senior Subordinated Notes provided no response to the proposal

then or at any time thereafter.  The Prepetition Lenders, however, provided a counterproposal in

the form of a term sheet for the sale of substantially all of the Debtors' assets to them through a

credit bid.

23.     Given its limited liquidity and with the initial indications of interest from the sales process showing the Senior Subordinated Notes to be materially impaired, the Company elected to not make its August 15 interest payment under the Senior Subordinated Notes. This constituted a default under the Indenture and the Prepetition Credit Agreement, which, if not cured within a 30-day grace period, would ripen into an event of default. To avoid that result, the holders of the Senior Subordinated Notes and the Prepetition Lenders provided the Company with short-term waivers of such defaults, which were ultimately extended to December 15, 2012.

24.     As part of the marketing/sales process, the Debtors conducted tax diligence regarding various restructuring alternatives and determined that a sale transaction would trigger a substantial capital gains tax. The Debtors, however, also recognized that, in the absence of a viable alternative financing that would repay the Prepetition Lenders' claims, their ability to confirm a chapter 11 plan required the support of the Prepetition Lenders; that support was not, and has not been, forthcoming.

25.     Although the Debtors' sales process continued right up to the Petition Date (and is proposed to resume postpetition under the proposed bidding procedures), the sale process conducted by the Debtors over the course of approximately six (6) months produced no bid that provided consideration in equal to or in excess of the Debtors' obligations under the Prepetition Credit Agreement. Additionally, the Debtors were unable to (i) obtain the requisite financing for a chapter 11 plan that would pay the Prepetition Lenders' claims in full or (ii) as noted, propose a chapter 11 plan structure supported by the requisite Prepetition Lenders. Accordingly, the only viable path forward for the Company was to negotiate the best possible transaction for their estates with the steering committee of Prepetition Lenders (the "Steering Committee").

26.     The Debtors believe that the credit bid transaction negotiated with the Steering Committee represents the highest and best offer available to the Company at this time. Consummating the sale transaction with the Prepetition Lenders will enable the Debtors to maintain their ongoing businesses and the continuity of quality patient care and services and preserve the jobs of their 4500 plus employees.  Additionally, the auction process contemplated by the Bidding Procedures will provide further opportunity for any interested bidders to formally bid for the Company's assets or to offer to fund a chapter 11 plan that would pay the Prepetition Lenders in full.  Furthermore, a competitive auction process may generate bids sufficient to yield recoveries to the Debtors' unsecured creditors.  Thus, while consummation of the proposed sale transaction would most likely be followed by a conversion of these cases to chapter 7,  the Debtors have determined that pursuing the sale transaction in the manner, and with the procedures proposed, will provide all interested parties ample opportunity to participate, and is the best means to maximize the value of the Debtors' estates.

27.     During the waiver period, in recognition that a bankruptcy filing may ultimately become necessary, the Debtors (through Rothschild) contacted potential sources of DIP financing (including the Prepetition Lenders and fourteen (14) additional third-party lenders). The Debtors received only one response from a potential lender other than the Prepetition Lenders, who was willing to provide priming financing, but only with the consent of the Prepetition Lenders. The Prepetition Lenders would not consent to being primed. Accordingly, the Debtors received no firm commitment to provide DIP financing from any party other than the Prepetition Lenders. The Debtors' proposed postpetition financing (the "Proposed DIP Financing") is conditioned upon the Debtors undertaking a court-supervised sale process for their assets. Notably, the Proposed DIP Financing will stay in place even if the Stalking Horse

Bid is not ultimately the successful bid. Furthermore, the proposed bid procedures would permit a chapter 11 plan alternative, if such plan provides a par plus accrued interest recovery in cash to the Prepetition Lenders.

## PART II

### FIRST DAY PLEADINGS

28.    In furtherance of these objectives, the Debtors expect to file the First Day Pleadings,[5] each as listed on the attached Exhibit B, and respectfully request that the Court consider entering the proposed orders granting such First Day Pleadings.  I have reviewed each of the First Day Pleadings and proposed orders (including the exhibits thereto) and the facts set forth therein are true and correct to the best of my knowledge, information and belief.  Moreover, I believe that the relief sought in each of the First Day Pleadings (a) is vital to enable the Debtors to make the transition to, and operate in, chapter 11 with minimum interruption or disruption to their businesses or loss of productivity or value and (b) constitutes a critical element in maximizing value during these Chapter 11 Cases.

**D.    Administrative Pleadings (Items 1 and 2)**

29.    The Debtors have filed two "administrative" pleadings that seek to jointly administer the Debtors' chapter 11 cases for procedural purposes only and to retain Kurtzman Carson Consultants LLC ("KCC") as notice and claims agent.  The Debtors' attorneys have explained to me the customary practices with regard to the requested relief in chapter 11 business reorganization cases and the rationale for these pleadings.

30.    Joint Administration.  The Debtors are requesting that their chapter 11 cases be jointly administered only for procedural purposes.  As set forth above, LifeCare is the

---

[5]    Any term not defined herein has the meaning ascribed to it in the specific First Day Pleading being described.

direct or indirect parent of each of the other Debtors.  I believe that joint administration of these cases will avoid the unnecessary time and expense of duplicative motions, applications, orders and other pleadings, and related notices, that otherwise would need to be filed in each separate case absent joint administration.  Moreover, joint administration will relieve this Court of the burden of entering duplicative orders and maintaining duplicative files, and will ease the burden on the office of the United States Trustee in supervising these cases.  Accordingly, the joint administration will save considerable time and expense for the Debtors, the Clerk of the Court, the U.S. Trustee and other parties in interest, which will, in turn, result in substantial savings for the Debtors' estates.

31.    Retention of KCC.  The Debtors also seek authority to retain KCC as notice and claims agent in their chapter 11 cases.  I understand that such appointment is required by the rules of this Court.  Moreover, such relief is prudent in light of the thousands of creditors, potential creditors and parties in interest to whom certain notices will be sent.  Accordingly, I believe that the most effective and efficient manner by which to give notice and process claims in these cases is to engage KCC, an independent third party with significant experience in this role, to act as an agent of the Court.  In addition, the Debtors seek to retain KCC to design and implement an appropriate publication noticing program.  Such relief is prudent in order to provide any unknown litigation claimants with notice of the bankruptcy and to give the Debtors the benefit of a discharge and injunction with respect to any such unknown litigation claims.

**E.      Motion to Continue Certain Banking and Business Practices (Item 3)**

32.    Cash Management.  The Debtors have filed a motion to continue their ordinary course banking practices.  I understand that the Debtors maintain a cash management system, comprised of approximately fifteen (15) domestic bank accounts (the "Bank Accounts") maintained in financially stable FDIC-insured banks, that facilitates the efficient flow and

management of funds involved in the Debtors' operations (the "Cash Management System").

The Cash Management System is managed centrally by Debtor LifeCare Management Services,

L.L.C. ("LMS").  The Debtors routinely deposit, withdraw and otherwise transfer money to,

from and between the Bank Accounts by various methods (collectively, the "Ordinary Transfer

Methods"), including by checks, drafts, automated clearing house transfers and other electronic

funds transfers.  I believe that in the aggregate, on a monthly basis, the Debtors' business

generates thousands of transfers using various Ordinary Transfer Methods.  The amount of funds

that flow through the Cash Management System fluctuates greatly.  However, I understand the

monthly average for the twelve (12) months ending October 31, 2012, was approximately $44

million in receipts and $46 million in disbursements.  I believe that use of the Cash Management

System is essential to enable the Debtors to control and monitor funds, ensure cash availability

and liquidity, comply with the requirements of their financing arrangements, and reduce

administrative expenses by facilitating the movement of funds and enhancing the development of

accurate account balance information.

       33.    Revenues.  Most of the Debtors' revenues derive from payments for

patient services.  Funds received on account of such services, as well as additional revenues not

directly related to patient care (such as cafeteria receipts, credit card payment credits, refunds for

drugs, tax refunds and other miscellaneous cash receipts) are deposited in one of several zero-

balance lockbox accounts, which are automatically swept to a central interest bearing

concentration account (the "Cash Consolidation Account").

       34.    Disbursements. The Debtors maintain two primary disbursement accounts.

The Company's payroll-related disbursements, including wages, contributions to 401(k) plans,

payroll taxes and amounts deposited into employee flexible spending accounts, originate from a

zero-balance payroll account located at JPMorgan (the "Payroll Account").  The Debtors make all other disbursements, to the extent paid by manual check, from a zero-balance cash disbursement account located at JPMorgan (the "Cash Disbursement Account").  The Cash Disbursement Account is utilized to pay vendors and service providers.  Funds are drawn from the Cash Consolidation Account to the Cash Disbursement Account to cover any checks that have been processed each day.  In addition, the Debtors make certain disbursements directly from the Cash Consolidation Account.

35.    Additional Accounts.  The Debtors also maintain two interest-bearing money market savings accounts (the "Money Market Accounts").  The Money Market Accounts, which are located at JPMorgan and Compass Bank, typically hold funds in excess of the amounts required by the Debtors in the day-to-day operation of its business.

36.    Intercompany Transactions.  In the ordinary course of business, the Debtors engage in various transactions relating to the business relationships between and among themselves (the "Intercompany Transactions").  I understand that the Intercompany Transactions primarily include the routine deposit of receivables for patient payments and payables for services such as payroll, rent, medical supplies and various other disbursements made by the Debtors.  The Intercompany Transactions are generally settled by book entry, rather than by an actual transfer of cash or cash evidenced by intercompany notes.  Pursuant to the Debtors' Cash Management System, all Intercompany Transactions are tracked such that all debits and credits between and among the Debtors are systemically monitored and recorded.  The Debtors maintain intercompany balances for each of the Debtors, which are adjusted upward or downward as a result of such ordinary course Intercompany Transactions.  Consistent with their prepetition practice, the Debtors maintain records of all transfers and can ascertain, trace and account for all

Intercompany Transactions.  I strongly believe that failure to continue the Intercompany

Transactions in the ordinary-course of the Debtors' business would unnecessarily and severely

hinder operations.  Individual Debtors do not have the accounts or infrastructure to manage

receipts and disbursements.  As I have noted above, each Debtor relies primarily upon LMS to

collect its receipts and to make payments on its behalf.  Accordingly, absent the continuation of

the Intercompany Transactions, the Debtors would be essentially unable to operate their business

during the Chapter 11 Cases, and the ability to maximize value for creditors and other parties in

interest would be drastically reduced.  Avoiding such potentially crippling hindrances by

continuing the Intercompany Transactions is, therefore, in the best interests of the estates.

37.    It is my understanding that requiring the debtors to alter their banking and

business practices, including the use of numerous business forms (including, without limitation,

checks, business letterhead, purchase orders, invoices, envelopes, promotional materials and

other business forms and correspondence) would impair the Debtors' estates and disrupt their

efforts to reorganize and pursue other alternatives to maximize the value of their estates.

Consequently, I believe that maintenance of the extant Cash Management System and the

Debtors' other business and banking practices, as requested in certain of the First Day Pleadings,

during the duration of the chapter 11 cases, is in the best interests of all creditors and other

parties in interest.

**F.    Waiver of Investment and Deposit Requirements (Item 4)**

38.    I am advised by counsel that section 345 of the Bankruptcy Code

establishes certain investment and deposit restrictions.  I believe that the Debtors' cash

investment practices substantially conform with the approved investment and deposit practices

identified in section 345 of the Bankruptcy Code, and that all money deposits are safe and

prudent and yield, under the circumstances, the maximum reasonable net return on such money.

Nonetheless, out of an abundance of caution, to the extent that such deposits do not conform to the approved practices identified in section 345 of the Bankruptcy Code, the Debtors seek to have such requirements waived so as to allow the Company's Banks to accept and hold such funds in accordance with the Debtors' prepetition practices.  In my opinion, a waiver of the section 345 requirements is in the best interests of the estates, all creditors and other parties in interest.

**G.      Payment of Employee and Payroll Obligations and Certain Taxes (Item 5)**

39.      I believe that in order to minimize the personal hardship employees will suffer if prepetition obligations are not honored, and to maintain morale, it is important that the Debtors continue to pay certain prepetition wages, compensation and employee benefits programs.  The Company currently employs approximately 4,564 employees (the "Employees"). I understand that the vast majority of the Company's Employees are employed on a full-time salaried basis, while others are employed on a per diem, part-time or weekend basis.  The Employees perform a variety of critical functions, including but not limited to:  accounting, administrative support, accounts payable, billing operations, compliance (legal and regulatory), corporate development, customer care, dietary, external affairs, financial planning and analysis, government sales/contracting, housekeeping, human resources, information technology, legal, managed care, marketing, network operations and maintenance, nursing, payroll, pharmacy tech, plant operations and speech, physical, respiratory, and occupational therapy.  I believe that retaining the Employees, whose skills and understanding of the Debtors' operations and infrastructure are essential to the effective operation and reorganization of the Debtors' businesses, is critical to the Debtors' ability to operate and reorganize in chapter 11.

40.      Wages and Salaries.  The Debtors pay the majority of their Employees on a bi-weekly basis on Fridays.  The Debtors' payroll obligations generally include base wages and

salaries, commissions and bonuses, as applicable.  The average monthly payroll for the Debtors'

Employees is approximately $8.1 million, including payroll taxes.  On December 7, 2012 the

Debtors made their most recent company-wide payroll, and as such, excluding claims related to

Year-End Bonuses, I believe that no Employee has a claim against the Debtors for payment in

excess of the $11,725 priority cap set forth in section 507(a)(4) of the Bankruptcy Code.  As of

the Petition Date, the Debtors estimate that they have approximately $5.21 million of accrued but

unpaid payroll obligations and related payroll taxes.

       41.    <u>Bonuses</u>.  To attract the best employees and incentivize them to stay, the

Debtors offer a variety of bonus plans.  Because of a shortage of qualified applicants in certain

markets in which the Debtors operate, the Debtors from time to time offer sign-on bonuses to

such Employees ("<u>Sign-on Bonuses</u>").  As of the Petition Date, the Debtors owe approximately

$50,100 to twenty-three (23) Employees on account of unpaid Sign-on Bonuses.  In addition, the

Debtors maintain a number of bonus compensation plans for groups of Employees they believe

are essential to improving the operating performance of the business.  One such plan, referred to

as the Business Development Discretionary Bonus Plan (the "<u>BDD Plan</u>"), provides the Debtors'

full and part-time business development directors, liaisons and intake coordinators (currently

approximately 144 Employees) with the opportunity to earn monthly bonus payments based

upon the achievement of specified targets related to maintaining a high patient-to-bed ratio at all

times.  On average, the Debtors award approximately $78,500 per month under the BDD Plan.

The Debtors also compensate their six (6) full-time collectors, who are responsible for collecting

accounts receivable from governmental and private payors, through a combination of hourly

wages and incentive-based bonus payments made pursuant to the Discretionary LMS Collector

Compensation Plan (the "<u>Collector Plan</u>").  The Debtors pay an average of approximately $5,000

in Collector Plan bonuses in a given month.  In addition, the Debtors offer two bonus plans to

their hospital-level and corporate leadership teams for meeting and exceeding specified annual

performance benchmarks.

      42.    Year-End Bonuses.  Sixty-one (61) hospital-level chief executive officers,

chief operations officers, directors of finance, nurse leaders and directors of pharmacy are

eligible to participate ("Eligible HL Recipients") in the Hospital Leadership Bonus Plan (the

"HL Plan"), which provides annual bonuses based upon achievement of budgeted quarterly

and/or annual EBITDAM targets that vary by hospital. The Debtors expect to pay approximately

$601,534.06 in HL Plan bonuses in April 2013.  The Support Center Leadership Bonus Plan (the

"SCL Plan") is designed to reward thirty-four (34) members of the Debtors' corporate leadership

team (the "Eligible SCL Recipients") if the Company meets or exceeds annual EBITDA targets.

If performance levels remain at their current levels, the Debtors project that bonuses under the

SCL Plan will be payable to the Debtors' senior management team in the aggregate amount of

$686,593.44, and to other Eligible SCL Recipients in the aggregate amount of $717,126.56.

Bonuses payable under the HL Plan and the SCL Plan (collectively, the "Year-End Bonuses")

are scheduled to be paid in April 2013.  The Debtors are not seeking authority to pay any Year-

End Bonuses pursuant to the Interim Order.  However, the Year-End Bonuses were promised to

eligible Employees who met or achieved performance benchmarks.  By definition, the recipients

of the Year-End Bonuses represent the Debtors' highest performing hospital-level and corporate

leaders.  I fully believe that payment of the Year-End Bonuses is critical to maintaining the

morale and productivity of the recipients and to maximizing the value of the Debtors' estates.

      43.    Other Employee Compensation:  Paid Time Off, Expense Reimbursement
and Other Compensation.  The Debtors offer their Employees other forms of compensation,

including paid time off and the reimbursement of certain expenses.  Certain of the Debtors'

Employees are eligible to receive paid time off ("Paid Time Off").  I understand that the amount

of Paid Time Off provided to each employee depends on whether the Employee is full- or part-

time (including weekend Employees), the number of hours the Employee has worked, how long

the Employee has been employed by the Company and the Employee's position within the

Company.  On average, non-executive Employees are eligible for 200 hours of Paid Time Off

per year and executive Employees are eligible for one month of Paid Time Off per year.  Non-

executive Employees are paid for accrued but unused Paid Time Off  upon termination of their

employment.  Additionally, the Debtors routinely reimburse Employees for certain expenses

incurred within the scope of their employment, including expenses for travel, lodging,

professional seminars and conventions, ground transportation, meals, supplies, and

miscellaneous business expenses (collectively, the "Reimbursable Expenses").  Accordingly, all

such Reimbursable Expenses were incurred by Employees with the understanding that they

would be reimbursed by the Debtors.  The Debtors estimate that, as of the Petition Date, less than

$50,000 in Reimbursable Expenses have been incurred but not yet reimbursed.  The Debtors also

routinely withhold from Employee paychecks amounts that the Debtors are required to transmit

to third parties.  Such withheld funds, to the extent that they remain in the Debtors' possession,

constitute moneys held in trust and therefore are not property of the Debtors' bankruptcy estates.

Thus, the Debtors have authority to direct such funds to the appropriate parties in the ordinary

course of business.  However, out of an abundance of caution, the Debtors request that the Court

also authorize them to direct such trust funds to the appropriate parties.

       44.   Medical and Insurance Benefit Plans.  The Debtors have established plans

and policies to provide their Employees with (a) health benefits, including medical, dental,

prescription drug and vision and (b) insurance benefits, including short and long-term disability, life insurance, and accidental death and dismemberment insurance (collectively, the "Medical and Insurance Benefits"). The Debtors fund the Medical and Insurance Benefits through company contributions and private insurance arrangements. An important element of the Medical and Insurance Benefits is medical, prescription drug, dental and vision coverage. Employees are offered a choice of PPO medical, prescription drug and dental plans. The medical plan is self-insured and administered by Blue Cross Blue Shield of Texas ("BCBS"). The Debtors pay an average of approximately $1,597,000 per month under this plan, including approximately $157,000 per month in administration costs payable to BCBS. The prescription drug plan is also self-insured and is administered by CVS Caremark ("Caremark"). The Debtors pay an average of approximately $418,000 per month under the plan administered by Caremark, with average administration costs of approximately $12,000. The Debtors offer two dental plans – one self-insured and one fully insured – administered by CIGNA. The Debtors pay an average of approximately $143,000 per month under the self-insured plan administered by CIGNA, with aggregate average administration costs (with respect to the self-insured plan) and premium costs (with respect to the fully insured plan) of approximately $14,000. Claims under the Debtors' self-insured medical, prescription drug and dental plans are initially paid by the plan administrators. Upon determination by the plan administrators that submitted claims are valid, the plan administrators make payment to claimants and, on a weekly basis, the Debtors reimburse the plan administrators by wire transfer or automatic debit from the Debtors' bank accounts for the aggregate outstanding amount from the prior week. As of the Petition Date, the amount of all claims paid by the plan administrators but not yet reimbursed by the Debtors (the "Unreimbursed Medical Claims") is estimated to be $471,000. The Debtors provide or offer

certain Employees various life and accident insurance benefits and plans.  Certain insurance

plans are provided at the expense of the Debtors as a benefit to their Employees.  For example,

the Debtors provide Employees with life insurance and accidental death and dismemberment

insurance coverage (the "Life and AD&D Plan").  Basic coverage, which is capped at $50,000

(or $25,000 for part-time Employees) is self-insured and administered by Dearborn National.  On

average, the Debtors pay an average of approximately $10,000 per month to Dearborn National

under the Life and AD&D Plan.  In addition, the Debtors provide long-term disability insurance

(the "LTD Plan") to Employees.  Under the LTD Plan, which is fully insured by Dearborn

National, Employees disabled for more than one year become eligible to receive benefits equal to

40% of their base pay.  The Debtors pay premiums of approximately $59,000 per month under

the LTD Plan.  The Debtors estimate that they owe nothing to Dearborn National on account of

the Life and AD&D Plan and the LTD Plans as of the Petition Date.  It is my opinion that these

plans are important to the maintenance of Employee welfare and morale, and are therefore

critical to the uninterrupted operation of Debtors' businesses.  The Debtors also make available

to Employees, at the Employees' expense, certain additional insurance coverage.  Optional

coverage includes, among others, vision insurance, supplemental life and AD&D insurance,

short-term disability insurance, supplemental long-term disability insurance, auto/home

insurance, critical illness coverage, pet insurance and legal services insurance (collectively, the

"Optional Plans").  The Optional Plans are fully funded by Employees and are fully insured,

depending upon the plan, by Vision Service Plan, Dearborn National, MetLife and Colonial Life

(the "Optional Plan Insurers").  The Debtors withhold monthly premiums for the Optional Plans

from the paychecks of Employees who elect to participate.  On average, these premiums total

approximately $235,000 per month.  The Debtors incur no costs on account of the Optional Plans.

45.    <u>Other Benefits</u>. The Debtors maintain a 401(k) savings plan for Employees (the "<u>Savings Plan</u>").  Under the Savings Plan, eligible Employees may elect to contribute up to 50% of their eligible pay up to the annual IRS dollar limit (which varies annually).  The Saving Plan is administered by Fidelity.  The Debtors pay approximately $17,250 in quarterly administration fees to Fidelity in connection with the Savings Plan.  The Debtors also provide a tuition reimbursement benefit to Employees (the "<u>Tuition Reimbursement Benefit</u>").  The Debtors' monthly cost related to the Tuition Reimbursement Benefit is approximately $9,000.  I believe that these benefits contribute to Employee welfare and morale and should therefore be maintained through the duration of these cases.

46.    <u>Direction to Banks</u>.  Finally, the Debtors seek an order authorizing and directing the financial institutions upon which any checks, drafts, electronic funds transfers, or wire transfers are drawn in payment of the Prepetition Employee Obligations – either before, on, or after the Petition Date – to honor all such checks or drafts issued, upon presentation thereof, or all such wire transfer instructions, upon receipt thereof, provided that sufficient funds are immediately available and on deposit in the applicable accounts and prohibiting financial institutions from placing any holds on, or attempting to reverse, any automatic transfers to Employees' accounts for Prepetition Employee Obligations.  The Debtors also seek an order authorizing them to issue new postpetition checks or effect new postpetition fund transfers on account of the Prepetition Employee Obligations to replace any prepetition checks or fund transfer requests that may be dishonored or rejected.

47.    I firmly believe that continued payment, when due, of prepetition wages and salaries, and the continuation, without interruption, of compensation and benefit plans, policies, programs and practices described herein is necessary to ensure the ongoing services of

the Debtors' Employees during the Chapter 11 Cases.  It is my opinion that any significant

deterioration in morale at this time will substantially and adversely impact the Debtors and their

ability to reorganize, thereby resulting in immediate and irreparable harm to the Debtors and

their estates.

**H.      Motions for Payment of Other Critical Business Expenditures**

      **(a)  Insurance  (Item 6)**

      48.      In connection with their businesses, the Debtors maintain various

insurance policies providing coverage for, among other things, workers' compensation liability,

general commercial liability, general property liability, hospital professional liability, physician

professional liability, employment practices liability, automobile liability, directors and officers

liability, fiduciary liability, special accident liability, crime liability and umbrella liability

(collectively, the "Insurance Policies").  I understand that the Insurance Policies are essential to

the preservation of the value of the Debtors' business, property and assets.  Not only are some of

the Insurance Policies required by various regulations, laws and contracts that govern the

Debtors' commercial activities, section 1112(b)(4)(C) of the Bankruptcy Code provides that

"failure to maintain appropriate insurance that poses a risk to the estate or to the public" is

"cause" for mandatory conversion or dismissal of a chapter 11 case. 11 U.S.C. § 1112(b)(4)(C).

Moreover, I have been advised by counsel that the Operating and Reporting Guidelines Issued

for Debtors in Possession and Trustees by the Office of the United States Trustee for the District

of Delaware require the Debtors to maintain insurance coverage throughout the pendency of the

Chapter 11 Cases.

      49.      If the Debtors are unable to continue making payments on the Insurance

Policies, it is my understanding that the Debtors' providers may seek relief from the automatic

stay to terminate such Insurance Policies.  The Debtors would be required to obtain replacement

insurance on an expedited basis and at a significant cost to the estates. Even if the Debtors'
insurance providers were not permitted to terminate the agreements, it is my opinion that any
interruption of payment would have a severe, adverse effect on the Debtors' ability to finance
premiums for future policies. In light of the importance of maintaining insurance coverage with
respect to their business activities and preserving liquidity by financing their insurance premiums,
I believe it is in the best interest of the Debtors' estates to receive Court approval to honor the
Debtors obligations under the Installment Policies and the Premium Finance Arrangement and,
as necessary, renew or enter into new such agreements.

**(b)  Taxes  (Item 7)**

50.     The Debtors, in the ordinary course of their businesses, incur various tax
liabilities and have generally paid such tax liabilities as they became due. The Debtors' books
and records reflect that, to the Debtors' knowledge, they are substantially current on all Taxes,
not otherwise subject to dispute, which were due and payable prior to the Petition Date. The
only Taxes due and payable prior to the Petition Date that remain outstanding are sales and use
taxes in the State of Colorado. The Taxing Authorities, however, will continue to invoice the
Debtors for Taxes relating to periods prior to the Petition Date following the commencement of
the Chapter 11 Cases. Specifically, in the aggregate, the Debtors estimate that approximately
$2,237,000 in prepetition Taxes will become due and payable following the Petition Date. As of
the Petition Date, the Debtors estimate that approximately $13,000 in Sales and Use Taxes,
$833,000 in Income and Franchise Taxes, $525,000 in Property Taxes and $866,000 in Business
License Fees and Other Taxes and Fees relating to the prepetition period will become due and
owing to the Taxing Authorities in the ordinary course of business.

51.     It is my belief that the continued payment of the Taxes on their normal due dates will ultimately preserve the resources of the Debtors' estates, thereby promoting their prospects for a successful reorganization.  If such obligations are not timely paid, it is my understanding that the Debtors will be required to expend time and money to resolve a multitude of issues related to such obligations, each turning on the particular terms of each Taxing Authority's applicable laws.  The Debtors desire to avoid unnecessary disputes with the Taxing Authorities – and expenditures of time and money resulting from such disputes – over a myriad of issues that are typically raised by such entities as they attempt to enforce their rights to collect taxes.  The Debtors may suffer clear and irreparable harm if the prepetition Taxes are not paid when they become due and payable.  Additionally, the Taxing Authorities may cause the Debtors to be audited if Taxes are not paid immediately.  Such audits will unnecessarily divert the Debtors' attention away from the reorganization process.  If the Debtors do not pay such amounts in a timely manner, the Taxing Authorities may attempt to revoke the Debtors' licenses, suspend the Debtors' operations and pursue other remedies that will harm the estates.  In all cases, the Debtors' failure to pay Taxes could have a material adverse impact on their ability to operate in the ordinary course of business.  I have also been advised that the federal government and many states in which the Debtors operate have laws providing that the Debtors' officers, directors or other responsible employees could, under certain circumstances, be held personally liable for the payment of certain Taxes.  In such event, collection efforts by the Taxing Authorities would be extremely distracting for the Debtors and their directors and officers in their efforts to bring the Chapter 11 Cases to an expeditious conclusion.

**(c)     Critical Vendors (Item 9)**

52.     The Debtors continue to do business with two types of vendors whose goods and services are essential to the Debtors' operations: (i) physicians (the "Physician Critical Vendors") and (ii) suppliers of goods and other services (the "Other Critical Vendors" and together with the Physician Critical Vendors, the "Critical Vendors").  By this Motion, the Debtors seek entry of an order granting them authority to make payments toward the prepetition claims of the Critical Vendors (the "Critical Vendor Claims"), on the terms set forth below.  The Debtors estimate that they have approximately 59 Other Critical Vendors and 367 Physician Critical Vendors, that are owed approximately $3.25 million.  The Debtors wish to pay such Critical Vendors up to $3.25 million, to be allocated at the Debtors' discretion.

53.     The Debtors believe that many of their vendors will continue to do business with the Debtors after commencement of the Chapter 11 Cases because doing so simply makes good business sense.  However, I anticipate that certain vendors that supply goods or services that are critical to maintaining patient care and necessary to the Debtors' business, will: (a) refuse to deliver goods and services without payment of their prepetition claims; (b) refuse to deliver goods and services on reasonable credit terms absent payment of prepetition claims, thereby requiring the Debtors to use even greater liquidity and increase their operating costs; or (c) suffer significant financial hardship, such that the Debtors' non-payment of their prepetition claims could have a significant negative impact on a Critical Vendor's business and therefore its ability to supply the Debtors with needed goods and services.  Accordingly, the Debtors request the Court's authority to pay a portion of the prepetition Critical Vendor Claims because payment of such claims is necessary to an effective reorganization.  In order to determine which of the Debtors' vendors are critical to the Debtors' businesses, the Debtors used the following criteria: (a) whether the potential consequences of nonpayment could negatively affect patient care; (b)

whether the vendor in question is a "sole source" provider; (c) whether quality requirements or other specifications prevent the Debtors from obtaining a vendor's products or services from alternative sources within a reasonable timeframe; (d) if a vendor is not a sole source provider, whether the Debtors have sufficient product in inventory to continue operations while a replacement vendor is put in place; (e) whether a vendor meeting the standards of (b) or (c) is likely to refuse to ship product to the Debtors postpetition if its prepetition balances are not paid; and (f) whether a vendor would suffer significant financial hardship absent the Debtors' payment of prepetition claims.  I am confident that this process has appropriately identified only those vendors that meet some or all of the foregoing stringent guidelines and that, if the Debtors failed to pay for the vital goods and services they provided prepetition, would likely cease to provide them in the future.  It is my opinion that the cessation of such goods or services would adversely impact the Debtors' ability to reorganize, and any efforts to replace such good or services would distract the Debtors from the chapter 11 process more generally, at the expense of the Debtors' creditors and other parties in interest.

**I.      Utilities (Item 8)**

54.     In connection with the operation of their businesses and the management of their properties, the Debtors obtain water, gas, electricity, telephone and similar utility products and services (collectively, the "Utility Services") from various utility companies (the "Utility Companies").  The Debtors have filed a motion requesting that the Court approve the Debtors' proposed form of adequate assurance of postpetition payment (the "Proposed Adequate Assurance") to the Utility Companies, as that term is used in section 366 of the Bankruptcy Code, approving procedures for resolving any objections by the Utility Companies relating to the Proposed Adequate Assurance and prohibiting the Utility Companies from altering, refusing or discontinuing service to or discriminating against the Debtors.

55.     I believe that any interruption in Utility Services, even for a brief period of time, would disrupt the Debtors' ability to continue operations.  Such a result could potentially jeopardize patient care and impair the Debtors' reorganization efforts and, ultimately, the value of the Debtors' businesses.  In my opinion, it is critical that Utility Services continue uninterrupted during the Chapter 11 Cases.  I believe that the procedures the Debtors have proposed for the Utility Companies adequately protect such Utility Companies' rights that I have been advised are provided to the Utility Companies under the Bankruptcy Code, while also protecting the Debtors' need to continue to receive, for the benefit of their estates, the Utility Services upon which their businesses depend.

**J.      Cash Collateral (Item 10)**

56.     The Debtors are also requesting authority to use Cash Collateral and grant adequate protection to the Prepetition Lenders for such use.  Substantially all of the Debtors' cash, including without limitation, all cash and other amounts on deposit or maintained by the Debtors in any account or accounts with any Prepetition Lender and any cash proceeds of the disposition of any Prepetition Collateral, but excluding cash of LifeCare Investments 2 LLC, constitute proceeds of the Prepetition Collateral and, therefore, I am advised, are cash collateral of the Prepetition Lenders within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral").  The Debtors, therefore, have limited access to immediately available funds.

57.     As further described above, the Debtors operate a sound business despite being burdened by impending debt maturities that threaten ongoing operations.  The Debtors have immediate cash needs in order to permit, among other things, the orderly continuation of the operation of their business and the completion of the sale process or a reorganization.  I strongly believe that the Debtors' access to the Cash Collateral, and all other Prepetition Collateral, is necessary in order to ensure that the Debtors have sufficient working capital and

liquidity to operate their businesses and thus preserve and maintain the going concern value of their estates.  Specifically, the Debtors need to use such funds to maintain patient care by paying physicians, employees and other service providers, securing goods, and to maintain the operation of their business as they undertake the sale process or a reorganization.  In my opinion, the use of Cash Collateral, and all other Prepetition Collateral, will enable the Debtors to retain employees and sustain critical relationships with physicians and other providers whose referrals are vital to the continued success of the Debtors' business.  Moreover, access to the Cash Collateral, and all other Prepetition Collateral, on an interim basis is necessary to avoid immediate and irreparable harm to the Debtors pending the DIP Hearing.  As of the Petition Date, the Debtors have approximately $20 million of cash on hand that does not constitute Cash Collateral. I understand that together with the Cash Collateral, and all other Prepetition Collateral, the Debtors have sufficient liquidity to operate their business until a postpetition financing facility is approved by the Court on a final basis.

58.    In exchange for the Debtors' use of Cash Collateral, and all other Prepetition Collateral, the Debtors have agreed to provide certain adequate protections to the Prepetition Lenders.  To that end, the Debtors and the Prepetition Lenders have negotiated, and the Debtors request that the Court approve, as of the Petition Date, certain protections of the Prepetition Lenders' interests in the Prepetition Collateral from any diminution in value resulting from the Debtors' use, sale or lease of such collateral or the imposition of the automatic stay. Such protections are integral to the Debtors' ability to use the Cash Collateral.

I swear under penalty of perjury that the foregoing is true and correct.

Dated:          December 11, 2012

By:          _____*/s/ Phillip B. Douglas*_____
                    Name: Phillip B. Douglas
                    Title: Chief Executive Officer and
                    Authorized Representative

## **EXHIBIT A**

**Corporate Organizational Chart**

**Debtor Organizational Chart**



**EXHIBIT B**

**List of First Day Motions**

1.  Debtors' Motion for Order (A) Directing Joint Administration of Cases Pursuant to Fed. R. Bankr. P. 1015(b) and Del. Bankr. L.R. 1015-1 and (B) Waiving Requirements of 11 U.S.C.§ 342(c)(1) and Fed. R. Bankr. P. 1005 and 2002(n) (Docket No. 3)

2.  Debtors' Application for Order Pursuant to 28 U.S.C. § 156(c), Fed. R. Bankr. P. 2002 and Del. Bankr. L.R. 2002-1(f) Authorizing Debtors to Employ and Retain Kurtzman Carson Consultants LLC as Notice, Claims and Solicitation Agent *Nunc Pro Tunc* to the Petition Date (Docket No.4)

3.  Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, 364 and 503, Fed. R. Bankr. P. 6003 and 6004 and Del. Bankr. L.R. 2015-2 (I) Authorizing (A) Continued Use of Existing Cash Management System, Bank Accounts and Business Forms, (B) Payment of Related Prepetition Obligations and (C) A Waiver of Certain Operating Guidelines Relating to Bank Accounts; (II) Authorizing Continued Engagement in Intercompany Transactions and (III) According Administrative Expense Priority Status to All Postpetition Intercompany Claims (Docket No. 5)

4.  Debtors' Motion for Interim and Final Orders Under 11 U.S.C. §§ 105 and 345 and Del. Bankr. L.R. 2015-2(b) Waiving Investment and Deposit Requirements (Docket No. 6)

5.  Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a), 1107(a) and 1108 and Fed. R. Bankr. P. 6003, Authorizing Debtors To, *Inter Alia*, Pay Prepetition Wages, Compensation and Employee Benefits (Docket No. 7)

6.  Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364, 1107 and 1108 and Fed. R. Bankr. P. 6003 Authorizing Debtors to (I) Maintain Existing Insurance Policies and Pay All Insurance Obligations Arising Thereunder, (II) Renew, Revise, Extend, Supplement, Change or Enter into New Insurance Policies; and (III) Continue to Honor Insurance Premium Financing Obligations (Docket No. 8)

7.  Debtors' Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363, 507(a)(8), 541, 1107(a) and 1108 and Fed. R. Bankr. P. 6003 Authorizing the Debtors to Pay Certain Prepetition Taxes and Related Obligations (Docket No. 9)

8.  Debtors' Motion for Interim and Final Orders Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Approving Debtors' Proposed Form of Adequate Assurance of Payment, (II) Establishing Procedures for Resolving Objections by Utility Companies and (III) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Service (Docket No. 10)

9.  Debtors' Motion for Order Under 11 U.S.C. §§ 105(a), 363(b), 364, 1107(a), and 1108 and Fed. R. Bankr. P. 6003 Authorizing Payment of Prepetition Claims of Certain Critical Vendors (Docket No. 11)

10.　Debtors' Motion  Under 11 U.S.C. §§ 105, 361, 362, 363(C), 363(M), 364(E) And 507 And Fed. R. Bankr. P. 2002 And 4001 For (A) An Interim Order (I) Authorizing The Debtors To Use Cash Collateral, (II) Granting Adequate Protection To Prepetition Secured Lenders, (III) Scheduling A Hearing For The Approval Of Postpetition Financing Pursuant To Fed. R. Bankr. P. 4001(B) And 4001(C), And (IV) Granting Related Relief And (B) A Final Order (I) Authorizing The Debtors To Use Cash Collateral,(II) Granting Adequate Protection To Prepetition Secured Lenders, And (III) Authorizing The Debtors To Obtain Postpetition Financing (Docket No. 12)