IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                        :
In re:                                  :    Chapter 11
                                        :
LCI HOLDING COMPANY, INC., et al.,      :    Case No. 12-13319 (___)
                                        :
                    Debtors.[1]         :    Joint Administration Pending
                                        :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**DEBTORS' MOTION FOR ORDERS: (A)(I) ESTABLISHING BIDDING
PROCEDURES RELATING TO THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS' ASSETS; (II) APPROVING EXPENSE REIMBURSEMENT; (III)
ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION AND
ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS; (IV) APPROVING
FORM AND MANNER OF NOTICE OF ALL PROCEDURES, PROTECTIONS,
SCHEDULES AND AGREEMENTS, AND (V) SCHEDULING A HEARING TO
CONSIDER THE PROPOSED SALE, AND (B)(I) APPROVING THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) AUTHORIZING THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES; AND (III) GRANTING CERTAIN RELATED RELIEF**

LCI Holding Company, Inc. ("LCI") and certain of its subsidiaries, including

LifeCare Holdings, Inc. ("LifeCare"), the debtors and debtors in possession in the above-

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  LCI Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty Hospital, Ltd. (5386).  The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 – Suite 150, Plano, TX 75024.

captioned cases (collectively, the "Debtors" and, together with the non-debtor subsidiaries of LCI, the "Company"), on behalf of the Sellers (as defined herein), hereby move (the "Motion") the Court, pursuant to sections 105, 363 and 365 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for entry of an order (the "Bidding Procedures Order"), substantially in the form attached hereto as Exhibit A, (i) approving the proposed auction and bidding procedures (the "Bidding Procedures"), which are attached as Exhibit B hereto, for the potential sale of substantially all of the Debtors' assets (the "Acquired Assets"); (ii) approving an expense reimbursement provision; (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iv) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (v) scheduling a hearing (the "Sale Hearing") to approve such sale (the "Sale Transaction").  The Debtors also hereby move the Court, pursuant to Bankruptcy Code sections 105, 363 and 365 and Bankruptcy Rules 2002, 6004 and 6006, for entry of an order (the "Sale Order"), substantially in the form attached hereto as Exhibit C, (i) authorizing the sale of the Acquired Assets free and clear of liens, claims, interests and encumbrances; (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases as set forth in the Asset Purchase Agreement (as defined herein); and (iii) granting related relief.[2]  In support of the Motion, the Debtors rely upon and incorporate by reference (1) the Declaration of Phillip B. Douglas in Support of Chapter 11 Petitions and First Day Pleadings (the "First Day Declaration"), filed with the Court concurrently herewith,

---

[2]    This Motion contains the Debtors' request for entry of the Bidding Procedures Order and approval of the Sale Order.  The Debtors are seeking approval of the Bidding Procedures Order at the initial hearing to be conducted on this Motion. The Sale Order is requested to be considered at the Sale Hearing.

and (2) the Declaration of Neil A. Augustine (the "Augustine Declaration").[3]  In further support

of the Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157

and 1334.  This is a core proceeding under 28 U.S.C. § 157(b).  Venue of these cases and this

Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The legal predicates for the relief requested herein are Bankruptcy Code

sections 105, 363 and 365.  Such relief is also warranted pursuant to Bankruptcy Rules 2002,

6004 and 6006.

## BACKGROUND

### A.      The Chapter 11 Filing

3.      On December 11, 2012 (the "Petition Date"), the Debtors each

commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code

(collectively, the "Chapter 11 Cases").  The Debtors have requested that the Chapter 11 Cases be

jointly administered.  The factual background regarding the Debtors, including their business

operations, their capital and debt structure, and the events leading to the filing of the Chapter 11

Cases, is set forth in the First Day Declaration.[4]

4.      The Debtors continue to manage and operate their businesses as debtors in

possession pursuant to Bankruptcy Code sections 1107 and 1108.

---

[3]    The Augustine Declaration will be filed with the Court no later than the hearing on this Motion.

[4]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the First Day
Declaration or the Asset Purchase Agreement.

5.      To date, no creditors' committee has been appointed in the Chapter 11

Cases by the United States Trustee.  No trustee or examiner has been appointed in the Debtors'

Chapter 11 Cases.

**B.      Events Leading to the Chapter 11 Cases and the Sale Transaction**

6.      As described in detail in the First Day Declaration, the Debtors have

commenced the Chapter 11 Cases due to a combination of factors, including loss of revenues,

regulatory restrictions on growth, and impending debt maturities.  In 2005, Hurricane Katrina

destroyed the Company's three facilities located in New Orleans, Louisiana, causing untold

human suffering to patients and staff and significant economic damage to the enterprise.  The

destruction of these facilities caused material losses for the Company and had a significant

negative impact on the Company's net patient revenue.

7.      The regulatory framework governing LTAC hospitals, most notably (i)

regulations affecting rates for Medicare reimbursement, which is the Company's largest source

of revenue, (ii) the 25% Rule, and (iii) the three-year moratorium imposed by Congress on the

construction or expansion of LTAC facilities, has significantly limited the Company's ability to

raise revenues and grow its way back into its capital structure.  The Company achieved some

success in its efforts to raise revenues within the regulatory framework by completing the

HealthSouth and Vibra Acquisitions, reducing costs and implementing programs to increase

census and revenue per patient day.  However, these strategies did not provide sufficient

incremental revenue and profitability to offset the Katrina-related losses, the lost growth

opportunities in the New Orleans market and the broader setbacks that Katrina had delivered.

8.      Consequently, over the course of the first quarter of 2012, it became

evident to the Board and management that the hoped-for growth and greater regulatory certainty

would not materialize in a timeframe that worked for the Company.  The stated maturity of the

4

Senior Subordinated Notes is August 11, 2013. That fact compelled the Prepetition Lenders to insist on a "springing maturity" as a condition to closing the 2011 refinancing. More specifically, if the Company did not pay the Senior Subordinated Notes in full by May 15, 2013, the maturity date of the Prepetition Credit Agreement would accelerate to this date (from its stated May 2015 maturity). As a result, the Board determined to retain a financial advisor to help the Company work through various strategic alternatives. After considering several candidates and interviewing two, the Company retained Rothschild, Inc. ("Rothschild").

9.    The Company, with Rothschild's guidance and advice of counsel, developed a process to evaluate and consider strategic alternatives, including a sale of the business and engagement with the Company's existing creditors around a stand-alone restructuring plan. As described in more detail below, Rothschild received limited indications of interest in a sale transaction. The Debtors presented an initial proposal in August 2012 to all parties for a restructuring pursuant to a chapter 11 plan. The holders of the Senior Subordinated Notes provided no response to the proposal then or at any time thereafter. The Prepetition Lenders would not consent to, or finance, a plan, but provided a counterproposal in the form of a term sheet for the sale of substantially all of the Debtors' assets.

10.    Having received no proposal that provided consideration in excess of the Debtors' obligations under the Prepetition Credit Agreement, and without the ability to pursue a plan, the Debtors determined that a sale process undertaken in chapter 11, with the attendant opportunities for potential purchasers to participate in an auction, would provide the best opportunity to maximize value for all parties in interest.

**C.    The Debtors' Marketing and Sales Efforts**

11.    Between June 2012 and the Petition Date, the Company and Rothschild identified and contacted approximately thirty-two (32) potential financial and strategic

counterparties. Approximately seven (7) of those parties entered into confidentiality agreements with the Company. Rothschild distributed a Confidential Information Memorandum (the "CIM") to the parties that signed confidentiality agreements. However, the only indication of interest received by the Debtors reflected an enterprise value less than the amount of the debt under the Prepetition Credit Agreement (not to mention the Senior Subordinated Notes and the Vibra Note). Nonetheless, the Company continued to engage with interested parties and to solicit interest from additional parties not involved in the first round of the sale process, including competitors. Rothschild attempted to persuade one of the Debtors' competitors—an LTAC operator owned by the largest holder of the Senior Subordinated Notes—to engage in the sale process. Although this attempt was not successful, another competitor, after receiving a CIM and conducting preliminary due diligence, submitted a potentially viable indication of interest. The bidder was provided access to a virtual data room and opportunities to conduct in-person due diligence with the Debtors' management team. The potential purchaser ultimately submitted a bid, which the Prepetition Lenders requested be raised. Additional negotiations and counterproposals produced a series of follow-on bids, however, none of the bids provided total consideration equal to or in excess of the obligations outstanding under the Prepetition Credit Agreement.

12.     Due to the inadequate or uncommitted proposals for the Acquired Assets, and with patient care their foremost concern, the Debtors and their advisors determined that a sale of the Acquired Assets to Hospital Acquisition LLC (the "Stalking Horse Purchaser") would be in the best interests of the Company and would provide the best opportunity to preserve ongoing operations. As a result of negotiations between the Debtors, the Prepetition Agent and the Steering Committee, LCI Holdco, LLC, LifeCare Holdings, Inc. and the Additional Sellers

(together, the "Sellers"),[5] have entered into an asset purchase agreement (the "Asset Purchase

Agreement") with the Stalking Horse Purchaser to sell the Acquired Assets, subject to higher or

better offers received through the Bidding Procedures and subject to this Court's approval.  The

Debtors believe that the sale of the Acquired Assets to the Stalking Horse Purchaser or to a party

submitting the bid with the highest or best recovery to the Debtors' estates at auction (the

"Successful Bidder," such definition to include the Stalking Horse Purchaser) will maximize the

value of the estates and preserve the Debtors' ability to provide the highest quality care for their

patients.

**D.      The Asset Purchase Agreement**

13.     A summary of the principal terms of the Asset Purchase Agreement, a

complete copy of which is attached hereto as Exhibit D, including terms that are required to be

highlighted pursuant to Local Bankruptcy Rule 6004-1, is as follows:[6]

- Purchase Price.  Section 3.1 of the Asset Purchase Agreement provides that the
  purchase price (the "Purchase Price") for the Acquired Assets shall be (a) cash (the
  "Cash Consideration") in an amount equal to: (i) the Seller Retained Professional
  Fees, plus (ii) the Committee Retained Professional Fees, plus (iii) the Estimated
  Wind Down Expenses, plus (iv) any outstanding Liabilities under the DIP Credit
  Agreement on the Closing Date; and (b) the assumption by the Stalking Horse
  Purchaser or its designee of the Assumed Liabilities from Sellers, including the
  assumption of the obligation to pay to the applicable counterparties of the applicable
  Assigned Contracts the Cure Costs payable by the Stalking Horse Purchaser under
  Section 2.5; and (c) the release of Sellers and any guarantors under the Credit
  Agreement of all or a portion (as determined by the Stalking Horse Purchase) of the
  Liabilities arising under, or otherwise relating to the Credit Agreement in an
  aggregate amount equal to $320 million (the "Credit Bid and Release") under Section
  363(k) of the Bankruptcy Code; provided that the Credit Bid and Release shall be

---

[5]    Debtors, LCI Holding Company, Inc., LCI Intermediate Holdco, Inc., LCI Healthcare Holdings, Inc., and Boise
       Intensive Care Hospital, Inc. are not parties to the Asset Purchase Agreement.

[6]    The following summary is qualified in its entirety by reference to the provisions of the Asset Purchase
       Agreement.  In the event of any inconsistencies between the provisions of the Asset Purchase Agreement and
       the terms herein, the terms of the Asset Purchase Agreement shall govern.

reduced dollar-for-dollar to the extent that the Stalking Horse Purchaser assumes (in its sole discretion) any portion of the Indebtedness under the Credit Agreement.

- Purchased Assets. Section 2.1 of the Asset Purchase Agreement lists the Acquired Assets, and provides that the Stalking Horse Purchaser shall acquire, free and clear of all liens, claims, interests and encumbrances, all of Sellers' properties, rights, claims and assets, other than the Excluded Assets, of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, licensed, used or held for use in or relating to the Business, whether or not reflected on the books and records of the Debtors, as the same shall exist on the Closing Date.  Without limiting the generality of the prior sentence, such Acquired Assets shall include, whether they relate exclusively to the Business or not (except any Excluded Facility or where so noted in the following list or in any definition used in the following list) all of Sellers' direct or indirect right, title and interest in, to and under the following: (a) all inventory of any kind or nature, merchandise and goods, related to the Business or Acquired Assets and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including food, laundry, medical, housekeeping and other supplies, disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("Inventory"); (b) all Equipment; (c) all Assigned Contracts; (d) all (i) Owned Real Property, (ii) Leased Real Property (and any such agreement and rights related thereto or under such lease to the extent that such lease is an Assigned Contract), and (iii) Occupancy Agreements, in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof; (e) all Permits and pending applications therefor that relate to the Business or the Acquired Assets, to the extent assignable; (f) all Intellectual Property; (g) all Accounts Receivable; (h) all Pre-Paid Expenses; (i) all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business, including the Avoidance Actions; (j) to the extent permitted by Legal Requirements, all Documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case arising under or relating to the Acquired Assets, the Assumed Liabilities or the Business; (k) all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of

action arising or existing therefrom; (l) all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers; (m) other than as set forth in Section 2.2(h), all rights under or arising out of all insurance policies relating to the Business or any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies); (n) all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures); (o) all telephone, telex and telephone facsimile numbers and other directory listings; (p) all assets (whether in trust or otherwise) with respect to any Transferred Benefit Plan; (q) shares of capital stock or other equity interests in the entities listed on Schedule 2.1(q); (r) all assets, if any, listed on Schedule 2.1(r) (regardless of whether such assets are covered by any of the foregoing); (s) all rights to refunds of Taxes paid by Sellers which refunds are attributable to Pre-Closing Tax Periods; and (t) all proceeds and products of any and all of the foregoing Acquired Assets.

- Excluded Assets. Section 2.2 of the Asset Purchase Agreement lists the excluded assets which the Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to (collectively, the "Excluded Assets"). The Excluded Assets include, without limitation: (a) the assets, if any, listed on Schedule 2.2(a); (b) any Excluded Benefit Plan, and any asset in respect thereof; (c) any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, other than any such capital stock or equity interest set forth on Schedule 2.1(q); (d) subject to Section 2.1(q), the limited liability company and corporate books and records of internal limited liability company and corporate proceedings (including stock certificates and membership interest certificates), Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, copies of the foregoing items shall be made available by Sellers to the Stalking Horse Purchaser; (e) Documents that Sellers are required by Legal Requirements to retain; (f) any Contract that is not an Assigned Contract; (g) all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(m); (h) all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries; (i) any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document; and (j) shares of capital stock or other equity interests in the Excluded Facility and all rights, Claims, assets and properties of the Excluded Facility.

- Termination. Section 11.1 of the Asset Purchase Agreement sets forth circumstances under which the Asset Purchase Agreement may be terminated. Among other things,

these provisions allow the Stalking Horse Purchaser to terminate the Asset Purchase Agreement if (i) the Bankruptcy Court has not entered the Bidding Procedures Order on or prior to January 11, 2013; (ii) the Sale Hearing has not taken place on or prior to March 12, 2013; (iii) the Bankruptcy Court has not entered the Sale Order on or prior to March 14, 2013; and (iv) the Sale Order has not become a final order within fourteen (14) days after entry thereof.

- Expense Reimbursement and Overbid Protection. Section 7.5 of the Asset Purchase Agreement provides that, upon termination of the Asset Purchase Agreement pursuant to section 11.2, Sellers agree to pay the Stalking Horse Purchaser the reasonable out-of-pocket costs and expenses of the Stalking Horse Purchaser (including reasonable expenses of counsel, investment bankers and other outside consultants, reasonable legal expenses and all filing fees under the HSR Act) related to negotiating the Asset Purchase Agreement and investigating Sellers, the Business or the Acquired Assets up to a maximum of $1,000,000 (the "Expense Reimbursement"). In addition, the Bidding Procedures Order shall provide for an initial overbid protection in the amount of $3,000,000 and minimum bid increments thereafter of $1,000,000.

- Record Retention. Section 8.6 of Asset Purchase Agreement provides that from and after the Closing Date, each Party to the Asset Purchase Agreement shall provide the other Parties (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to the Asset Purchase Agreement as of the Closing Date so as to enable the Stalking Horse Purchaser and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions. If any party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

- Sale of Avoidance Actions. Section 2.1(i) of the Asset Purchase Agreement provides for the sale by the Sellers of their Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business, including Avoidance Actions.

- Requested Findings as to Successor Liability. Section 8.10 of the Asset Purchase Agreement provides that the Parties intend that, except where expressly prohibited under applicable Legal Requirements, upon the Closing, the Stalking Horse Purchaser shall not be deemed to: (i) be the successor of Sellers, (ii) have, *de facto*, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the

Parties intend that the Stalking Horse Purchaser shall not be liable for any Encumbrances (other than Assumed Liabilities and Closing Encumbrances) against Seller or any of its predecessors or Affiliates, and the Stalking Horse Purchaser shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising prior to the Closing Date.

- <u>Arrangements with Management</u>. Section 8.5(h) of the Asset Purchase Agreement provides that, by no later than the date on which the Bidding Procedures Order is entered into by the Bankruptcy Court, the Stalking Horse Purchaser agrees to use commercially reasonable efforts to negotiate (on terms acceptable to Buyer in its sole discretion) employment contracts with each member of Senior Management, to be executed and effective on the Closing Date.

## RELIEF REQUESTED

14.     By this Motion, the Debtors first request entry of the Bidding Procedures Order, which will authorize and approve, among other things: (i) the Bidding Procedures for conducting the auction for the Acquired Assets; (ii) the Expense Reimbursement (as defined below); (iii) the Assumption and Assignment Procedures; (iv) the scheduling of the Sale Hearing to approve any such Sale Transaction with respect to any bid accepted by the Debtors; and (v) the form and manner of notice with respect to all procedures, protections, schedules and agreements.

15.     Second, at the Sale Hearing, the Debtors will request entry of the Sale Order that will, *inter alia*, approve (i) the sale of the Acquired Assets in accordance with the terms of the Asset Purchase Agreement executed by the Stalking Horse Purchaser or such other Successful Bidder, which shall be free and clear of all liens, claims, encumbrances, and other interests, including rights or claims based on any taxes or successor or transferee liability (other than certain expressly specified permitted encumbrances and assumed liabilities, all as more specifically set forth in the Asset Purchase Agreement); and (ii) the assumption and assignment

of certain executory contracts and unexpired leases related to the Acquired Assets and the Sale Transaction.

## BASIS FOR RELIEF

### A. Necessity for Sale

16.     As discussed above, the Debtors face impending debt maturities that threaten the viability of the Company and its continued operations.  The Debtors have pursued various financial and strategic alternatives, and have determined that the best course of action for the Company is a sale of the Acquired Assets in the manner and on the timetable set forth in the Bidding Procedures.

17.     The Debtors' highest priority in the Chapter 11 Cases is to continue providing the highest levels of care, without interruption to their patients, while preserving value. The Bidding Procedures allow the Debtors to continue the thorough sale process begun prior to the Petition Date in a further effort to maximize the value of the Acquired Assets.  The Debtors believe that this process will encourage third party participation and protect the ongoing business, while also alleviating any concerns regarding patient care.  In addition, the physicians and other providers that refer patients to the Debtors will be assured that there will be no disruption in patient care during the Chapter 11 Cases.

18.     Absent a sale, and without the support of the Prepetition Lenders for a chapter 11 plan, liquidation would be the Debtors' only other option.  As described above, a prompt sale of the Debtors' assets protects the Debtors' estates from this risk and avoids any interruption to the Debtors' business, thereby providing the greatest available protection to the Debtors' patients and stakeholders.

12

**B.     Approval of Bidding Procedures**

19.     The Bidding Procedures are designed to maximize value for the Debtors'

estates, while ensuring an orderly sale process consistent with the timeline available to the

Debtors under the Asset Purchase Agreement and the terms of the Proposed DIP Financing.  The

Bidding Procedures describe, among other things, the procedures for interested parties to access

due diligence, the manner in which bidders and bids become "qualified," the receipt and

negotiation of bids received, the conduct of any auction, the selection and approval of any

ultimately successful bidders, and the deadlines with respect to the foregoing (the "Bidding

Process").  The Debtors further believe, with the concurrence and support of their key

constituents, that the Bidding Process affords the Debtors a sufficient opportunity to pursue a

sale process that will maximize the value of their estates.

20.     Certain of the key terms of the Bidding Procedures are highlighted as

follows pursuant to Local Bankruptcy Rule 6004-1(c):[7]

> **Access to Diligence Materials:** To participate in the bidding process and to receive
> access to due diligence (the "Diligence Materials"), a party must submit to the Debtors (i)
> an executed confidentiality agreement in the form and substance satisfactory to the
> Debtors and (ii) evidence demonstrating the party's financial capability with respect to an
> Alternate Transaction as determined by the Debtors.

> **Bid Deadline:** The following parties must receive a Bid in writing, on or before
> February 27, 2013 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be
> agreed to by the Debtors (the "Bid Deadline"):  (1) the Debtors, LifeCare Holdings, Inc.,
> 5340 Legacy Drive, Suite 150, Building 4, Plano, TX 750024, Attn: Erik Pahl, general
> counsel (erik.pahl@lifecare-hospitals.com); (2) counsel for the Debtors, Skadden, Arps,
> Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, Attn. Ken Ziman,
> Esq. (ken.ziman@skadden.com) and Felicia Perlman, Esq.
> (felicia.perlman@skadden.com); (3) financial advisor to the Debtors, Rothschild Inc.,

---

[7]     The following summary is qualified in its entirety by reference to the provisions of the Bidding Procedures.  In
the event of any inconsistencies between the provisions of the Bidding Procedures and the terms herein, the
terms of the Bidding Procedures shall govern.  Unless otherwise defined in the summary set forth in the
accompanying text, capitalized terms shall have the meanings ascribed to them in the Bidding Procedures.

1251 Avenue of the Americas, 51st Floor, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@rothschild.com) and Stephen Antinelli (stephen.antinelli@rothschild.com) (4) counsel to the Official Committee of Unsecured Creditors (if one has been appointed) (the "Committee"); (5) counsel to the Stalking Horse Purchaser and the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, NY 10036, Attn: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Scott Alberino, Esq. (salberino@akingump.com); (6) financial advisor to the Stalking Horse Purchaser, Alvarez & Marsal; 600 Madison Avenue, 7th Floor, New York, NY 10022 Attn: Vin Batra (vbatra@alvarezandmarsal.com); and George Varughese (gvarughese@alvarezandmarsal.com); and (7) counsel to the Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Sandeep Qusba, Esq. (squsba@stblaw.com) and Morris Massel (mmassel@stblaw.com).

**Auction Qualification Process:** To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the conditions set forth below. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

      (a)     Good Faith Deposit: Each Bid must be accompanied by a deposit in the amount of five percent (5%) of the purchase price contained in the Modified Asset Purchase Agreement (as defined below) or, in the case of a Chapter 11 Plan Bid, five percent (5%) of the amount of the cash payments contemplated by such bid, to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

      (b)     Same or Better Terms: Each Bid must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Asset Purchase Agreement and shall satisfy the "Minimum Bid" requirements set forth in clause (d) below.

      (c)     Executed Agreement: Each Bid (other than a Chapter 11 Plan Bid) must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Modified Asset Purchase Agreement"). A Bid (other than a Chapter 11 Plan Bid) shall also include a copy of the Asset Purchase Agreement marked against the Modified Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser such as the Expense Reimbursement provisions contained in the Asset Purchase Agreement).

A Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Investment Agreement"). Such Investment Agreement must provide for an investment of capital in accordance with these Bidding Procedures in exchange for substantially all of the equity of the reorganized Debtors in a non-taxable recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization.

(d)     Minimum Bid:  A Bid (other than a Chapter 11 Plan Bid) for all or substantially all of the Debtors' assets must propose a minimum purchase price equal to or greater than what is likely to result in a value to the Debtors' estate in the Debtors' reasonable judgment, equal to:

> (1)     The Cash Consideration (as defined in the Asset Purchase Agreement); plus
>
> (2)     cash in an amount equal to the credit bid amount provided by the Stalking Horse Purchaser; ***plus***
>
> (3)     the Expense Reimbursement in cash; plus
>
> (4)     $3,000,000 in cash(the "Initial Overbid").

A Chapter 11 Plan Bid must provide for payment in cash in an amount not less than the sum of:

> (5)     the Cash Consideration; ***plus***
>
> (6)     cash in the amount equal to the principal amount outstanding under the Credit Agreement plus accrued and unpaid interest as of the Closing Date; ***plus***
>
> (7)     the Expense Reimbursement in cash; ***plus***
>
> (8)     the Initial Overbid.

(e)     Designation of Assigned Contracts and Leases:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to it at closing, pursuant to an Alternate Transaction.

(f)    <u>Assumption of Liabilities</u>:  A Bid must provide for the payment or
       assumption of at least all or substantially all of the Assumed
       Liabilities (as defined in the Asset Purchase Agreement).

(g)    <u>Corporate Authority</u>:  A Bid must include written evidence
       reasonably acceptable to the Debtors demonstrating appropriate
       corporate authorization to consummate the proposed Alternate
       Transaction; *provided* that, if the Bidder is an entity specially
       formed for the purpose of effectuating the Alternate Transaction,
       then the Bidder must furnish written evidence reasonably
       acceptable to the Debtors of the approval of the Alternate
       Transaction by the equity holder(s) of such Bidder.

(h)    <u>Proof of Financial Ability to Perform</u>:  A Bid must include written
       evidence that the Debtors conclude, in consultation with their
       advisors and the Consultation Parties, demonstrates that the Bidder
       has the necessary financial ability to close the Alternate
       Transaction and provide adequate assurance of future performance
       under all contracts to be assumed and assigned in such Alternate
       Transaction.  Such information must include, *inter alia*, the
       following:

       (1)    contact names and numbers for verification of
              financing sources;

       (2)    evidence of the Bidder's internal resources and
              proof of unconditional debt funding commitments
              from a recognized banking institution and, if
              applicable, equity commitments in an aggregate
              amount equal to the cash portion of such Bid or the
              posting of an irrevocable letter of credit from a
              recognized banking institution issued in favor of the
              Debtors in the amount of the cash portion of such
              Bid, in each case, as are needed to close the
              Alternate Transaction;

       (3)    the Bidder's current financial statements (audited if
              they exist) or other similar financial information
              reasonably acceptable to the Debtors;

       (4)    a description of the Bidder's pro forma capital
              structure; and

       (5)    any such other form of financial disclosure or
              credit-quality support information or enhancement

16

> reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(i)  <u>Regulatory and Third Party Approvals</u>: A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement or Investment Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible);

(j)  <u>Contingencies</u>: Each Bid (1) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Asset Purchase Agreement and (2) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(k)  <u>Irrevocable</u>: Each Bid must be irrevocable through the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

**Qualified Bidder:** A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "<u>Qualified Bid</u>" for such assets, and such Bidder shall constitute a "<u>Qualified Bidder</u>" for such assets. Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. In addition, the Stalking Horse Purchaser will receive, from each Bidder, a copy of any Bids at the time such Bid is submitted to the Debtors. The Debtors shall inform counsel to the Stalking Horse Purchaser whether the Debtors will consider such Bids to be Qualified Bids no later than two (2) business days before the Auction.

**Auction and Auction Procedures:** If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "<u>Auction</u>") to determine the highest or best Qualified Bid. This determination shall take into account any factors the Debtors, in

consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's right to the Expense Reimbursement (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors shall not conduct the Auction. Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

The Auction shall take place on March 5, 2013 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the Agent and the Committee. The Auction shall be conducted according to the following procedures:

Only the Debtors, the Consultation Parties, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction. The Stalking Horse Purchaser (as a representative of the lenders under the Credit Agreement (collectively, the "Prepetition Lenders") reserves the right to make any Bid comprised of cash and/or any credit bid (pursuant to section 363(k) of the Bankruptcy Code or other applicable law) at the Auction; *provided* that the cash component of any subsequent Bid by the Stalking Horse Purchaser may not be less than the Cash Consideration (as defined in the Asset Purchase Agreement). For the avoidance of doubt, at any time, and from time to time, during the Auction, the Stalking Horse Purchaser may increase its Bid, including by increasing the amount of the Credit Bid to the full amount then outstanding and owing under the Credit Agreement.

**Terms of Overbids:** An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)    Minimum Overbid Increments: Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $1,000,000. The Debtors reserve the right, in consultation with the Consultation Parties, to announce reductions or increases in the minimum incremental bids (or in valuing such bids) at any time during the Auction. Additional

consideration in excess of the amount set forth in the respective Auction Baseline Bid may include (i) cash and/or noncash consideration, *provided*, *however*, that the value for such non-cash consideration shall be determined by the Debtors with the consent of the Agent and the Steering Committee and (ii) in the case of a Bid by the Stalking Horse Purchaser, a credit bid of up to the full amount then outstanding and owing under the Credit Agreement and the Expense Reimbursement.

(b) <u>Stalking Horse Purchaser May Credit Bid Expense Reimbursement</u>: The Stalking Horse Purchaser shall be permitted to credit bid the full amount of the Expense Reimbursement pursuant to any Overbid in connection with each round of bidding in the Auction.

(c) <u>Remaining Terms Are the Same as for Qualified Bids</u>: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, *provided*, *however*, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Asset Purchase Agreement, Modified Asset Purchase Agreement or Investment Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

**Announcement and Consideration of Overbids:** (a) <u>Announcement of Overbids</u>: The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration. (b) <u>Consideration of Overbids</u>: Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with

such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

**Backup Bidder:** Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and in consultation with the Consultation Parties, will be designated as the backup bidder (collectively, the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is eighty (80) days after the date of entry of the Sale Order, which date will be extended for an additional sixty (60) days if the only condition to Closing that remains outstanding on the 80th day after entry of the Sale Order is satisfaction of regulatory approvals required under the applicable Purchase Agreement (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder (defined herein).

Following the Sale Hearing, if the Successful Bidder (as defined below) fails to consummate an approved transaction, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case of a breach or failure to perform on the part of such Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

**Reservation of Rights of Prepetition Lenders:** Notwithstanding anything to the contrary in the Asset Purchase Agreement, these Bidding Procedures or the Bidding Procedures Order, the Prepetition Lenders and the Agent reserve their rights to, and shall be permitted to, consult with, negotiate with, participate in, or enter into agreements with any Preliminary Interested Investor with respect to a Bid. For the avoidance of doubt, the foregoing shall include the right for the Prepetition Secured Lenders, the Agent or their affiliates or designees to offer or provide debt or equity financing arrangements in connection with any Bid (or to receive any fees in connection therewith), notwithstanding such Lender or Agent's relationship with the Stalking Horse Purchaser, and to take any actions in furtherance of any of the foregoing or any matters incidental thereto.

**C.    Expense Reimbursement**

21.    After extensive arm's length negotiations, the Debtors and the Stalking Horse Purchaser executed the Asset Purchase Agreement. The Asset Purchase Agreement allows the Debtors to maximize the value received for the Acquired Assets by establishing a minimum acceptable bid and will promote more competitive bidding. As part of the negotiations, the Debtors have agreed to provide, subject to the approval of this Court, the reimbursement of all reasonable expenses incurred by the Stalking Horse Purchaser in connection with the negotiation of the Asset Purchase Agreement, including conducting due diligence related to the Sellers, the Company and the Acquired Assets, of up to $1,000,000 (the "Expense Reimbursement").

22.    Under section 7.5 of the Asset Purchase Agreement, the Stalking Horse Purchaser is entitled to be paid the Expense Reimbursement if the Asset Purchase Agreement is terminated pursuant to Section 11.2(b) therein, provided that the Stalking Horse Purchaser is not in default thereunder. The Debtors have further agreed that their obligation to pay the Expense Reimbursement pursuant to the Asset Purchase Agreement shall, upon entry of the Bidding Procedures Order, constitute a super priority administrative expense of the Debtors under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

23.    The Debtors believe that the Expense Reimbursement is fair and reasonable in light of the circumstances and because, if the Expense Reimbursement is triggered, the Stalking Horse Purchaser's efforts will have increased the chances that the Debtors will receive the highest or otherwise best offer for the Acquired Assets, to the benefit of the Debtors' creditors.

**D.    Assumption and Assignment Procedures**

24.    The Debtors propose the following procedures for notifying counterparties to executory contracts and unexpired leases of potential cure amounts in the event the Debtors decide to assume such contracts or leases.

25.    Schedule 2.5(a) of the Asset Purchase Agreement sets forth a list of all executory contracts which are to be included in the Acquired Assets (the "Assigned Contracts"). Within ten (10) business days after entry of the Bidding Procedures Order or as soon thereafter as practicable, the Debtors will file with the Court a notice of cure amount (the "Cure Notice"), substantially in the form attached hereto as Exhibit E, and serve the Cure Notice on all non-debtor parties to the Assigned Contracts (the "Contract Notice Parties").

26.    The Cure Notice shall (i) state the cure amounts that the Debtors believe are necessary to assume such Assigned Contracts pursuant to section 365 of the Bankruptcy Code (the "Cure Amount"); (ii) notify the non-debtor party that such party's contract or lease may be assumed and assigned to a purchaser of the Acquired Assets at the conclusion of the Auction; (iii) state the date of the Sale Hearing; and (iv) state a deadline by which the non-debtor party shall file an objection to the Cure Amount or to the assumption and assignment of the Assigned Contracts. The Debtors request that the Court set the deadline to object to any Cure Amount or to assumption and assignment fifteen (15) days after service of the Cure Notice. Any such objection shall (i) be in writing; (ii) state the basis for such objection; and (iii) state with specificity what cure amount the party to the Assigned Contract believes is required (in all cases with appropriate documentation in support thereof). The Cure Notice shall also provide that objections to any Cure Amount or to assumption and assignment will be heard at the Sale Hearing or at a later hearing, as determined by the Debtors. If a Successful Bidder that is not the Stalking Horse Purchaser prevails at the Auction, then the deadline to object to assumption and

22

assignment shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.

27.     As soon as possible after the conclusion of the Auction, the Debtors shall file with the Bankruptcy Court a Post Auction Notice (as defined below) that identifies any Successful Bidder and provides notice that the Debtors will seek to assume and assign the Assigned Contracts at the Sale Hearing.  At the Sale Hearing, the Debtors shall (i) present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder and (ii) request entry of an order granting approval of the assumption and assignment of any Assigned Contracts to the Successful Bidder.

28.     In addition, if the Debtors discover that a contract was omitted from Schedule 2.5 of the Asset Purchase Agreement (the "Previously Omitted Contract"), then the Debtors will notify the Successful Bidder within two Business Days (as defined in the Asset Purchase Agreement) of the omission.  If the Successful Bidder wishes to assume a Previously Omitted Contract, then the Debtors shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to the Previously Omitted Contract indicating the Debtors' intent to assume and assign the Previously Omitted Contract.  The counterparties will have fifteen (15) Business Days to object to the Cure Amount or the assumption.  If the parties cannot agree on a resolution, the Debtors will seek an expedited hearing before the Court to determine the Cure Amount and approve the assumption.  If there is no objection, then the Debtors will obtain an order of this Court fixing the Cure Amount and approving the assumption of the Previously Omitted Contract.

E.    **Notice Procedures**

29.     Notice of Sale Hearing.  Within five (5) days after the entry of the Bidding Procedures Order, or as soon thereafter as practicable (the "Mailing Date"), the Debtors (or their

agents) shall serve the Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the Bidding Procedures by first-class mail, postage prepaid, upon (a) all entities known to have expressed an interest in a transaction with respect to all or part of the Acquired Assets at any time; (b) all entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the Acquired Assets; (c) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by this Motion; (d) the United States Attorney's office; (e) the Securities and Exchange Commission; (f) the Internal Revenue Service; (g) the Debtors' thirty (30) largest unsecured creditors, or the committee of unsecured creditors appointed in the Chapter 11 Cases, if any (the "Committee"); (h) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. and Scott Alberino, Esq.; and (i) counsel to the agent under the Debtors' prepetition and postpetition senior secured credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba, Esq. and Morris Massel. Such notice shall be sufficient and proper notice of the Sale Transaction with respect to known interested parties.

30. Sale Notice. On the Mailing Date or as soon thereafter as practicable, the Debtors (or their agents) shall serve by first-class mail, postage prepaid, a sale notice (the "Sale Notice"), substantially in the form attached hereto as Exhibit F, upon all other known creditors of the Debtors.

31. Publication Notice. The Debtors also propose, pursuant to Bankruptcy Rules 2002 and 6004, that the publication of the Sale Notice, attached hereto as Exhibit G, in *The Wall Street Journal* and such local newspapers as the Debtors deem appropriate on the Mailing

24

Date or as soon as practicable thereafter, be deemed sufficient notice to any other interested parties whose identities are unknown to the Debtors.

       32.     Post Auction Notice. As soon as possible after the conclusion of the Auction the Debtors shall file, but not serve, a notice identifying any Successful Bidder (the "Post Auction Notice"), substantially in the form attached hereto as Exhibit H.

**APPLICABLE AUTHORITY**

       33.     "Under Delaware law, the business judgment rule operates as a presumption 'that directors making a business decision, not involving self-interest, act on an informed basis, in good faith and in the honest belief that their actions are in the corporation's best interest.'" Continuing Creditors' Comm. of Star Telecomms., Inc. v. Edgecomb, 385 F.Supp.2d 449, 462 (D. Del. 2004) (quoting Grobow v. Perot, 539 A.2d 180, 187 (Del. 1988)); see also Ad Hoc Comm. of Equity Holders of Tectonic Network, Inc. v. Wolford, 554 F.Supp.2d 538, 555 n.111 (D. Del. 2008). Thus, this Court should grant the relief requested in this Motion if the Debtors demonstrate a sound business justification therefore. See In re Delaware & Hudson Ry. Co., 124 B.R. 169, 179 (D. Del. 1991).

       34.     The Debtors have sound business justifications for selling the Acquired Assets at this time. First, the Debtors are committed to maintaining high quality patient care, continuing operations, and preserving the value of the business during the Chapter 11 Cases and beyond. The Debtors have commenced the Chapter 11 Cases in order to adjust their capital structure for the current LTAC environment. Diminishing Medicare rates and an adverse regulatory environment have compressed value and acceptable levels of debt and rendered the Debtors' capital structure unsustainable. Impending debt maturities and a lack of refinancing alternatives threaten the long-term viability of the Company. Despite these challenges, the Debtors' clinical outcomes are strong and getting stronger. Given the impediments to plan

25

confirmation described in the First Day Declaration, the Debtors have determined that the best

option for reaching their primary goals is through a sale of the Acquired Assets. The Debtors

submit that the sale of the Acquired Assets to the Stalking Horse Purchaser pursuant to the Asset

Purchase Agreement, or to another Successful Bidder pursuant to a Modified Asset Purchase

Agreement (as defined in the Bidding Procedures), is in the Debtors' best interests and should be

approved.

**A.      The Bidding Procedures Are Fair And Are Designed To Maximize The Value
Received For The Acquired Assets.**

35.    Bankruptcy Code section 363(b)(1) provides that "[t]he trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1). The Debtors believe that the Bidding Procedures

are appropriate under Bankruptcy Code sections 105 and 363 to ensure that the bidding process

is fair and reasonable and will yield the maximum value for their estates and creditors. The

Bidding Procedures proposed herein are designed to maximize the value received for the

Acquired Assets by facilitating a competitive bidding process in which all potential bidders are

encouraged to participate and submit competing bids. The Bidding Procedures provide potential

bidders with sufficient notice and an opportunity to acquire information necessary to submit a

timely and informed bid. Thus, the Debtors and all parties in interest can be assured that the

consideration for the Acquired Assets will be fair and reasonable. At the same time, the Bidding

Procedures provide the Debtors with the opportunity to consider all competing offers and to

select, in their reasonable business judgment, and after consultation with Agent, the Steering

Committee, the Committee and their respective advisors, the highest and best offer for the

Acquired Assets.

36.     Accordingly, the Debtors believe the Court should approve the Bidding
Procedures.  Similar procedures have been previously approved by this Court.  See, e.g., In re
Vertis Holdings, Inc., Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012); In re A123
Systems, Inc., Case No. 12-12859 (KJC) (Bankr. D. Del. Nov. 8, 2012); In re Digital Domain
Media Group, Inc., Case No. 12-12568 (BLS) (Bankr. D. Del. Sept. 12, 2012); In re Tri-Valley
Corporation, Case No. 12-12291 (MFW) (Bankr. D. Del. Sept. 5, 2012).

**B.     The Expense Reimbursement Should Be Authorized.**

37.     The Asset Purchase Agreement provides for an Expense Reimbursement
for the Stalking Horse Purchaser in the event that the Asset Purchase Agreement is terminated
pursuant to the terms therein.  In connection with the Sale Transaction, the Debtors seek
authorization to pay the Expense Reimbursement in accordance with the terms of the Asset
Purchase Agreement.  Approval of expense reimbursements and other forms of bidding
protections in connection with the sale of significant assets pursuant to section 363 of the
Bankruptcy Code has become established practice in chapter 11 cases.  Such bidding protections
enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes
is fair, while providing the debtor with an opportunity to enhance the value to its estate through
an auction process.  Historically, bankruptcy courts have approved bidding incentives similar to
the Expense Reimbursement pursuant to the "business judgment rule."  See e.g., Official Comm.
of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.), 147 B.R. 650
(S.D.N.Y. 1992); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989).

38.     The United States Court of Appeals for the Third Circuit, however, has
established standards for determining the propriety of bidding incentives in the bankruptcy
context.  In Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181
F.3d 527 (3d Cir. 1999); see also In re Reliant Energy Channelview LP, 594 F.3d 200 (3d Cir.

27

2010). The Court held that even though bidding incentives are measured against a business judgment standard in nonbankruptcy transactions, the administrative expense provisions of Bankruptcy Code section 503(b) govern in the bankruptcy context. Accordingly, to be approved, bidding incentives must provide some postpetition benefit to the debtor's estate. See O'Brien 527 F.3d at 533.

39.    The amount of the Expense Reimbursement is reasonable and appropriate in light of the size and nature of the transaction and the efforts that have been and will be expended by the Stalking Horse Purchaser. Moreover, the Expense Reimbursement is actually necessary to preserve the value of the estate. The Expense Reimbursement was negotiated in good faith and is necessary to secure the Stalking Horse Purchaser's commitment under the Asset Purchase Agreement. In sum, the Debtors' ability to offer the Expense Reimbursement enables them to ensure the sale of the Acquired Assets to the Stalking Horse Purchaser at a price they believe to be fair while, at the same time, providing them with the potential of even greater benefit to the estates. Moreover, payment of the Expense Reimbursement will not diminish the Debtors' estates. The Debtors do not intend to terminate the Asset Purchase Agreement if to do so would incur an obligation to pay the Expense Reimbursement, unless to accept an alternative bid, which bid must exceed the consideration offered by the Stalking Horse Purchaser by an amount sufficient to pay the Expense Reimbursement.

40.    This Court has approved protections similar to the proposed Expense Reimbursement as reasonable and consistent with the type and range of bidding protection typically approved. See, e.g., In re Magic Brands, LLC, Case No. 10-11310 (BLS) (Bankr. D. Del. May 18, 2010) (authorizing stalking horse expense reimbursement); In re Spheris, Inc., Case No. 10-10352 (KG) (Bankr. D. Del. Feb. 23, 2010) (same); see also, In re Vertis Holdings, Inc.,

Case No. 12-12821 (CSS) (Bankr. D. Del. Nov. 2, 2012) (approving break-up fee and expense

reimbursement); In re Trident Microsystems, Inc., Case No. 12-10069 (CSS) (Bankr. D. Del.

Jan. 18, 2012) (same).

**C.    Approval Of The Sale Transaction Is Warranted Under Bankruptcy Code Section 363(b).**

41.    Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after

notice and a hearing, may use, sell, or lease, other than in the ordinary course of business,

property of the estate." 11 U.S.C. § 363(b)(1).  Bankruptcy Code section 105(a) provides in

relevant part: "The Court may issue any order, process, or judgment that is necessary or

appropriate to carry out the provisions of this title." 11 U.S.C. § 105(a).

42.    A debtor should be authorized to sell assets out of the ordinary course of

business pursuant to section 363 of the Bankruptcy Code and prior to obtaining a confirmed plan

of reorganization if it demonstrates a sound business purpose for doing so.  See In re Abbotts

Dairies of Pennsylvania, Inc., 788 F.2d 143, 147-49 (3d Cir. 1986) (implicitly adopting the

"sound business judgment test" of Lionel); In re Dura Auto. Sys., Inc., Case No. 06-11202

(KJC), 2007 WL 7728109, at *5 (Bankr. D. Del. Aug. 15, 2007) (finding that "[t]he Debtors

have demonstrated compelling circumstances and a good, sufficient, and sound business purpose

and justification for the Sale prior to, and outside of, a plan of reorganization."); Dai-Ichi

Kangyo Bank Ltd. v. Montgomery Ward Holding Corp. (In re Montgomery Ward Holding

Corp.), 242 B.R. 147, 153 (D. Del. 1999) ("In determining whether to authorize the use, sale or

lease of property of the estate under [section 363(b)], courts require the debtor to show that a

sound business purpose justifies such actions"); Delaware & Hudson Ry. Co., 124 B.R. at 176

(sale of substantially all of debtor's assets outside of reorganization plan is appropriate when a

sound business reason justifies such a sale); see also Comm. of Equity Sec. Holders v. Lionel

Corp. (In re Lionel Corp.), 722 F.2d 1063, 1070 (2d Cir. 1983); Titusville Country Club v.

Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (stating

that the "sound business purpose test" is appropriate); In re Mid-American Waste System, Case

No. 97-104 (PJW) (Bankr. D. Del. Mar. 7, 1997). Once a court has determined there is a sound

business justification for a sale outside of a plan, the court must also determine that (i) the trustee

has provided the interested parties with adequate and reasonable notice, (ii) the sale price is fair

and reasonable and (iii) the purchaser is proceeding in good faith. Delaware & Hudson, 124

B.R. at 176.

43.     The Debtors submit that the sale of the Acquired Assets is based upon the

sound business judgment of the Debtors. As explained above, the Debtors have determined that

a sale, conducted in accordance with the Bidding Procedures, is not only in the best interest of

the Company, but also current and future patients who rely on the Debtors' specialized services.

An orderly sale process will instill confidence in referring physicians and other providers that

patients will not be affected by the Chapter 11 Cases, which will help to ensure that the Debtors

can continue successful ongoing operations. The Debtors have determined that their best, if not

only viable, opportunity to maximize creditor recoveries and continue as a going concern is to

sell substantially all of the Acquired Assets as a going concern.

44.     The Debtors also meet the additional requirements necessary to approve a

sale under section 363 of the Bankruptcy Code. As stated herein, the Debtors will provide

adequate notice of the Sale Transaction to interested parties, and the Debtors believe that the

aforementioned notice procedures are reasonable and adequate under the circumstances.

Additionally, the Debtors entered into the Asset Purchase Agreement after a long and deliberate

effort to market the Acquired Assets and, while hopeful that other bidders materialize, are

confident that the sale price is fair and reasonable. Moreover, the Stalking Horse Purchaser has

proceeded in good faith. Both the Debtors and the Stalking Horse Purchaser were represented by

practical and experienced advisors in the arm's-length negotiations of the Asset Purchase

Agreement. Accordingly, it is a valid exercise of the Debtors' business judgment to seek the

relief requested by this Motion.

**D.    The Proposed Sale Transaction Satisfies The Requirements Of Bankruptcy Code
Section 363(f) For A Sale Free And Clear Of Interests.**

45.    Bankruptcy Code section 363(f) provides:

The Trustee may sell property under subsection (b) or (c) of this section free and
clear of any interest in such property of an entity other than the estate, only if –

(1)    applicable non-bankruptcy law permits sale of such property free
and clear of such interest;

(2)    such entity consents;

(3)    such interest is a lien and the price at which such property is to be
sold is greater than the aggregate value of all liens on such
property;

(4)    such interest is in bona fide dispute; or

(5)    such entity could be compelled, in a legal or equitable proceeding,
to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

46.    As Bankruptcy Code section 363(f) is stated in the disjunctive, when

proceeding pursuant to section 363(b), it is only necessary to meet one of the five (5) conditions

of section 363(f). Because the Prepetition Lenders consent to the Sale Transaction, the Debtors

believe that they have satisfied the requirements of section 363(f). Therefore, pursuant to

Bankruptcy Code section 363, the Debtors may sell the Acquired Assets free and clear of all liens, claims, and encumbrances.

47.    The Debtors also submit that it is appropriate to sell the Acquired Assets free and clear of successor liability relating to the Debtors' businesses. Such a provision ensures that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code section 363 sale takes free and clear from successor liability relating to the debtor's business. See, e.g., In re Trans World Airlines, Inc., 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); In re Leckie Smokeless Coal Co., 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); In re Insilco Techs., Inc., 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); see also, In re General Motors Corp., 407 B.R. 463, 505-06 (Bankr. S.D.N.Y. 2009) (holding that "[T]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); In re Chrysler LLC, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam* claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale Transaction.").

48.    The purpose of an order purporting to authorize the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if

claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising

from a seller's pre-sale conduct. Moreover, without such assurances, the Debtors would run the

risk that potential bidders may not enter the Auction or, if they did, would do so with reduced bid

amounts. To that end, the Successful Bidder should not be liable under any theory of successor

liability relating to the Debtors' businesses, but should hold the Acquired Assets free and clear.

E.    **A Successful Bidder Should Be Entitled To The Protections Of Bankruptcy Code Section 363(m).**

49.    Pursuant to section 363(m) of the Bankruptcy Code, a good faith

purchaser is one who purchases assets for value, in good faith, and without notice of adverse

claims. In re Mark Bell Furniture Warehouse, Inc., 992 F.2d 7, 9 (1st Cir. 1993); In re

Willemain v. Kivitz, 764 F.2d 1019, 1023 (4th Cir. 1985); In re Congoleum Corp., Case No. 03-

51524, 2007 WL 1428477, *2 (Bankr. D. N.J. May 11, 2007); Abbotts Dairies of Penn., 788

F.2d at 147.

50.    The Asset Purchase Agreement was negotiated at arm's-length, with both

parties represented by their own counsel. Accordingly, the Debtors request that the Sale Order

include a provision that the Successful Bidder for the Acquired Assets, is a "good faith"

purchaser within the meaning of section 363(m) of the Bankruptcy Code. The Debtors believe

that providing the Successful Bidder with such protection will ensure that the maximum price

will be received by the Debtors for the Acquired Assets and closing of the same will occur

promptly.

F.    **Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized.**

51.    Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a

debtor in possession "subject to the court's approval, may assume or reject any executory

contract or [unexpired] lease of the debtor." 11 U.S.C. § 365(a). The standard governing

bankruptcy court approval of a debtor's decision to assume or reject an executory contract or unexpired lease is whether the debtor's reasonable business judgment supports assumption or rejection. See, e.g., In re HQ Global Holdings, Inc., 290 B.R. 507, 511 (Bankr. D. Del. 2003) (debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned if decision was product of bad faith, whim, or caprice); see also In re Market Square Inn, Inc., 978 F.2d 116, 121 (3d Cir. 1992) (assumption or rejection of lease "will be a matter of business judgment by the bankruptcy court"); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F.2d 36, 39-40 (3d Cir. 1989) (same). If the debtor's business judgment has been reasonably exercised, a court should approve the assumption or rejection of an unexpired lease or executory contract. See Group of Institutional Investors v. Chicago M. St. P. & P.R.R. Co., 318 U.S. 523 (1943); Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp., 872 F. 2d 36, 39-40 (3d Cir. 1989). The business judgment test "requires only that the trustee [or debtor in possession] demonstrate that [assumption or] rejection of the contract will benefit the estate." Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.), 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987) (quoting In re Stable Mews Assoc., 41 B.R. 594, 596 (Bankr. S.D.N.Y 1984)). Any more exacting scrutiny would slow the administration of a debtor's estate and increase costs, interfere with the Bankruptcy Code's provision for private control of administration of the estate, and threaten the court's ability to control a case impartially. See Richmond Leasing Co. v. Capital Bank, NA., 762 F.2d 1303, 1311 (5th Cir. 1985). Moreover, pursuant to section 365(b)(1) of the Bankruptcy Code, for a debtor to assume an executory contract, it must "cure, or provide adequate assurance that the debtor will promptly cure," any default, including compensation for any "actual pecuniary loss" relating to such default. 11 U.S.C. § 365(b)(1).

52.    Once an executory contract is assumed, the trustee or debtor in possession may elect to assign such contract. See In re Rickel Home Center, Inc., 209 F.3d 291, 299 (3d Cir. 2000) ("[t]he Code generally favors free assignability as a means to maximize the value of the debtor's estate"); see also In re Headquarters Dodge, Inc., 13 F.3d 674, 682 (3d Cir. 1994) (noting purpose of section 365(f) is to assist trustee in realizing the full value of the debtor's assets).

53.    Section 365(f) of the Bankruptcy Code provides that the "trustee may assign an executory contract . . . only if the trustee assumes such contract . . . and adequate assurance of future performance is provided." 11 U.S.C. § 365(f)(2). The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given a "practical, pragmatic construction." In re DBSI, Inc., 405 B.R. 698, 708 (Bankr. D. Del. 2009); EBG Midtown S. Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); see also In re Decora Indus., 2002 U.S. Dist. LEXIS 27031, at *23 (D. Del. 2002) ("adequate assurance falls short of an absolute guaranty of payment"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

54.    Adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business to give it strong likelihood of succeeding).

55.    To facilitate and effect the Sale Transaction, the Debtors request approval under Bankruptcy Code section 365 of the Debtors' assumption and assignment of the Assigned

Contracts to the Stalking Horse Purchaser or another Successful Bidder. The Debtors further request that the Sale Order provide that the Assigned Contracts will be transferred to, and remain in full force and effect for the benefit of, the Stalking Horse Purchaser or another Successful Bidder notwithstanding any provisions in the Assigned Contracts, including those described in Bankruptcy Code sections 365(b)(2) and (f)(1) and (3) that prohibit such assignment.

56.    The Stalking Horse Purchaser will have the financial resources required to complete the Sale Transaction, including the assumption of the Assigned Contracts at the closing of the Asset Purchase Agreement. The Stalking Horse Purchaser is an entity formed by the Steering Committee for the purposes of entering into the Asset Purchase Agreement. Moreover, the Debtors contemplate that the Successful Bidder, if someone other than the Stalking Horse Purchaser, will be able to provide adequate assurance of future performance in connection with any assigned executory contracts and leases because such Successful Bidder must submit evidence sufficient to demonstrate its financial wherewithal and ability to consummate the Sale Transaction. Furthermore, to the extent that any defaults exist under any executory contract or unexpired lease that is to be assumed and assigned in connection with the sale of the Acquired Assets, the Successful Bidder will cure any such default prior to such assumption and assignment.

57.    The Debtors will present facts at the Sale Hearing to show the financial credibility, willingness, and ability of the Stalking Horse Purchaser or another Successful Bidder to perform under the Assigned Contracts. The Sale Hearing thus will afford the Court and other interested parties the opportunity to evaluate the ability of the Stalking Horse Purchaser or another Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts, as required under Bankruptcy Code section 365(b)(1)(C). Further, as set

forth above, the Debtors will give notice to all parties to the Assigned Contracts or the Previously Omitted Contracts of their intention to assume the Assigned Contracts or the Previously Omitted Contracts, as the case may be, and what the Debtors believe are the Cure Amounts.

58.     Accordingly, the Debtors submit that implementation of the proposed Assumption and Assignment Procedures is appropriate in these cases.  The Court, therefore, should have a sufficient basis to authorize the Debtors to reject or assume and assign contracts as will be set forth in the Successful Bidder's Asset Purchase Agreement.

<b>NOTICE</b>

59.     Notice of this motion shall be given to:  (i) the United States Trustee for the District of Delaware; (ii) counsel to the Steering Committee and the Stalking Horse Purchaser, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. and Scott Alberino, Esq.; (iii) counsel to the agent under the Debtors' postpetition senior secured credit facility, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba, Esq. and Morris Massel Esq.; (iv) the parties included on the Debtors' list of thirty (30) largest unsecured creditors; (v) all entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in or on the Acquired Assets; (vi) all persons who expressed interest in purchasing the Acquired Assets within the last six (6) months; and (vii) all parties entitled to notice pursuant to Local Bankruptcy Rule 9013-1(m).

<b>NO PRIOR REQUEST</b>

60.     No previous request for the relief sought herein has been made to this Court or any other court.

37

**CONCLUSION**

WHEREFORE the Debtors respectfully request entry of an order (i) approving the Bidding Procedures; (ii) approving the Expense Reimbursement; (iii) scheduling the Sale Hearing; (iv) approving the Assumption and Assignment Procedures; (v) approving the form and manner of notice of all procedures, protections, schedules, and agreements; (vi) authorizing the sale of the Acquired Assets to the Stalking Horse Purchaser pursuant to the Asset Purchase Agreement or to the Successful Bidder pursuant to a Modified Asset Purchase Agreement as the Debtors may enter into prior to the Sale Hearing; (vii) authorizing the assumption and assignment of the Assigned Contracts; and (viii) such other and further relief as is just and proper.

Dated: Wilmington, Delaware

December 11, 2012

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

*/s/ Anthony W. Clark*
Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
Matthew N. Kriegel (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

**EXHIBIT A**

**BIDDING PROCEDURES ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                                        :
In re:                                                  :     Chapter 11
                                                        :
LCI HOLDING COMPANY, INC., et al.,                      :     Case No. 12-13319 (___)
                                                        :
              Debtors.[1]                               :     Joint Administration Pending
                                                        :
                                                        :     Re: Docket No. [●]
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**ORDER (I) ESTABLISHING BIDDING PROCEDURES RELATING TO THE SALE OF
SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (II) APPROVING EXPENSE
REIMBURSEMENT; (III) ESTABLISHING PROCEDURES RELATING TO THE
ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS
AND UNEXPIRED LEASES, INCLUDING NOTICE OF PROPOSED CURE AMOUNTS;
(IV) APPROVING FORM AND MANNER OF NOTICE OF ALL PROCEDURES,
PROTECTIONS, SCHEDULES AND AGREEMENTS, (V)
SCHEDULING A HEARING TO CONSIDER THE PROPOSED SALE;
AND (VI) GRANTING CERTAIN RELATED RELIEF**

Upon the motion (the "Motion")[2] of the Debtors for an order (the "Order") (i)

approving the proposed auction and bidding procedures (the "Bidding Procedures"), which are

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Boise
Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012),
LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LifeCare Ambulatory Surgery Center, Inc.
(N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at
Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062),
LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of
Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans,
L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P.
(2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672),
LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare
Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC
(4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc.
(2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver,
Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San
Antonio Specialty Hospital, Ltd. (5386). LCI Holding Company, Inc. (7662) and LCI Intermediate Holdco, Inc.
(7709), whose chapter 11 cases are proposed to be jointly administered with the Debtors' cases, are not movants
with respect to the Motion. The address of the Company's corporate headquarters is 5340 Legacy Drive,
Building 4 – Suite 150, Plano, TX 75024.

[2]    Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the Motion, the
Bidding Procedures or the Asset Purchase Agreement.

attached as <u>Exhibit A</u> hereto, for the potential sale of substantially all of the Debtors' assets (the "<u>Acquired Assets</u>"); (ii) approving an expense reimbursement provision (the "<u>Expense Reimbursement</u>"); (iii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "<u>Assumption and Assignment Procedures</u>"); (iv) approving the form and manner of notice of all procedures, protections, schedules and agreements; and (v) scheduling a hearing (the "<u>Sale Hearing</u>") to approve such sale (the "<u>Sale Transaction</u>"); and the Court having considered the Motion, and the arguments of counsel made, and the evidence adduced, at the hearing on the Motion (the "<u>Bidding Procedures Hearing</u>"); and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and all other interested parties; and upon the record of the Bidding Procedures Hearing and the Chapter 11 Cases, and after due deliberation thereon, and good cause appearing therefore, it is hereby,

## FOUND, CONCLUDED AND DECLARED THAT:[3]

A.    This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b). Venue of these cases and this Motion in this District is proper under 28 U.S.C. §§ 1408 and 1409. The legal predicates for the relief requested in the Motion are Bankruptcy Code sections 105, 363 and 365. Such relief is also warranted pursuant to Bankruptcy Rules 2002, 6004 and 6006, and 9014.

B.    The relief granted herein is in the best interests of the Debtors, their estates and other parties in interest.

---

[3]    The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such.

C.      The Debtors have articulated good and sufficient business reasons for the Court to (i) approve the Bidding Procedures, (ii) approve the Expense Reimbursement, (iii) approve the Assumption and Assignment Procedures, (iv) approve the form and manner of notice of the Motion, the Auction and the Sale Hearing, and (v) set the date of the Auction and the Sale Hearing.

D.      Due, sufficient, and adequate notice of the Bidding Procedures Hearing and the relief requested in the Motion and the relief granted herein has been given in light of the circumstances and the nature of the relief requested, and no other or further notice thereof is required.

E.      The Bidding Procedures, substantially in the form attached hereto, and incorporated herein by reference as if fully set forth in the Order, are fair, reasonable and appropriate, were negotiated in good faith by the Debtors and the Stalking Horse Purchaser, and represent the best method for maximizing the value of the Debtors' estates.

F.      The Expense Reimbursement, to the extent payable under the Asset Purchase Agreement, (i) shall be deemed an actual and necessary cost of preserving the Debtors' estates within the meaning of section 503(b) of the Bankruptcy Code, (ii) is of substantial benefit to the Debtors' estates (iii) is reasonable and appropriate, including in light of the size and nature of the Sale Transaction and the efforts that have been and will be expended by the Stalking Horse Purchaser, (iv) has been negotiated by the parties and their respective advisors at arm's-length and in good faith, and (v) is necessary to ensure that the Stalking Horse Purchaser will continue to pursue the proposed Sale Transaction. The Expense Reimbursement is a material inducement for, and condition of, the Stalking Horse Purchaser's entry into the Asset Purchase Agreement. The Stalking Horse Purchaser is unwilling to commit to purchase the Purchased

3

Assets under the terms of the Asset Purchase Agreement unless the Stalking Horse Purchaser is assured the Expense Reimbursement, if it is not the purchaser of the assets under the Asset Purchase Agreement.

        G.     The Assumption and Assignment Procedures are reasonable and appropriate.

**IT IS THEREFORE, ORDERED, ADJUDGED AND DECREED THAT:**

1.     The Motion is GRANTED, as set forth herein.

2.     Any objections filed in response to the Motion and the relief granted herein, to the extent not resolved as set forth herein or at the Bidding Procedures Hearing, are hereby overruled.

3.     The Bidding Procedures, as attached hereto, are approved. The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

### The Bid Deadline

4.     The following parties must receive a Bid in writing, **on or before February 27, 2013 at 5:00 p.m. (prevailing Eastern Time)** or such earlier date as may be agreed to by the Debtors (the "Bid Deadline"): (1) the Debtors, LifeCare Holdings, Inc., 5340 Legacy Drive, Suite 150, Building 4, Plano, TX 750024, Attn: Erik Pahl, general counsel (erik.pahl@lifecare-hospitals.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, Attn. Ken Ziman, Esq. (ken.ziman@skadden.com) and Felicia Perlman, Esq. (felicia.perlman@skadden.com); (3) financial advisor to the Debtors, Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@rothschild.com) and Stephen

Antinelli (stephen.antinelli@rothschild.com) (4) counsel to the Official Committee of Unsecured

Creditors (if one has been appointed) (the "Committee"); (5) counsel to the Stalking Horse

Purchaser and the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant

Park, NY 10036, Attn: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Scott Alberino, Esq.

(salberino@akingump.com); (6) financial advisor to the Stalking Horse Purchaser, Alvarez &

Marsal; 600 Madison Avenue, 7th Floor, New York, NY 10022 Attn: Vin Batra

(vbatra@alvarezandmarsal.com); and George Varughese (gvarughese@alvarezandmarsal.com);

and (7) counsel to the Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New

York, New York 10017, Attn: Sandeep Qusba, Esq. (squsba@stblaw.com) and Morris Massel,

Esq. (mmassel@stblaw.com).

### Notice of the Sale Transaction and the Sale Hearing

     5.     Within five (5) days after the entry of the Bidding Procedures Order, or as

soon thereafter as practicable (the "Mailing Date"), the Debtors (or their agents) shall serve the

Motion, the Asset Purchase Agreement, the Bidding Procedures Order, and the Bidding

Procedures by first-class mail, postage prepaid, upon (a) all entities known to have expressed an

interest in a transaction with respect to all or part of the Acquired Assets at any time; (b) all

entities known to have asserted any lien, claim, interest or encumbrance in or upon any of the

Acquired Assets; (c) all federal, state and local regulatory or taxing authorities or recording

offices which have a reasonably known interest in the relief requested by this Motion; (d) the

United States Attorney's office; (e) the Securities and Exchange Commission; (f) the Internal

Revenue Service; (g) the Debtors' thirty (30) largest unsecured creditors, or the Committee, if

any; (h) counsel to the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant

Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. and Scott Alberino, Esq.; and (i) counsel

to the agent under the Debtors' prepetition and postpetition senior secured credit facility,

Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep

Qusba, Esq. and Morris Massel, Esq.

6.    On the Mailing Date or as soon thereafter as practicable, the Debtors (or

their agents) shall serve by first-class mail, postage prepaid the Sale Notice upon all other known

creditors of the Debtors.

7.    The Debtors shall publish notice of the proposed Sale Transaction in *The

Wall Street Journal* and such local newspapers as the Debtors deem appropriate on the Mailing

Date or as soon as practicable thereafter.  Such publication notice shall be sufficient and proper

notice of the Sale Transaction to any other interested parties whose identities are unknown to the

Debtors.

8.    The Sale Hearing to approve the sale of the Acquired Assets to the

Successful Bidder shall be held on [●] at [●].m. **(Prevailing Eastern Time).**

9.    Objections, if any, to the sale of the Acquired Assets must be filed and

served on counsel for the Debtors by [●], **2013 at 4:00 p.m. (Prevailing Eastern Time).**

## The Auction

10.    The Auction shall take place on **March 5, 2013 at 10:00 a.m. (prevailing**

**Eastern Time)** at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom

LLP, 4 Times Square, New York, NY 10036, or such other place and time as the Debtors shall

notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the Agent and the

Committee.

11.    Only the Debtors, the Consultation Parties, and any other Qualified

Bidder, in each case, along with their representatives and counsel, shall attend the Auction (such

6

attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified

Bidders will be entitled to make any Bids at the Auction. The Debtors and their professionals

shall direct and preside over the Auction and the Auction shall be transcribed. Each Qualified

Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with

respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands

and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the

Bankruptcy Court.

### Assumption and Assignment Procedures

12.    On or before [●], the Debtors shall file with the Court and serve on each

party to an Assigned Contract a Cure Notice that shall (i) state the cure amounts that the Debtors

believe are necessary to assume such Assigned Contracts pursuant to section 365 of the

Bankruptcy Code (the "Cure Amount"); (ii) notify the non-debtor party that such party's contract

or lease may be assumed and assigned to a purchase of the Acquired Assets at the conclusion of

the Auction; (iii) state the date of the Sale Hearing; and (iv) state a deadline by which the non-

debtor party shall file an objection to the Cure Amount or to the assumption and assignment of

the Assigned Contracts.

13.    Any objection to the Cure Amount or to assumption and assignment must

be filed with the Court and served on the Debtors' counsel (Skadden, Arps, Slate, Meagher &

Flom LLP, 155 N. Wacker Dr., Chicago, IL 60606, Attn: Felicia Gerber Perlman and Matthew

N. Kriegel), and the Stalking Horse Purchaser's counsel (Akin Gump Strauss Hauer & Feld LLP,

One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. and Scott Alberino, Esq.), **so**

**as to be received on or before [●], 2013 at 4:00 p.m. (Prevailing Eastern Time).** Any such

objection must also (i) state the basis for such objection and (ii) state with specificity what cure

7

amount the party to the Assigned Contract believes is required (in all cases with appropriate

documentation in support thereof). If no objection is timely received, the Cure Amount set forth

in the Cure Notice shall be controlling notwithstanding anything to the contrary in any Assigned

Contract or other document as of the date of the Cure Notice. The Cure Notice shall also provide

that objections to any Cure Amount or to assumption and assignment will be heard at the Sale

Hearing or at a later hearing, as determined by the Debtors. If a Successful Bidder that is not the

Stalking Horse Purchaser prevails at the Auction, then the deadline to object to assumption and

assignment shall be extended to the date of the Sale Hearing; provided, however, that the

deadline to object to the Cure Amount shall not be extended.

        14.    If the Debtors discover that a contract was omitted from Schedule 2.5 of

the Asset Purchase Agreement (the "Previously Omitted Contract"), then the Debtors will notify

the Successful Bidder within two Business Days (as defined in the Asset Purchase Agreement) of

the omission. If the Successful Bidder wishes to assume a Previously Omitted Contract, then the

Debtors shall serve a notice (the "Previously Omitted Contract Notice") to the counterparties to

the Previously Omitted Contract indicating the Debtors' intent to assume and assign the

Previously Omitted Contract. The counterparties will have fifteen (15) Business Days to object

to the Cure Amount or the assumption. If the parties cannot agree on a resolution, the Debtors

will seek an expedited hearing before the Court to determine the Cure Amount and approve the

assumption. If there is no objection, then the Debtors will obtain an order of this Court fixing the

Cure Amount and approving the assumption of the Previously Omitted Contract.

## The Asset Purchase Agreement

15.     Any obligations of the Debtors set forth in the Asset Purchase Agreement that are intended to be performed prior to the Sale Hearing and/or entry of the Sale Order are authorized as set forth herein.

16.     The Expense Reimbursement is hereby approved, subject to the terms of the Asset Purchase Agreement.

17.     Upon entry of this Order, the Expense Reimbursement (if earned pursuant to the Asset Purchase Agreement and this Order), until paid, shall constitute a super priority administrative expense of the Debtors under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

## Related Relief

18.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

19.     Notwithstanding anything to the contrary in the Asset Purchase Agreement, the Bidding Procedures or this Order, the Prepetition Lenders and the Agent (each as defined in the Bidding Procedures) reserve their rights to, and shall be permitted to, consult with, negotiate with, participate in, or enter into agreements with any Preliminary Interested Investor (as defined in the Bidding Procedures) with respect to a Bid.  For the avoidance of doubt, the foregoing shall include the right for the Prepetition Lenders, the Agent or their affiliates or designees to offer or provide debt or equity financing arrangements in connection with any Bid (or to receive any fees in connection therewith), notwithstanding such Prepetition Lender or

Agent's relationship with the Stalking Horse Purchaser, and to take any actions in furtherance of any of the foregoing or any matters incidental thereto.

20.     Notwithstanding the possible applicability of Bankruptcy Rules 6004(h), 6006(d), or otherwise, the terms and conditions of this Order shall be immediately effective and enforceable upon its entry.

21.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Order.

Dated:  Wilmington, Delaware
        [●], 2013


_____

Honorable [●]
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT B**

**BIDDING PROCEDURES**

## BIDDING PROCEDURES[1]

By the Motion dated as of the Petition Date, LCI Holding Company, Inc. and its direct and indirect subsidiaries that are debtors and debtors in possession (collectively, the "Debtors"),[2] sought approval of, among other things, the procedures through which they will determine the highest or otherwise best offer for the sale of substantially all of their assets (the "Acquired Assets") described in the Asset Purchase Agreement by and between Hospital Acquisition LLC, as proposed purchaser (the "Stalking Horse Purchaser"), and the Debtors, as sellers, dated as of December [__], 2012 (the "Asset Purchase Agreement"), a copy of which is attached as Exhibit D to the Motion.

[On [_____], 2013 the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to determine the highest or otherwise best offer for the Acquired Assets through the process and procedures set forth below (the "Bidding Procedures"). [The Bidding Procedures provide that the Debtors may also consider competing bids in the form of a non-taxable recapitalization transaction effectuated through a chapter 11 plan of reorganization, subject to the requirements set forth herein (a "Chapter 11 Plan Bid").]

## Key Dates For Potential Competing Bidders

These Bidding Procedures provide interested parties with the opportunity to qualify and participate in an auction, to be conducted by the Debtors (the "Auction"), and submit competing bids for the Acquired Assets. The Debtors shall assist Preliminary Interested Investors (as defined below) in conducting their respective due diligence investigations and shall accept Bids (as defined below) until **February 27, 2013 at 5:00 p.m. (prevailing Eastern Time)**.

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the motion for approval of, among other things, these Bidding Procedures (the "Motion") or in the Asset Purchase Agreement, as applicable.

[2] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: LCI Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty Hospital, Ltd. (5386). The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 – Suite 150, Plano, TX 75024.

The key dates for the sale process are as follows:

| | |
|---|---|
| February 27, 2013 at 5:00 P.M. EDT | Bid Deadline - Due Date for Bids and Deposits |
| March 5, 2013 at 10:00 A.M. EDT | Auction |
| March 12, 2013 at 10:00 A.M. EDT | Sale Hearing |

### *Access to Diligence Materials.*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors (i) an executed confidentiality agreement in the form and substance satisfactory to the Debtors and (ii) evidence demonstrating the party's financial capability to consummate a sale transaction for the Acquired Assets or a non-taxable recapitalization transaction pursuant to a chapter 11 plan of reorganization (any such transaction, an "Alternate Transaction") as determined by the Debtors.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor." The Debtors will afford any Preliminary Interested Investor the time and opportunity to conduct reasonable due diligence; provided, however, that the Debtors shall not be obligated to furnish any due diligence information after the Bid Deadline (as defined below). The Debtors reserve the right to withhold any Diligence Materials that the Debtors, in consultation with the agent under the Debtors' postpetition senior secured credit facility and agent under the Credit Agreement[3] (the "Agent") and the unaffiliated group of lenders under the Credit Agreement (the "Steering Committee") to the extent practicable, determine are business-sensitive or otherwise not appropriate for disclosure to a Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Debtors nor their representatives shall be obligated to furnish information of any kind whatsoever to any person that is not determined to be a Preliminary Interested Investor.

All due diligence requests must be directed to Rothschild Inc.

### *Due Diligence from Bidders.*

Each Preliminary Interested Investor and Qualified Bidder (as defined below) shall comply with all reasonable requests for additional information and due diligence access by the Debtors or their advisors regarding such Bidder and its contemplated transaction. Failure by a Preliminary Interested Investor to comply with requests for additional information and due

---

[3]    "Credit Agreement" means that certain credit agreement, as amended or modified from time to time, dated as of February 1, 2011, among LifeCare Holdings, Inc., as the Borrower, LCI Holdco, LLC, various financial institutions as Lenders and JPMorgan Chase Bank, N.A., as the Administrative Agent and Collateral Agent.

diligence access will be a basis for the Debtors to determine that such bidder is not a Qualified Bidder. Failure by a Qualified Bidder (other than the Stalking Horse Purchaser) to comply with requests for additional information and due diligence access will be a basis for the Debtors to determine that a bid made by such Qualified Bidder is not a Qualified Bid.

## Auction Qualification Process

To be eligible to participate in the Auction, each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the conditions set forth below. A Bid will not be considered qualified for the Auction if such Bid does not satisfy each of the following conditions:

(a)    Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of five percent (5%) of the purchase price contained in the Modified Asset Purchase Agreement (as defined below) or, in the case of a Chapter 11 Plan Bid, five percent (5%) of the amount of the cash payments contemplated by such bid, to an interest-bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit"). The Stalking Horse Purchaser shall not be required to submit a Good Faith Deposit.

(b)    Same or Better Terms:  Each Bid must be on terms that, in the Debtors' business judgment, are the same or better than the terms of the Asset Purchase Agreement and shall satisfy the "Minimum Bid" requirements set forth in clause (d) below.

(c)    Executed Agreement:  Each Bid (other than a Chapter 11 Plan Bid) must be based on the Asset Purchase Agreement and must include executed transaction documents, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Modified Asset Purchase Agreement"). A Bid (other than a Chapter 11 Plan Bid) shall also include a copy of the Asset Purchase Agreement marked against the Modified Asset Purchase Agreement to show all changes requested by the Bidder (including those related to purchase price and to remove all provisions that apply only to the Stalking Horse Purchaser such as the Expense Reimbursement provisions contained in the Asset Purchase Agreement).

A Chapter 11 Plan Bid must be accompanied by an executed investment agreement, signed by an authorized representative of such Bidder, pursuant to which the Bidder proposes to effectuate an Alternate Transaction (the "Investment Agreement"). Such Investment Agreement must provide for an investment of capital in accordance with these Bidding Procedures in exchange for substantially all of the equity of the reorganized Debtors in a non-taxable recapitalization transaction effectuated pursuant to a chapter 11 plan of reorganization.

(d)    Minimum Bid:  A Bid (other than a Chapter 11 Plan Bid) for all or substantially all of the Debtors' assets must propose a minimum purchase price equal to or greater than what is likely to result in a value to the Debtors' estate in the Debtors' reasonable judgment, equal to:

3

(1)    the Cash Consideration (as defined in the Asset Purchase Agreement); ***plus***

(2)    cash in an amount equal to the credit bid amount provided by the Stalking Horse Purchaser; ***plus***

(3)    the Expense Reimbursement in cash; ***plus***

(4)    $3,000,000 in cash (the "Initial Overbid").

A Chapter 11 Plan Bid must provide for payment in cash in an amount not less than the sum of:

(5)    the Cash Consideration; ***plus***

(6)    cash in the amount equal to the principal amount outstanding under the Credit Agreement plus accrued and unpaid interest as of the Closing Date; ***plus***

(7)    the Expense Reimbursement in cash; ***plus***

(8)    the Initial Overbid.

(e)    <u>Designation of Assigned Contracts and Leases</u>:  A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and, with respect to any Bid that is not a Chapter 11 Plan Bid, assigned to it at closing, pursuant to an Alternate Transaction.

(f)    <u>Assumption of Liabilities</u>:  A Bid must provide for the payment or assumption of at least all or substantially all of the Assumed Liabilities (as defined in the Asset Purchase Agreement).

(g)    <u>Corporate Authority</u>:  A Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Alternate Transaction; *provided* that, if the Bidder is an entity specially formed for the purpose of effectuating the Alternate Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Alternate Transaction by the equity holder(s) of such Bidder.

(h)    <u>Disclosure of Identity of Bidder</u>:  A Bid must fully disclose the identity of each entity that will be bidding for or purchasing the Acquired Assets or otherwise participating in connection with such Bid, and the complete terms of any such participation, including any agreements, arrangements or understandings concerning a collaborative or joint bid or any other combination concerning the proposed Bid;

(i)    <u>Proof of Financial Ability to Perform</u>:  A Bid must include written evidence that the Debtors conclude, in consultation with their advisors and the Consultation

4

Parties, demonstrates that the Bidder has the necessary financial ability to close the Alternate Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Alternate Transaction. Such information must include, *inter alia*, the following:

    (1)    contact names and numbers for verification of financing sources;

    (2)    evidence of the Bidder's internal resources and proof of unconditional debt funding commitments from a recognized banking institution and, if applicable, equity commitments in an aggregate amount equal to the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Alternate Transaction;

    (3)    the Bidder's current financial statements (audited if they exist) or other similar financial information reasonably acceptable to the Debtors;

    (4)    a description of the Bidder's pro forma capital structure; and

    (5)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors, in consultation with the Consultation Parties, demonstrating that such Bidder has the ability to close the Alternate Transaction.

(j)    <u>Regulatory and Third Party Approvals</u>:  A Bid must set forth each regulatory and third-party approval required for the Bidder to consummate the Alternate Transaction, and the time period within which the Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the Modified Asset Purchase Agreement or Investment Agreement, those actions the Bidder will take to ensure receipt of such approval(s) as promptly as possible);

(k)    <u>Contingencies</u>:  Each Bid (1) may not contain representations and warranties, covenants, or termination rights materially more onerous in the aggregate to the Debtors than those set forth in the Asset Purchase Agreement and (2) may not be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence.

(l)    <u>Irrevocable</u>:  Each Bid must be irrevocable through the Auction, *provided* that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of the Bidding Procedures.

(m)    <u>Bid Deadline</u>:  The following parties must receive a Bid in writing, on or before February 27, 2013 at 5:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by the Debtors (the "<u>Bid Deadline</u>"):  (1) the Debtors, LifeCare

5

Holdings, Inc., 5340 Legacy Drive, Suite 150, Building 4, Plano, TX 750024, Attn: Erik Pahl, general counsel (erik.pahl@lifecare-hospitals.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, Attn. Ken Ziman, Esq. (ken.ziman@skadden.com) and Felicia Perlman, Esq. (felicia.perlman@skadden.com); (3) financial advisor to the Debtors, Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@rothschild.com) and Stephen Antinelli (stephen.antinelli@rothschild.com); (4) counsel to the Official Committee of Unsecured Creditors (if one has been appointed) (the "Committee"); (5) counsel to the Stalking Horse Purchaser and the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, NY 10036, Attn: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Scott Alberino, Esq. (salberino@akingump.com); (6) financial advisor to the Stalking Horse Purchaser, Alvarez & Marsal; 600 Madison Ave, 7th Floor, New York, NY 10022 Attn: Vin Batra (vbatra@alvarezandmarsal.com); and George Varughese (gvarughese@alvarezandmarsal.com); and (7) counsel to the Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, New York 10017, Attn: Sandeep Qusba, Esq. (squsba@stblaw.com) and Morris Massel, Esq. (mmassel@stblaw.com).

A Bid received from a Bidder before the Bid Deadline that meets the above requirements for the applicable assets shall constitute a "Qualified Bid" for such assets, and such Bidder shall constitute a "Qualified Bidder" for such assets. Notwithstanding anything herein to the contrary, the Asset Purchase Agreement submitted by the Stalking Horse Purchaser shall be deemed a Qualified Bid, and the Stalking Horse Purchaser a Qualified Bidder. In addition, the Stalking Horse Purchaser will receive, from each Bidder, a copy of any Bids at the time such Bid is submitted to the Debtors. The Debtors shall inform counsel to the Stalking Horse Purchaser whether the Debtors will consider such Bids to be Qualified Bids no later than two (2) business days before the Auction.

## Auction

If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Stalking Horse Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest or best Qualified Bid. This determination shall take into account any factors the Debtors, in consultation with the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid to the estates and may include, but are not limited to, the following: (a) the amount and nature of the consideration, including any assumed liabilities; (b) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Debtors' assets and the cost to the Debtors of such modifications or delay; (d) the total consideration to be received by the Debtors; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; and (f) the net benefit to the Debtors' estates, taking into account the Stalking Horse Purchaser's right to the Expense Reimbursement (collectively, the "Bid Assessment Criteria"). If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors shall not conduct the Auction. Unless otherwise agreed to by the Stalking Horse Purchaser in its sole discretion, only Qualified Bidders may

participate in the Auction.

## Procedures for Auction

The Auction shall take place on March 5, 2013 at 10:00 a.m. (prevailing Eastern Time) at the offices of counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, or such other place and time as the Debtors shall notify all Qualified Bidders, the Stalking Horse Purchaser and its counsel, the Agent and the Committee. The Auction shall be conducted according to the following procedures:

Only the Debtors, the Consultation Parties, and any other Qualified Bidder, in each case, along with their representatives and counsel, shall attend the Auction (such attendance to be in person) and only the Stalking Horse Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction. The Stalking Horse Purchaser (as a representative of the lenders under the Credit Agreement (collectively, the "Prepetition Lenders") reserves the right to make any Bid comprised of cash and/or any credit bid (pursuant to section 363(k) of the Bankruptcy Code or other applicable law) at the Auction; *provided* that the cash component of any subsequent Bid by the Stalking Horse Purchaser may not be less than the Cash Consideration (as defined in the Asset Purchase Agreement). For the avoidance of doubt, at any time, and from time to time, during the Auction, the Stalking Horse Purchaser may increase its Bid, including by increasing the amount of the Credit Bid to the full amount then outstanding and owing under the Credit Agreement.

### The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction and the Auction shall be transcribed. Other than as expressly set forth herein, the Debtors (in consultation with the Consultation Parties) may conduct the Auction in the manner they determine will result in the highest, best, or otherwise superior offer for any of the Debtors' assets. The Debtors shall use their best efforts to provide each Qualified Bidder participating in the Auction with a copy of the Modified Asset Purchase Agreement associated with the highest or best Qualified Bid, as determined by the Debtors in consultation with the Consultation Parties, received before the Bid Deadline, (such highest or best Qualified Bid the "Auction Baseline Bid"). In addition, at the start of the Auction, the Debtors shall describe the terms of the Auction Baseline Bid. Each Qualified Bidder participating in the Auction must confirm that it (a) has not engaged in any collusion with respect to the bidding or sale of any of the assets described herein, (b) has reviewed, understands and accepts the Bidding Procedures and (c) has consented to the core jurisdiction of the Bankruptcy Court (as described more fully below).

### Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the respective Auction Baseline Bid. To submit an Overbid for purposes of this Auction, a Bidder must comply with the following conditions:

(a)  Minimum Overbid Increments:  Any Overbid after and above the respective Auction Baseline Bid shall be made in increments valued at not less than $1,000,000. The Debtors reserve the right, in consultation with the Consultation

7

Parties, to announce reductions or increases in the minimum incremental bids (or in valuing such bids) at any time during the Auction. Additional consideration in excess of the amount set forth in the respective Auction Baseline Bid may include (i) cash and/or noncash consideration, *provided, however*, that the value for such non-cash consideration shall be determined by the Debtors with the consent of the Agent and the Steering Committee and (ii) in the case of a Bid by the Stalking Horse Purchaser, a credit bid of up to the full amount then outstanding and owing under the Credit Agreement and the Expense Reimbursement.

(b)    Stalking Horse Purchaser May Credit Bid Expense Reimbursement: The Stalking Horse Purchaser shall be permitted to credit bid the full amount of the Expense Reimbursement pursuant to any Overbid in connection with each round of bidding in the Auction.

(c)    Remaining Terms Are the Same as for Qualified Bids: Except as modified herein, an Overbid at the Auction must comply with the conditions for a Qualified Bid set forth above, *provided, however*, that the Bid Deadline shall not apply. Any Overbid must include, in addition to the amount and the form of consideration of the Overbid, a description of all changes requested by the Bidder to the Asset Purchase Agreement, Modified Asset Purchase Agreement or Investment Agreement, as the case may be, in connection therewith. Any Overbid must remain open and binding on the Bidder.

At the Debtors' discretion, to the extent not previously provided (which shall be determined by the Debtors in consultation with the Consultation Parties), a Bidder submitting an Overbid at the Auction must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Alternate Transaction proposed by such Overbid.

*Announcement and Consideration of Overbids.*

(a)    Announcement of Overbids:  The Debtors shall announce at the Auction the material terms of each Overbid, the total amount of consideration offered in each such Overbid, and the basis for calculating such total consideration.

(b)    Consideration of Overbids:  Subject to the deadlines set forth herein, the Debtors reserve the right, in their reasonable business judgment in consultation with the Consultation Parties, to make one or more continuances of the Auction to, among other things:  facilitate discussions between the Debtors and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Alternate Transaction at the prevailing Overbid amount.

***Backup Bidder.***

Notwithstanding anything in the Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next highest or otherwise best Bid at the Auction, as determined by the Debtors, in the exercise of their business judgment and in consultation with the Consultation Parties, will be designated as the backup bidder (collectively, the "Backup Bidder"). The Backup Bidder shall be required to keep its initial Bid (or if the Backup Bidder submitted one or more Overbids at the Auction, the final respective Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is eighty (80) days after the date of entry of the Sale Order, which date will be extended for an additional sixty (60) days if the only condition to Closing that remains outstanding on the 80th day after entry of the Sale Order is satisfaction of regulatory approvals required under the applicable Purchase Agreement (the "Outside Backup Date") or the closing of the transaction with the Successful Bidder (defined herein).

Following the Sale Hearing, if the Successful Bidder (as defined below) fails to consummate an approved transaction, the Debtors may designate the Backup Bidder to be the new Successful Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court. In such case of a breach or failure to perform on the part of such Successful Bidder, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. The Debtors specifically reserve the right to seek all available damages, including specific performance, from any defaulting Successful Bidder (including any Backup Bidder designated as a Successful Bidder) in accordance with the terms of the Bidding Procedures.

***Additional Procedures.***

The Debtors (after consulting with the Consultation Parties) may announce at the Auction additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

***Consent to Jurisdiction as Condition to Bidding.***

The Stalking Horse Purchaser (in its capacity as a Bidder), and all Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court to enter an order or orders, which shall be binding in all respects, in any way related to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of documents relating to any Alternate Transaction and waived any right to a jury trial in connection with any disputes relating to the Debtors, these Chapter 11 Cases, the Bidding Procedures, the Asset Purchase Agreement, the Auction, or the construction and enforcement of documents relating to any Alternate Transaction.

***Sale Is As Is/Where Is.***

The Acquired Assets or any other assets of the Debtors sold pursuant to the Bidding Procedures, shall be conveyed at Closing in their then-present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR**

IMPLIED."

*Closing the Auction.*

The Auction shall continue until there is only one Qualified Bid for the Acquired Assets that the Debtors determine in their reasonable business judgment, after consultation with the Consultation Parties, is the highest or best Qualified Bid at the Auction. Thereafter, the Debtors shall select such Qualified Bid, in consultation with the Consultation Parties, which produces the highest or best recovery to the estates, as the overall highest or best Qualified Bid (such Bid, the "Successful Bid," and the Bidder submitting such Successful Bid, the "Successful Bidder"). In making this decision, the Debtors shall consider the Bid Assessment Criteria.

The Auction shall close when the Successful Bidder submits fully executed sale and transaction documents or a fully executed Investment Agreement memorializing the terms of the Successful Bid.

Promptly following the Debtors' selection of the Successful Bid and the conclusion of the Auction, the Debtors shall announce the Successful Bid and Successful Bidder and shall file with the Bankruptcy Court notice of the Successful Bid and Successful Bidder.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

## Expense Reimbursement

Pursuant to the Bidding Procedures Order, the Stalking Horse Purchaser is entitled to the Expense Reimbursement, in an amount of up to $1,000,000, in accordance with the terms of the Asset Purchase Agreement and the Bidding Procedures Order.

Pursuant to the Bidding Procedures Order, except for the Stalking Horse Purchaser, no other party submitting an offer or Bid or a Qualified Bid shall be entitled to any expense reimbursement, breakup fee, termination or similar fee or payment.

## Return of Good Faith Deposits

The Good Faith Deposits of all Qualified Bidders shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Bankruptcy Court. The Good Faith Deposit of any Qualified Bidder that is neither the Successful Bidder nor the Backup Bidder shall be returned to such Qualified Bidder not later than five (5) business days after the Sale Hearing. The Good Faith Deposit of the Backup Bidder, if any, shall be returned to the Backup Bidder on the date that is the earlier of 72 hours after (a) the closing of the transaction with the Successful Bidder (defined herein) for the assets bid upon by the Backup Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, their respective owners shall receive any and all interest that will have accrued thereon. If the Successful Bidder timely closes the winning transaction, its Good Faith Deposit shall be credited towards the purchase prices.

10

### The Consultation Parties

The Debtors shall consult with the Agent, the Steering Committee, the Committee and their respective advisors (collectively, the "Consultation Parties" and each, a "Consultation Party") as explicitly provided for in these Bidding Procedures; provided, however, that the Debtors shall not be required to consult with any Consultation Party (and its advisors) that submits a Bid or has a Bid submitted on its behalf for so long as such Bid remains open, including any credit bid if the Debtors determine, in their reasonable business judgment, that consulting with such Consultation Party regarding any issue, selection or determination would be likely to have a chilling effect on potential bidding or otherwise be contrary to goal of maximizing value for the Debtors' estates from the sale process.

### Reservation of Rights of the Debtors

Except as otherwise provided in the Asset Purchase Agreement, these Bidding Procedures or the Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interest of their estates, in consultation with the Consultation Parties to: (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest or best proposal and which is the next highest or best proposal; (d) reject any Bid that is (1) inadequate or insufficient, (2) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (3) contrary to the best interests of the Debtors and their estates; (e) waive terms and conditions set forth herein with respect to all potential bidders; (f) impose additional terms and conditions with respect to all potential bidders; (g) extend the deadlines set forth herein; (h) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (i) modify the Bidding Procedures and implement additional procedural rules that are reasonable under the circumstances for conducting the Auction so long as such rules are not inconsistent in any material respect with the Bidding Procedures or the Asset Purchase Agreement.

### Reservation of Rights of Prepetition Lenders

Notwithstanding anything to the contrary in the Asset Purchase Agreement, these Bidding Procedures or the Bidding Procedures Order, the Prepetition Lenders and the Agent reserve their rights to, and shall be permitted to, consult with, negotiate with, participate in, or enter into agreements with any Preliminary Interested Investor with respect to a Bid. For the avoidance of doubt, the foregoing shall include the right for the Prepetition Lenders, the Agent or their affiliates or designees to offer or provide debt or equity financing arrangements in connection with any Bid (or to receive any fees in connection therewith), notwithstanding such Lender or Agent's relationship with the Stalking Horse Purchaser, and to take any actions in furtherance of any of the foregoing or any matters incidental thereto.

11

**EXHIBIT C**

**SALE ORDER**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------

|  |  |
|---|---|
| In re: | ) |
|  | ) Chapter 11 |
| LCI HOLDING COMPANY, INC., et al., | ) |
|  | ) Case No. 12-13319 (___) |
| Debtors.[1] | ) |
|  | ) Joint Administration Pending |
|  | ) |

---------------------------------------------------------

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE
DEBTORS ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES
AND INTERESTS; (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT
OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND
(III) GRANTING CERTAIN RELATED RELIEF**

Upon consideration of the motion (the "Motion")[2] dated December 11, 2012 of

the above-captioned debtors and debtors-in-possession (the "Debtors") for, among other things,

entry of an order (the "Order") (i) approving the sale of substantially all of the Debtors' assets

(the "Sale Transaction") free and clear of all liens, claims, encumbrances and interests (the

---

[1] The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty Hospital, Ltd. (5386). LCI Holding Company, Inc. (7662) and LCI Intermediate Holdco, Inc. (7709), whose chapter 11 cases are proposed to be jointly administered with the Debtors' cases, were not movants with respect to the Motion. The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 – Suite 150, Plano, TX 75024.

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Motion or the Asset Purchase Agreement (as defined herein), as applicable.

"Encumbrances"), except to the extent set forth in the Asset Purchase Agreement (the "Asset Purchase Agreement") pursuant to sections 105, 363 and 365 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"), and Rules 2002, 6004 and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); (ii) authorizing the assumption and assignment of certain executory contracts and unexpired leases (the "Assigned Contracts") identified by the Debtors and more fully described in the Asset Purchase Agreement dated as of December 10, 2012 (attached hereto as Exhibit A) by and between the Debtors[3] and Hospital Acquisition LLC (the "Purchaser") for the purchase of the Acquired Assets[4] and the assumption of the Assumed Liabilities (as defined in the Asset Purchase Agreement); and (iii) granting certain related relief; and the Court having held a hearing on [●] (the "Sale Hearing") to approve the Sale Transaction; and the Court having reviewed and considered (a) the Motion, (b) the Augustine Declaration, (c) the objections to the Motion, if any, and (d) the arguments of counsel made, and the evidence proffered or adduced at the Sale Hearing; and it appearing that the relief requested in the Motion is in the best interests of the Debtors, their estates and creditors and other parties in interest; and upon the record of the Sale Hearing and the Chapter 11 Cases; and after due deliberation thereon; and good cause appearing therefore, it is hereby

---

[3]   Specifically, the Asset Purchase Agreement is between Hospital Acquisition LLC, and the following Debtor entities: (i) LCI Holdco, LLC, (ii) LifeCare Holdings, Inc., and (iii) the Additional Sellers. Debtors, LCI Holding Company, Inc., LCI Intermediate Holdco, Inc., LCI Healthcare Holdings, Inc., and Boise Intensive Care Hospital, Inc. are not parties to the Asset Purchase Agreement.

[4]   The "Acquired Assets" consist of substantially all of the assets of the Debtors. Acquired Assets do not include the Excluded Assets as referenced in section 2.2 of the Asset Purchase Agreement or any assets of the Debtors not party to the Asset Purchase Agreement.

**FOUND AND DETERMINED THAT:**[5]

A.    **Jurisdiction and Venue**.  The court has jurisdiction over the Motion pursuant to 28 U.S.C. § 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue of these cases and the Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

B.    **Statutory Predicates**.  The statutory predicates for the relief sought in the Motion are sections 105, 363 and 365 of the Bankruptcy Code, and Bankruptcy Rules 2002, 6004, and 6006.

C.    **Petition Date**.  On December 11, 2012 (the "Petition Date"), LCI Holding Company, Inc. and 34 of its subsidiaries each commenced a case by filing a petition for relief under chapter 11 of the Bankruptcy Code.

D.    **Entry of Bidding Procedures Order**.  On [●], 2012, this Court entered an order (the "Bidding Procedures Order") (A) approving bidding and auction procedures (the "Bidding Procedures"); (B) approving an expense reimbursement provision; (C) authorizing the Assumption and Assignment Procedures, including notice of proposed cure amounts (the "Cure Amounts"); (D) approving the form and manner of notice of all procedures, protections, schedules, and agreements; and (E) scheduling the Sale Hearing.

E.    **Compliance with Bidding Procedures Order**.  As demonstrated by (i) the Augustine Declaration, (ii) the testimony and other evidence proffered or adduced at the Sale Hearing, and (iii) the representations of counsel made on the record at the Sale Hearing, the Debtors have marketed the Acquired Assets and conducted the sale process in compliance with

---

[5]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. P. 7052.

the Bidding Procedures Order, and the Auction was duly noticed and conducted in a non-collusive, fair and good faith manner.  The Debtors and their professionals have actively marketed the Acquired Assets and conducted the sale process in compliance with the Bidding Procedures Order, and have afforded potential purchasers a full and fair opportunity to make higher and better offers.  The Purchaser, the Prepetition Lenders and the Prepetition Agent acted in compliance with the terms of the Bidding Procedures.  In accordance with the Bidding Procedures, the Debtors determined that the bid submitted by the Purchaser and memorialized by the Asset Purchase Agreement is the Successful Bid (as defined in the Bidding Procedures).

      F.    **Notice**.  As evidenced by the affidavits of service and publication previously filed with the Court, and based on the representations of counsel at the Sale Hearing, (i) proper, timely, adequate and sufficient notice of the Motion, the Sale Hearing, the Sale Transaction, the Assumption and Assignment Procedures (including the objection deadline with respect to any Cure Amount) and the assumption and assignment of the Assigned Contracts and the Cure Amounts has been provided in accordance with sections 102(l), 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006 and in compliance with the Bidding Procedures Order, (ii) such notice was good and sufficient, and appropriate under the particular circumstances, and (iii) no other or further notice of the Motion, the Sale Hearing, the Sale Transaction, or the assumption and assignment of the Assigned Contracts or the Cure Amounts is or shall be required.  With respect to entities whose identities are not reasonably ascertained by the Debtors, publication of the Sale Notice (as defined in the Motion) in *The Wall Street Journal* on [●], 2013, was sufficient and reasonably calculated under the circumstances to reach such entities.

4

G. **Corporate Authority**. Each Debtor (i) has full corporate power and authority to execute the Asset Purchase Agreement and all other documents contemplated thereby, and the Sale of the Acquired Assets by the Debtors has been duly and validly authorized by all necessary corporate action of each of the Debtors, (ii) has all of the corporate power and authority necessary to consummate the transactions contemplated by the Asset Purchase Agreement, (iii) has taken all corporate action and formalities necessary to authorize and approve the Asset Purchase Agreement and the consummation by the Debtors of the transactions contemplated thereby, including, without limitation, as required by their respective organizational documents and (iv) no government, regulatory or other consents or approvals, other than those expressly provided for in the Asset Purchase Agreement, are required for the Debtors to enter into the Asset Purchase Agreement and consummate the Sale Transaction.

H. **Opportunity to Object**. A fair and reasonable opportunity to object or be heard with respect to the Motion and the relief requested therein has been afforded to all interested persons and entities, including: (i) the Office of the United States Trustee; (ii) counsel for the Purchaser; (iii) [counsel for the Committee]; (iv) all entities known to have expressed an interest in a transaction with respect to the Acquired Assets during the past six months; (v) all entities known to have asserted any Encumbrances in or upon the Acquired Assets; (vi) all federal, state and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (vii) all parties to Assigned Contracts; (viii) the United States Attorney's office (ix) the Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) the Prepetition Lenders; and (xii) all entities filing notices of appearance or requests for notice under Bankruptcy Rule 2002 in these Chapter 11 Cases.

5

I.    **Sale in Best Interest**. Consummation of the sale of the Acquired Assets at this time is in the best interests of the Debtors, their creditors, their estates and other parties in interest.

J.    **Business Justification**. Sound business reasons exist for the Sale Transaction. Entry into the Asset Purchase Agreement, and the consummation of the transactions contemplated thereby, including the Sale Transaction and the assumption and assignment of the Assigned Contracts, constitutes each Debtor's exercise of sound business judgment and such acts are in the best interests of each Debtor, its estate, and all parties in interest. The Court finds that each Debtor has articulated good and sufficient business reasons justifying the Sale Transaction. Such business reasons include, but are not limited to, the following: (i) the Sale Transaction is the only viable alternative to liquidation; (ii) the Asset Purchase Agreement constitutes the highest and best offer for the Acquired Assets; (iii) the Asset Purchase Agreement and the closing thereon will present the best opportunity to realize the value of the Acquired Assets on a going concern basis and avoid decline and devaluation of the Acquired Assets; (iv) unless the Sale Transaction and all of the other transactions contemplated by the Asset Purchase Agreement are concluded expeditiously, as provided for in the Motion and pursuant to the Asset Purchase Agreement, recoveries to creditors may be diminished; and (v) any plan would not have likely yielded as favorable an economic result.

K.    The terms and conditions of the Asset Purchase Agreement, including, without limitation, the consideration to be realized by the Debtors, are fair and reasonable. Approval of the Motion, the Asset Purchase Agreement, and the transactions contemplated thereby, including, without limitation, the Sale Transaction and the assumption and assignment

6

of the Assigned Contracts, is in the best interests of the Debtors, their estates and creditors, and all other parties in interest.

L.    **Arms-Length Sale**.  The Asset Purchase Agreement was negotiated, proposed and entered into by the Debtors and the Purchaser without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Debtors nor the Purchaser has engaged in any conduct that would cause or permit the Asset Purchase Agreement to be avoided under 11 U.S.C. § 363(n).  Specifically, the Purchaser has not acted in a collusive manner with any person and the purchase price was not controlled by any agreement among bidders.  The Purchaser is not an "Insider" of the Debtors as defined in Bankruptcy Code section 101(31).

M.    **Good Faith Purchaser**.  The Purchaser is a good faith purchaser for value and, as such, is entitled to all of the protections afforded under 11 U.S.C. § 363(m) and any other applicable or similar bankruptcy and non-bankruptcy law.  Specifically: (i) the Purchaser recognized that the Debtors were free to deal with any other party interested in purchasing the Acquired Assets; (ii) the Purchaser complied in all respects with the provisions in the Bidding Procedures Order; (iii) the Purchaser agreed to subject its bid to the competitive bid procedures set forth in the Bidding Procedures Order; (iv) all payments to be made by the Purchaser in connection with the Sale Transaction have been disclosed; (v) no common identity of directors, officers or controlling stockholders exists among the Purchaser and the Debtors; (vi) the negotiation and execution of the Asset Purchase Agreement was at arm's-length and in good faith, and at all times each of the Purchaser and the Debtors were represented by competent counsel of their choosing; (vii) the Purchaser did not in any way induce or cause the chapter 11 filing of the Debtors; and (viii) the Purchaser has not acted in a collusive manner with any

7

person. The Purchaser will be acting in good faith within the meaning of 11 U.S.C. § 363(m) in closing the transactions contemplated by the Asset Purchase Agreement.

N.    **Credit Bid.** The Prepetition Lenders are secured creditors of the Debtors, holding valid, binding, enforceable and perfected security interests in, on and against the Debtors, their estates and property of the estates, arising in connection with the Prepetition Credit Agreement. The Prepetition Lenders hold an allowed secured claim in the aggregate amount of not less than $355,000,000 (the "Allowed Prepetition Claim"), which claim is not subject to avoidance, reduction, disallowance, impairment or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, plus such additional amounts to the extent allowed under the Cash Collateral Order (the "Allowed Additional Postpetition Claim" and together with the Allowed Prepetition Claim, the "Allowed Prepetition Secured Claim"), and pursuant to the Bidding Procedures and the Cash Collateral Order were authorized to credit bid any or all of such Allowed Prepetition Secured Claim at the Auction.

O.    Pursuant to its agreement under the Asset Purchase Agreement and Bankruptcy Code sections 363(b) and 363(k), the Purchaser credit bid $[●] of the Allowed Prepetition Claim, which credit bid was a valid and proper offer pursuant to the Bidding Procedures Order (the "Credit Bid"). Pursuant to the terms of the Prepetition Credit Agreement, the Prepetition Agent's submission of the Credit Bid on behalf of the Prepetition Lenders is authorized pursuant to the terms of the Prepetition Credit Agreement. Subject to the occurrence of the Closing Date, the Credit Bid is binding on the Prepetition Lenders.

P.    **Free and Clear.** The Debtors may sell the Acquired Assets free and clear of all obligations, Liabilities and Encumbrances (other than Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities) because, with respect to each creditor asserting a

8

lien, claim, encumbrance, or interest, one or more of the standards set forth in Bankruptcy Code § 363(f)(1)-(5) has been satisfied. Those holders of Encumbrances who did not object or withdrew objections to the Sale Transaction are deemed to have consented to the Sale Transaction pursuant to section 363(f)(2) of the Bankruptcy Code. Those holders of Encumbrances who did object fall within one or more of the other subsections of section 363(f) of the Bankruptcy Code.

Q.    The Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the transactions contemplated hereby, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts, (i) if the transfer of the Acquired Assets were not free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (subject only, in the case of the Purchaser with respect to the Acquired Assets, to the Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities), including, without limitation, rights or claims based on any taxes or successor or transferee liability or (ii) if the Purchaser would, or in the future could, be liable for any such liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes or successor or transferee liability (subject only, in the case of the Purchaser with respect to the Acquired Assets, to the Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities). The Purchaser will not consummate the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts, unless this Court expressly orders that none of the Purchaser, its affiliates, its present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise,

9

directly or indirectly, any liens, claims, encumbrances, and other interests, including, without limitation, rights or claims based on any taxes, successor or transferee liability.

       R.      Not transferring the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever (subject only, in the case of the Purchaser with respect to the Acquired Assets, to the Closing Encumbrances and Permitted Encumbrances) including, without limitation, rights or claims based on any taxes, successor or transferee liability, would adversely impact the Debtors' efforts to maximize the value of their estates, and the transfer of the Acquired Assets other than pursuant to a transfer that is free and clear of all liens, claims, encumbrances, and other interests of any kind or nature whatsoever would be of substantially less benefit to the Debtors' estates.

       S.      Without limiting the generality of the foregoing, none of the Purchaser, its respective affiliates, their respective present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, and other interests relating to any U.S. federal, state or local income tax liabilities, that the Debtors incur in connection with the consummation of the transactions contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts.

       T.      **Assumption of Executory Contracts and Unexpired Leases.**  The (i) transfer of the Acquired Assets to the Purchaser and (ii) assignment to the Purchaser of the Assigned Contracts, will not subject the Purchaser to any liability whatsoever prior to the Closing Date (defined below) or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part,

10

directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable law, including, without limitation, any theory of antitrust, successor or transferee liability. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign the Assigned Contracts to the Purchaser in connection with the consummation of the Sale Transaction, and the assumption and assignment of the Assigned Contracts is the best interests of the Debtors, their estates, and their creditors. The Assigned Contracts being assigned to the Purchaser are an integral part of the Acquired Assets being purchased by the Purchaser and, accordingly, such assumption and assignment of Assigned Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

U.    **Cure/Adequate Assurance**. The Purchaser has (i) cured, or has provided adequate assurance of cure, of any default existing prior to the date hereof under any of the Assigned Contracts, within the meaning of 11 U.S.C. § 365(b)(1)(A), and (ii) provided compensation or adequate assurance of compensation to any party for any actual pecuniary loss to such party resulting from a default prior to the date hereof under any of the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(B). The Purchaser has provided or will provide adequate assurance of future performance of and under the Assigned Contracts within the meaning of 11 U.S.C. § 365(b)(1)(C).

V.    **Prompt Consummation**. The sale of the Acquired Assets must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale Transaction, and the Debtors and the Purchaser intend to close the Sale Transaction as soon as reasonably practicable.

11

W.    The Debtors have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transaction contemplated by the Asset Purchase Agreement, including, without limitation, the Sale Transaction and the assumption and assignment of the Assigned Contracts, prior to, and outside of, a chapter 11 plan of reorganization. Confirmation of a chapter 11 plan is not feasible, and the Debtors' estates will suffer irreparable harm if the relief requested in the Motion is not granted on an expedited basis. In addition, consummation of the Sale Transaction will prevent the continuing accrual of interest and fees to the Debtors' postpetition lenders.

X.    **No Fraudulent Transfer**. The Asset Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. The Purchaser is not a mere continuation, and is not holding itself out as a mere continuation, of any of the Debtors or their respective estates and there is no continuity between the Purchaser and the Debtors. The Sale Transaction does not amount to a consolidation, merger or *de facto* merger of the Purchaser and any of the Debtors.

Y.    The consideration provided by the Purchaser for the Acquired Assets pursuant to the Asset Purchase Agreement (i) is fair and reasonable, (ii) is the highest and best offer for the Acquired Assets, (iii) will provide a greater recovery for the Debtors' creditors than would be provided by any other practical available alternative, and (iv) constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia (including, without limitation, the Uniform Fraudulent Conveyance Act and the Uniform Fraudulent Transfer Act).

12

Z.    **Purchaser Not an Insider and No Successor Liability**.  Immediately

prior to the Closing Date, the Purchaser was not an "insider" or "affiliate" of the Debtors, as

those terms are defined in the Bankruptcy Code, and no common identity of incorporators,

directors or stockholders existed between the Purchaser and the Debtors.  The transfer of the

Acquired Assets and the assumption of the Assumed Liabilities (including any individual

elements of the Sale Transaction) to the Purchaser, except as otherwise set forth in the Asset

Purchase Agreement, does not, and will not, subject the Purchaser to any liability whatsoever,

with respect to the operation of the Debtors' businesses prior to the closing of the Sale

Transaction or by reason of such transfer under the laws of the United States, any state, territory,

or possession thereof, or the District of Columbia, based, in whole or in part, directly or

indirectly, in any theory of law or equity including, without limitation, any laws affecting

antitrust, successor, transferee or vicarious liability.  Pursuant to the Asset Purchase Agreement,

the Purchaser is not purchasing all of the Debtors' assets in that the Purchaser is not purchasing

any of the Excluded Assets or assuming the Excluded Liabilities, and the Purchaser is not

holding itself out to the public as a continuation of the Debtors.  The Sale does not amount to a

consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the Debtors'

estates.  There is not substantial continuity between the Purchaser and the Debtors, and there is

no continuity of enterprise between the Debtors and the Purchaser.  The Purchaser is not a mere

continuation of the Debtors or the Debtors' estates, and the Purchaser does not constitute a

successor to the Debtors or the Debtors' estates.

AA.    **Legal, Valid Transfer**.  The transfer of the Acquired Assets to the

Purchaser will be a legal, valid, and effective transfer of the Acquired Assets, and will vest the

Purchaser with all right, title, and interest of the Debtors to the Acquired Assets free and clear of

all Encumbrances (other than Closing Encumbrances, Permitted Encumbrances and Assumed Liabilities), as set forth in the Asset Purchase Agreement. The Acquired Assets constitute property of the Debtors' estates and good title is vested in the Debtors' estate within the meaning of section 541(a) of the Bankruptcy Code. The Debtors are the sole and rightful owners of the Acquired Assets, and no other person has any ownership right, title, or interests therein.

BB.    **Asset Purchase Agreement Not Modified**. The terms of the Asset Purchase Agreement, including any amendments, supplements, and modifications thereto, are fair and reasonable in all respects and the terms of the Order shall not modify the terms of the Asset Purchase Agreement.

CC.    **Not a Sub Rosa Plan**. The Sale does not constitute a *sub rosa* chapter 11 plan for which approval has been sought without the protections that a disclosure statement would afford. The Sale neither impermissibly restructures the rights of the Debtors' creditors, nor impermissibly dictates a liquidating plan of reorganization for the Debtors.

DD.    **Legal and Factual Bases**. The legal and factual bases set forth in the Motion and at the Sale Hearing establish just cause for the relief granted herein.

It is therefore **ORDERED, ADJUDGED, AND DECREED THAT:**

**General Provisions**

1.    The Motion is GRANTED and APPROVED in all respects.

2.    All objections to the Motion or the relief requested therein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are overruled on the merits and denied with prejudice.

14

**Approval of the Sale of the Acquired Assets**

3.      The Asset Purchase Agreement, including any amendments, supplements and modifications thereto, and all of the terms and conditions therein, is hereby approved.

4.      Pursuant to 11 U.S.C. § 363(b), the sale of the Acquired Assets to the Purchaser free and clear of all obligations, Liabilities and Encumbrances (except Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities), and the transactions contemplated thereby is approved in all respects.

**Sale and Transfer of Acquired Assets**

5.      Pursuant to 11 U.S. C. § 363(b), the Debtors are hereby authorized and directed to sell the Acquired Assets to the Purchaser and consummate the Sale Transaction in accordance with, and subject to the terms and conditions of, the Asset Purchase Agreement, and to transfer and assign all right, title and interest (including common law rights) to all property, licenses and rights to be conveyed in accordance with and subject to the terms and conditions of the Asset Purchase Agreement, and are further authorized and directed to execute and deliver, and are empowered to perform under, consummate and implement, the Asset Purchase Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the Asset Purchase Agreement, including, without limitation, the related documents, exhibits and schedules, and to take all further actions as may be reasonably requested by the Purchaser for the purposes of assigning, transferring, granting, conveying and conferring to the Purchaser or reducing to possession, the Acquired Assets, or as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement.

6.      Pursuant to 11 U.S.C. § 363 (b) and 363(f), the Acquired Assets shall be transferred to the Purchaser upon consummation of the Asset Purchase Agreement (the "Closing Date") free and clear of all obligations, Liabilities and Encumbrances (except for Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities) of any kind or nature whatsoever, including without limitation, rights or claims (for purposes of this Order, the term "claim" shall have the meaning ascribed to such term in Bankruptcy Code section 101(5)) based on any taxes or successor or transferee liability, including, without limitation all claims arising in any way in connection with any agreements, acts, or failures to act, of any of the Debtors or any of the Debtors' predecessors or affiliates, whether known or unknown, contingent or otherwise, whether arising before or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity or otherwise, including, without limitation, claims otherwise arising under federal or state tax laws or doctrines of successor or transferee liability.

7.      Following the Closing, the Debtors or the Purchaser are authorized and directed to execute and file a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all obligations, Liabilities and Encumbrances in the Acquired Assets of any kind or nature whatsoever. On the Closing Date, this Order will be construed, and constitute for any and all purposes, a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in such Acquired Assets to the Purchaser. On the Closing Date, this Order also shall be construed, and constitute for any and all purposes, a complete and general assignment of all right, title and interest of the Debtors and each bankruptcy estate to the Purchaser in the Assigned Contracts. Each and every federal, state, and local governmental

16

agency or department is hereby directed to accept any and all documents and instruments

necessary and appropriate to consummate the transactions contemplated by the Asset Purchase

Agreement.

8.    All entities who are presently, or on the Closing Date may be, in

possession of some or all of the Acquired Assets are hereby directed to surrender possession of

the Acquired Assets to the Purchaser on the Closing Date.

9.    All persons and entities are prohibited and enjoined from taking any action

to adversely affect or interfere with the ability of the Debtors to transfer the Acquired Assets to

the Purchaser in accordance with the Asset Purchase Agreement and this Order; provided,

however, that the foregoing restriction shall not prevent any party from appealing this Order in

accordance with applicable law or opposing any appeal of this Order.

10.    Except as expressly permitted by the Asset Purchase Agreement or this

Order, all persons and entities, including, but not limited to, all debt security holders, equity

security holders, governmental, tax, and regulatory authorities, lenders, trade creditors, dealers,

employees, litigation claimants, and other creditors, holding liens, claims encumbrances, and

other interests of any kind or nature whatsoever, including, without limitation, rights or claims

based on any taxes or successor or transferee liability, against or in a Debtor or the Acquired

Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or

noncontingent, senior or subordinated), arising under or out of, in connection with, or in any way

relating to, the Debtors, the Acquired Assets or the operation of the Acquired Assets before the

Closing Date, or the transactions contemplated by the Asset Purchase Agreement, including,

without limitation, the Sale Transaction and the assumption and assignment of the Assigned

Contracts, are forever barred, estopped, and permanently enjoined from asserting against the

17

Purchaser, its respective successors and assigns, their respective property and the Acquired

Assets, such persons' or entities' liens, claims, encumbrances, or other interests, including,

without limitation, rights or claims based on any taxes or successor or transferee liability.

11.    On the Closing Date of the Sale Transaction, each of the Debtors'

creditors is authorized and directed to execute such documents and take all other actions as may

be necessary to release its Encumbrances on the Acquired Assets, if any, as such Encumbrances

may have been recorded or otherwise exist.

12.    To the extent provided by section 525 of the Bankruptcy Code, no

governmental unit may deny, revoke, suspend, or refuse to renew any permit, license or similar

grant relating to the operation of the Acquired Assets on account of the filing or pendency of the

Chapter 11 Cases or the consummation of the transactions contemplated by the Asset Purchase

Agreement, including, without limitation, the Sale Transaction and the assumption and

assignment of the Assigned Contracts.

13.    Subject to the terms and conditions of this Order, the transfer of the

Acquired Assets to the Purchaser pursuant to the Asset Purchase Agreement constitutes a legal,

valid, and effective transfer of the Acquired Assets, and shall vest the Purchaser with all right,

title, and interest of the Debtors in and to the Acquired Assets free and clear of all Encumbrances

of any kind or nature whatsoever (other than Closing Encumbrances, Permitted Encumbrances

and the Assumed Liabilities).

**No Successor Liability**

14.    The Purchaser is not a "successor" to the Debtors or their estates by

reason of any theory of law or equity, and the Purchaser shall not assume, or be deemed to

assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or

18

their estates, other than the Assumed Liabilities, with respect to the Acquired Assets or

otherwise, including, but not limited to, under any bulk sales law, doctrine or theory of successor

liability, or similar theory or basis of liability except for the assumption of the Asset Purchase

Agreement and any documents related thereto.  Except to the extent the Purchaser assumes

Assumed Liabilities and is ultimately permitted to assume the Assigned Contracts pursuant to the

Asset Purchase Agreement, neither the purchase of the Acquired Assets by the Purchaser nor the

fact that the Purchaser is using any of the Acquired Assets previously operated by the Debtors

will cause the Purchaser to be deemed a successor in any respect to the Debtors' businesses or

incur any liability derived therefrom within the meaning of any foreign, federal, state or local

revenue, pension, ERISA, tax, labor, employment, environmental, or other law, rule or regulation

(including, without limitation, filing requirements under any such laws, rules or regulations), or

under any products liability law or doctrine with respect to the Debtors' liability under such law,

rule or regulation or doctrine.

   15. The Purchaser has given substantial consideration under the Purchase

Agreement, which consideration shall constitute valid and valuable consideration for the releases

of any potential claims of successor liability of the Purchaser and which shall be deemed to have

been given in favor of the Purchaser by all holders of Encumbrances and Liabilities (except for

Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities) in or against the

Debtors, or the Acquired Assets.  Upon consummation of the Sale Transaction, the Purchaser

shall not be deemed to (a) be the successor to the Debtors, (b) have, *de facto* or otherwise,

merged with or into the Debtors, or (c) be a mere continuation, alter ego or substantial

continuation of the Debtors.

16.    Except to the extent the Purchaser or otherwise specifically agreed in the Asset Purchase Agreement or this Order, the Purchaser shall not have any liability, responsibility or obligation for any claims, liabilities or other obligations of the Debtors or their estates, including without limitation, any claims, liabilities or other obligations related to the Acquired Assets prior to Closing Date.  Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrances and Liabilities (except for Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities) against, in or to the Debtors or the Acquired Assets.  For the purposes of paragraphs 14 through 16 of this Order, all references to the Purchaser shall include the Purchaser's Affiliates, Subsidiaries and shareholders.

**Good Faith**

17.    The transactions contemplated by the Asset Purchase Agreement are undertaken by the Purchaser in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein by this Order to consummate the Sale Transaction shall not affect the validity of the sale of the Acquired Assets to the Purchaser.  The Purchaser is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

18.    As a good faith purchaser of the Acquired Assets, the Purchaser has not entered into an agreement with any other potential bidders at the Auction, and has not colluded with any of the other bidders, potential bidders or any other parties interested in the Acquired Assets, and, therefore, neither the Debtors nor any successor in interest to the Debtors' estates shall be entitled to bring an action against the Purchaser, and the Sale Transaction may not be avoided pursuant to section 363(n) of the Bankruptcy Code.

20

19.     The Purchaser, Prepetition Agent and the Prepetition Lenders are released from any liability related to or arising from the submission of the Credit Bid.

**Assumption and Assignment of Assigned Contracts**

20.     Pursuant to 11 U.S.C. § 105(a) and 365, and subject to and conditioned upon the closing of the Sale Transaction, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement, of the Assigned Contracts is hereby approved, and the requirements of 11 U.S.C. § 365(b)(1) with respect thereto are hereby deemed satisfied.

21.     The Debtors are hereby authorized and directed in accordance with 11 U.S.C. § 105(a), 363 and 365 to (a) assume and assign to the Purchaser, effective upon the Closing Date of the Sale Transaction, the Assigned Contracts free and clear of all Encumbrances of any kind or nature whatsoever (except for Closing Encumbrances and Permitted Encumbrances) and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

22.     The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer and, pursuant to 11 U.S.C. § 365(k), the Debtors shall be relieved from any further liability with respect to the Assigned Contracts after such assignment to and assumption by the Purchaser, except as provided in the Asset Purchase Agreement.

23.     All defaults or other obligations of the Debtors under the Assigned Contracts arising or accruing prior to the date of this Order (without giving effect to any

21

acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the

Bankruptcy Code) shall be cured by the Purchaser at the Closing Date or as soon thereafter as

reasonably practicable, and the Purchaser shall have no liability or obligation arising or accruing

prior to the Closing Date, except as otherwise expressly provided in the Asset Purchase

Agreement.  The Purchaser may elect to take assignment of certain contracts and leases

previously omitted from Schedule 2.5(a) of the Asset Purchase Agreement (the "Previously

Omitted Contracts") after the Closing.  Upon designation of such Previously Omitted Contracts

as "Assumed" by the Purchaser, the Debtors shall serve a notice on the counterparties to such

Previously Omitted Contracts that identifies the Purchaser of the Acquired Assets and provides

notice that the Debtors are assuming and assigning the Previously Omitted Contract to the

Purchaser.  The counterparties will have fifteen (15) Business Days (as defined in the Asset

Purchase Agreement) to object to the Cure Amount or the assumption.  If the counterparties, the

Debtors and the Purchaser are unable to reach a consensual resolution with respect to an

objection to the Cure Amount or assumption of a Previously Omitted Contract, the Debtors will

seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the

assumption.  If there is no objection, then the Debtors will obtain an order of this Court fixing the

Cure Amount and approving the assumption of the Previously Omitted Contract.

    24.  Each non-Debtor party to an Assigned Contract hereby is forever barred,

estopped, and permanently enjoined from raising or asserting against the Debtors or the

Purchaser, or the property of either of them, any assignment fee, default, breach or claim of

pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts,

existing as of the date of the Sale Hearing, or arising by reason of the consummation of

transactions contemplated by the Asset Purchase Agreement, including, without limitation, the

Sale Transaction and the assumption and assignment of the Assigned Contracts. Any party that may have had the right to consent to the assignment of an Assigned Contract is deemed to have consented to such assignment for purposes of section 365(e)(2)(A)(ii) of the Bankruptcy Code and otherwise if such party failed to object to the assumption and assignment of such Assigned Contract.

25.     To the extent a counterparty to an Assigned Contract failed to timely object to a Cure Amount, such Cure Amount shall be deemed to be finally determined and any such counterparty shall be prohibited from challenging, objecting to or denying the validity and finality of the Cure Amount at any time, and such Cure Amount, when paid, shall completely revive any Assigned Contract to which it relates.

**Additional Provisions**

26.     The consideration provided by the Purchaser for the Acquired Assets under the Asset Purchase Agreement shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia.

27.     Each and every federal, state, and local governmental agency, court or department is directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.  On the Closing Date, the Debtors and the Purchaser are authorized to take such actions as may be necessary to obtain a release of any and all obligations, Liabilities and Encumbrances (other than Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities) in the Acquired Assets, if any, and to the extent contemplated hereby and by the Asset Purchase Agreement. This Order (a) shall be effective as a determination that, on the Closing Date, (i) all

23

Encumbrances of any kind or nature whatsoever existing as to the Acquired Assets prior to the

Closing Date have been unconditionally released, discharged and terminated, and that the

conveyances described herein have been effected, (ii) the Credit Bid portion of the Allowed

Prepetition Claims are deemed exchanged for a pro rata share of the interests in the Purchaser,

and (iii) at Closing, all of the Prepetition Lenders shall be deemed to be bound by the Limited

Liability Company Agreement of Hospital Acquisition LLC (as amended or restated from time

to time) without any further action, approval or consent by the Prepetition Agent or any

Prepetition Lender or further court order, and (b) shall be binding upon and shall govern the acts

of all entities including without limitation, all filing agents, filing officers, title agents, title

companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative

agencies, governmental departments, secretaries of state, federal, state, and local officials, and all

other persons and entities who may be required by operation of law, the duties of their office, or

contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any of the Acquired

Assets. Each and every federal, state and local governmental agency or department is hereby

directed to accept any and all documents and instruments necessary and appropriate to

consummate the transactions contemplated by the Asset Purchase Agreement. The Purchaser

and the Debtors shall take such further steps and execute such further documents, assignments,

instruments and papers as shall be reasonably requested by the other to implement and effectuate

the transactions contemplated in this paragraph. All interests of record as of the date of this

Order shall be forthwith deemed removed and stricken as against the Acquired Assets. All

entities described in this paragraph are authorized and specifically directed to strike all such

24

recorded liens, claims, rights, interests and encumbrances against the Acquired Assets from their records, official and otherwise.

28.     If any person or entity that has filed statements or other documents or agreements evidencing claims, liens, encumbrances, or interests in any of the Acquired Assets does not deliver to the Debtors or the Purchaser prior to the Closing Date, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary for the purpose of documenting the release of all interests and other interests that the person or entity has or may assert with respect to any of the Acquired Assets, the Debtors and/or the Purchaser are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of such persons or entity with respect to any of the Acquired Assets.

29.     The Debtors will cooperate with the Purchaser and the Purchaser will cooperate with the Debtors, in each case to ensure that the transaction contemplated in the Asset Purchase Agreement is consummated, and the Debtors will make such modifications or supplements to any bill of sale or other document executed in connection with the closing to facilitate such consummation as contemplated by the Asset Purchase Agreement (including, without limitation, adding such specific assets to such documents as may be reasonably requested by the Purchaser pursuant to the terms of the Asset Purchase Agreement).

30.     The Purchaser shall have no liability or responsibility for any liability or other obligation of the Debtors arising under or related to the Acquired Assets other than for the Assumed Liabilities. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Asset Purchase Agreement, the Purchaser shall not be liable for any claims against the Debtors or any of their predecessors or affiliates, and the Purchaser shall have

no successor or vicarious liabilities of any kind or character whether known or unknown as of the Closing Date, now existing or hereinafter arising, whether fixed or contingent, with respect to the Debtors, the Acquired Assets or any obligations of the Debtors arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing, or payable under, out of, or in connection with, or in any way relating to the operation of the business prior to the Closing Date.

31.     Under no circumstances shall the Purchaser be deemed a successor of or to the Debtors for any Encumbrance against or in the Debtors or the Acquired Assets of any kind or nature whatsoever. The sale, transfer, assignment and delivery of the Acquired Assets and the Assigned Contracts shall not be subject to any Encumbrance, and Encumbrances of any kind or nature whatsoever (except the Closing Encumbrances and Permitted Encumbrances) shall remain with, and continue to be obligations of, the Debtors. All persons holding Encumbrances against, on, or in the Debtors or the Acquired Assets of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing such Encumbrances of any kind or nature whatsoever (except the Closing Encumbrances and Permitted Encumbrances) against the Purchaser, its officers, directors, shareholders and professionals, its property, its successors and assigns, or the Acquired Assets with respect to any Encumbrance of any kind or nature whatsoever such person or entity had, has, or may have against or in the Debtors, their estates, officers, directors, shareholders, or the Acquired Assets. Following the Closing Date, no holder of an Encumbrance in the Debtors shall interfere with the Purchaser's title to or use and enjoyment of the Acquired Assets and the Assigned Contracts based on or related to such Encumbrance, or any actions that the Debtors may take in their Chapter 11 Cases.

26

32.     Consistent with the terms of the Asset Purchase Agreement, the Purchaser is authorized and directed to take appropriate measures to deposit cash in an amount equal to the Retained Professional Fees into the Retained Professional Fees Escrow and cash in an amount equal to the Estimated Wind Down Expenses into the Wind Down Expense Escrow. Funds in the Retained Professional Fees Escrow and the Wind Down Expense Escrow shall not constitute property of the Debtors' estates and the funds deposited therein shall be used to satisfy the carve out obligations of the DIP Lenders under prior cash collateral orders and shall remain subject to the liens in favor of the Prepetition Agent and the Prepetition Lenders. Funds in the Retained Professional Fees Escrow may be released upon entry of an order or orders of the Bankruptcy Court allowing all or a portion of the Retained Professional Fees and no further order of the Court shall be required for payment of such fees from the Retained Professional Fees Escrow. Upon payment in full of the Retained Professional Fees, any funds remaining in the Retained Professional Fees Escrow shall be paid to Purchaser without any further order or approval. Funds held in the Wind Down Expense Escrow may be released in the manner provided in the Asset Purchase Agreement, without further order of this Court, and upon the closing of the Chapter 11 Cases, any funds remaining in such escrow shall be paid to Purchaser without any further order or approval. The funds held in the Retained Professional Fees Escrow and the Wind Down Expense Escrow shall not be subject to disgorgement, avoidance or clawback by any party including, without limitation, the Purchaser, the DIP Lenders, any of the Debtors' successors or assigns, or any trustee appointed in the Debtors' Chapter 11 Cases or upon the conversion of any of such cases to cases under chapter 7 of the Bankruptcy Code; provided that nothing in this paragraph 32 shall prejudice the Purchaser's right to compel a refund of any funds remaining in (a) the Retained Professional Fees Escrow upon payment in full of the Retained

27

Professional Fees and (b) the Wind Down Expense Escrow upon the closing of the Chapter 11 Cases. For the avoidance of doubt, no liens shall attach to the funds in either the Retained Professional Fees Escrow or the Wind Down Expense Escrow.

33.     The terms and provisions of the Asset Purchase Agreement and this Order shall be binding in all respects upon, and shall inure to the benefit of, the Debtors and their respective affiliates, successors and assigns, their estates, and their creditors, the Purchaser, and its respective affiliates, successors and assigns, and any affected third parties including, but not limited to, all persons asserting Encumbrances on the Acquired Assets to be sold to the Purchaser pursuant to the Asset Purchase Agreement, notwithstanding any subsequent appointment of any trustee(s) under any chapter of the Bankruptcy Code, as to which trustee(s) such terms and provisions likewise shall be binding.

34.     The failure specifically to include any particular provisions of the Asset Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Asset Purchase Agreement be authorized and approved in its entirety.

35.     The Asset Purchase Agreement and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by both parties, and in accordance with the terms thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtors' estates. To the extent that any provision of the Asset Purchase Agreement conflicts with or is, in any way, inconsistent with any provision of this Order, this Order shall govern and control.

28

36.     Nothing contained in any plan of reorganization or liquidation confirmed in these Chapter 11 Cases or any order of this Court confirming such plans or in any other order in these Chapter 11 Cases, including any order entered after any conversion of these Chapter 11 Cases to a case under chapter 7 of the Bankruptcy Code, shall alter, conflict with, or derogate from, the provisions of the Asset Purchase Agreement or the terms of this Order.  The provisions of this Order and the Asset Purchase Agreement and any actions taken pursuant hereto or thereto shall survive entry of any order which may be entered confirming or consummating any plan of reorganization of the Debtors, or which may be entered converting these Chapter 11 Cases from chapter 11 to chapter 7 of the Bankruptcy Code, and the terms and provisions of the Asset Purchase Agreement as well as the rights and interests granted pursuant to this Order and the Asset Purchase Agreement shall continue in these Chapter 11 Cases or any superseding case and shall be specifically performable and enforceable against and binding upon the Debtors, their estates and the Purchaser and their respective successors and permitted assigns, including any trustee, responsible officer or other fiduciary hereafter appointed as a legal representative of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code.

37.     The provisions of this Order are nonseverable and mutually dependent.

38.     To the extent applicable, the automatic stay pursuant to section 362 of the Bankruptcy Code is hereby lifted with respect to the Debtors to the extent necessary, without further order of the Court (a) to allow the Purchaser to give the Debtors any notice provided for in the Asset Purchase Agreement, and (b) to allow the Purchaser to take any and all actions permitted by the Asset Purchase Agreement.

39.     There are no brokers involved in consummating the Sale Transaction and no brokers' commissions are due.

29

40.    Compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

41.    The Debtors and each other person having duties or responsibilities under the Asset Purchase Agreement or this Order, and their respective agents, representatives, and attorneys, are authorized and empowered to carry out all of the provisions of the Asset Purchase Agreement, to issue, execute, deliver, file and record, as appropriate, the Asset Purchase Agreement, and any related agreements, and to take any action contemplated by the Asset Purchase Agreement or this Order, and to issue, execute, deliver, file and record, as appropriate, such other contracts, instruments, releases, deeds, bills of sale, assignments, or other agreements, and to perform such other acts as are consistent with, and necessary or appropriate to, implement, effectuate and consummate the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby, all without further application to, or order of, the Court. Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required by applicable business corporation, trust and other laws of applicable governmental units with respect to the implementation and consummation of the Asset Purchase Agreement and this Order and the transactions contemplated thereby and hereby.

42.    This Court shall retain exclusive jurisdiction to enforce and implement the terms and provisions of the Asset Purchase Agreement, all amendments thereto, any waivers and consents thereunder, and of each of the agreements executed in connections therewith in all respects, including, but not limited to, retaining jurisdiction to (a) compel delivery of the Acquired Assets to the Purchaser free and clear of Encumbrances (other than Closing Encumbrances and Permitted Encumbrances), or compel the performance of other obligations owed by the Debtors, (b) compel delivery of the purchase price or performance of other

obligations owed to the Debtors, (c) resolve any disputes arising under or related to the Asset

Purchase Agreement, except as otherwise provided therein, (d) interpret, implement, and enforce

the provisions of this Order, and (e) protect the Purchaser against (i) claims made related to any

of the Excluded Liabilities, (ii) any claims of successor or vicarious liability related to the

Acquired Assets or Assigned Contracts, or (iii) any claims of Encumbrances asserted on or in the

Debtors or the Acquired Assets, of any kind or nature whatsoever.

43.    To the extent that any provision of this Order conflicts with the Asset

Purchase Agreement, this Order shall control.

Dated: Wilmington, Delaware
      [●], 2013

_____

Honorable [●]
UNITED STATES BANKRUPTCY JUDGE

**EXHIBIT D**

**ASSET PURCHASE AGREEMENT**

EXECUTION COPY

---

ASSET PURCHASE AGREEMENT

DATED AS OF DECEMBER 10, 2012

BY AND AMONG

HOSPITAL ACQUISITION LLC, AS BUYER

AND

LCI HOLDCO LLC,

LIFECARE HOLDINGS, INC.

AND

CERTAIN SUBSIDIARIES OF LIFECARE HOLDINGS, INC., AS SELLERS

TABLE OF CONTENTS

ARTICLE 1

DEFINITIONS

| | | |
|---|---|---|
| 1.1 | Definitions | 2 |
| 1.2 | Other Definitions and Interpretive Matters | 14 |

ARTICLE 2

PURCHASE AND SALE

| | | |
|---|---|---|
| 2.1 | Purchase and Sale | 15 |
| 2.2 | Excluded Assets | 17 |
| 2.3 | Assumed Liabilities | 17 |
| 2.4 | Excluded Liabilities | 18 |
| 2.5 | Assignment and Assumption of Contracts | 20 |
| 2.6 | Further Assurances | 22 |

ARTICLE 3

PURCHASE PRICE

| | | |
|---|---|---|
| 3.1 | Consideration | 22 |
| 3.2 | Allocation of Purchase Price | 23 |
| 3.3 | Limitation on Buyer Liability | 23 |

ARTICLE 4

CLOSING AND DELIVERIES

| | | |
|---|---|---|
| 4.1 | Closing Date | 23 |
| 4.2 | [Reserved] | 24 |
| 4.3 | Buyer's Deliveries | 24 |
| 4.4 | Sellers' Deliveries | 24 |

ARTICLE 5

REPRESENTATIONS AND WARRANTIES OF SELLERS

| | | |
|---|---|---|
| 5.1 | Organization and Good Standing | 25 |
| 5.2 | Authority; Validity; Consents | 26 |
| 5.3 | No Conflict | 26 |
| 5.4 | Real Property | 26 |
| 5.5 | Environmental and Health and Safety Matters | 28 |
| 5.6 | Title to Acquired Assets | 29 |

i

| 5.7 | Taxes | 29 |
| 5.8 | Legal Proceedings | 30 |
| 5.9 | Compliance with Legal Requirements; Permits | 30 |
| 5.10 | Certificates of Need | 31 |
| 5.11 | Accreditation | 31 |
| 5.12 | Government Program Participation; Reimbursement | 31 |
| 5.13 | LTACH Representations | 32 |
| 5.14 | Third Party Payor Cost Reports | 32 |
| 5.15 | Regulatory Compliance | 32 |
| 5.16 | Compliance Programs | 33 |
| 5.17 | Medical Staff Matters | 33 |
| 5.18 | Labor Matters | 34 |
| 5.19 | Employee Benefits | 34 |
| 5.20 | Sellers' Intellectual Property | 37 |
| 5.21 | Contracts | 37 |
| 5.22 | Sufficiency of Assets; Inactive Entities | 38 |
| 5.23 | Insurance | 38 |
| 5.24 | Brokers or Finders | 38 |
| 5.25 | Affiliate Interests | 38 |
| 5.26 | Bank Accounts | 39 |
| 5.27 | Undue Influence | 39 |
| 5.28 | Financial Statements | 39 |
| 5.29 | Absence of Certain Changes | 40 |
| 5.30 | WARN Act | 41 |

# ARTICLE 6

## REPRESENTATIONS AND WARRANTIES OF BUYER

| 6.1 | Organization and Good Standing | 41 |
| 6.2 | Authority; Validity; Consents | 41 |
| 6.3 | No Conflict | 42 |
| 6.4 | Availability of Funds | 42 |
| 6.5 | Litigation | 42 |
| 6.6 | Brokers or Finders | 42 |

# ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

| 7.1 | Access and Reports | 42 |
| 7.2 | Operations Prior to the Closing Date | 43 |
| 7.3 | HSR Act; Cooperation | 44 |
| 7.4 | Bankruptcy Court Matters | 46 |
| 7.5 | Expense Reimbursement | 47 |
| 7.6 | Update of Disclosure Schedules; Notice of Developments | 47 |
| 7.7 | Bidding Procedures | 47 |

| | | |
|---|---|---|
| 7.8 | Transition of Business | 48 |
| 7.9 | Sale Free and Clear | 48 |
| 7.10 | Buyer Financing Matters | 48 |

## ARTICLE 8

### ADDITIONAL AGREEMENTS

| | | |
|---|---|---|
| 8.1 | Taxes | 48 |
| 8.2 | Bulk Sales | 50 |
| 8.3 | Payments Received | 50 |
| 8.4 | Assigned Contracts: Adequate Assurance and Performance | 50 |
| 8.5 | Employee Matters | 50 |
| 8.6 | Post-Closing Books and Records and Personnel | 52 |
| 8.7 | Warranties Exclusive | 53 |
| 8.8 | Casualty Loss | 53 |
| 8.9 | Change of Name | 53 |
| 8.10 | No Successor Liability | 54 |
| 8.11 | Excluded Facility Wind Down | 54 |

## ARTICLE 9

### CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE

| | | |
|---|---|---|
| 9.1 | Accuracy of Representations | 54 |
| 9.2 | Sellers' Performance | 55 |
| 9.3 | No Order | 55 |
| 9.4 | Governmental Authorizations | 55 |
| 9.5 | Sellers' Deliveries | 55 |
| 9.6 | Sale Order | 55 |
| 9.7 | Assigned Contracts | 55 |

## ARTICLE 10

### CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE

| | | |
|---|---|---|
| 10.1 | Accuracy of Representations | 56 |
| 10.2 | Sale Order in Effect | 56 |
| 10.3 | Buyer's Performance | 56 |
| 10.4 | No Order | 56 |
| 10.5 | Governmental Authorizations | 56 |
| 10.6 | Buyer's Deliveries | 56 |

## ARTICLE 11

### TERMINATION

| | | |
|---|---|---|
| 11.1 | Termination Events | 57 |

11.2      Effect of Termination .............................................................................................59

## ARTICLE 12

### GENERAL PROVISIONS

12.1      Survival ....................................................................................................................59
12.2      Confidentiality .........................................................................................................59
12.3      Public Announcements .............................................................................................60
12.4      Notices ......................................................................................................................60
12.5      Waiver .......................................................................................................................61
12.6      Entire Agreement; Amendment ................................................................................61
12.7      Assignment ...............................................................................................................62
12.8      Severability ...............................................................................................................62
12.9      Expenses ...................................................................................................................62
12.10     Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver ................62
12.11     Counterparts .............................................................................................................63
12.12     Parties in Interest; No Third Party Beneficiaries; No Amendment .........................63
12.13     Remedies ..................................................................................................................63
12.14     Specific Performance for Post-Closing Covenants ..................................................63
12.15     Sellers' Representative; Reliance .............................................................................64

## SCHEDULES

| | |
|---|---|
| Schedule 1.1(a) | Sellers' Knowledge Persons |
| Schedule 1.1(b) | Permitted Encumbrances |
| Schedule 2.1(q) | Equity Interests Acquired |
| Schedule 2.1(r) | Other Acquired Assets |
| Schedule 2.2(a) | Certain Excluded Assets |
| Schedule 2.3(d) | Trade Payables |
| Schedule 2.3(g) | Specific Liabilities |
| Schedule 2.5(a) | Assigned Contracts |
| Schedule 5.2 | Required Consents |
| Schedule 5.3 | Conflicts |
| Schedule 5.4(a) | Owned Real Property |
| Schedule 5.4(b) | Lessor Leases |
| Schedule 5.4(c) | Leases (for Leased Real Property) |
| Schedule 5.4(d) | Occupancy Agreements |
| Schedule 5.5 | Environmental and Health and Safety Matters |
| Schedule 5.5(d) | Environmental and Health and Safety Permits |
| Schedule 5.7(a) | Taxes |
| Schedule 5.7(c) | Tax Incentive Defaults |
| Schedule 5.7(d) | Withholding Taxes |
| Schedule 5.8 | Legal Proceedings |
| Schedule 5.9(b) | Compliance with Legal Requirements; Permits |
| Schedule 5.11 | Accreditation |
| Schedule 5.12 | Program Agreements/National Provider Identifiers |
| Schedule 5.13 | Hospitals; LTACH Requirements |
| Schedule 5.15 | Convictions; Exclusions |
| Schedule 5.16 | Investigations; False Claims; Complaints |
| Schedule 5.17 | Medical Staff Matters |
| Schedule 5.18(b) | Employees on Leave of Absence |
| Schedule 5.19(a) | Benefit Plans |
| Schedule 5.20(a) | Patents, Trademarks and Copyrights |
| Schedule 5.20(b) | Claims Relating to Intellectual Property Rights |
| Schedule 5.21 | Contracts and Cure Costs |
| Schedule 5.22(a) | Sufficiency of Assets |
| Schedule 5.22(c) | Inactive Entities |
| Schedule 5.23 | Insurance |
| Schedule 5.25 | Affiliate Interests |
| Schedule 5.26 | Bank Accounts |
| Schedule 5.29(b) | Certain Changes |
| Schedule 6.2 | Buyer Consents |
| Schedule 7.2 | Operations Prior to Closing |
| Schedule 8.5(a) | Senior Management |
| Schedule 8.5(c) | Transferred Benefit Plans |
| Schedule 9.4 | Governmental Authorizations |

**EXHIBITS**

Exhibit A          Bidding Procedures
Exhibit B          Form of Bidding Procedures Order
Exhibit C          Form of Sale Order

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of December 10, 2012 (the "Execution Date"), is made and entered into by and among Hospital Acquisition LLC, a limited liability company organized under the laws of the State of Delaware ("Buyer"), LCI Holdco, LLC, a Delaware limited liability company ("LCI Holdco"), LifeCare Holdings, Inc., a Delaware corporation (the "Company") and the Additional Sellers (together with the Company, the "Sellers" and each entity individually a "Seller"). Capitalized terms used herein and not otherwise defined herein have the meanings set forth in Article 1.

### RECITALS

WHEREAS, Sellers are engaged in the business of operating long-term acute care hospitals ("LTACHs") in the United States (such business, as conducted by Sellers, the "Business");

WHEREAS, it is anticipated that shortly after the execution of this Agreement, Sellers will file a voluntary petition (the "Bankruptcy Case") under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

WHEREAS, in accordance with the Bidding Procedures and subject to the terms and conditions set forth in this Agreement and the entry of the Sale Order, Sellers desire to sell to Buyer all of the Acquired Assets, Buyer desires to purchase from Sellers all of the Acquired Assets and assume all of the Assumed Liabilities, and the Parties intend to effectuate the transactions contemplated by this Agreement, upon the terms and conditions hereinafter set forth;

WHEREAS, the Acquired Assets and Assumed Liabilities shall be purchased and assumed by Buyer pursuant to the Sale Order, free and clear of all Encumbrances (other than Closing Encumbrances and Permitted Encumbrances), pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, and Rules 6004 and 6006 of the Federal Rules of Bankruptcy Procedure;

WHEREAS, the Sellers' ability to consummate the transactions set forth in this Agreement is subject to, among other things, the entry of the Sale Order by the Bankruptcy Court; and

WHEREAS, the board of directors (or similar governing body) of each Seller has determined that it is advisable and in the best interests of such Seller and its constituencies to enter into this Agreement and to consummate the transactions provided for herein, subject to entry of the Sale Order, and each has approved the same.

NOW, THEREFORE, in consideration of the premises and the mutual promises herein made, and in consideration of the foregoing and of the representations, warranties, covenants, agreements and conditions herein contained, the receipt and sufficiency of which are hereby acknowledged, the Parties, intending to be legally bound hereby, agree as follows:

949685.05-NYCSR03A - MSW

# ARTICLE 1

## DEFINITIONS

1.1    <u>Definitions</u>.

For purposes of this Agreement, the following terms have the meanings specified or referenced below.

"<u>Accounts Receivable</u>" means, with respect to each Seller, all accounts receivable, notes receivable, purchase orders, negotiable instruments, completed work or services that has not been billed, chattel paper, notes and other rights to payment, including those consisting of all accounts receivable in respect of services rendered or products sold to customers by such Seller, any other miscellaneous accounts receivable of such Seller, and any claim, remedy or other right of such Seller related to any of the foregoing, together with all unpaid financing charges accrued thereon and any payments with respect thereto.

"<u>Acquired Assets</u>" has the meaning set forth in <u>Section 2.1</u>.

"<u>Action</u>" means any legal action, suit, arbitration, complaint, grievance, summons, litigation, mediation, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, investigation or similar matter by or before any Governmental Authority.

"<u>Additional Sellers</u>" means:

(i)    Crescent City Hospitals, L.L.C., LifeCare Hospitals, LLC, LifeCare Hospitals of North Carolina, L.L.C., LifeCare Hospitals of New Orleans, L.L.C. and LifeCare Management Services, L.L.C., each a Louisiana limited liability company;

(ii)    LifeCare Hospitals of Chester County, Inc. and LifeCare Hospitals of Dayton, Inc., each a Nevada corporation;

(iii)    LifeCare Holding Company of Texas, L.L.C., LifeCare Hospitals of Pittsburgh, LLC and LifeCare Investments, L.L.C., each a Nevada limited liability company;

(iv)    LifeCare Hospitals of North Texas, L.P., LifeCare Hospitals of Ft. Worth, L.P. and San Antonio Specialty Hospital, Ltd., each a Texas limited partnership;

(v)    LifeCare Hospitals of Milwaukee, Inc., LifeCare Hospitals of Northern Nevada, Inc., LifeCare Hospitals of South Texas, Inc., LifeCare REIT 1, Inc., LifeCare REIT 2, Inc. and NextCARE Specialty Hospital of Denver, Inc., each a Delaware corporation;

(vi)    LifeCare Hospitals of Mechanicsburg, LLC, LifeCare Hospital at Tenaya, LLC, LifeCare Hospitals of Sarasota, LLC, LifeCare Investments 2, LLC, LifeCare Specialty Hospital of North Louisiana, LLC and Pittsburgh Specialty Hospital, LLC, each a Delaware limited liability company; and

(vii)    NextCARE Hospitals / Muskegon, Inc., a Michigan corporation.

"<u>Affiliate</u>" has the meaning set forth in Rule 12b-2 of the regulations promulgated under the Securities Exchange Act of 1934.

"<u>Agreement</u>" has the meaning set forth in the introductory paragraph.

2

"Allocation Statement" has the meaning set forth in Section 3.2.

"Alternative Transaction" means (i) any investment in, financing of, capital contribution or loan to, or restructuring or recapitalization of all or any portion of Sellers (including any exchange of all or any portion of Sellers' outstanding debt obligations for equity securities of Sellers), (ii) any merger, consolidation, share exchange or other similar transaction to which Sellers are a party, (iii) any direct or indirect sale of all or substantially all of the assets of, or any issuance, sale or transfer of any equity interests in, Sellers, or (iv) any other transaction, including a plan of liquidation or reorganization, that transfers or vests ownership of, economic rights to, or benefits in all or a substantial portion of the assets to any party other than Buyer or one or more Buyer Designees.

"Antitrust Law" means, collectively, the HSR Act, title 15 of the United States Code §§ 1-7, as amended (the Sherman Act), Title 15 of the United States Code §§ 12-27 and Title 29 of the United States Code §§ 52-53, as amended (the Clayton Act), the Federal Trade Commission Act (15 U.S.C. § 41 et seq.), as amended, and the rules and regulations promulgated thereunder, and any other Legal Requirements that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition, as such of the foregoing are enacted and in effect as of the date hereof.

"Applicable Rate" means, for a particular day, the prime rate as reported in The Wall Street Journal published for such day or, if such rate is regularly reported in The Wall Street Journal, but is not reported on such day, such rate as most-recently reported in The Wall Street Journal (or, if such rate is no longer reported in The Wall Street Journal, a comparable rate), calculated on a daily basis based on a 365-day year.

"Assigned Contracts" has the meaning set forth in Section 2.5(a)(i).

"Assumed Liabilities" has the meaning set forth in Section 2.3.

"Assumption Agreement" means an Assignment and Assumption Agreement in customary form reasonably acceptable to the Parties.

"Audited Financial Statements" has the meaning set forth in Section 5.28.

"Avoidance Action" means any claim, right or cause of action of any Seller arising under Chapter 5 of the Bankruptcy Code and any analogous state law claims relating to the Acquired Assets or the Business.

"Backup Bidder" has the meaning set forth in the Bidding Procedures.

"Bankruptcy Case" has the meaning set forth in the recitals.

"Bankruptcy Code" means Title 11 of the United States Code, Sections 101 et seq.

"Bankruptcy Court" has the meaning set forth in the recitals.

"Benefit Plan" has the meaning set forth in Section 5.19(a).

"Bid Deadline" has the meaning set forth in the Bidding Procedures.

"Bidding Procedures" means bid procedures in substantially the form attached hereto as **Exhibit A**, to be approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"Bidding Procedures Order" means an Order of the Bankruptcy Court in substantially the form attached hereto as **Exhibit B**.

"Bill of Sale" means a Bill of Sale in customary form reasonably acceptable to the Parties.

"Business" has the meaning set forth in the recitals.

"Business Day" means any day of the year on which national banking institutions in New York city are open to the public for conducting business and are not required or authorized to close.

"Buyer" has the meaning set forth in the introductory paragraph and shall also include any Buyer Designee.

"Buyer Designee" has the meaning set forth in Section 2.1.

"Cash Consideration" has the meaning set forth in Section 3.1(a).

"Claim" means a "claim" as defined in Section 101(5) of the Bankruptcy Code, against any Seller.

"Closing" has the meaning set forth in Section 4.1.

"Closing Date" means the date and time as of which the Closing occurs as set forth in Section 4.1.

"Closing Encumbrances" means Liens granted pursuant to, or otherwise permitted by, the Exit Facility.

"COBRA" has the meaning set forth in Section 5.19(f).

"Code" means the Internal Revenue Code of 1986, as amended.

"Committee Retained Professional Fees" means an aggregate amount equal to the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by the official committee of unsecured creditors in the Bankruptcy Case, if any, pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses (x) are accrued and unpaid as of the Closing Date and (y) with respect to hourly or monthly professional fees, have been authorized pursuant to the budget prepared in conjunction with the DIP Credit Agreement and order approving the DIP Credit Agreement. For the avoidance of doubt, Committee Retained Professional Fees shall not include any transaction-based fees.

"Committee Retained Professional Fees Escrow" means the escrow account established pursuant to the Committee Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"Committee Retained Professional Fees Escrow Agreement" means an escrow agreement reasonably acceptable to the Parties by and among Buyer, Sellers and Escrow Agent for the disbursement of the amount payable by Buyer pursuant to Section 3.1(a)(ii) in connection with the Committee Retained Professional Fees, and which shall provide that any amount not so used to satisfy such Fees shall be promptly returned to Buyer.

"Company" has the meaning set forth in the introductory paragraph.

4

"Confidentiality Agreements" has the meaning set forth in Section 12.2.

"Contract" means any agreement, contract, obligation, promise, undertaking, lease (including Leases, Lessor Leases, and Occupancy Agreements), sublease, purchase order, arrangement, license, commitment, insurance policy or other binding arrangement or understanding (in each case whether written or oral), and any amendments, modifications or supplements thereto.

"Copyrights" means all United States and foreign copyright rights in any original works of authorship, whether registered or unregistered, including all copyright registrations and applications.

"Corporate Integrity Agreement" means a corporate integrity agreement, certification of compliance agreement, a settlement agreement with integrity provisions or other similar agreement between a Person and OIG.

"Credit Agreement" means the Credit Agreement dated as of February 1, 2011, among the Company, LCI Holdco, the lenders from time to time party thereto and JPMorgan Chase Bank, N.A., a national banking association, as administrative agent and collateral agent for such lenders, as amended, supplemented or otherwise modified prior to the date hereof.

"Credit Bid and Release" has the meaning set forth in Section 3.1(c).

"Cure Costs" means all monetary liabilities, including pre-petition monetary liabilities, of Sellers that must be paid or otherwise satisfied to cure all of Sellers' monetary defaults under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code at the time of the assumption thereof and assignment to Buyer as provided hereunder as such amounts are determined by the Bankruptcy Court.

"Cure Notice" means, with respect to each Assigned Contract, the notice submitted by Sellers to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order setting forth the Cure Cost amount with respect thereto as calculated by Sellers.

"Deeds" means the deeds transferring title to the Owned Real Property.

"DIP Credit Agreement" means that certain debtor-in-possession credit agreement to be executed on or prior to the Petition Date by and among the Sellers, the agent named therein, and the lenders names therein and the other parties thereto, as the same may be subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

"Disclosure Schedules" means the Disclosure Schedules attached hereto, dated as of the date hereof, delivered by Sellers to Buyer in connection with the execution of this Agreement, as the same may be supplemented and amended pursuant to Section 7.6.

"Documents" means all financial, patient, medical staff, personnel and other records maintained at the Hospitals or otherwise in storage pursuant to an Assigned Contract, including all equipment records, medical records, documents, files and current personnel records.

"DOL" has the meaning set forth in Section 5.19(c).

"Employees" means all employees of Sellers on the Execution Date, as well as any additional persons who become employees of Sellers in the Ordinary Course of Business during the period from the Execution Date through and including the Closing Date.

5

"Encumbrance" means any charge, Lien, Claim, right, demand, mortgage, lease, debt, losses, damage, demand, fine, judgment, penalty, liability, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, premium, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, rights of others, easement, restrictive covenant, right of way, preemptive right, conditional sale, servitude, conditional sale agreement or restriction (whether on voting, sale, transfer, defenses, set-off or recoupment rights, disposition or otherwise), encroachment, encumbrance, third party interest or other restriction or limitation of any kind, whether imposed by Contract, Legal Requirement, equity or otherwise.

"Environmental, Health and Safety Laws" has the meaning set forth in Section 5.5(a).

"Equipment" means all furniture, fixtures, equipment, computers, machinery, vehicles, apparatus, appliances, implements, telephone systems, signage, supplies and all other tangible personal property of every kind and description, and improvements and tooling used, or held for use, in connection with the operation of the Business, wherever located, including communications equipment, information technology assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" means an escrow agent acceptable to Buyer.

"Estimated Wind Down Expenses" means (1) the out of pocket administrative costs and expenses, up to an aggregate amount of $3 million, that Sellers expect to incur in connection with winding down their bankruptcy estates, aside from the Excluded Facility, from and after the Closing Date, as set forth in the Wind Down Budget (provided that only $1.5 million of such $3 million amount shall be used for such costs and expenses other than pre-closing real property Tax liabilities of Sellers); and (2) Excluded Facility Wind Down Expenses.

"Excluded Assets" has the meaning set forth in Section 2.2.

"Excluded Benefit Plans" means all Benefit Plans of the Sellers other than the Transferred Benefit Plans set forth on Schedule 8.5(c).

"Excluded Facility" means (i) the assets associated with any single facility or (ii) the equity interests in any single entity set forth on Schedule 2.1(q) and the assets owned, directly or indirectly, by such entity, in each case, with respect to which, Buyer determines, in its sole discretion, to exclude from the Acquired Assets by providing written notice thereof to Sellers at least ten (10) Business Days prior to the Bid Deadline as of the Execution Date; provided, however, that if the Bid Deadline is moved after the Execution Date to a date that is at least five (5) Business Days earlier than the original Bid Deadline, the Buyer shall have until five (5) Business Days after such new accelerated Bid Deadline to provide such written notice.

"Excluded Facility Wind Down Expenses" means the out of pocket administrative expenses that Sellers and their Affiliates expect to incur after the Closing Date in connection with the winding down of the Excluded Facility, which amount shall be reasonably determined by Sellers prior to the Closing but which shall in no event exceed $750,000.

6

"Excluded Liabilities" has the meaning set forth in Section 2.4.

"Execution Date" has the meaning set forth in the introductory paragraph.

"Exit Facility" means the new financing facility to be entered into by the Buyer on the Closing Date, as the same may be subsequently modified, amended or supplemented, together with all instruments and agreements related thereto.

"Expense Reimbursement" means an amount, for which Sellers shall be liable under the circumstances set forth in Section 11.2, equal to the reasonable out-of-pocket costs and expenses of Buyer (including reasonable expenses of counsel, investment bankers and other outside consultants, reasonable legal expenses and all filing fees under the HSR Act) related to negotiating this Agreement and investigating Sellers, the Business or the Acquired Assets up to a maximum of $1,000,000, which amount, upon entry of the Bidding Procedures Order, shall constitute a super priority administrative expense of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of any kind, including those specified in Sections 503(b) or 507(b) of the Bankruptcy Code, and be paid as set forth in Section 11.2.

"Final Order" means an Action taken or Order issued by the applicable Governmental Authority as to which:  (i) no request for stay of the Action or Order is pending, no such stay is in effect, and, if any deadline for filing any such request is designated by statute or regulation, it is passed, including any extensions thereof; (ii) no petition for rehearing or reconsideration of the Action or Order, or protest of any kind, is pending before the Governmental Authority and the time for filing any such petition or protest is passed; (iii) the Governmental Authority does not have the Action or Order under reconsideration or review on its own motion and the time for such reconsideration or review has passed; and (iv) the Action or Order is not then under judicial review, there is no notice of appeal or other application for judicial review pending, and the deadline for filing such notice of appeal or other application for judicial review has passed, including any extensions thereof; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

"Financial Statements" has the meaning set forth in Section 5.28.

"GAAP" has the meaning set forth in Section 5.28.

"Governmental Authority" means any United States federal, state or local or any foreign government, governmental authority or regulatory or administrative authority, agency or commission or any court, tribunal or judicial body having jurisdiction.

"Governmental Authorization" means any approval, consent, license, Permit, waiver or other authorization issued, granted or otherwise made available by or under the authority of any Governmental Authority.

"Government Programs" means Medicare, Medicaid, and TRICARE.

"Hazardous Substance" means any "pollutant," "contaminant," "hazardous waste," "hazardous material" or "hazardous substance" under any Environmental, Health and Safety Laws or any other substance, waste or related material, the presence of which requires investigation, remediation or corrective action.

7

"Hospitals" means the LTACH facilities listed on Schedule 5.13.

"HSR Act" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended, and the rules and regulations promulgated thereunder.

"Improvements" means the buildings, structures, systems, facilities, easements, rights-of-way, privileges, improvements, licenses, hereditaments, appurtenances and all other rights and benefits appurtenant or in any way related to and/or demised under any lease of, or other contract or agreement for the use of, the Owned Real Property or Leased Real Property.

"Indebtedness" means, at any time and with respect to any Person: (a) all indebtedness of such Person for borrowed money; (b) all indebtedness of such Person for the deferred purchase price of property or services (other than trade payables, other expense accruals and deferred compensation items arising in the Ordinary Course of Business); (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments (other than performance, surety and appeal bonds arising in the Ordinary Course of Business in respect of which such Person's liability remains contingent); (d) all indebtedness of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property); (e) all obligations of such Person under leases which have been or should be, in accordance with GAAP, recorded as capital leases, to the extent required to be so recorded; (f) all reimbursement, payment or similar obligations of such Person, contingent or otherwise, under acceptance, letter of credit or similar facilities; (g) all Indebtedness of others referred to in clauses (a) through (f) above guaranteed directly or indirectly by such Person, or in effect guaranteed directly or indirectly by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness, (ii) to purchase, sell or lease (as lessee or lessor) property, or to purchase or sell services, primarily for the purpose of enabling the debtor to make payment of such Indebtedness, (iii) to supply funds to or in any other manner invest in the debtor (including any agreement to pay for property or services irrespective of whether such property is received or such services are rendered) or (iv) otherwise to assure a creditor against loss in respect of such Indebtedness; and (h) all Indebtedness referred to in clauses (a) through (g) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien upon or in property (including accounts and contract rights) owned by such Person, even though such Person has not assumed or become liable for the payment of such Indebtedness.

"Intellectual Property" means all intellectual property, including all Copyrights, Patents, Trademarks and Trade Secrets, owned, used or licensed by Sellers and used or held for use in the Business or the Acquired Assets.

"Inventory" has the meaning set forth in Section 2.1(a).

"IRS" has the meaning set forth in Section 5.19(c).

"Joint Commission" means the Joint Commission, formerly known as the Joint Commission on Accreditation of Healthcare Organizations (JCAHO).

"Knowledge" means, with respect to any matter in question, in the case of Sellers, the actual knowledge of any of the individuals listed on Schedule 1.1(a) is deemed to have after due investigation and inquiry.

8

"LCI Holdco" has the meaning set forth in the introductory paragraph.

"Leased Real Property" means the real property leased by Sellers, as tenant, together with, to the extent leased by Sellers in connection with the Business or the Acquired Assets, all buildings and other structures, facilities or Improvements located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing (each such real property lease a "Lease," and collectively, the "Leases").

"Legal Requirement" means any federal, state, provincial, local, municipal, foreign, international, multinational, or other administrative Order, constitution, law, ordinance, principle of common law, regulation, statute or treaty.

"Lessor Leases" has the meaning set forth in Section 5.4(b).

"Liability" means Claim or Encumbrance of any kind or nature whatsoever (whether known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, liquidated or unliquidated, or due or to become due).

"Lien" means any "interest" as that term is used in Section 363(f) of the Bankruptcy Code, mortgage, deed of trust, pledge, assignment, security interest, encumbrance, lien, mechanics lien, charge, hypothecation, deemed trust, action, easement, charge or otherwise, or claim of any kind or nature whatsoever in respect of any property, other than any license of Intellectual Property, including any of the foregoing created by, arising under, or evidenced by any conditional sale or other title retention agreement, the interest of a lessor under a capital lease, any financing lease having substantially the same economic effect as any of the foregoing, or the filing of a financing statement naming the owner of the property as to which such lien relates as the debtor under the Uniform Commercial Code or any comparable Legal Requirement in any other jurisdiction.

"LTACH" has the meaning set forth in the recitals.

"Material Adverse Effect" means any change, event, state of facts or occurrence that individually or in the aggregate (taking into account all other such changes, events, states of fact or occurrences) has had, or would be reasonably expected to have, a material adverse change in or material adverse effect on (x) the Acquired Assets or the financial condition or results of operations of the Business (excluding the Excluded Assets and the Excluded Liabilities), in each case taken as a whole or (y) the ability of the Sellers to consummate the transactions contemplated by this Agreement or to perform any of their obligations under this Agreement, but, with respect to clause (x), excluding (a) any change or effect to the extent that it results from or arises out of (i) the fact of the commencement of the Bankruptcy Cases; (ii) the execution and delivery of this Agreement or the announcement thereof or consummation of the transactions contemplated hereby; (iii) changes in (or proposals to change) Legal Requirements or accounting regulations or principles  applicable to the LTACH industry, except to the extent such changes disproportionately affect the Sellers, taken as a whole, as compared to other companies in the LTACH industry; or (iv) any specific action required to be taken by this Agreement or taken at the written request of Buyer after the Execution Date; and (b) any change or effect of economic or political conditions (including acts of terrorism or war) to the extent that such conditions do not disproportionately affect the Sellers, taken as a whole, as compared to other companies in the LTACH industry or the securities or financial markets in any country or region.

9

"National Provider Identifier" means the unique 10-digit identifier assigned to a health care provider by the National Plan and Provider Enumeration System.

"Occupancy Agreements" has the meaning set forth in Section 5.4(d).

"OIG" means the Office of the Inspector General of the Department of Health and Human Services.

"Order" means any award, writ, injunction, judgment, order, ruling, decision, subpoena, mandate, precept, command, directive, consent, approval, award, decree or similar determination or finding entered, issued, made or rendered by any Governmental Authority.

"Ordinary Course of Business" means, with respect to any Person, the ordinary and usual course of normal day to day operations of such Person and its business, consistent with its past practice.

"Outside Date" has the meaning set forth in Section 11.1(a)(iii).

"Owned Real Property" means the real property in which Sellers have fee title (or equivalent) interest, together with all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems, equipment and items of personal property of Sellers attached or appurtenant thereto and all easements, licenses, rights and appurtenances relating to the foregoing.

"Party" or "Parties" means, individually or collectively, Buyer and Sellers.

"Patents" means United States and foreign patents and patent applications, as well as any continuations, continuations-in-part, divisions, extensions, reexaminations, reissues, renewals and patent disclosures related thereto.

"Paying Party" has the meaning set forth in Section 8.1(c).

"Permits" means all approvals, permits, licenses, franchises, approvals, consents, certificates, notices, qualifications, authorizations, registrations, clearances and Orders, together with all modifications, amendments, supplements and extensions thereof, of or from any Governmental Authority or any other Person that are necessary for Sellers to own the Acquired Assets or operate the Business.

"Permitted Encumbrances" means: (i) easements, leases, reservations, or other rights of others in, or minor defects and irregularities in title that do not materially interfere with the operation of the Business or use of the Acquired Assets; (ii) any Encumbrance or privilege vested in any lessor, licensor or permittor for rent or other obligations solely related to the period after the Closing; (iii) licenses of or other grants of rights to use Intellectual Property entered into in the Ordinary Course of Business that do not interfere with the operation of the Business or use of the Acquired Assets; (iv) statutory liens for current Taxes not yet due or delinquent (or which may be paid without interest or penalties) that are apportioned as provided in this Agreement; and (v) Encumbrances set forth on Schedule 1.1(b), in each case with respect to (i) through (v), which are permitted by Section 6.02 of the Credit Agreement.

"Person" means any individual, corporation (including any non-profit corporation), partnership, limited liability company, joint venture, unincorporated organization, estate, trust, association, organization or other legal entity or group (as defined in Section 13(d)(3) of the Securities and Exchange Act of 1934, as amended) or Governmental Authority.

"Petition Date" means the date on which Sellers commence the Bankruptcy Case.

"Post-Closing Tax Period" has the meaning set forth in Section 8.1(b).

"Pre-Closing Tax Period" has the meaning set forth in Section 8.1(b).

"Pre-Paid Expenses" means all deposits (including customer deposits and security deposits (whether maintained in escrow or otherwise) for rent, electricity, telephone or otherwise), advances, pre-paid expenses, prepayments, vendor rebates and other refunds of every kind and nature (whether or not known or unknown or contingent or non-contingent) except to the extent related to the Cash Consideration.

"Previously Omitted Contract" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Designation" has the meaning set forth in Section 2.5(b)(i).

"Previously Omitted Contract Notice" has the meaning set forth in Section 2.5(b)(ii).

"Proceeding" means any Action, arbitration, audit, hearing, investigation, litigation, or suit (whether civil, criminal, administrative or investigative) commenced, brought, conducted, or heard by or before, or otherwise involving, any Governmental Authority.

"Professional" means any Person retained by Sellers or a statutory committee of unsecured creditors in the Bankruptcy Case pursuant to an Order of the Bankruptcy Court under Section 327, 363 or 1103 of the Bankruptcy Code.

"Program Agreements" has the meaning set forth in Section 5.12.

"Purchase Price" has the meaning set forth in Section 3.1.

"Real Property" means the Owned Real Property and the Leased Real Property.

"Reimbursing Party" has the meaning set forth in Section 8.1(c).

"Rejected Contracts" has the meaning set forth in Section 2.5(a)(i).

"Release" means (a) any releasing, spilling, discharging, disposing, leaking, pumping, injecting, pouring, depositing, dispersing, emitting, leaching or migrating into the indoor or outdoor environment, including ambient air, surface water, groundwater and surface or subsurface strata, or into or out of any property, including the movement of Hazardous Substances through or in the air, soil, surface water, groundwater, surface or subsurface strata or property and (b) the abandonment or discarding of barrels, tanks, containers or receptacles, whether or not sealed or closed, containing, or which formerly contained, Hazardous Substances.

"Representative" means, with respect to a particular Person, any director, officer, employee, agent, consultant, advisor or other representative of such Person, including legal counsel, accountants and financial advisors.

"Retained Professional Fees" means the Committee Retained Professional Fees and Seller Retained Professional Fees.

"Sale Hearing" means the hearing to consider the entry of the Sale Order.

"Sale Motion" means the motion filed by Sellers pursuant to, *inter alia*, Sections 363 and 365 of the Bankruptcy Code to obtain the Bidding Procedures Order and the Sale Order and approve the transactions contemplated by this Agreement.

"Sale Order" means an Order of the Bankruptcy Court, substantially in the form attached as **Exhibit C**, pursuant to, *inter alia*, Sections 105, 363 and 365 of the Bankruptcy Code authorizing and approving, *inter alia*, the sale of the Acquired Assets to Buyer on the terms and conditions set forth herein, free and clear of all Encumbrances, and the assumption and assignment of the Assigned Contracts to Buyer, and containing findings of fact and conclusions of law that Buyer has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code, a proposed version of which Order is to be filed by Sellers with the Bankruptcy Court with the filing of the Sale Motion.

"Sales Taxes" has the meaning set forth in Section 8.1(a).

"Seller" has the meaning set forth in the introductory paragraph.

"Seller Retained Professional Fees" means an aggregate amount equal to the reasonable and documented out-of-pocket fees and expenses incurred by Professionals retained by Sellers pursuant to section 327 of the Bankruptcy Code, in each case, to the extent such out-of-pocket fees and expenses (x) are accrued and unpaid as of the Closing Date, (y) with respect to hourly or monthly professional fees, have been authorized pursuant to the budget prepared in conjunction with the DIP Credit Agreement and order approving the DIP Credit Agreement, and (z) with respect to any transaction based fees, have been approved by order of the Bankruptcy Court.

"Seller Retained Professional Fees Escrow" means the escrow account established pursuant to the Seller Retained Professional Fees Escrow Agreement with subaccounts for each such Professional.

"Seller Retained Professional Fees Escrow Agreement" means an escrow agreement reasonably acceptable to the Parties by and among Buyer, Sellers and Escrow Agent for the disbursement of the amount payable by Buyer pursuant to Section 3.1(a)(i) in connection with the Seller Retained Professional Fees, and which shall provide that any amount not so used to satisfy such Fees shall be promptly returned to Buyer.

"Sellers Cost Reports" has the meaning set forth in Section 5.14.

"Senior Management" has the meaning set forth in Section 8.5(a).

"Straddle Period" has the meaning set forth in Section 8.1(b).

"Subsidiary" means any entity with respect to which a specified Person (or a Subsidiary thereof) has the power, through the ownership of securities or otherwise, to elect a majority of the directors or similar managing body.

"Successful Bidder" has the meaning set forth in the Bidding Procedures.

"Tax" or "Taxes" (and with correlative meaning, "Taxable" and "Taxing") means (i) any federal, state, provincial, local, foreign or other income, alternative, minimum, add-on minimum, accumulated earnings, personal holding company, franchise, capital stock, net worth, capital, profits, intangibles, windfall profits, gross receipts, value added, sales, use, goods and services, excise, customs duties, transfer, conveyance, mortgage, registration, stamp,

documentary, recording, premium, severance, environmental (including taxes under Section 59A of the Code), natural resources, real property, personal property, ad valorem, intangibles, rent, occupancy, license, occupational, employment, unemployment insurance, social security, disability, workers' compensation, payroll, health care, withholding, estimated or other similar tax, duty, levy or other governmental charge or assessment or deficiency thereof (including all interest and penalties thereon and additions thereto whether disputed or not) and (ii) any liability for any items described in clause (i) payable by reason of contract, transferee liability or operation of law (including Treasury Regulation Section 1.1502-6 or otherwise).

"Tax Return" means any return, declaration, report, claim for refund, information return or other document (including any related or supporting estimates, elections, schedules, statements, or information) filed or required to be filed in connection with the determination, assessment or collection of any Tax or the administration of any laws, regulations or administrative requirements relating to any Tax.

"Trade Payables" means accounts payable obligations of Sellers incurred at any time, except to the extent that such obligations (i) do not relate to the Acquired Assets or (ii) will not be payable by Buyer following the Closing pursuant to any Assigned Contract or Cure Costs. For the avoidance of doubt, Trade Payables do not include any obligations related to the Excluded Facility (if any).

"Trade Secrets" means trade secrets and other confidential and proprietary information and know-how.

"Trademarks" means United States, state and foreign trademarks, service marks, logos, slogans, trade dress and trade names, Internet domain names and any other similar designations of source of goods or services, whether registered or unregistered, and registrations and pending applications to register the foregoing, and all goodwill related to or symbolized by the foregoing.

"Transaction Documents" means this Agreement, the Assumption Agreement, the Bill of Sale and any other agreements, instruments or documents entered into at the Closing pursuant to this Agreement.

"Transfer Taxes" has the meaning set forth in Section 8.1(a).

"Transferred Benefit Plans" has the meaning set forth in Section 8.5(c).

"Transferred Employees" has the meaning set forth in Section 8.5(a).

"Unaudited Financial Statements" has the meaning set forth in Section 5.28.

"Updated Schedules" has the meaning set forth in Section 7.6(a).

"WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, as amended, any similar Legal Requirement and the rules and regulations thereunder.

"WARN List" has the meaning set forth in Section 8.5(g).

"Welfare Plan" has the meaning set forth in Section 5.19(f).

"Wind Down Budget" means a budget prepared in good faith by Sellers and acceptable to Buyer of the Estimated Wind Down Expenses, excluding those wind down costs and expenses associated with the Excluded Facility, setting forth a reasonably detailed

13

breakdown of such costs and expenses by category, the initial form of which shall be provided in writing by Sellers to Buyer on or prior to the Execution Date, and the final form of which shall be delivered at Closing.

"Wind Down Expense Escrow" means the escrow account established pursuant to the Wind Down Expense Escrow Agreement.

"Wind Down Expense Escrow Agreement" means an escrow agreement reasonably acceptable to the Parties by and among Buyer, Sellers and Escrow Agent for the disbursement of the amount payable by Buyer pursuant to Section 3.1(a)(iii) in connection with the Estimated Wind Down Expenses, and which shall provide that any amount not so used to satisfy such Expenses shall be returned to Buyer.

    1.2    Other Definitions and Interpretive Matters.

    (a)    Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

Calculation of Time Period.  When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.  If the last day of such period is a day other than a Business Day, the period in question shall end on the next succeeding Business Day.

Day.  Any reference in this Agreement to days (but not Business Days) means to calendar days.

Dollars.  Any reference in this Agreement to $ means United States dollars.

Exhibits/ Schedules.  All Exhibits and Schedules attached or annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein.  Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

Gender and Number.  Any reference in this Agreement to gender includes all genders, and words imparting the singular number only include the plural and vice versa.

Headings.  The provision of a table of contents, the division of this Agreement into Articles, Sections and other subdivisions and the insertion of headings are for convenience of reference only and shall not affect or be utilized in the construction or interpretation of this Agreement.  All references in this Agreement to any "Section" or "Article" are to the corresponding Section or Article of this Agreement unless otherwise specified.

Herein.  Words such as "herein," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.

Including.  The word "including" or any variation thereof means "including, without limitation," and shall not be construed to limit any general statement that it follows to the specific or similar items or matters immediately following it.

    (b)    No Strict Construction.  Buyer, on the one hand, and Sellers, on the other hand, participated jointly in the negotiation and drafting of this Agreement, and, in the event an ambiguity or question of intent or interpretation arises, this Agreement shall be

construed as jointly drafted by Buyer, on the one hand, and Sellers, on the other hand, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any provision of this Agreement. Without limiting the foregoing, no rule of strict construction construing ambiguities against the draftsperson shall be applied against any Person with respect to this Agreement.

**ARTICLE 2**

**PURCHASE AND SALE**

2.1     Purchase and Sale.

Subject to the entry of the Sale Order and upon the terms and subject to the conditions of this Agreement, on the Closing Date, Sellers shall unconditionally sell, transfer, assign, convey and deliver, or cause to be sold, transferred, assigned, conveyed and delivered, to Buyer and/or one or more other Persons designated by Buyer (a "Buyer Designee"), and Buyer shall purchase, acquire and accept from Sellers, free and clear of all Encumbrances (other than Closing Encumbrances and Permitted Encumbrances), all of Sellers' direct or indirect right, title and interest in, to or under the Business and the following (collectively, the "Acquired Assets"): all of Sellers' properties, rights, claims and assets (other than the Excluded Assets) of every kind and description, wherever situated or located, real, personal or mixed, tangible or intangible, contingent, owned, leased, licensed, used or held for use in or relating to the Business, whether or not reflected on the books and records of Sellers, as the same shall exist on the Closing Date. Without limiting the generality of the prior sentence, such Acquired Assets shall include, whether they relate exclusively to the Business or not (except any Excluded Facility or where so noted in the following list or in any definition used in the following list) all of Sellers' direct or indirect right, title and interest in, to and under the following:

(a)     all inventory of any kind or nature, merchandise and goods, related to the Business or Acquired Assets and maintained, held or stored by or for the Sellers on the Closing Date, whether or not prepaid, and wherever located, held or owned, and any prepaid deposits for any of the same, including food, laundry, medical, housekeeping and other supplies, disposables and consumables used, or held for use, in connection with the Business, including any goods in transit ("Inventory");

(b)     all Equipment;

(c)     all Assigned Contracts;

(d)     all (i) Owned Real Property, (ii) Leased Real Property (and any such agreement and rights related thereto or under such lease to the extent that such lease is an Assigned Contract), and (iii) Occupancy Agreements, in each case, together with all interests in and to all Improvements located thereon or attached thereto, and other appurtenances thereto, and rights in respect thereof;

(e)     all Permits and pending applications therefor that relate to the Business or the Acquired Assets, to the extent assignable;

(f)     all Intellectual Property;

(g)     all Accounts Receivable;

15

(h)    all Pre-Paid Expenses;

(i)    all goodwill, customer and referral relationships, other intangible property and all privileges, set-offs, indemnification rights, causes of action, actions, Claims and demands and rights of any kind as against others (whether by contract or otherwise) relating to, arising from or associated with any of the Acquired Assets (including the Intellectual Property), the Assumed Liabilities and/or the Business, including the Avoidance Actions;

(j)    to the extent permitted by Legal Requirements, all Documents and other books and records (financial, accounting, personnel files and other), and correspondence, and all customer sales, marketing, advertising, packaging and promotional materials, files, data, software (whether written, recorded or stored on disk, film, tape or other media, and including all computerized data), drawings, engineering and manufacturing data and other technical information and data, and all other business and other records, in each case arising under or relating to the Acquired Assets, the Assumed Liabilities or the Business;

(k)    all rights, remedies and benefits of Sellers arising under or relating to any of the Acquired Assets, the Assumed Liabilities or the Business, including rights, remedies and benefits arising out of express or implied warranties, representations and guarantees from suppliers, manufacturers, contractors or others to the extent relating to the operation of the Business or affecting the Equipment, Inventory or other tangible Acquired Assets or ordered by the Sellers prior to the Closing Date (and in any case, any component thereof), and all claims and causes of action arising or existing therefrom;

(l)    all cash and cash equivalents, including checks, commercial paper, treasury bills, certificates of deposit, bank accounts and other bank deposits, instruments and investments of Sellers;

(m)    other than as set forth in Section 2.2(h), all rights under or arising out of all insurance policies relating to the Business or any of the Acquired Assets or Assumed Liabilities (including returns and refunds of any premiums paid, or other amounts due back to Sellers, with respect to cancelled policies);

(n)    all rights, but not obligations, under non-disclosure or confidentiality, non-compete, or non-solicitation agreements or key employee retention plans or similar arrangements with (or for the benefit of) employees and agents of Sellers or with third parties (including any non-disclosure or confidentiality, non-compete, or non-solicitation agreements or any key employee retention plans or similar arrangements entered into in connection with or in contemplation of the auction contemplated by the Bidding Procedures);

(o)    all telephone, telex and telephone facsimile numbers and other directory listings;

(p)    all assets (whether in trust or otherwise) with respect to any Transferred Benefit Plan;

(q)    shares of capital stock or other equity interests in the entities listed on Schedule 2.1(q);

(r)    all assets, if any, listed on Schedule 2.1(r) (regardless of whether such assets are covered by any of the foregoing);

16

(s)    all rights to refunds of Taxes paid by Sellers which refunds are attributable to Pre-Closing Tax Periods; and

(t)    all proceeds and products of any and all of the foregoing Acquired Assets.

2.2    Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, nothing herein shall be deemed to sell, transfer, assign, convey or deliver any of the Excluded Assets to Buyer, and Sellers shall retain all right, title and interest to, in and under, and all Liabilities with respect to, the Excluded Assets.  For all purposes of and under this Agreement, the term "Excluded Assets" shall consist of only the following items, assets and properties (whether or not such assets are otherwise described in Section 2.1):

(a)    the assets, if any, listed on Schedule 2.2(a);

(b)    any Excluded Benefit Plan, and any asset in respect thereof;

(c)    any shares of capital stock or other equity interest in or issued by any Seller or any securities convertible into, exchangeable or exercisable for shares of capital stock or other equity interest in or issued by any Seller, other than any such capital stock or equity interest set forth on Schedule 2.1(q);

(d)    subject to Section 2.1(q), the limited liability company and corporate books and records of internal limited liability company and corporate proceedings (including stock certificates and membership interest certificates), Tax records, work papers and other records of Sellers as they pertain to ownership, organization, qualification to do business or existence of Sellers; provided, however, copies of the foregoing items shall be made available by Sellers to Buyer;

(e)    Documents that Sellers are required by Legal Requirements to retain ;

(f)    any Contract that is not an Assigned Contract;

(g)    all rights under or arising out of insurance policies to the extent not set forth in Section 2.1(m);

(h)    all current and prior director and officer insurance policies of the Sellers and all rights of any nature with respect thereto, including all insurance recoveries thereunder and rights to assert claims with respect to any such insurance recoveries;

(i)    any rights, claims or causes of action of Sellers under this Agreement or any other Transaction Document; and

(j)    shares of capital stock or other equity interests in the Excluded Facility and all rights, Claims, assets and properties of the Excluded Facility.

2.3    Assumed Liabilities.

Subject to entry of the Sale Order, upon the terms and subject to the conditions of this Agreement, on the Closing Date, Buyer or Buyer Designee shall, effective at the time of the Closing, assume and agree to discharge and perform when due, the Liabilities of Sellers (and

17

only those Liabilities of Sellers) which are enumerated in this Section 2.3 (the "Assumed Liabilities"). Except to the extent that any of the following are specified in Section 2.4, the following Liabilities of Sellers (and only the following Liabilities) shall constitute, without duplication, the Assumed Liabilities:

(a) all Liabilities under the Assigned Contracts;

(b) all Cure Costs;

(c) Trade Payables incurred in the Ordinary Course of Business after the Petition Date;

(d) Trade Payables incurred in the Ordinary Course of Business prior to the Petition Date set forth on Schedule 2.3(d), which schedule shall be delivered in accordance with Section 7.6, subject to Buyer's prior consent;

(e) Liabilities arising out of the Acquired Assets following the Closing Date;

(f) Liabilities arising under the Exit Facility and any letter of credit issued on behalf of or assumed by Buyer or its Affiliates pursuant to the Exit Facility;

(g) those specific Liabilities of Sellers (if any) identified on Schedule 2.3(g);

(h) Liabilities arising under drafts or checks outstanding at the Closing incurred in the Ordinary Course of Business; and

(i) Liabilities in respect of any Employee incurred pursuant to Sellers' policies but unpaid as of the Closing Date: (i) for salary, wages, benefits, expense reimbursements, supplies or overhead (other than pursuant to an Excluded Benefit Plan) or (ii) arising under any Transferred Benefit Plan; provided, however, that Liabilities in respect of (w) any Employee for any transaction bonus, change-in-control or similar agreement, (x) any member of Senior Management for severance arising under a pre-Petition Date employment or severance agreement, (y) any obligations incurred in contravention of this Agreement or (z) any claims by Employees alleging violations by Sellers prior to the Closing Date of any Legal Requirement including violations of the Fair Labor Standards Act and/or state wage and hours laws shall constitute Excluded Liabilities.

The assumption by Buyer of the Assumed Liabilities shall not, in any way, enlarge the rights of any third parties relating thereto.

2.4    Excluded Liabilities.

Notwithstanding any provision in this Agreement to the contrary, Buyer shall not assume and shall not be obligated to assume or be obliged to pay, perform or otherwise discharge any Liability of, or Liability against, Sellers, Sellers' Subsidiaries, the Business or the Acquired Assets, of any kind or nature, whether absolute, accrued, contingent or otherwise, whether due or to become due and whether or not assets, and whether or not known or unknown or currently existing or hereafter arising or matured or unmatured, direct or indirect, and however arising, other than the Assumed Liabilities, and Sellers shall be solely and exclusively liable with respect to all Liabilities of Sellers, other than the Assumed Liabilities (such Liabilities other than Assumed Liabilities, collectively, the "Excluded Liabilities"). Without limiting the generality of

the foregoing, the Excluded Liabilities shall include each of the following Liabilities of Sellers and Sellers' Subsidiaries other than the Assumed Liabilities:

(a)    any and all Liabilities for Indebtedness with respect to borrowed money (other than obligations with respect to capitalized leases that are Assigned Contracts);

(b)    all guarantees of third party obligations and reimbursement obligations to guarantors of Sellers' obligations or under letters of credit (except for such obligations under the Exit Facility);

(c)    subject to Section 8.1, (i) all Liabilities with respect to (x) Taxes imposed on Sellers, the Business or the Acquired Assets that are attributable to any Pre-Closing Tax Period or that arise as a consequence of the Closing or the other transactions contemplated by this Agreement; and (y) Taxes related to the Excluded Assets; and (ii) all Sales Taxes.

(d)    all Actions and Proceedings (other than Avoidance Actions) pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date even if instituted after the Closing Date;

(e)    all Liabilities to any owner or former owner of capital stock or warrants, holder of Indebtedness for borrowed money (except to the extent an Assumed Liability), or current or former officer or director of any Seller or Subsidiary of Seller;

(f)    all Liabilities in respect of any Employee or former employee other than as set forth in Section 2.3(i);

(g)    all Liabilities with respect to any Excluded Asset, including Contracts that are not Assigned Contracts and any Excluded Benefit Plans;

(h)    draft or checks outstanding at the Closing (except to the extent an Assumed Liability under Section 2.3(h));

(i)    all Liabilities under any futures contracts, options on futures, swap agreements or forward sale agreements;

(j)    all Liabilities for: (i) costs and expenses incurred or owed in connection with the administration of the Bankruptcy Case (including all Retained Professional Fees); and (ii) all costs and expenses incurred in connection with the negotiation, execution and consummation of the transactions contemplated under this Agreement;

(k)    all Liabilities related to the WARN Act with respect to Employees, and for any action resulting from Employees' separation of employment prior to or on the Closing Date;

(l)    other Liabilities relating to the conduct of the Business or to the Acquired Assets (and the use thereof) arising or accruing at any time on or prior to the Closing Date;

(m)    all Liabilities of the Excluded Facility or related to the operations or assets of the Excluded Facility;

(n)    all Liabilities accruing, arising out of, or relating to any federal, state or local investigations of, or Claims or actions against, any Seller or any Employee, medical staff, agents, vendors or representatives with respect to acts or omissions prior to the Closing;

(o)    all Liabilities arising under the terms of the Government Programs, or commercial third party payor programs, relating to periods prior to Closing, including any retroactive denials of claims or civil monetary penalties; and

(p)    all Liabilities arising from or relating to alleged or asserted violations of the federal False Claims Act (31 U.S.C. §§ 3729-3733) or qui tam actions arising thereunder or under similar state false claims prohibitions (regardless of whether any Governmental Authority has intervened) pending on or before the Closing Date or to the extent against or giving rise to Liability against the Business or the Acquired Assets prior to the Closing Date even if instituted after the Closing Date.

2.5    Assignment and Assumption of Contracts.

(a)    Assignment and Assumption at Closing.

(i)    Schedule 2.5(a) sets forth a list of all executory Contracts (including all Leases, Lessor Leases and Occupancy Agreements) to which one or more of the Sellers are party and which are to be included in the Acquired Assets (the "Assigned Contracts"). From and after the date hereof until two (2) Business Days prior to Closing, the Sellers shall make such deletions to Schedule 2.5(a) as Buyer shall request in writing. Any such deleted Contract shall be deemed to no longer be an Assigned Contract. All Contracts of Sellers that are not listed on Schedule 2.5(a) shall not be considered an Assigned Contract or Acquired Asset and shall be deemed "Rejected Contracts."

(ii)    Sellers shall take all actions required to assume and assign the Assigned Contracts to Buyer (other than payment of Cure Costs, if so required), including taking all actions required to obtain an Order containing a finding that the proposed assumption and assignment of the Assigned Contracts to Buyer satisfies all applicable requirements of Section 365 of the Bankruptcy Code.

(iii)    At Closing, (x) Sellers shall, pursuant to the Sale Order and the Assumption Agreement, assume and assign to Buyer (the consideration for which is included in the Purchase Price) each of the Assigned Contracts that is capable of being assumed and assigned and (y) Buyer shall pay promptly all Cure Costs (if any) in connection with such assumption and assignment (as agreed to among Buyer and Sellers or as determined by the Bankruptcy Court) and assume and perform and discharge the Assumed Liabilities (if any) under the Assigned Contracts, pursuant to the Assumption Agreement.

(b)    Previously Omitted Contracts.

(i)    If prior to or following Closing, it is discovered that a Contract should have been listed on Schedule 2.5(a) but was not listed on Schedule 2.5(a) (any such Contract, a "Previously Omitted Contract"), Sellers shall, promptly following the discovery thereof (but in no event later than two (2) Business Days following the discovery thereof), notify Buyer in writing of such Previously Omitted Contract and all Cure Costs (if any) for such Previously Omitted Contract. Buyer shall thereafter deliver written notice to Sellers, no later

20

than five (5) Business Days following notification of such Previously Omitted Contract from Sellers, designating such Previously Omitted Contract as "Assumed" or "Rejected" (a "Previously Omitted Contract Designation"). A Previously Omitted Contract designated in accordance with this Section 2.5(b)(i) as "Rejected," or with respect to which Buyer fails to deliver a Previously Omitted Contract Designation, shall be a Rejected Contract.

(ii)    If Buyer designates a Previously Omitted Contract as "Assumed" in accordance with Section 2.5(b)(i), Sellers shall serve a notice (the "Previously Omitted Contract Notice") on the counterparties to such Previously Omitted Contract notifying such counterparties of the Cure Costs with respect to such Previously Omitted Contract and Sellers' intention to assume and assign such Previously Omitted Contract in accordance with this Section 2.5. The Previously Omitted Contract Notice shall provide the counterparties to such Previously Omitted Contract with fifteen (15) Business Days to object, in writing to the Sellers and Buyer, to the Cure Costs or the assumption of its Contract. If the counterparties, Sellers and Buyer are unable to reach a consensual resolution with respect to the objection, the Sellers will seek an expedited hearing before Bankruptcy Court to determine the Cure Costs and approve the assumption. If no objection is served on the Sellers and Buyer, Sellers shall obtain an order of the Bankruptcy Court fixing the Cure Costs and approving the assumption of the Previously Omitted Contract.

(c)    Non-Assignment of Contracts and Permits. Notwithstanding anything contained in this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer any Contract or any Permit, if, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code, an attempt at assignment or transfer thereof, without the consent or approval required or necessary for such assignment or transfer, would constitute a breach thereof or in any way adversely affect any of the rights of Buyer, as the assignee or transferee of such Contract or Permit (as the case may be) thereunder. If, notwithstanding the provisions of Sections 363 and 365 of the Bankruptcy Code and the commercially reasonable efforts of Sellers, such consent or approval (not including any approval under the HSR Act, if applicable) is required but not obtained with respect to an Assigned Contract or a Permit, neither Sellers nor Buyer shall be in breach of this Agreement nor shall the Purchase Price be adjusted nor (but subject to Buyer's termination right set forth in Section 11.1(b)) shall the Closing be delayed in respect of the Assigned Contracts or the Permits; provided, however, if the Closing occurs, then, with respect to any Assigned Contract or Permit for which consent or approval is required but not obtained, from and after the Closing, Sellers shall cooperate, without further consideration, with Buyer in any reasonable arrangement Buyer may request to provide Buyer with all of the benefits of, or under, the applicable Assigned Contract or applicable Permit, including enforcement for the benefit of Buyer of any and all rights of Sellers against any party to the applicable Assigned Contract or applicable Permit arising out of the breach or cancellation thereof by such party; provided, however, to the extent that any such arrangement has been made to provide Buyer with the benefits of, or under, the applicable Assigned Contract or applicable Permit, from and after Closing, Buyer shall be responsible for, and shall promptly pay all payment and other obligations under such Assigned Contract or Permit (all of which shall constitute, and shall be deemed to be, Assumed Liabilities hereunder) to the same extent as if such Assigned Contract or Permit had been assigned or transferred at Closing with respect to Assigned Contracts and Permits, and at such applicable later date specified in this Section 2.5(c) with respect to any additional Assigned Contracts. Any assignment to Buyer of any Assigned Contract or Permit that shall, notwithstanding the

21

provisions of Sections 363 and 365 of the Bankruptcy Code, require the consent or approval of any Person for such assignment as aforesaid shall be made subject to such consent or approval being obtained.

2.6    Further Assurances.

At and after the Closing, and without further consideration therefor, Sellers shall execute and deliver to Buyer such further instruments and certificates as shall be necessary or desirable (i) to vest, perfect or confirm ownership (of record or otherwise) in Buyer and/or one or more Buyer Designees, Sellers' right, title or interest in to or under any or all of the Acquired Assets and Business, including the Real Property, free and clear of all Encumbrances (other than Closing Encumbrances and Permitted Encumbrances) or (ii) to otherwise effectuate the purposes and intent of this Agreement and the other Transaction Documents or for aiding, assisting, collecting and reducing to possession any of the Acquired Assets and exercising rights with respect thereto. Each of Sellers, on the one hand, and Buyer, on the other hand, shall take, or cause to be taken, all actions, do or cause to be done all things as may be reasonably requested by the other Party in order to vest, perfect or confirm any and all right, title and interest in, to and under such rights, properties or assets in Buyer or one of more Buyer Designees or otherwise to carry out this Agreement, and shall execute and deliver all deeds, bills of sale, instruments of conveyance, powers of attorney, assignments, assumptions and assurances, and as may be required to consummate the transactions contemplated by this Agreement. Notwithstanding anything contained herein to the contrary, nothing herein shall prohibit any Seller from ceasing its operations or winding up its affairs following the Closing.

# ARTICLE 3

## PURCHASE PRICE

3.1    Consideration.

The aggregate consideration (the "Purchase Price") for the purchase, sale, assignment and conveyance of Sellers' right, title and interest in, to and under the Acquired Assets shall consist of:

(a)    cash (the "Cash Consideration") in an amount equal to:

(i)    the Seller Retained Professional Fees, *plus*

(ii)    the Committee Retained Professional Fees, *plus*

(iii)    the Estimated Wind Down Expenses, *plus*

(iv)    any outstanding Liabilities under the DIP Credit Agreement on the Closing Date; and

(b)    the assumption by Buyer or Buyer Designee of the Assumed Liabilities from Sellers, including the assumption of the obligation to pay to the applicable counterparties of the applicable Assigned Contracts the Cure Costs payable by Buyer under Section 2.5; and

(c)    the release of Sellers and any guarantors under the Credit Agreement of all or a portion (as determined by Buyer) of the Liabilities arising under, or

22

otherwise relating to the Credit Agreement in an aggregate amount equal to $320 million (the "Credit Bid and Release") under Section 363(k) of the Bankruptcy Code; provided that the Credit Bid and Release shall be reduced dollar-for-dollar to the extent that Buyer assumes (in its sole discretion) any portion of the Indebtedness under the Credit Agreement.

3.2    Allocation of Purchase Price.

Within sixty (60) days of the Closing Date, Buyer shall prepare and deliver to Seller a statement allocating the sum of the Purchase Price, the Assumed Liabilities and other relevant items among the Acquired Assets in accordance with Section 1060 of the Code and the Treasury regulations promulgated thereunder (such statement, the "Allocation Statement"), and the Allocation Statement shall be finalized upon reasonable consultation with Seller, and with Seller's consent, which consent shall not be unreasonably withheld or delayed. The Parties shall follow the Allocation Statement for purposes of filing IRS Form 8594 (and any supplements to such form) and all other Tax Returns, and shall not voluntarily take any position inconsistent therewith. If the IRS or any other taxation authority proposes a different allocation, Seller or Buyer, as the case may be, shall promptly notify the other party of such proposed allocation. Seller or Buyer, as the case may be, shall provide the other party with such information and shall take such actions (including executing documents and powers of attorney in connection with such proceedings) as may be reasonably requested by such other party to carry out the purposes of this Section 3.2. Except as otherwise required by any Legal Requirement or pursuant to a "determination" under Section 1313(a) of the Code (or any comparable provision of United States state, local, or non-United States law), (i) the transactions contemplated by Article 2 of this Agreement shall be reported for all Tax purposes in a manner consistent with the terms of this Section 3.2; and (ii) neither Party (nor any of their Affiliates) will take any position inconsistent with this Section 3.2 in any Tax Return, in any refund claim, in any litigation or otherwise. Notwithstanding the allocation of the Purchase Price set forth in the Allocation Statement, nothing in the foregoing shall be determinative of values ascribed to the Acquired Assets or the allocation of the value of the Acquired Assets in any plan or reorganization or liquidation that may be proposed.

3.3    Limitation on Buyer Liability.

For the avoidance of doubt, except with respect to amounts deposited at Closing pursuant to Section 4.3 into the Committee Retained Professional Fee Escrow, the Seller Retained Professional Fee Escrow and the Wind Down Expenses Escrow, Buyer shall have no liability with respect to Committee Retained Professional Fees, Seller Retained Professional Fees or Estimated Wind Down Expenses or with respect to any amounts that would have been such Fees or Expenses if not for the limitations contained in this Agreement.

**ARTICLE 4**

**CLOSING AND DELIVERIES**

4.1    Closing Date.

Upon the terms and subject to the conditions hereof, the closing of the sale of the Acquired Assets and the assumption of the Assumed Liabilities (other than those pertaining to Previously Omitted Contracts pursuant to Section 2.5(b)) contemplated hereby (the "Closing") shall take place at the offices of Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square,

New York, New York no later than five (5) Business Days following the date on which all the conditions set forth in Article 9 and Article 10 have been satisfied or (if permissible) waived by the Party entitled to waive such condition (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or on such other date and time as Sellers and Buyer may mutually agree in writing. The date and time at which the Closing actually occurs is hereinafter referred to as the "Closing Date." Upon consummation of the Closing, the purchase and sale of the Acquired Assets and the assumption of the Assumed Liabilities hereunder, and the Closing, shall be deemed to have occurred as of 12:01 a.m. (New York time) on the Closing Date.

4.2     [Reserved].

4.3     Buyer's Deliveries.

Subject to satisfaction or (if permissible) waiver of the conditions set forth in Article 9 and Article 10, at the Closing, Buyer shall deliver (or cause one or more of its Affiliates or Buyer Designees to deliver) to Sellers:

(a)     the Cash Consideration in cash by wire transfer of immediately available funds as follows:

(i)     an amount equal to the Retained Professional Fees into the Committee Retained Professional Fees Escrow and Seller Retained Professional Fees Escrow, as applicable, for the purpose of paying the Retained Professional Fees in accordance with the Sale Order; and

(ii)     an amount equal to the Estimated Wind Down Expenses into the Wind Down Expense Escrow for the purpose of winding down the bankruptcy estates of Sellers in accordance with the Wind Down Budget; and

(iii)     an amount equal to the outstanding Liabilities under the DIP Credit Agreement on the Closing Date into the account specified in the DIP Credit Agreement.

(b)     the Assumption Agreement, duly executed by Buyer or Buyer Designee;

(c)     each other Transaction Document to which Buyer is a party, duly executed by Buyer;

(d)     the certificates of Buyer to be received by Sellers pursuant to Sections 10.1 and 10.3; and

(e)     such other documents as Seller may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

4.4     Sellers' Deliveries.

At the Closing, Sellers shall deliver to Buyer:

(a)     possession of the Acquired Assets and the Business;

24

(b)     the Bills of Sale, the Deeds, the Assumption Agreement and each other Transaction Document to which any Seller is a party, duly executed by the applicable Sellers;

(c)     instruments of assignment of the Patents and Trademarks that are owned by Sellers and included in the Acquired Assets, if any, duly executed by the applicable Sellers, in form for recordation with the appropriate Governmental Authorities, in customary form and reasonably acceptable to the Parties;

(d)     with respect to the Owned Real Property, possession of the Owned Real Property, together with  any existing surveys, legal descriptions and title policies concerning the Owned Real Property that are in the possession of Sellers which shall be deemed to be delivered to the extent located at any of the Real Property;

(e)     a certified copy of the Sale Order;

(f)     the certificates of Sellers to be received by Buyer pursuant to Sections 9.1 and 9.2;

(g)     certificates executed by each Seller, in the form prescribed under Treasury Regulation Section 1.1445-2(b), that such Seller is not a foreign person within the meaning of Section 1445(f)(3) of the Code;

(h)     such other bills of sale, deeds, endorsements, assignments and other good and sufficient instruments of conveyance and transfer, in form reasonably satisfactory to Buyer, as Buyer may reasonably request to vest in Buyer all of Sellers' right, title and interest of Sellers in, to or under any or all the Acquired Assets, including all Owned Real Property;

(i)     such ordinary and customary documents (including any factually accurate affidavits) as may be required by any title company or title insurance underwriter to enable Buyer to acquire, at Buyer's sole election and Buyer's sole cost and expense, one or more owner policies of title insurance issued by such title company covering any or all of the Hospitals in form and substance reasonably acceptable to Sellers; and

(j)     such other documents as Buyer may reasonably request that are customary for a transaction of this nature and necessary to evidence or consummate the transactions contemplated by this Agreement.

## ARTICLE 5

### REPRESENTATIONS AND WARRANTIES OF SELLERS

Sellers hereby jointly and severally represent and warrant to Buyer as follows, except as disclosed in the Disclosure Schedules attached hereto:

5.1     Organization and Good Standing.

Each Seller is an entity duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization.  Each Seller has all requisite corporate or limited liability company power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.  Sellers are duly qualified or licensed to do business and are in good standing in each jurisdiction where the character of their Business or the nature of their properties makes such qualification or licensing necessary, except for such

failures to be so qualified or licensed or in good standing as would not, individually or in the aggregate, have a Material Adverse Effect.

5.2     Authority; Validity; Consents.

Each Seller has, subject to entry of the Sale Order, the requisite corporate or limited liability company power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which such Seller is a party and to consummate the transactions contemplated hereby and thereby, and, subject to entry of the Sale Order, the execution, delivery and performance of this Agreement and such other Transaction Documents by such Seller and the consummation by such Seller of the transactions contemplated herein and therein have been duly and validly authorized by all requisite corporate or limited liability company action. This Agreement has been duly and validly executed and delivered by each Seller and each other Transaction Document required to be executed and delivered by a Seller at the Closing will be duly and validly executed and delivered by such Seller at the Closing. Subject to entry of the Sale Order, this Agreement and the other Transaction Documents constitute, with respect to each Seller that is party thereto, the legal, valid and binding obligations of such Seller, enforceable against such Seller in accordance with their respective terms, except as such enforceability is limited by general principles of equity. Subject to entry of the Sale Order, except (a) as required to comply with the HSR Act, (b) for entry of the Sale Order, (c) for notices, filings and consents required in connection with the Bankruptcy Case and (d) for the notices, filings and consents set forth on Schedule 5.2, Sellers are not required to give any notice to, make any registration, declaration or filing with or obtain any consent, waiver or approval from, any Person (including any Governmental Authority) in connection with the execution and delivery of this Agreement and the other Transaction Documents or the consummation or performance of any of the transactions contemplated hereby and thereby.

5.3     No Conflict.

Except as set forth in Schedule 5.3, neither the execution and delivery by any Seller of this Agreement or any other Transaction Document to which it is (or will be) a party nor after giving effect to the Sale Order, the consummation of the transactions contemplated hereby or thereby nor, after giving effect to the Sale Order, compliance by it with any of the provisions hereof or thereof will (i) conflict with or result in a violation of (A) any provision of the certificate of incorporation or bylaws (or other organizational or governing documents) of such Seller or (B) any Order binding upon such Seller or by which the Business or any Acquired Assets are subject or bound, (ii) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under (A) any Contract, or (B) any license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority, or (iii) result in the creation of any Lien upon the properties or assets of such Seller being sold or transferred hereunder.

5.4     Real Property.

(a)     Owned Real Property. Except for Permitted Encumbrances, Sellers have good and marketable title in the Owned Real Property set forth on Schedule 5.4(a). Except for the Lessor Leases, none of the Owned Real Property is subject to any lease or grant to any Person of any right to the use, purchase, occupancy or enjoyment of such Owned Real Property

26

or any portion thereof required to conduct the Business. Except for Permitted Encumbrances, the Owned Real Property is not subject to any Encumbrances or to any use restrictions, exceptions, reservations or limitations, which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business and in the same manner after the Closing as conducted by Sellers prior to Closing. There are no pending or, to Sellers' Knowledge, threatened condemnation proceedings relating to any of the Owned Real Property.

(b)    Lessor Leases.  Schedule 5.4(b) lists, as of the Execution Date, all unexpired leases or other occupancy agreements whereby any Seller leases an interest in any Owned Real Property to a third party (the "Lessor Leases").  Sellers have provided true, complete and correct copies of the Lessor Leases to Buyer, including any amendments thereto through the date hereof.  Sellers are not in material breach of or in default under the Lessor Leases and, to Sellers' Knowledge, no party to any Lessor Lease has given Sellers written notice of or, to Sellers' Knowledge, made a claim with respect to any material breach or default thereunder, nor are Sellers aware of any condition that currently exists or with the passage of time will result in a default or material breach by any party to a Lessor Lease.

(c)    Leased Real Property.  Schedule 5.4(c) contains a list and brief description of all Leased Real Property held or used for, or necessary to the operation of the Business.  Sellers have made available true and complete copies of all Leases to Buyer.  Other than as set forth on Schedule 5.4(c), Sellers are not in breach of any material term or in "default" under any Lease and, to Sellers' Knowledge, no party to any Lease has given Sellers written notice of or made a claim with respect to any breach or default thereunder.  To Sellers' Knowledge, there are no conditions that currently exist or with the passage of time will result in a default or breach of any material term by any party to a Lease.  To Sellers' Knowledge, none of the Leased Real Property is subject to any sublease or grant to any Person of any right to the use, occupancy or enjoyment of the Leased Real Property or any portion thereof that would materially impair the use of the Leased Real Property in the operation of the Business.  To Sellers' Knowledge, the Leased Real Property is not subject to any Encumbrances (other than Permitted Encumbrances) that were placed on the Leased Real Property through the action or inaction of Sellers and materially impact the Business use of the Leased Real Property.  To Sellers' Knowledge, the Leased Real Property is not subject to any use restrictions, exceptions, reservations or limitations which in any material respect interfere with or impair the present and continued use thereof in the Ordinary Course of Business.  To Sellers' Knowledge, there are no pending or threatened condemnation or other proceedings or claims relating to any of the Leased Real Property.  To Sellers' Knowledge, the Leases will continue to be legal, valid, binding, enforceable and in full force and effect on the same material terms immediately following the consummation of the transactions contemplated hereby.

(d)    Occupancy Agreements.  Schedule 5.4(d) contains a list of easements, licenses, use agreements and other occupancy agreements for real property granted by third parties to Sellers that are used or expected to be used in the operation of the Business (the "Occupancy Agreements").  Sellers have made available true and complete copies of all Occupancy Agreements to Buyer.  To Sellers' Knowledge, Sellers are not in breach of or in default under the Occupancy Agreements and no party to any Occupancy Agreement has given Sellers written notice of or made a claim with respect to any material breach or default thereunder, nor are Sellers aware of any condition that currently exists or with the passage of time will result in a default or breach by any party to an Occupancy Agreement.

27

(e)    Conformity of the Owned Real Property, Leased Real Property and Occupancy Agreements.  All buildings, structures and improvements located on, fixtures contained in, and appurtenances attached to the Owned Real Property, Leased Real Property and Occupancy Agreements conform in all material respects to any Legal Requirements, including without limitation, those related to zoning, use or construction, and the Owned Real Property, Leased Real Property, Occupancy Agreements are zoned for the purposes for which they are presently used by Sellers.

5.5    Environmental and Health and Safety Matters.

Except as set forth on Schedule 5.5:

(a)    Sellers' operation of the Business has materially complied and is in material compliance with all Legal Requirements concerning public health and safety, worker health and safety, Hazardous Substances and environmental matters ("Environmental, Health and Safety Laws"). Sellers have not received any written or oral notice, report or other information alleging any pending or threatened violation of any Environmental, Health and Safety Laws, nor do Sellers have any unresolved citations alleging any violations of Environmental, Health and Safety Laws;

(b)    there has been no Release of any Hazardous Substances at, on or under any of the Real Property that would require reporting, investigation, or cleanup under Environmental, Health and Safety Laws and none of such properties has been used by any Person as a landfill or storage, treatment, manufacturing, processing, distribution or disposal site for any type of Hazardous Substance or non-hazardous solid wastes as defined under the Resource Conservation and Recovery Act of 1976, as amended, or any similar state or local Legal Requirement;

(c)    none of the Hospitals or any aspect of the Business is subject to any consent decree or other Order with or from any Governmental Authority under any Environmental, Health and Safety Laws;

(d)    all Permits required to be obtained or filed by Sellers under any Environmental, Health and Safety Laws in connection with the Acquired Assets are set forth on Schedule 5.5(d). Such Permits have been timely and duly obtained or filed, are in full force and effect, free from breach, and will not be adversely affected by this Agreement or the transactions contemplated hereby;

(e)    Sellers have not received any written communication from a Governmental Authority, Person or any citizens' group, employee or otherwise within the past five years, alleging (i) that any of the Sellers or any Owned Real Property or Leased Real Property has violated or is in violation of any Environmental, Health and Safety Laws or is liable for any cleanup of Hazardous Substances or (ii) that the Sellers have any pre-existing environmental Liability; and

(f)    Sellers have made available or provided Buyer with copies of all environmental assessments, audits (including compliance audits), evaluations, studies, and tests in their possession or within their reasonable control relating to the Business, the Owned Real Property or the Leased Real Property, any real property previously or currently owned, leased, or used by or on behalf of Sellers have at any time had a legal or beneficial interest, whether

28

generated by Sellers or others, including environmental audits and environmental site assessments.

5.6    Title to Acquired Assets.

Immediately prior to Closing, Sellers will have, and, upon delivery to Buyer on the Closing Date of the instruments of transfer contemplated by Section 4.4, and upon entry of the Sale Order, Sellers will thereby transfer to Buyer and Buyer will (subject to Section 2.5(c)) be vested, to the maximum extent permitted by Sections 363 and 365 of the Bankruptcy Code, with good, valid and marketable title to, or, in the case of property leased or licensed by Sellers, a valid leasehold or licensed interest in, all of the Acquired Assets, free and clear of all Encumbrances, except (a) for the Assumed Liabilities, (b) for Closing Encumbrances and (c) for Permitted Encumbrances. The Acquired Assets consisting of personal property are in good operating condition and repair (reasonable wear and tear excepted) and are suitable for the purposes for which they are presently used. No Seller has taken any action, or failed to take any action, which action or failure would preclude or prevent Buyer as a legal matter from conducting the Business as currently conducted in all material respects. No Acquired Asset (except for the Owned Real Property, Leased Real Property, and Occupancy Agreements) is subject to any agreement, written or oral, for its sale or use by any Person other than Sellers.

5.7    Taxes.

(a)    Sellers have each timely filed all material Tax Returns required to be filed with the appropriate Governmental Authorities (taking into account any extension of time to file granted to Sellers), and, except as set forth on Schedule 5.7(a), all material Taxes relating to the Acquired Assets that are due and payable, whether or not shown to be payable on such Tax Returns, have been timely paid, except for any unpaid Taxes which are specified in Section 8.1(b) to be paid at Closing or assumed by Buyer and paid after Closing. Except as set forth on Schedule 5.7(a), (i) no examination of any such Tax Return of Sellers is currently in progress by any Governmental Authority and no Seller has received notice of any contemplated examination of any such Tax Return; and (ii) no material adjustment has been proposed in writing with respect to any such Tax Returns for the last five (5) fiscal years by any Governmental Authority.

(b)    Sellers have not received written notice of any material tax deficiency outstanding, proposed or assessed against or allocable to Sellers and have not executed any waiver of any statute of limitations in respect of Taxes nor agreed to any extension of time with respect to a Tax assessment or deficiency with respect to the Acquired Assets.

(c)    Except as set forth on Schedule 5.7(c), Sellers are not in default under, nor to Sellers' Knowledge does there exist any condition which, with the giving of notice or passage of time would constitute a default by Sellers under, any agreement with any Governmental Authority that provides for or results in a reduction, rebate or exemption from Taxes or any other form of Tax incentive applicable to any Hospital or the Business, except for such defaults or conditions which would not, individually or in the aggregate, have a Material Adverse Effect.

(d)    Except as set forth on Schedule 5.7(d), each Seller has withheld and paid all Taxes required to have been withheld and paid in connection with amounts paid or owing to any employee, independent contractor, creditor, stockholder, or other third party and all

IRS Forms W-2 and Forms 1099 (or any other applicable form) required with respect thereto have been properly and timely distributed.

(e)    No Seller is a party to any Tax allocation or sharing agreement.  No Seller (A) has been a member of an affiliated group filing a consolidated federal income Tax Return (other than a group, the common parent of which was LCI Holding Company, Inc.) or (B) has any liability for the Taxes of any Person (other than a Seller) under Treas. Reg. §1.1502-6 (or any similar provision of state, local, or non-U.S. law), as a transferee or successor, by contract, or otherwise.

(f)    No Seller is or has been a party to any "listed transaction," as defined in Code Section 6707A(c)(2) and Treas. Reg. §1.6011-4(b)(2).

5.8    Legal Proceedings.

Except for the Bankruptcy Case and as set forth on Schedule 5.8, there is no Proceeding or Order pending, outstanding or, to Sellers' Knowledge, threatened against or related to the Business, whether at law or in equity, whether civil or criminal in nature or by or before any arbitrator or Governmental Authority, nor, to the Sellers' Knowledge, are there any investigations relating to the Business pending or threatened by or before any arbitrator or any Governmental Authority, which, if determined adversely, would reasonably be expected to be material to the Business or the Acquired Assets, taken as a whole.

5.9    Compliance with Legal Requirements; Permits.

(a)    Each Hospital is licensed as a hospital or a specialty hospital to operate in accordance with the Legal Requirements of the state in which such Hospital is located. The pharmacies, laboratories, and all other ancillary departments located at the Hospitals or operated for the benefit of the Hospitals that are required to be separately licensed are duly licensed by the appropriate Governmental Authority.

(b)    Except as disclosed on Schedule 5.9(b), each Hospital possesses the Permits necessary for Sellers to own and operate the Hospitals and the Acquired Assets and to carry on the Business as currently conducted. Sellers have provided accurate and complete copies to Buyer of each Permit listed on Schedule 5.9(b).  Schedule 5.9(b) lists all material Permits owned or held by Sellers applicable to the Acquired Assets or the Hospitals.  Sellers and the Hospitals, as applicable, are, and at all times have been, in material compliance with the terms of such Permits, and there are no provisions in, or agreements relating to, any Permit that preclude or limit Sellers from operating the Hospitals and the Acquired Assets and carrying on Business as currently conducted.  There is no pending or, to Sellers' Knowledge, threatened Proceeding by or before any Governmental Authority to revoke, cancel, rescind, suspend, restrict, modify, or refuse to renew such Permits owned or held by Sellers and listed on Schedule 5.9(b). To Sellers' Knowledge, no event has occurred and no facts exist with respect to any Permit that would allow the suspension, revocation, or termination of same.  Neither Sellers nor the Hospitals has received any written notice or communication from any Governmental Authority regarding any violation of any Permit owned or held by Sellers and listed on Schedule 5.9(b) (other than any surveys or deficiency reports for which Sellers have submitted a plan of correction that has been accepted or approved by the applicable Governmental Authority). Sellers have delivered to Buyer accurate and complete copies of all survey reports, deficiency

notices, plans of correction, and related correspondence received by Sellers or the Hospitals since January 1, 2010 in connection with the Permits owned or held by Sellers.

### 5.10    Certificates of Need.

All certificates of need approvals necessary for Sellers to own and operate the Hospitals and the Acquired Assets and to carry on the Business as currently conducted in all material respects. Seller and the Hospitals, as applicable, are, and at all times have been, in material compliance with the terms and conditions of any such certificates of need approvals. Each such certificate of need is valid and in good standing and not subject to meritorious challenge.

### 5.11    Accreditation.

Sellers maintain all Joint Commission accreditations and other accreditations necessary to operate the Hospitals as currently operated in all material respects. All such accreditations are and shall be current and in full force and effect as of the date hereof and as of the Closing Date. Except as otherwise disclosed in Schedule 5.11 and to Sellers' Knowledge, no event has occurred or other fact exists with respect to such accreditations that allows, or after notice or the lapse of time or both, would allow, revocation or termination of any such accreditations, or would result in any other material impairment in the rights of any holder thereof. There is no pending or, to Sellers' Knowledge, threatened Proceeding by any accrediting body to revoke, cancel, rescind, suspend, restrict, modify, or non-renew any such accreditation. Sellers have delivered a copy of each Hospital's most recent Joint Commission accreditation reports and any reports, documents, or correspondence relating thereto to Buyer.

### 5.12    Government Program Participation; Reimbursement.

The Hospitals are certified for participation in the Government Programs and have current and valid provider agreements listed on Schedule 5.12 (the "Program Agreements") and are excluded from the Medicare prospective payment system. Sellers have delivered accurate and complete copies of all such Program Agreements, or correspondence evidencing such participation, to Buyer. The Hospitals are in substantial compliance with the conditions of participation in the Government Programs and with the terms, conditions, and provisions of the Program Agreements. Except as otherwise disclosed on Schedule 5.12 and to Sellers' Knowledge, no events or facts exist that would cause any Program Agreement to be suspended, terminated, restricted or withdrawn. There is no Proceeding, survey, or other action pending, or, to Sellers' Knowledge, threatened, involving any of the Government Programs or any other third party payor programs, including the Hospitals' participation in and the reimbursement received by Sellers with respect to the Hospitals from the Government Programs or any other third party payor programs. Neither Sellers nor, to Sellers' Knowledge, any of their employees, officers, or directors have committed a violation of any Legal Requirement relating to payments and reimbursements under the Government Programs or any other third party payor program. Schedule 5.12 contains a list of all National Provider Identifiers and all provider numbers of Sellers with respect to the Hospitals under the Government Programs.

5.13    LTACH Representations.

Schedule 5.13 sets forth a true and complete list of all Hospitals operated by Sellers. Except as disclosed on Schedule 5.13, Sellers are (or will be as of the Closing Date) in compliance with the requirements to qualify each Hospital as a long term acute care hospital in accordance with all Legal Requirements, including the requirements set forth at 42 CFR. § 412.23(e). Each Hospital satisfies (or will satisfy as of the Closing Date) all requirements for exclusion from the Medicare prospective payment system specified in 42 CFR. § 412.1(a)(1) by complying with the requirements set forth at 42 CFR. § 412.23(e). Except as disclosed on Schedule 5.13, no Proceedings or surveys are pending or, to Sellers' Knowledge, threatened that relate to any Hospital's status as a long term care hospital under 42 CFR. § 412.23(e). Except as disclosed on Schedule 5.13, no Hospital is subject to the special payment provisions for long term care hospitals specified in 42 CFR. §§ 412.534 and 412.536. To the extent any Seller has increased the number of beds at a Hospital since December 29, 2007, each such increase in beds was implemented consistently with an applicable exception to the moratorium on the development of new long term acute care hospital facilities established by Section 114 of the Medicare/Medicaid State Children's Health Insurance Program Extension Act and regulations promulgated thereunder.

5.14    Third Party Payor Cost Reports.

Sellers have timely filed all required cost reports relating to Sellers and the Hospitals for periods ending on or prior to the Closing Date (the "Sellers Cost Reports"), and copies of Sellers Cost Reports filed by or on behalf of Sellers since 2008 to date have been provided to Buyer. All Sellers Cost Reports accurately reflect the information required to be included therein, and such Sellers Cost Reports do not claim, and neither Sellers nor the Hospitals have received, reimbursement in any amount in excess of the amounts allowed by Legal Requirement or any applicable agreement. To Sellers' Knowledge, there are no facts or circumstances that would give rise to any material change in allowed costs under Sellers Cost Reports.

5.15    Regulatory Compliance.

(a)    Except as disclosed in Schedule 5.15, Sellers, the Hospitals, and their respective officers, directors or employees, have not been convicted of, charged with, or, to Sellers' Knowledge, investigated for or engaged in, conduct that would constitute a Medicare or other Federal Health Care Program (as defined in 42 U.S.C. § 1320a-7(b)(f)) related offense or convicted of, charged with or, to Sellers' Knowledge, investigated for, or engaged in conduct that would constitute a violation of any Legal Requirement related to fraud, theft, embezzlement, breach of fiduciary duty, kickbacks, bribes, other financial misconduct, obstruction of an investigation or controlled substances. Except as disclosed in Schedule 5.15, Sellers, the Hospitals, and their respective officers, directors, employees or independent contractors of Sellers or the Hospitals (whether an individual or entity), have not been excluded from participating in any Government Program, subject to sanction pursuant to 42 U.S.C. § 1320a-7a or § 1320a-8 or been convicted of a crime described at 42 U.S.C. § 1320a-7b, nor, to Sellers' Knowledge, are any such exclusions, sanctions or charges threatened or pending;

(b)    Sellers, the Hospitals, and the Acquired Assets have been and are presently in compliance in all material respects with all Legal Requirements, including, but not

32

limited to, Title XVIII of the Social Security Act, 42 U.S.C. §§ 1395-1395hhh (the Medicare statute), including specifically, the Ethics in Patient Referrals Act, as amended, or "Stark Law," 42 U.S.C. § 1395nn; Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v (the Medicaid statute); the Federal Health Care Program Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b); the False Claims Act, as amended, 31 U.S.C. §§ 3729-3733; the Program Fraud Civil Remedies Act, 31 U.S.C. §§ 3801-3812; the Anti-Kickback Act of 1986, 41 U.S.C. §§ 51-58; the Civil Monetary Penalties Law, 42 U.S.C. §§ 1320a-7a and 1320a-7b; the Exclusion Laws, 42 U.S.C. § 1320a-7; HIPAA; Section 504 of the Rehabilitation Act of 1973; the Immigration Reform and Control Act of 1985; and all applicable implementing regulations, rules, ordinances and Orders; and any similar state and local statutes, regulations, rules, ordinances and Orders, and any corresponding state statutes and applicable implementing regulations that address the subject matter of the foregoing;

(c)     Neither Sellers nor the Hospitals have received any written, or to Sellers' Knowledge, oral communication from a Governmental Authority, commercial payor or patient that alleges the Hospitals or the Acquired Assets are not in material compliance with any Legal Requirement, other than statements of deficiencies from a Governmental Authority received in the Ordinary Course of Business; and

(d)     Sellers, the Hospitals and Sellers' officers, directors or employees have not engaged in any activities that are prohibited under 42 U.S.C. §§ 1320a-7 et seq., or the regulations promulgated thereunder, or under any other Legal Requirements, or which are prohibited by applicable rules of professional conduct.

5.16    Compliance Programs.

Sellers have provided to Buyer an accurate and complete copy of each Hospital's current compliance program materials. Sellers and the Hospitals have conducted their operations in accordance with their respective compliance programs.  Sellers have granted Buyer access to logs and other information maintained by Sellers under their respective compliance programs. No Seller (a) is a party to a Corporate Integrity Agreement with the OIG; (b) has any reporting obligations pursuant to any settlement agreement entered into with any Governmental Authority; (c) except as disclosed in Schedule 5.16, and, to Sellers' Knowledge, has been the subject of any Government Program investigation conducted by any federal or state enforcement agency; (d) except as disclosed in Schedule 5.16, has been a defendant in any qui tam/False Claims Act litigation (other than by reason of a sealed complaint of which Sellers have no Knowledge); and (e) except as disclosed in Schedule 5.16, has received any complaints with respect to the Hospitals through such Seller's compliance "hotline" from employees, independent contractors, vendors, physicians, patients, or any other persons that could reasonably be considered to indicate that such Seller has materially violated, or is currently in material violation of, any Legal Requirement. For purposes of this Agreement, the term "compliance program" refers to provider programs of the type described in the compliance guidance published by the OIG.

5.17    Medical Staff Matters.

Except as otherwise disclosed on Schedule 5.17, there are no (i) pending or, to the Knowledge of Sellers, threatened Professional Review Actions (as that term is defined at 42 U.S.C. § 1151 (a)) with respect to any medical staff member of the Hospitals or any applicant thereto, including any adverse actions for which a medical staff member or applicant has

requested a review hearing as provided by the bylaws of the medical staff, that has not been scheduled or that has been scheduled but has not been completed, (ii) pending or, to the Knowledge of Sellers threatened disputes with applicants, staff members or advanced practice professionals, or (iii) pending investigations by the respective medical staff executive committee against or pertaining to medical staff members or advanced practice professionals, and all appeal periods in respect of any medical staff member or applicant against whom a Professional Review Action has been taken have expired. Except as disclosed on Schedule 5.17, no medical staff members of the Hospitals have had their privileges revoked, suspended, or reduced since June 1, 2012.

5.18    Labor Matters.

(a)    There are no union, collective bargaining or other employee association Contracts to which Sellers or their Affiliates are a party relating to any Employee. There is no pending or, to Sellers' Knowledge, threatened, strike, slowdown, picketing, lockouts or work stoppage, and there is no pending application for certification of a collective bargaining agent involving any Seller and any Employee.

(b)    Schedule 5.18(b) sets forth a true, complete and accurate list of the name, title, employment status and place of employment of all Employees on an approved leave of absence, whether paid or unpaid, other than Employees on scheduled vacation or jury duty, as of the relevant date.

5.19    Employee Benefits.

(a)    Except as set forth in Schedule 5.19(a), Sellers do not sponsor, maintain or contribute to, or have any obligation to maintain or contribute to, or have any direct or indirect liability, whether contingent or otherwise, with respect to any plan, program, arrangement or agreement that is a pension, profit-sharing, savings, retirement, employment, consulting, severance pay, termination, executive compensation, incentive compensation, deferred compensation, bonus, stock purchase, stock option, phantom stock or other equity-based compensation, change in control, retention, salary continuation, vacation, sick leave, disability, death benefit, group insurance, hospitalization, medical, dental, life (including all individual life insurance policies as to which any Seller(s) is the owner, the beneficiary, or both), Code Section 125 "cafeteria" or "flexible" benefit, employee loan, educational assistance or fringe benefit plan, program, arrangement or agreement, whether written or oral, including any (i) "employee benefit plan" within the meaning of Section 3(3) of ERISA or (ii) other employee benefit plans, agreements, programs, policies, arrangements or payroll practices, whether or not subject to ERISA (including any funding mechanism therefor now in effect or required in the future as a result of the transaction contemplated by this Agreement or otherwise) under which any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers has any present or future right to benefits (individually, a "Benefit Plan," and collectively the "Benefit Plans"). All references to "Sellers" in this Section 5.19 shall refer to Sellers, each of their Subsidiaries and any Person that would be considered a single employer with Sellers under Sections 414(b), (c), (m) or (o) of the Code.

(b)    Sellers do not maintain, contribute to, or have any obligation to maintain or contribute to, or have any direct or indirect liability, whether contingent or otherwise, with respect to, and have not maintained, contributed to or had any direct or indirect liability,

whether contingent or otherwise, with respect to any Benefit Plan (including, for such purpose, any "employee benefit plan," within the meaning of Section 3(3) of ERISA, which any Seller previously maintained or contributed to), that is, or has been, (i) within the last six years, subject to Title IV of ERISA or Section 412 of the Code, (ii) maintained by more than one employer within the meaning of Section 413(c) of the Code, (iii) subject to Sections 4063 or 4064 of ERISA, (iv) at any time, a "multiemployer plan," within the meaning of Section 4001(a)(3) of ERISA, (v) a "multiple employer welfare arrangement" as defined in Section 3(40) of ERISA, or (vi) an "employee pension benefit plan" within the meaning of Section 3(2) of ERISA and that is not intended to be qualified under Section 401(a) of the Code.

(c)     Except where Sellers could not reasonably be expected to have any material liability, (i) each Benefit Plan has been established and administered in all respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code and all other Legal Requirements; (ii) with respect to each Benefit Plan, all reports, returns, notices and other documentation that are required to have been filed with or furnished to the Internal Revenue Service (the "IRS"), the United States Department of Labor ("DOL") or any other Governmental Authority, or to the participants or beneficiaries of such Benefit Plan have been filed or furnished on a timely basis; (iii) each Benefit Plan that is intended to be qualified within the meaning of Section 401(a) of the Code is so qualified and has received a favorable determination letter from the IRS (covering all required tax law changes) to the effect that the Benefit Plan satisfies the requirements of Section 401(a) of the Code and that its related trust is exempt from taxation under Section 501(a) of the Code and, to the Knowledge of Sellers, there are no facts or circumstances that could reasonably be expected to cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA, the Code or any other Legal Requirements; (iv) other than routine claims for benefits, no liens, lawsuits or complaints to or by any person or Governmental Authority have been filed against any Benefit Plan or against Sellers with respect to any Benefit Plan or, to the Knowledge of Sellers, against any other person or party with respect to any Benefit Plan and, to the Knowledge of Sellers, no such liens, lawsuits or complaints are contemplated or threatened with respect to any Benefit Plan; (v) no individual who has performed services for any Seller has been improperly excluded from participation in any Benefit Plan; and (vi) there are no audits or proceedings initiated pursuant to the IRS Employee Plans Compliance Resolution System (currently set forth in Revenue Procedure 2008-50) or similar proceedings pending with the IRS or DOL with respect to any Benefit Plan.

(d)     Neither Sellers nor, to the Knowledge of Sellers, any other "party in interest" or "disqualified person" with respect to any Benefit Plan has engaged in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code involving such Benefit Plan which, individually or in the aggregate, could reasonably be expected to subject Sellers to Liability, tax or penalty imposed by Section 4975 of the Code or Sections 501, 502 or 510 of ERISA. To the Knowledge of Sellers, no fiduciary has incurred any liability for breach of fiduciary duty or any other failure to act or comply with the requirements of ERISA, the Code or any other Legal Requirements in connection with the administration or investment of the assets of any Benefit Plan.

(e)     All liabilities or expenses of Sellers in respect of any Benefit Plan (including workers compensation) which have not been paid, have been properly accrued on Sellers' most recent financial statements in compliance with GAAP. All contributions (including

35

all employer contributions and employee salary reduction contributions) or premium payments required to have been made under the terms of any Benefit Plan, or in accordance with Legal Requirements, as of the date hereof have been timely made or reflected on Sellers' financial statements in accordance with GAAP.

(f)    Sellers have no obligation to provide or make available post-employment benefits under any Benefit Plan which is a "welfare plan" (as defined in Section 3(1) of ERISA) ("Welfare Plan") to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers, except as may be required under the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended (otherwise referred to as "COBRA"), and at the sole expense of such individual. There are no reserves, assets, surpluses or prepaid premiums with respect to any Benefit Plan which is a Welfare Plan.

(g)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will (either alone or in combination with another event) (i) result in any payment becoming due, or increase the amount of any compensation due, to any current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) of Sellers; (ii) increase any benefits otherwise payable under any Benefit Plan; (iii) result in the acceleration of the time of payment or vesting of any such compensation or benefits; (iv) result in a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA or Section 4975 of the Code or (v) result in the payment of any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment," as defined in Section 280G(b)(1) of the Code. No current or former officer, director, employee, leased employee, consultant or agent (or their respective beneficiaries) has or will obtain a right to receive a gross-up payment from any Seller with respect to any excise taxes that may be imposed upon such individual pursuant to Section 409A of the Code, Section 4999 of the Code or otherwise.

(h)    Sellers have no direct or indirect liability, whether absolute or contingent, under any Benefit Plan, with respect to any misclassification of any person as an independent contractor rather than as an employee, or with respect to any employee leased from another employer.

(i)    With respect to each Benefit Plan, except as publicly filed under the Securities Exchange Act of 1934, Sellers have provided to Buyer, a true, correct and complete copy (or, to the extent no such copy exists or the Benefit Plan is not in writing, an accurate written description) thereof and, to the extent applicable, all (A) material documents, (B) material contracts, (C) trust agreements, (D) testings, (E) IRS determination letters, (F) IRS Forms 5500 (including schedules) for the three plan years completed prior to the Execution Date, (G) financial statements for the three plan years completed prior to the Execution Date, (H) any material correspondence with any Governmental Authority, and (I) any other documents reasonably requested by Buyer.

(j)    Sellers have no plan, contract or commitment, whether legally binding or not, to create any additional employee benefit or compensation plans, policies or arrangements or, except as may be required by law, to modify any Benefit Plan. Sellers may amend or terminate any Benefit Plan (other than an employment agreement or any similar agreement that cannot be terminated without the consent of the other party) at any time without

incurring liability thereunder, other than in respect of accrued and vested obligations and medical or welfare claims incurred prior to such amendment or termination. There is no restriction in any plan document of any Transferred Benefit Plan prohibiting the assumption thereof by Buyer at the Closing in accordance with this Agreement.

(k)     No Benefit Plan covers any current or former officers, directors, employees, leased employees, consultants or agents (or their respective beneficiaries) of Sellers outside of the United States.

5.20    Sellers' Intellectual Property.

(a)     Schedule 5.20(a) sets forth a true and complete list of all U.S. and foreign (i) issued Patents and pending applications for Patents; (ii) registered Trademarks and pending applications for Trademarks; and (iii) registered Copyrights and pending applications for Copyrights, in each case which are owned by a Seller as of the Execution Date and which are material to the Acquired Assets. Except as set forth on Schedule 5.20(a), Sellers are the sole owners of all of the applications and registrations set forth on Schedule 5.20(a), and all such applications and registrations are in effect and subsisting.

(b)     Except as disclosed on Schedule 5.20(b), and except as would not, individually or in the aggregate, have a Material Adverse Effect, to Sellers' Knowledge, (i) the conduct of the Business by Sellers as currently conducted (including the products and services currently sold or provided by Sellers) does not infringe or otherwise violate any Person's intellectual property rights, and no such claims are pending or threatened in writing against Sellers, and (ii) no Person is infringing or otherwise violating any Intellectual Property owned by Sellers, and no such claims are pending or threatened in writing against any Person by Sellers.

(c)     To Sellers' Knowledge, the Acquired Assets and any rights provided to Buyer pursuant to the Transaction Documents include all third party intellectual property rights required to operate the Hospitals in the manner in which they were operated and to otherwise conduct the Business as it is presently being conducted by Sellers.

5.21    Contracts.

Schedule 5.21 sets forth a complete list, as of the date hereof, of all Contracts (including Leases, Lessor Leases and Occupancy Agreements) to which any Seller is a party and the Cure Costs with respect thereto. Except as set forth on Schedule 5.21, no Seller has assigned, delegated or otherwise transferred to any third party any of its rights or obligations with respect to any such Contract. Each Contract is in full force and effect and is a valid and binding obligation of each Seller party thereto in accordance with its terms and conditions, in each case except (x) as such enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity, (y) as set forth on Schedule 5.21 and (z) as would not, individually or in the aggregate, have a Material Adverse Effect. Upon entry of the Sale Order and payment of the Cure Costs, (i) no Seller will be in breach or default of its obligations under any Assigned Contract, (ii) no condition exists that with notice or lapse of time or both would constitute a default by any Seller under any Assigned Contract and (iii) to Sellers' Knowledge, no other party to any Assigned Contract is in breach or default thereunder, except in the case of clauses (i), (ii) and (iii) for any breaches or defaults that would not, individually or in the aggregate, have a Material Adverse Effect. The Cure Cost amounts calculated by Sellers and specified in the Cure

37

Notices submitted by Sellers with respect to each of the Assigned Contracts and each Contract listed or described in Schedule 5.21 to the counterparty or counterparties thereto pursuant to the Bidding Procedures Order are, to Sellers' Knowledge, true and correct.

5.22    Sufficiency of Assets; Inactive Entities.

(a)    Except as set forth on Schedule 5.22(a), to Sellers' Knowledge, (a) except for such approvals, permits, licenses, franchises, approvals, consents, certificates, notices, qualifications, authorizations, regulations, clearances and Orders necessary for the Buyer or Buyer Designees to operate the Business, the Acquired Assets will, as of the Closing Date, constitute all of the assets and rights necessary for Buyer to conduct the Business substantially as presently conducted by Sellers and (b) none of the Acquired Assets is owned by any Person other than Sellers.

(b)    LifeCare Hospitals of San Antonio, LLC, CareRehab Services, LLC and LifeCare Ambulatory Surgery Center, Inc. have no properties, rights, claims, assets, liabilities, operations, contracts or receivables.

(c)    Except as set forth on Schedule 5.22(c), LCI Holding Company, Inc., LCI Intermediate Holdco, Inc. and LCI Holdco have no properties, rights, claims, assets, liabilities, operations, contracts or receivables.

5.23    Insurance.

Sellers maintain the insurance policies set forth on Schedule 5.23, which Schedule sets forth all insurance policies covering the property, assets, Employees and operations of the Business (including policies providing property, casualty, liability and workers' compensation coverage).  Such policies are in full force and effect and, except as set forth on Schedule 5.23, will continue in full force and effect immediately following the Closing (except to the extent any such policy has been replaced with comparable substitute insurance).  Sellers have paid all premiums on such policies due and payable prior to the Closing Date.  Sellers have not done anything by way of action or inaction that invalidates any such policies in whole or in part.

5.24    Brokers or Finders.

Other than the Retained Professional Fees, Sellers have not incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with this Agreement, the other Transaction Documents or the transactions contemplated hereby or thereby for which Buyer is or will become liable, and, except as otherwise contemplated hereby with respect to Retained Professional Fees, Sellers shall indemnify and hold harmless Buyer from any claims with respect to any such fees or commissions.

5.25    Affiliate Interests.

All Contracts between any Seller and any Affiliate of any Seller (but not including another Seller) are listed on Schedule 5.25. To the Knowledge of Sellers, no such Affiliate of any Seller has any direct or indirect interest in, or controls or is a director, officer, employee or partner of, or consultant to, or lender to or borrower from or has the right to participate in the profits of, (i) any Person which does business with any Seller or is competitive with the Business, or (ii) any property, asset or right which is used by any Seller. All

Indebtedness of any such Affiliate to Seller, and all Indebtedness of Seller to any such Affiliate of Seller, is listed on Schedule 5.25.

5.26    Bank Accounts.

Schedule 5.26 sets forth a complete list of all bank accounts (including any deposit accounts, securities accounts and any sub-accounts) of Sellers.

5.27    Undue Influence.

No Seller has directly or indirectly, on behalf of or with respect to the Business or the Acquired Assets: (a) made any contributions, payments or gifts of its property to or for the private use of any governmental official, employee or agent where either the payment or the purpose of such contribution, payment or gift is illegal under the laws of the United States, any state thereof or any other jurisdiction (foreign or domestic) in any material respect; (b) either established or maintained any unrecorded fund or asset for any purpose, or made any intentionally false or artificial entries on its books or records for any reason; (c) made any payments to any Person with the intention or understanding that any part of such payment was to be used for any purpose other than that described in the documents supporting the payment; (d) either made any contribution, or reimbursed any political gift or contribution made by any other Person, to candidates for public office, whether federal, state or local, where such contribution or reimbursement would be in violation of any Legal Requirement in any material respect; (e) made or received any payment which was not legal in any material respect to make or receive; (f) engaged in any material transaction or made or received any material payment which was not properly recorded on the books of the Sellers; (g) created or used any "off-book" bank or cash account or "slush fund;" or (h) engaged in any conduct constituting a violation in any material respect of the Foreign Corrupt Practices Act of 1977.

5.28    Financial Statements.

Sellers have delivered to Buyer the consolidated balance sheets of the Company and its Subsidiaries as of, and consolidated statements of operations, stockholder's equity (deficit) and cash flows for, the fiscal years ended December 31, 2011 and December 31, 2010 (collectively, the "Audited Financial Statements"). The Audited Financial Statements have been prepared in accordance with generally accepted accounting principles ("GAAP") consistently applied in accordance with the Company's past practice throughout the periods indicated. Sellers have also delivered to Buyer unaudited condensed consolidated balance sheets for the Company and its Subsidiaries as of September 30, 2012 and the condensed consolidated statements of operations, stockholder's equity (deficit) and cash flows for the period then ending September 30, 2012 (collectively, the "Unaudited Financial Statements"). The Unaudited Financial Statements have been prepared in accordance with GAAP consistently applied in accordance with Sellers' past practice except for the absence of footnotes and customary year-end adjustments. The Audited Financial Statements and the Unaudited Financial Statements (together the "Financial Statements") (i) are true, correct and complete in all material respects, (ii) are in accordance in all material respects with the books and records of Sellers, and (iii) fairly present in all material respects the financial position of Sellers at the dates specified and the results of their operations for the period covered. The copies of the Financial Statements delivered to Buyer are true, correct and complete copies.

5.29    Absence of Certain Changes.

(a)    Since September 30, 2012, there has not been a Material Adverse Effect.

(b)    Except as set forth on Schedule 5.29.(b) or as contemplated by this Agreement, from September 30, 2012 to the Execution Date, Sellers have not:

(i)    Except for executory contracts and unexpired leases rejected by Sellers pursuant to the Sale Order with the prior written consent of Buyer, terminated, modified or amended any material Assigned Contract or taken any action which materially violates, materially conflicts with or resulted in a material breach of any provision of, or constitutes a default under, any Assigned Contract;

(ii)    Purchased or otherwise acquired any material properties or assets (tangible or intangible) or sold, leased, transferred or otherwise disposed of any Acquired Assets, except for purchases of materials and sales of Inventory in the Ordinary Course of Business, (i) permitted, allowed or suffered any of the Acquired Assets to be subjected to any Encumbrance (other than Permitted Encumbrances), or (ii) removed any Equipment or other material assets (other than Inventory) from the Real Property other than in the Ordinary Course of Business;

(iii)    Waived or released any claim or rights included in or related to the Acquired Assets or the Business with a value individually or in the aggregate in excess of $250,000 or revalued any of the Acquired Assets, except for adjustments to the value of Inventory in the Ordinary Course of Business;

(iv)    Entered into any material contractual relationship with any third party related to the Acquired Assets or the Business, other than in the Ordinary Course of Business;

(v)    Made any material commitments for capital expenditures;

(vi)    Other than in the Ordinary Course of Business, increased the benefits of or compensation (whether in the form of salary, bonus or otherwise) payable to any employee, contractor or consultant of Sellers, or granted any bonus, benefit, payment (contingent or otherwise) or other direct or indirect compensation to any employee, contractor or consultant of Sellers;

(vii)    Except as required by Legal Requirements, adopted, amended or terminated any Benefit Plan;

(viii)    Introduced any material change with respect to the operations of the Business;

(ix)    Suffered any material damage or destruction to or loss of any material assets or properties whether or not covered by insurance;

(x)    Changed in any way Sellers' accounting methods, principles or practices other than required by changes in GAAP;

(xi)    Incurred any Indebtedness or paid, discharged or satisfied any claims, liabilities or obligations, other than the payment, discharge or satisfaction in the Ordinary Course of Business of Liabilities incurred in the Ordinary Course of Business;

40

(xii)    Allow any Permit held by any Seller to terminate, expire or lapse;

(xiii)    Ceased to operate or maintain any of the Hospitals in the Ordinary Course of Business; or

(xiv)    Agreed or committed to do any of the foregoing.

5.30    WARN Act.

No Seller has, within the ninety (90) days immediately prior to the Closing Date, in whole or in part taken any action or actions which would, independently of the transaction contemplated hereby, result in a plant closing or mass layoff, temporary or otherwise, within the meaning of the WARN Act, or any similar Legal Requirement.

## ARTICLE 6

### REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Sellers as follows:

6.1    Organization and Good Standing.

Buyer is a limited liability company, duly organized, validly existing and in good standing under the laws of the State of Delaware. Buyer has the requisite power and authority to own or lease and to operate and use its properties and to carry on its business as now conducted.

6.2    Authority; Validity; Consents.

Buyer has the requisite power and authority necessary to enter into and perform its obligations under this Agreement and the other Transaction Documents to which it is a party and to consummate the transactions contemplated hereby and thereby. The execution, delivery and performance of this Agreement by Buyer and the consummation by Buyer of the transactions contemplated herein have been duly and validly authorized by all requisite limited liability company or corporate actions in respect thereof. This Agreement has been duly and validly executed and delivered by Buyer and each other Transaction Document to which Buyer is a Party will be duly and validly executed and delivered by Buyer, as applicable, at the Closing. This Agreement and the other Transaction Documents to which Buyer is a party constitute the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with their respective terms, except in each case as such enforceability is limited by bankruptcy, insolvency, reorganization, moratorium or similar laws now or hereafter in effect relating to creditors' rights generally or general principles of equity. Except as required to comply with the HSR Act or as set forth on Schedule 6.2, Buyer is not or will be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement and the other Transaction Documents to which it is a Party or the consummation or performance of any of the transactions contemplated hereby or thereby, except for such notices, filings and consents, the failure of which to provide, make or obtain, would not, individually or in the aggregate, materially affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

41

### 6.3    No Conflict.

Neither the execution and delivery by Buyer of this Agreement or the Transaction Documents to which it is a party nor the consummation of the transactions contemplated hereby or thereby nor compliance by it with any of the provisions hereof or thereof (a) conflict with or result in a violation of (i) any provision of the organizational documents of Buyer or (ii) any judgment, order, writ, injunction, decree, statute, law, ordinance, rule or regulation in any material respect binding upon Buyer or (b) violate, conflict with, or result in a breach of any of the terms of, or constitute a default under, or give rise to any right of termination, modification, cancellation or acceleration under, (A) any note, bond, mortgage, indenture, deed of trust, contract, commitment, arrangement, license, agreement, lease or other instrument or obligation to which Buyer is a party or by which Buyer may be bound or to which any of Buyer's assets may be subject or affected in any material respect and that, in each case, is material to the business of Buyer, or (B) any material license, permit, authorization, consent, order or approval of, or registration, declaration or filings with, any Governmental Authority.

### 6.4    Availability of Funds.

Buyer shall have on the Closing Date sufficient unrestricted funds or committed lines of credit on hand to pay the portion of the Purchase Price payable in cash at the Closing. Buyer has provided to Sellers true and correct redacted copies of documentation evidencing Buyer's empowerment as of the Closing Date to deliver the Credit Bid and Release. At the Closing, Buyer will be capitalized with either (i) a senior secured working capital facility with availability of not less than $45 million or (ii) such other financing terms and amounts as are reasonably acceptable to Buyer and Sellers (either (i) or (ii) being the "Closing Financing").

### 6.5    Litigation.

There are no Proceedings pending or, to the knowledge of Buyer, threatened, that would affect Buyer's ability to perform its obligations under this Agreement or any other Transaction Documents or to consummate the transactions contemplated hereby or thereby.

### 6.6    Brokers or Finders.

Neither Buyer nor any Person acting on behalf of Buyer has paid or become obligated to pay any fee or commission to any broker, finder, investment banker, agent or intermediary for or on account of the transactions contemplated by this Agreement for which any Seller is or will become liable, and Buyer shall hold harmless and indemnify Sellers from any claims with respect to any such fees or commissions.

## ARTICLE 7

## ACTIONS PRIOR TO THE CLOSING DATE

### 7.1    Access and Reports.

(a)    Subject to applicable Legal Requirements, during the period from and including the Execution Date through and including the Closing Date or the earlier termination of this Agreement in accordance with the provisions of Article 11, Sellers shall (i) afford Buyer and its Representatives access, upon reasonable notice and during normal business

hours, to its employees, customers, suppliers, properties, books, Contracts and records, and furnish promptly to Buyer all information concerning the Acquired Assets, the Business, properties, any Transferred Benefit Plans and personnel as may be reasonably requested; (ii) furnish to Buyer such financial and operating data and other information relating to Sellers, the Business and the Acquired Assets as may be reasonably requested; (iii) permit Buyer, upon reasonable notice and during normal business hours, to make such reasonable inspections and, at Buyer's expense, copies there as Buyer may require and (iv) instruct the executive officers and senior business managers, employees, counsel, auditors and financing advisors of Sellers to reasonably cooperate with Buyer and its Representatives regarding the same. All requests for information made pursuant to this Section 7.1 shall be directed to Marc Strauss and Kevin Glodowski, Rothschild, 1251 Avenue of the Americas, 51st Floor, New York, NY 10020. All such information shall be governed by the terms of the Confidentiality Agreements. No investigation pursuant to this Section 7.1 or by Buyer or its Representatives at any time prior to or following the date hereof shall affect or be deemed to modify any representation or warranty made by the Sellers herein. Notwithstanding anything contained in this Agreement to the contrary, none of Buyer or its Representatives shall have any right to perform or conduct, or cause to be performed or conducted, any environmental sampling or testing at, in, on or underneath any of Sellers' properties without written consent from the Company, which consent shall not be unreasonably withheld.

(b)    This Section 7.1 shall not require Sellers to permit any access to, or to disclose (i) any information that, in the reasonable, good faith judgment (after consultation with counsel, which may be in-house counsel) of the Company, is reasonably likely to result in any violation of any Legal Requirement or any Contract to which the Company or any Seller is a party or cause any privilege (including attorney-client privilege) that Sellers would be entitled to assert to be undermined with respect to such information and such undermining of such privilege could in the Company's good faith judgment (after consultation with counsel, which may be in-house counsel) adversely affect in any material respect Sellers' position in any pending or, what the Company believes in good faith (after consultation with counsel, which may be in-house counsel) could be, future litigation or (ii) if the Company or any Seller, on the one hand, and Buyer or any of its Affiliates, on the other hand, are adverse parties in a litigation, any information that is reasonably pertinent thereto; provided, that, in the case of clause (i), the parties hereto shall cooperate in seeking to find a way to allow disclosure of such information to the extent doing so (A) would not (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be reasonably likely to result in the violation of any such Legal Requirement or Contract or be reasonably likely to cause such privilege to be undermined with respect to such information or (B) could reasonably (in the good faith belief of the Company (after consultation with counsel, which may be in-house counsel)) be managed through the use of customary "clean-room" arrangements pursuant to which non-employee Representatives of Buyer could be provided access to such information.

7.2    Operations Prior to the Closing Date.

Sellers covenant and agree that, except (v) as expressly contemplated by this Agreement, (w) as disclosed in Schedule 7.2, (x) with the prior written consent of Buyer (which consent shall not be unreasonably withheld or delayed) and (y) as otherwise required by Legal Requirements, after the Execution Date and prior to the Closing Date:

43

(a)    Sellers shall:

(i)    carry on the Business in the Ordinary Course of Business and use commercially reasonable efforts to maintain the Acquired Assets in the condition in which they exist on the date hereof, except for ordinary wear and tear and except for replacements, modifications or maintenance in the Ordinary Course of Business;

(ii)    maintain their books, accounts and records in accordance with past custom and practice;

(iii)    use commercially reasonable efforts to (A) retain employees who are in good standing and are necessary to conduct the Business as it is currently being conducted, (B) retain Employees who are in good standing and (C) maintain their relationships with and preserve for the Business the goodwill of their key suppliers and customers;

(iv)    (A) comply in all material respects with all Legal Requirements applicable to them or having jurisdiction over the Business or any Acquired Asset, (B) comply in all material respects with contractual obligations applicable to or binding upon them pursuant to Assigned Contracts and (C) maintain in full force and effect all Permits and comply in all material respects with the terms of each such Permit;

(v)    cause any of their current property insurance policies with respect to the Hospitals or any of the other Acquired Assets not to be canceled or terminated or any of the coverage thereunder to lapse unless, simultaneously with such termination, cancellation or lapse, replacement, policies providing coverage equal to or greater than the coverage under the canceled, terminated or lapsed policies are in full force and effect;

(vi)    maintain in full force and effect the existence of all material Intellectual Property owned by Sellers and included in the Acquired Assets; and

(vii)    use commercially reasonable efforts not to take or agree to or commit to assist any other Person in taking any action (i) that would reasonably be expected to result in a failure of any of the conditions to the Closing or (ii) that would reasonably be expected to impair the ability of Sellers or Buyer to consummate the Closing in accordance with the terms hereof or to materially delay such consummation.

(b)    Sellers shall not:

(i)    take any action enumerated in Section 5.29(b), except as set forth on Schedule 5.29(b); or

(ii)    assume, reject or assign any Assigned Contract other than pursuant to Section 2.5.

7.3    HSR Act; Cooperation.

(a)    Subject to Section 7.3(c), as soon as reasonably practicable (and, in any event, within five (5) Business Days, or a later date as agreed by the Parties) following entry of the Bidding Procedures Order, Sellers, on the one hand, and Buyer, on the other hand, shall each prepare and file, or cause to be prepared and filed, any notifications required to be filed under the HSR Act with the United States Federal Trade Commission and the Antitrust Division of the United States Department of Justice, and request early termination of the waiting period under the HSR Act.  Buyer, on the one hand, and Sellers, on the other hand, shall promptly

44

respond to any requests for additional information or documentary materials in connection with such filings and shall take all other actions necessary to cause the waiting periods under the HSR Act to terminate or expire at the earliest practicable date after the date of filing. Buyer shall be responsible for payment of the applicable filing fee under the HSR Act, and each Party shall be responsible for payment of its own respective costs and expenses (including attorneys' fees and other legal fees and expenses) associated with the preparation of its portion of any antitrust filings.

(b)    In addition to the actions to be taken under Section 7.3(a), Sellers, on the one hand, and Buyer, on the other hand, shall use reasonable best efforts to take, or cause to be taken, all actions, and to do, or cause to be done, and to assist and cooperate with the other in doing, all things necessary, proper or advisable to consummate and make effective, in the most expeditious manner practicable, the transactions contemplated hereby, including using reasonable best efforts to accomplish the following: (i) taking all reasonable acts necessary to cause the conditions precedent set forth in Article 9 and Article 10 to be satisfied, (ii) obtaining, at the earliest practicable date, of all necessary Governmental Authorizations and the making of all necessary registrations, declarations and filings (including registrations, declarations and filings with Governmental Authorities, if any) and the taking of all reasonable steps as may be necessary to avoid any Proceeding by any Governmental Authority, (iii) defending of any Proceedings challenging this Agreement or the consummation of the transaction contemplated hereby, including seeking to have any stay or temporary restraining order entered by any court or other Governmental Authority vacated or reversed, and (iv) executing and delivering any additional instruments necessary to consummate the transactions contemplated hereby and to fully carry out the purposes of this Agreement.

(c)    Sellers, on the one hand, and Buyer, on the other hand, (i) shall promptly inform each other of any communication from any Governmental Authority concerning this Agreement, the transactions contemplated hereby, and any filing, notification or request for approval and (ii) shall permit the other to review in advance any proposed written or material oral communication or information submitted to any such Governmental Authority in response thereto. In addition, none of Parties shall agree to participate in any meeting with any Governmental Authority in respect of any filings, investigation or other inquiry with respect to this Agreement or the transactions contemplated hereby, unless such Party consults with the other Parties in advance and, to the extent permitted by any such Governmental Authority, gives the other Parties the opportunity to attend and participate thereat, in each case to the maximum extent practicable. Subject to restrictions under any Legal Requirements, each of Buyer, on the one hand, and Sellers, on the other hand, shall furnish the other with copies of all correspondence, filings and communications (and memoranda setting forth the substance thereof) between it and its Affiliates and their respective Representatives on the one hand, and the Governmental Authority or members of its staff on the other hand, with respect to this Agreement, the transactions contemplated hereby (excluding documents and communications which are subject to preexisting confidentiality agreements or to the attorney-client privilege or work product doctrine or which refer to valuation of the Business) or any such filing, notification or request for approval. Each Party shall also furnish the other Party with such necessary information and assistance as such other Party and its Affiliates may reasonably request in connection with their preparation of necessary filings, registration or submissions of information to the Governmental Authority in connection with this Agreement, the transactions contemplated hereby and any such filing, notification or request for approval.

45

(d)     Subject to the terms and conditions of this Agreement, Buyer shall take any and all steps reasonably necessary to avoid or eliminate impediments under any Antitrust Law that may be asserted by any Governmental Authority with respect to the transactions contemplated hereby so as to enable the Closing to occur as soon as reasonably possible, including, proposing, negotiating, committing to and effecting, by consent decree or otherwise, the sale, divestiture or disposition of such assets or businesses of Buyer or any of its Subsidiaries as may be require in order to avoid the entry, or to effect the dissolution, of any injunction, temporary restraining order or other order in any suit or proceeding, which would otherwise have the effect of preventing, delaying or restricting the consummation of the transactions contemplated by this Agreement; provided, that (i) Sellers shall not take any such action without the prior written consent of Buyer and (ii) Buyer shall not be obligated to take any such action if such action would have a Material Adverse Effect on the Business or the Acquired Assets, taken as a whole.

7.4     Bankruptcy Court Matters.

(a)     Sale Motion.  In connection with the transactions contemplated by this Agreement, Sellers shall file with the Bankruptcy Court after the execution of this Agreement by each of the Parties, but in any event, on or prior to December 14, 2012, the Sale Motion, including the Bidding Procedures Order and Sale Order to be attached as exhibits thereto, which exhibits shall be in form and substance acceptable to Buyer in its sole discretion. Sellers shall affix a true and complete copy of this Agreement to the Sale Motion filed with the Bankruptcy Court (which shall be, subject to the approval of the Bankruptcy Court, without schedules).

(b)     Bankruptcy Court Orders.  After filing the Sale Motion, Sellers shall use commercially reasonable efforts to obtain Bankruptcy Court approval of the Bidding Procedures Order on prior to January 11, 2013 and the Sale Order on prior to March 14, 2013, each only with such changes as may be acceptable to Buyer in its sole discretion, and Sellers shall not amend or modify or consent to any amendment or modification of the Bidding Procedures Order or Sale Order without the consent of Buyer in its sole discretion.

(c)     Contracts. Sellers shall serve on all non-Debtor counterparties to all of their Contracts a notice specifically stating that Sellers are or may be seeking the assumption and assignment of such Contracts and shall notify such non-Debtor counterparties of the deadline for objecting to the Cure Costs, if any, which deadline shall not be less than three (3) Business Days prior to the Sale Hearing.

(d)     Bankruptcy Filings. From and after the Execution Date and until the Closing Date, Sellers shall deliver to Buyer drafts of any and all material pleadings, motions, notices, statements, schedules, applications, reports and other papers to be filed or submitted in connection with this Agreement for Buyer's prior review and comment, including any Tax motions, and such filings shall be acceptable to Buyer in its sole discretion to the extent they relate to the Acquired Assets, any Assumed Liabilities or any of Buyer's obligations hereunder. Sellers agree to diligently prosecute the entry of the Bidding Procedures Order and the Sale Order.  In the event the entry of the Bidding Procedures Order or the Sale Order shall be appealed, Sellers shall use their best efforts to defend such appeal. Sellers shall comply with all notice requirements (i) of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure

46

or (ii) imposed by Sale Order, in each case, in connection with any pleading, notice or motion to be filed in connection herewith.

       7.5     Expense Reimbursement.

       Notwithstanding anything in this Agreement to the contrary, from and after entry of the Bidding Procedures Order, Sellers agree to pay Buyer the Expense Reimbursement in the event this Agreement is terminated if and to the extent provided in Section 11.2. The Parties acknowledge and agree that the terms and conditions set forth in Section 11.2 with respect to the payment of the Expense Reimbursement shall become operative only if and to the extent that the Bankruptcy Court enters the Bidding Procedures Order.

       7.6     Update of Disclosure Schedules; Notice of Developments.

       (a)     Updated Disclosure Schedules. No later than the date of entry of the Bidding Procedures Order, Sellers shall deliver to the Buyer amended and complete Disclosure Schedules, (the "Updated Schedules"), and the Updated Schedules shall be deemed to have amended the original corresponding Disclosure Schedules for purposes of this Agreement; provided, however, the Sellers shall have until January 31, 2013 to deliver to the Buyer the Cure Costs to be provided on an amended Schedule 5.21.

       (b)     Seller Supplements. After delivery of the Updated Schedules until the Closing Date, Sellers may from time to time supplement or amend the Disclosure Schedules with respect to any matter that, if existing, occurring or known at the date of this Agreement, would have been required to be set forth or described in the Disclosure Schedules. Any such supplement or amendment shall be deemed to modify the Disclosure Schedules for purposes of this Agreement except to the extent the matters set forth in such supplement or amendment would reasonably be expected to have a Material Adverse Effect. Notwithstanding anything in this Section 7.6 to the contrary, in no event will Sellers be permitted to supplement or amend any Disclosure Schedules other than Disclosure Schedules required under Article 5 without the prior written consent of Buyer and any such supplements or amendments will not be deemed to modify any Schedules other than the Disclosure Schedules required under Article 5.

       (c)     Buyer Supplements. Buyer may supplement or amend Schedule 6.2 and Schedule 9.4 at any time until January 31, 2012, provided that any such supplements or amendments shall be reasonably determined by Buyer.

       (d)     Notice of Developments. Sellers shall promptly notify Buyer of, and furnish Buyer any information it may reasonably request with respect to, any event that would reasonably be expected to cause any of the conditions set forth in Article 9 not to be fulfilled by the Outside Date.

       7.7     Bidding Procedures.

       The Bidding Procedures to be employed with respect to this Agreement shall be those reflected in the Bidding Procedures Order. Buyer agrees and acknowledges that Sellers and their Representatives and Affiliates are and may continue soliciting inquiries, proposals or offers for the Acquired Assets in connection with an Alternative Transaction pursuant to the terms of the Bidding Procedures Order.

7.8     Transition of Business.

Sellers shall use commercially reasonable efforts to assist Buyer in accomplishing a smooth transition of the Business from Sellers to Buyer, including, holding discussions with respect to personnel policies and procedures, and other operational matters relating to the Business.

7.9     Sale Free and Clear.

Sellers acknowledge and agree, and the Sale Order shall provide that, on the Closing Date and concurrently with the Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by Sellers or their bankruptcy estate, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets.  On the Closing Date, the Acquired Assets shall be transferred to Buyer and/or one or more Buyer Designees, as applicable, free and clear of all obligations, Liabilities and Encumbrances, other than the Closing Encumbrances, Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

7.10    Buyer Financing Matters.

(a)     Buyer shall use commercially reasonable efforts to obtain a commitment letter with respect to the Closing Financing within sixty (60) days following the entry of the Sale Order.

(b)     Prior to the Closing Date, Buyer will not incur any material indebtedness for borrowed money.

**ARTICLE 8**

**ADDITIONAL AGREEMENTS**

8.1     Taxes.

(a)     Any sales Tax, use Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Sales Taxes") and any real property transfer Tax, documentary stamp Tax or similar Tax attributable to the sale or transfer of the Acquired Assets and not exempted under the Sale Order or by Section 1146(c) of the Bankruptcy Code ("Transfer Taxes") shall be borne by Buyer. Sellers and Buyer shall use commercially reasonable efforts and cooperate in good faith to exempt the sale and transfer of the Acquired Assets from any such Sales Taxes and Transfer Taxes. Sellers shall be responsible for preparing and filing all necessary Tax Returns or other documents with respect to Sales Taxes, and Buyer shall be responsible for preparing and filing Tax Returns with respect to Transfer Taxes; provided, however, that in the event any such Tax Return requires execution by the other Party, the Party responsible for preparing the Tax Return shall deliver it to the other Party not less than ten days before the due date thereof, and the other Party shall promptly execute such Tax Return and return it to the Party responsible for filing it.

(b)     All Liability for any real or personal property Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof, that ends on or before the

Closing Date (a "Pre-Closing Tax Period") shall be borne by Sellers. All Liability for any real or personal property Taxes with respect to the Acquired Assets for a Tax period or year, or portion thereof, that begins after the Closing Date (a "Post-Closing Tax Period") shall be borne by Buyer. The total amount of such Taxes allocable to the Pre-Closing Tax Period of any Tax period or year commencing on or before, and ending after, the Closing Date (a "Straddle Period") shall be the product of (i) such Tax for the entirety of such Straddle Period, multiplied by (ii) a fraction, the numerator of which is the number of days for such Straddle Period included in the Pre-Closing Tax Period and the denominator of which is the total number of days in such Straddle Period, and the balance of such Taxes shall be allocable to the Post-Closing Tax Period. At the Closing, the real and personal property Taxes with respect to each Acquired Asset for the applicable Straddle Period shall be prorated in accordance with the foregoing provisions based on the property Tax assessment for such Acquired Asset for such Straddle Period, if available, or if otherwise, based on the property Taxes paid with respect to such Acquired Asset during the preceding Tax year. With respect to any not yet delinquent real or personal property Taxes relating to a Straddle Period or Pre-Closing Tax Period, Buyer will assume responsibility for the actual payment of all such Taxes to the applicable Governmental Authority. With respect to any real or personal property Taxes relating to a Straddle Period or Pre-Closing Tax Period that are delinquent as of the Closing Date, the amount of which is known and not subject to dispute, Buyer shall either pay the delinquent amount of such Taxes directly to the applicable Governmental Authority at the Closing or, at Buyer's option, to such title company as designated by Buyer at the Closing, for further payment by it to the applicable Governmental Authority. With respect to any real or personal property Taxes relating to the Pre-Closing Tax Period which are either due and payable or delinquent, in the event that Buyer elects to cause such Taxes to be paid at or prior to Closing, any Permitted Encumbrances listed in Schedule 1.1(b) concerning such paid Taxes shall not be listed as a Closing Encumbrance in the deed for the applicable Owned Real Property.

(c)     Sellers, on the one hand, or Buyer, on the other hand, as the case may be (the "Reimbursing Party"), shall provide reimbursement for any Tax paid by the other (the "Paying Party") all or a portion of which is the responsibility of the Reimbursing Party in accordance with the terms of this Section 8.1 or which represents an overpayment for Taxes by the Paying Party. Within a reasonable time prior to the payment of any such Tax, the Paying Party shall give notice to the Reimbursing Party of the Tax payable and the Paying Party's and Reimbursing Party's respective Liability therefor, although failure to do so will not relieve the Reimbursing Party from its Liability hereunder except to the extent the Reimbursing Party is prejudiced thereby. Any amounts which may become payable from any Seller to Buyer pursuant to Section 8.1(a) shall constitute a constitute a super priority administrative expense of Sellers under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in Sections 503(b) or 507(b) of the Bankruptcy Code.

(d)     Buyer and Sellers agree to furnish or cause to be furnished to each other, upon request, as promptly as practicable, such information and assistance relating to the Business and the Acquired Assets (including access to books and records and Tax Returns and related working papers dated before Closing) as is reasonably necessary for the filing of all Tax Returns, the making of any election relating to Taxes, the preparation for any audit by any taxing authority, the prosecution or defense of any claims, suit or proceeding relating to any Tax, and the claiming by Buyer of any federal, state or local business tax credits or incentives that Buyer may qualify for in any of the jurisdictions in which any of the Acquired Assets are located;

provided, however, that neither Buyer nor any Seller shall be required to disclose the contents of its income Tax Returns to any Person other than the Parties. Any expenses incurred in furnishing such information or assistance pursuant to this Section 8.1(d) shall be borne by the Party requesting it.

8.2    Bulk Sales.

The Sale Order shall provide either that (i) Sellers have complied with the requirements of any Legal Requirement relating to bulk sales and transfer or (ii) compliance with the Legal Requirements relating to bulk sales and transfers is not necessary or appropriate under the circumstances.

8.3    Payments Received.

Sellers, on the one hand, and Buyer, on the other hand, each agree that, after the Closing, each will hold and will promptly transfer and deliver to the other, from time to time as and when received by them, any cash, checks with appropriate endorsements (using commercially reasonable efforts not to convert such checks into cash) or other property that they may receive on or after the Closing which belongs to the other and will account to the other for all such receipts.

8.4    Assigned Contracts: Adequate Assurance and Performance.

(a)    Buyer shall use commercially reasonable efforts to provide adequate assurance of the future performance by Buyer of each Assigned Contract as required under Section 365 of the Bankruptcy Code. Buyer and Sellers agree that they will promptly take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Contracts pursuant to Section 365 of the Bankruptcy Code, such as furnishing timely requested and factually accurate affidavits, non-confidential financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and Sellers' employees and representatives available to testify before the Bankruptcy Court.

(b)    Without limiting the provisions of Section 8.4(a), Buyer acknowledges that Sellers have no duty to maintain any letters of credit to secure performance or payment under any Assigned Contracts after the Closing, and Buyer shall cooperate with Sellers in Sellers' efforts to secure the release of any such letters of credit posted by Sellers, such cooperation to include, if necessary, the provision by Buyer of a guaranty, letter of credit or cash collateral to secure Buyer's payment and/or performance under any Assigned Contracts after the Closing.

8.5    Employee Matters.

(a)    Transferred Employees. Buyer agrees to offer employment effective as of the Closing Date to all current Employees provided such Employees continue to be employed by the Sellers as of the Closing Date (other than those members of management of Sellers set forth on Schedule 8.5(a) (as such list may be modified by Sellers and reasonably agreed to by Buyer prior to the Closing to take into account changes in Sellers' management, the "Senior Management")) on substantially similar terms, in the aggregate, as those under which each such Employee was employed immediately prior to the Closing Date, except for equity

50

compensation. Those Employees (other than members of Senior Management) who accept Buyer's offer of employment made pursuant to this Section 8.5(a) and actually commence employment with Buyer are referred to herein as "Transferred Employees." Sellers shall terminate, or shall cause to be terminated, the employment of all Transferred Employees effective as of the Closing Date. Upon any request by Buyer, Sellers shall provide Buyer with a list of all Employees.

(b)    Access to Information. After the Execution Date, Sellers shall provide Buyer and its Affiliates with access to the Employees and with information, including employee records and Benefit Plan data, reasonably requested by Buyer and such Affiliates, except as otherwise prohibited by law.

(c)    Benefit Plans. Buyer shall assume all obligations under or Liabilities with respect to any Benefit Plans set forth on Schedule 8.5(c) (such plans, the "Transferred Benefit Plans") consistent with Section 2.3(i) of this Agreement as Assumed Liabilities. The Transferred Benefit Plans shall be assumed by and assigned to Buyer on the Closing Date (or such Buyer Affiliates as Buyer so directs) in the manner described in this Agreement. Sellers shall make good faith efforts to consult with, and give reasonable assistance (including with respect to making amendments) to Buyer and its Affiliates in respect of any Transferred Benefit Plans, prior to and following the Closing Date. To the extent that service is relevant for purposes of eligibility and vesting, but not accrual under any benefit plan of Buyer or its Affiliates, including any Transferred Benefit Plan, Buyer shall credit (or cause to be credited) Transferred Employees for service earned prior to the Closing with Sellers in addition to service earned with Buyer on and after the Closing. To the extent the Transferred Employees and their eligible dependents enroll in any welfare benefit plan sponsored by Buyer or its Affiliates (including any Transferred Benefit Plan as applicable), subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to waive, or cause such waiver of, any preexisting condition limitations applicable to such Transferred Employees to the extent that the Transferred Employee's or eligible dependent's condition would not have operated as a preexisting condition under the applicable welfare benefit plan maintained by Sellers. In addition, subject to the terms of any such plan, Buyer shall undertake commercially reasonable efforts to (i) waive all waiting periods otherwise applicable to the Transferred Employees and their eligible dependents, other than waiting periods that are in effect with respect to such individuals as of the Closing to the extent not satisfied under the Transferred Benefit Plans or such other corresponding Benefit Plans of the Sellers and (ii) provide each Transferred Employee and his or her dependents with corresponding credit for any co-payments and deductibles paid by them under such Transferred Benefit Plans or corresponding Benefit Plans of Sellers during the portion of the respective plan year prior to the Closing. At any time and from time to time after the Execution Date, the Sellers and Buyer shall take, or cause to be taken, any and all actions necessary to effectuate the terms of this Section 8.5(c), including taking all action necessary to assign and assume and adopt each Transferred Benefit Plan in the manner contemplated by this Agreement effective as of the Closing. Sellers will reasonably cooperate with Buyer and its Affiliates and take, or cause to be taken, all reasonable actions as Buyer may reasonably request in order to effectuate the foregoing. Nothing herein shall prohibit Buyer or its Affiliates, as applicable, from terminating, amending, or otherwise affecting any Transferred Benefit Plan, at any time and from time to time following the Closing.

(d)    Change in Control, Severance or Similar Benefits.  Prior to the Closing Date, and to the extent necessary to implement this sentence, Sellers shall amend any Benefit Plan and take or cause to be taken all other action as may be required to provide that severance or separation payments and/or benefits (including payments of accrued vacation) shall not be payable to any Transferred Employee on account of the termination of such employee's employment with Sellers, and that the termination by Sellers of any Transferred Employee shall not constitute a "separation from service" under Treasury Regulations Section 1.409A-1(h).

(e)    Payroll Taxes.  For purposes of payroll taxes with respect to Transferred Employees, Sellers shall treat the transaction contemplated by this Agreement, as a transaction described in Treasury Regulation Sections 31.3121(a)(1)-1(b)(2) and 31.3306(b)(1)-(b)(2) (i.e., Buyer shall be treated as a successor for payroll tax purposes).

(f)    Beneficiaries; Employment Status.  All provisions contained in this Agreement with respect to employee benefit plans or compensation of Transferred Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein (i) shall confer upon any former, current or future employee of Sellers or Buyer or any legal representative or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (ii) shall cause the employment status of any former, present or future employee of Buyer to be other than terminable at will or (iii) shall confer any third party beneficiary rights upon any Transferred Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(g)    WARN Act.  On the Closing Date, Sellers shall provide a list setting forth the name and Hospital of any and all Employees who have experienced an employment loss or layoff (as defined by the WARN Act) within ninety (90) days prior to the Closing Date (the "WARN List").  For a period of ninety (90) days after the Closing Date, Buyer shall not engage in any conduct which would result in an employment loss or layoff for a sufficient number of employees of Buyer at any Hospital which, if aggregated with any such conduct prior to the Closing Date, would trigger obligations under the WARN Act.  In satisfying its obligations under this Section 8.5(g), Buyer shall take into account and be entitled to rely upon the WARN List.

(h)    Senior Management.  By no later than the date on which the Bidding Procedures Order is entered into by the Bankruptcy Court, Buyer agrees to use commercially reasonable efforts to negotiate (on terms acceptable to Buyer in its sole discretion) employment contracts with each member of Senior Management, to be executed and effective on the Closing Date.

(i)    For the avoidance of doubt, this Section 8.5 is subject to Sections 2.3 and 2.4.

8.6    Post-Closing Books and Records and Personnel.

From and after the Closing Date, each Party hereto shall provide the other Parties hereto (and their respective Representatives) with access, at reasonable times and in a manner so as not to unreasonably interfere with their normal business, solely to the books and records acquired pursuant to this Agreement as of the Closing Date so as to enable Buyer and Sellers to prepare Tax, financial or court filings or reports, to respond to court orders, subpoenas or inquiries, investigations, audits or other proceedings of Governmental Authorities, and to

prosecute and defend legal Actions or for other like purposes, including Claims, objections and resolutions. If any party desires to dispose of any such records, such Party shall, thirty (30) days prior to such disposal, provide the other Party with a reasonable opportunity to remove such records to be disposed of at the removing Party's expense.

8.7    Warranties Exclusive.

EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLERS MAKE NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF ANY OF THEIR ASSETS (INCLUDING THE ACQUIRED ASSETS), LIABILITIES (INCLUDING THE ASSUMED LIABILITIES) OR OPERATIONS, INCLUDING, WITH RESPECT TO MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE, OR NON-INFRINGEMENT, AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED AND NONE SHALL BE IMPLIED AT LAW OR IN EQUITY. BUYER HEREBY ACKNOWLEDGES AND AGREES THAT BUYER IS PURCHASING THE ACQUIRED ASSETS ON AN "AS IS, WHERE IS" BASIS AFTER GIVING EFFECT TO THE TERMS CONTAINED HEREIN.

8.8    Casualty Loss.

Notwithstanding any provision in this Agreement to the contrary, if, before the Closing, all or any portion of the Acquired Assets is (a) condemned or taken by eminent domain, or (b) is damaged or destroyed by fire, flood or other casualty, Sellers shall notify Buyer promptly in writing of such fact, (i) in the case of condemnation or taking, Seller shall assign or pay, as the case may be, any proceeds thereof to Buyer at the Closing, and (ii) in the case of fire, flood or other casualty, Seller shall assign the insurance proceeds therefrom to Buyer at Closing. Notwithstanding the foregoing, the provisions of this Section 8.8 shall not in any way modify Buyer's other rights under this Agreement, including any applicable right to terminate the Agreement if any condemnation, taking, damage or other destruction resulted in a Material Adverse Effect.

8.9    Change of Name.

Promptly following the Closing, each Seller shall, and shall cause its direct and indirect Subsidiaries to, discontinue the use of its current name (and any other trade names or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) and shall not subsequently change its name to or otherwise use or employ any name which includes the words "LifeCare", "NextCare", "Care", "LCI" and/or "Hospital" without the prior written consent of Buyer, and each Seller shall cause the names of Sellers in the caption of the Bankruptcy Case to be changed to the new names of each Seller as provided in the last sentence of this Section 8.9; provided, however, that Seller and each of its direct and indirect Subsidiaries may use its current name (and any other trade name or "d/b/a" names currently utilized by each Seller or its direct or indirect Subsidiaries) included on any business cards, stationery and other similar materials following the Closing for a period of up to one hundred and eighty (180) days solely for purposes of winding down the affairs of each Seller and the Excluded Facility, provided that when utilizing such materials, other than in incidental respects, Seller and each of its direct and indirect Subsidiaries shall use commercially reasonable efforts to indicate its new name and reference its current name (and any other trade names or "d/b/a" names currently utilized by each

Seller or its direct Subsidiaries) as "formally known as" or similar designation. From and after the Closing, each Seller covenants and agrees not to use or otherwise employ any of the trade names, corporate names, "d/b/a" names or any mark that is confusingly similar to the Intellectual Property rights utilized by Sellers and Sellers' Subsidiaries in the conduct of the Business or any Acquired Asset, which rights shall be included in the Acquired Assets purchased hereunder. Promptly following the Closing, Sellers shall file, and shall cause its direct and indirect Subsidiaries to file, all necessary organizational amendments with the applicable Secretary of State of each Seller's jurisdiction of formation and in each State in which each such Seller is qualified to do business and with the Bankruptcy Court to effectuate the foregoing.

8.10    No Successor Liability.

The Parties intend that, except where expressly prohibited under applicable Legal Requirement, upon the Closing, Buyer shall not be deemed to: (i) be the successor of Sellers, (ii) have, *de facto*, or otherwise, merged with or into Sellers, (iii) be a mere continuation or substantial continuation of Sellers or the enterprise(s) of Sellers, or (iv) be liable for any acts or omissions of Sellers in the conduct of the Business or arising under or related to the Acquired Assets other than as set forth in this Agreement. Without limiting the generality of the foregoing, and except as otherwise provided in this Agreement, the parties intend that Buyer shall not be liable for any Encumbrances (other than Assumed Liabilities, Closing Encumbrances and Permitted Encumbrances) against Seller or any of its predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the Business, the Acquired Assets or any Liabilities of Seller arising prior to the Closing Date. The Parties agree that the provisions substantially in the form of this Section 8.10 shall be reflected in the Sale Order.

8.11    Excluded Facility Wind Down.

Sellers shall use commercially reasonable efforts to expedite and minimize expenses relating to the wind down of the Excluded Facility, including initiating the wind down of the Excluded Facility prior to Closing and promptly completing the wind down after the Closing Date if not already completed; provided, however, that any such actions shall be subject to applicable Legal Requirements.

**ARTICLE 9**

**CONDITIONS PRECEDENT TO OBLIGATIONS OF BUYER TO CLOSE**

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Buyer, in its sole and absolute discretion:

9.1    Accuracy of Representations.

The representations and warranties of Sellers set forth in this Agreement shall be true and correct in all material respects (except that (i) Section 5.29(a) and (ii) those representations and warranties which are qualified as to materiality or Material Adverse Effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same

effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); provided, however, that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or Material Adverse Effect, the condition set forth in this Section 9.1 shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a Material Adverse Effect. Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.2     Sellers' Performance.

The covenants and agreements that Sellers are required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects and Buyer shall have received a certificate of Sellers to such effect signed by a duly authorized officer thereof.

9.3     No Order.

No Governmental Authority shall have enacted, issued, promulgated, decreed or entered any Order, which is in effect and has the effect of restraining or preventing the consummation of or imposing material modifications on the transactions contemplated by this Agreement.

9.4     Governmental Authorizations.

(a)     To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated.

(b)     All notices, filings, approvals and consents set forth on Schedule 9.4 shall have been made or obtained.

9.5     Sellers' Deliveries.

Each of the deliveries required to be made to Buyer pursuant to Section 4.4 shall have been so delivered.

9.6     Sale Order.

The Bankruptcy Court shall have entered the Sale Order and the Sale Order shall have become a Final Order.

9.7     Assigned Contracts.

The Bankruptcy Court shall have approved and authorized, other than with respect to Cure Costs, the assumption and assignment of each Assigned Contract, except as would not have a material effect on the Business from and after the Closing.

## ARTICLE 10

<u>CONDITIONS PRECEDENT TO THE OBLIGATION OF SELLERS TO CLOSE</u>

The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to fulfillment, at or prior to the Closing, of each of the following conditions, any one or more of which may be waived by Sellers, in their sole and absolute discretion:

10.1    <u>Accuracy of Representations.</u>

The representations and warranties of Buyer set forth in this Agreement shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or material adverse effect or similar expressions shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made on and as of the Closing Date (provided that representations and warranties which are confined to a specified date shall speak only as of such date); <u>provided, however,</u> that in the event of a breach of a representation or warranty other than a representation or warranty qualified by materiality or material adverse effect, the condition set forth in this <u>Section 10.1</u> shall be deemed satisfied unless the effect of all such breaches of representations and warranties taken together results in a material adverse effect.  Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.2    <u>Sale Order in Effect.</u>

The Bankruptcy Court shall have entered the Sale Order.

10.3    <u>Buyer's Performance.</u>

The covenants and agreements that Buyer is required to perform or to comply with pursuant to this Agreement at or prior to the Closing shall have been performed and complied with in all material respects, and Sellers shall have received a certificate of Buyer to such effect signed by a duly authorized officer thereof.

10.4    <u>No Order.</u>

No Governmental Authority shall have enacted, issued, promulgated or entered any Order, which is in effect and has the effect of preventing the consummation of the transactions contemplated by this Agreement.

10.5    <u>Governmental Authorizations.</u>

To the extent that the HSR Act is applicable, any waiting period (and any extension thereof) under the HSR Act and the antitrust legislation of any other relevant jurisdiction applicable to the purchase of the Acquired Assets or the Business contemplated by this Agreement shall have expired or shall have been terminated.

10.6    <u>Buyer's Deliveries.</u>

Each of the deliveries required to be made to Sellers pursuant to <u>Section 4.3</u> shall have been so delivered.

## ARTICLE 11

### TERMINATION

11.1    Termination Events.

Anything contained in this Agreement to the contrary notwithstanding, this Agreement may be terminated at any time prior to the Closing only as follows:

(a)    by either Sellers or Buyer:

(i)    if a Governmental Authority issues a final, non-appealable ruling or Order permanently restraining, enjoining or otherwise prohibiting the transactions contemplated hereby where such ruling or Order was not requested, encouraged or supported by any of Sellers or Buyer; provided that the right to terminate this Agreement under this Section 11.1(a)(i) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date;

(ii)    by mutual written consent of Sellers and Buyer; and

(iii)    if the Closing shall not have occurred by the date that is one hundred and twenty (120) days following the entry of the Sale Order (the "Outside Date"); provided, however, that if the Closing has not occurred by such date, but on such date all of the conditions set forth in Article 9 and Article 10 have been satisfied or waived (to the extent such conditions may be waived) other than the conditions set forth in Sections 9.4 and 10.5, then the Outside Date shall automatically be extended until one hundred and eighty (180) days after such initial Outside Date (and such extended date shall be deemed to be the "Outside Date" for all purposes hereunder) unless two (2) Business Days prior to the end of the second month following the Outside Date, Buyer provides written notice to Sellers that it is no longer extending the Outside Date pursuant to this Section 11.1(a)(iii); provided, further, the right to terminate this Agreement under this Section 11.1(a)(iii) shall not be available to any Party whose willful failure to fulfill any obligation under this Agreement shall have been the cause of, or shall have resulted in, the failure of the Closing to occur on or prior to the Outside Date; and

(b)    By Buyer:

(i)    if (A) the Bankruptcy Court has not entered the Bidding Procedures Order on or prior to January 11, 2013 or (B) the Bidding Procedures Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(ii)    if (A) the Sale Hearing has not taken place on or prior to March 12, 2013, (B) the Bankruptcy Court has not entered the Sale Order on or prior to March 14, 2013 or (C) the Sale Order shall have been stayed, vacated, modified or supplemented without Buyer's prior written consent;

(iii)    if the Sale Order has not become a Final Order within fourteen (14) days after the entry thereof;

(iv)  if any Seller seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, any of the cases commenced by Sellers under chapter 11 of the Bankruptcy Code and comprising part of the Bankruptcy Case, or appointing a trustee in the Bankruptcy Case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Sellers' businesses (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason and is not be reversed or vacated within fourteen (14) days after the entry thereof;

(v)  in the event of any breach of, or failure to perform, any agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Seller being unable to satisfy a condition set forth in Section 9.1 or Section 9.2 by the then-applicable Outside Date and (B) cannot be cured within thirty (30) days after Buyer notifies Sellers of such breach;

(vi)  if, at the end of the auction contemplated by the Bidding Procedures, Buyer is not determined by Sellers to be the Successful Bidder or the Backup Bidder;

(vii)  if, for any reason, Buyer is unable, pursuant to Section 363(k) of the Bankruptcy Code, to credit bid in payment of all or any portion of the Purchase Price as set forth in Section 3.1; or

(viii)  in the event the matters set forth in the Updated Schedules that were not contained in the Disclosure Schedules delivered as of the Execution Date would reasonably be expected to have a Material Adverse Effect; provided, however, that the termination right set forth in this Section 11.1(b)(viii) may only be exercised for five (5) Business Days following the delivery of the Updated Schedules.

(c)  By Sellers:

(i)  in the event of any breach of, or failure to perform, any agreements, covenants, representations or warranties contained herein, which breach or failure to perform (A) would result in Seller being unable to satisfy a condition set forth in Section 10.1 or Section 10.3 and (B) cannot be cured within thirty (30) days after Seller notifies Buyer of such breach; or

(ii)  if a bidder other than Buyer is the Successful Bidder at the auction contemplated by the Bidding Procedures.

Each condition set forth in this Section 11.1, pursuant to which this Agreement may be terminated shall be considered separate and distinct from each other such condition.  If more than one of the termination conditions set forth in Section 11.1 are applicable, the applicable party shall have the right to choose the termination condition pursuant to which this Agreement is to be terminated. The Parties acknowledge and agree that no notice of termination or extension of the Outside Date provided pursuant to this Section 11.1 shall become effective until two (2) Business Days after the delivery of such notice to the other Parties, and only if such notice shall not have been withdrawn during such two (2) Business Day period or otherwise become invalid.

11.2    Effect of Termination.

(a)    In the event of termination of this Agreement by Buyer or Sellers pursuant to this Article 11, this Agreement shall become null and void and have no effect and all rights and obligations of the Parties under this Agreement shall terminate without any Liability of any Party to any other Party except (i) nothing herein shall relieve any Party from Liability for any breach of this Agreement occurring prior to such termination and (ii) provisions of Section 7.5 and this Section 11.2 (and, to the extent applicable to the interpretation or enforcement of such provisions, Article 1 and Article 12), shall expressly survive the termination of this Agreement.

(b)    (i) In the event of a termination of this Agreement pursuant to Section 11.1(b) or the consummation by Sellers of an Alternative Transaction, Sellers shall pay to Buyer the Expense Reimbursement by wire transfer of immediately available funds within two (2) Business Days following the effectiveness of such termination or immediately upon such consummation; provided that under no circumstances shall Sellers be obligated to pay the Expense Reimbursement more than once; and provided, further that, if Sellers fail to pay any amounts due to Buyer pursuant to this Section 11.2(b) within the time period specified herein, Sellers shall pay the costs and expenses (including reasonable legal fees and expenses) incurred by Buyer in connection with any Action or Proceeding taken to collect payment of such amounts, together with interest on such unpaid amounts at the Applicable Rate, calculated on a daily basis from the date such amounts were required to be paid until the date of actual payment.

(c)    Each Party acknowledges that the agreements contained in this Section 11.2 are an integral part of the transactions contemplated by this Agreement, that without these agreements such Party would not have entered into this Agreement, and that any amounts payable pursuant to this Section 11.2 do not constitute a penalty.

## ARTICLE 12

### GENERAL PROVISIONS

12.1    Survival.

All covenants and agreements contained herein which by their terms are to be performed in whole or in part, or which prohibit actions, subsequent to the Closing shall, solely to the extent such covenants and agreements are to be performed, or prohibit actions, subsequent to the Closing, survive the Closing in accordance with their terms.  All other covenants and agreements contained herein, and all representations and warranties contained herein or in any certificated deliveries hereunder, shall not survive the Closing and shall thereupon terminate, including any Actions for damages in respect of any breach thereof.

12.2    Confidentiality.

The Parties agree that the confidentiality agreements entered into by them and their Affiliates, dated October 10, 2012 (the "Confidentiality Agreements"), shall continue in full force and effect notwithstanding the execution and delivery by the Parties of this Agreement; provided, however, that (a) the Confidentiality Agreements and the provisions of Section 9.12 of the Credit Agreement shall be deemed terminated effectively immediately upon the occurrence of the Closing, (b) disclosure of matters that become a matter of public record as a result of the

Bankruptcy Case and the filings related thereto shall not constitute a breach of such Confidentiality Agreements, and (c) disclosures permitted under this Agreement shall not constitute a breach of such Confidentiality Agreements. Following the Closing, each Seller agrees to, and to cause its Affiliates to, treat and hold as confidential, and not use or disclose all or any of the information concerning the Business, the Acquired Assets, the negotiation or existence and terms of this Agreement or the business affairs of Buyer except (i) disclosure of matters that become a matter of public record as a result of the Bankruptcy Case and the filings related thereto and (ii) disclosures permitted under this Agreement.

12.3    Public Announcements.

Unless otherwise required by applicable Legal Requirement or by obligations of Buyer or Sellers or their respective Affiliates pursuant to any listing agreement with or rules of any securities exchange, Buyer, on the one hand, and Sellers, on the other hand, shall consult with each other before issuing any press release or otherwise making any public statement with respect to this Agreement, the transactions contemplated hereby or the activities and operations of the other and shall not issue any such release or make any such statement without the prior written consent of the other (such consent not to be unreasonably withheld or delayed).

12.4    Notices.

All notices, requests, demands, waivers and other communications required or permitted to be given under this Agreement shall be in writing and shall be deemed to have been duly given if delivered personally or sent by overnight courier or facsimile transmission:

> (i)    If to Sellers, then to:

> LifeCare Holdings, Inc.
> 5560 Tennyson Parkway
> Plano, Texas 75024
> Attn: General Counsel
> Facsimile: 469-241-2199

> with a copy (which shall not constitute notice) to:

> Skadden, Arps, Slate, Meagher & Flom LLP
> Four Times Square
> New York, NY 10036
> Attn: Ken Ziman
> Facsimile: 917-777-3310

> and

> Attn: Felicia Gerber Perlman
> Facsimile: 312-407-8582

> (ii)    If to Buyer:

> Hospital Acquisition LLC
> c/o Akin Gump Strauss Hauer & Feld LLP

One Bryant Park
New York, NY  10036
Attn: Ira S. Dizengoff, Esq.
Facsimile: 212-872-1002

with a copy (which shall not constitute notice) to:

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, NY  10036
Attn: Ira S. Dizengoff, Esq.
Facsimile: 212-872-1002

and

Akin Gump Strauss Hauer & Feld LLP
1333 New Hampshire Avenue, N.W.
Washington, DC 20036
Attn: Scott Alberino, Esq.
Facsimile: 202-887-4288

or to such other person or address as any party shall specify by notice in writing to the other party. All such notices, requests, demands, waivers and communications shall be deemed to have been received on the date on which so personally-delivered or faxed or delivered by overnight courier.

12.5    Waiver.

Neither the failure nor any delay by any Party in exercising any right, power, or privilege under this Agreement or the documents referred to in this Agreement shall operate as a waiver of such right, power or privilege, and no single or partial exercise of any such right, power, or privilege shall preclude any other or further exercise of such right, power, or privilege or the exercise of any other right, power, or privilege.  To the maximum extent permitted by Legal Requirements, (a) no waiver that may be given by a Party shall be applicable except in the specific instance for which it is given, and (b) no notice to or demand on one Party shall be deemed to be a waiver of any right of the Party giving such notice or demand to take further action without notice or demand.

12.6    Entire Agreement; Amendment.

This Agreement (including the Disclosure Schedules and the Exhibits) and the other Transaction Documents supersede all prior agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to its subject matter and constitute a complete and exclusive statement of the terms of the agreements between Buyer, on the one hand, and Sellers, on the other hand, with respect to their subject matter.  This Agreement may not be amended, modified or supplements except by a written agreement executed by each of the Parties hereto.

12.7    Assignment.

This Agreement, and the rights, interests and obligations hereunder, shall not be assigned by any Party by operation of law or otherwise without the express written consent of the other Parties (which consent may be granted or withheld in the sole discretion of such other Party); provided, however, that Buyer shall be permitted to assign all or part of its rights or obligations hereunder to one or more Buyer Designees without the prior consent of Sellers.

12.8    Severability.

The provisions of this Agreement shall be deemed severable, and the invalidity or unenforceability of any provision shall not affect the validity or enforceability of the other provisions hereof. If any provision of this Agreement, or the application thereof to any Person or any circumstance, is invalid or unenforceable, (a) a suitable and equitable provision shall be substituted therefor in order to carry out, so far as may be valid and enforceable, the intent and purpose of such invalid or unenforceable provision and (b) the remainder of this Agreement and the application of such provision to other Persons or circumstances shall not be affected by such invalidity or unenforceability.

12.9    Expenses.

Except as otherwise expressly provided in this Agreement, including Section 11.2, whether or not the transactions contemplated by this Agreement are consummated, the Parties shall bear their own respective expenses (including all compensation and expenses of counsel, financial advisors, consultants, actuaries and independent accountants) incurred in connection with this Agreement and the transactions contemplated hereby. Any and all fees required by (i) any Governmental Authority or any Person to obtain or for the transfer of a Permit or (ii) incurred in connection with complying with any Antitrust Law, shall be the sole responsibility of Sellers.

12.10    Governing Law; Consent to Jurisdiction and Venue; Jury Trial Waiver.

(a)    Except to the extent the mandatory provisions of the Bankruptcy Code apply, this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York applicable to contracts made and to be performed entirely in such state without regard to principles of conflicts or choice of laws or any other law that would make the laws of any other jurisdiction other than the State of New York applicable hereto.

(b)    Without limitation of any Party's right to appeal any Order of the Bankruptcy Court, (i) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby and (ii) any and all claims relating to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent and submit to the exclusive jurisdiction and venue of the Bankruptcy Court and irrevocably waive the defense of an inconvenient forum to the maintenance of any such Action or Proceeding; provided, however, that, if the Bankruptcy Case is closed, all Actions and Proceedings arising out of or relating to this Agreement shall be heard and determined in a New York state court or a federal court sitting in the state of New York, and the Parties hereby irrevocably submit to the exclusive jurisdiction and venue of such courts in any such Action or Proceeding and irrevocably waive the defense of

an inconvenient forum to the maintenance of any such Action or Proceeding. The Parties consent to service of process by mail (in accordance with <u>Section 12.4</u>) or any other manner permitted by law.

        (c)    THE PARTIES HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED IN CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT OR THE ACTIONS OF SELLERS, BUYER OR THEIR RESPECTIVE REPRESENTATIVES IN THE NEGOTIATION OR PERFORMANCE HEREOF.

      12.11   <u>Counterparts</u>.

      This Agreement and any amendment hereto may be executed in two or more counterparts, each of which shall be deemed to be an original of this Agreement or such amendment and all of which, when taken together, shall constitute one and the same instrument. Notwithstanding anything to the contrary in <u>Section 12.4</u>, delivery of an executed counterpart of a signature page to this Agreement or any amendment hereto by telecopier, facsimile or email attachment that contains a portable document format (.pdf) file of an executed signature shall be effective as delivery of a manually executed counterpart of this Agreement or such amendment, as applicable.

      12.12   <u>Parties in Interest; No Third Party Beneficiaries; No Amendment</u>.

      This Agreement and the other Transaction Documents shall inure to the benefit of and be binding upon the Parties and their respective successors and permitted assigns. This Agreement and the other Transaction Documents are for the sole benefit of the Parties and their permitted assigns, and nothing herein, express or implied, is intended to or shall confer upon any other Person any legal or equitable benefit, claim, cause of action, remedy or right of any kind. Notwithstanding anything to the contrary, nothing in this Agreement shall constitute an amendment to any Benefit Plan.

      12.13   <u>Remedies</u>.

      Neither the exercise of nor the failure to exercise a right of set-off or to give notice of a claim under this Agreement will constitute an election of remedies or limit Sellers or Buyer in any manner in the enforcement of any other remedies that may be available to any of them, whether at law or in equity.

      12.14   <u>Specific Performance for Post-Closing Covenants</u>.

      Solely with respect to the Parties' respective covenants under this Agreement that survive the Closing, and solely to the extent to be performed after the Closing, (a) each Party recognizes that if such Party breaches or refuses to perform any such covenant, monetary damages alone would not be adequate to compensate the non-breaching Party or Parties for their injuries, (b) the non-breaching Party or Parties shall therefore be entitled, in addition to any other remedies that may be available, to obtain specific performance of the terms of such covenants, (c) if any Action or Proceeding is brought by the non-breaching Party or Parties to enforce such covenants, the Party in breach shall waive the defense that there is an adequate remedy at law, (d) each Party agrees to waive any requirement for the security or posting of any bond in connection with any Action or Proceeding seeking specific performance of such covenants and (e) each

Party agrees that the only permitted objection that it may raise in response to any action for specific performance of such covenants is that it contests the existence of a breach or threatened breach of such covenants. Notwithstanding any other provision of this Agreement to the contrary, no Party shall be entitled to any equitable remedy, including an injunction or order for specific performance, to enforce any provision of this Agreement prior to the Closing.

12.15  Sellers' Representative; Reliance.

Sellers, jointly and severally, hereby represent and warrant that the statements in this Section 12.15 are correct and complete as of the date of this Agreement:

(a)  The Company has been appointed, and is authorized, and empowered to act, in connection with, and to facilitate the consummation of, the transactions contemplated by this Agreement and the Transaction Documents and in connection with any activities to be performed by the Sellers under this Agreement and the Transaction Documents, for the purposes and with the powers, and authority set forth in this Agreement, which will include the sole power and authority:

(i)  to receive and distribute the Purchase Price or any other amount paid in connection with this Agreement or the Transaction Documents to Sellers;

(ii)  to enforce and protect the rights and interests of Sellers arising out of or under or in any manner relating to this Agreement and the Transaction Documents (including in connection with any claims related to the transactions contemplated hereby and thereby) and, in connection therewith, to (A) assert any claim or institute any action, (B) investigate, defend, contest or litigate any action initiated by Buyer or any other Person pursuant to this Agreement and the Transaction Documents and receive process on behalf of each Seller in any such action and compromise or settle on such terms as the Company will determine to be appropriate, give receipts, releases and discharges on behalf of all or any Seller with respect to any such action, (C) file any proofs, debts, claims and petitions as the Company may deem advisable or necessary, (D) settle or compromise any claims related to the transactions contemplated by this Agreement and the Transaction Documents, (E) assume, on each Sellers' behalf, the defense of any claims related to the transactions contemplated by this Agreement and the Transaction Documents, and (F) file and prosecute appeals from any decision, judgment or award rendered in any of the foregoing actions;

(iii)  to enforce or refrain from enforcing any right of any Seller (prior to the Closing) and/or of the Company arising out of or under or in any manner relating to this Agreement or the Transaction Documents;

(iv)  to take any action to be taken by one or more Sellers under or in connection with this Agreement or any Transaction Document; or

(v)  to make, execute, acknowledge and deliver all such other Contracts, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Company, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the

(vi)    activities described in <u>Section 12.15(a)(i)</u> through <u>Section 12.15(a)(iii)</u> and the transactions contemplated by this Agreement and the Transaction Documents.

(b)    The Company's power and grant of authority is (i) coupled with an interest and is irrevocable and survives the bankruptcy or liquidation of any Seller and will be binding on any successor thereto; and (ii) may be exercised by the Company acting by signing as the representative of any Seller.

(c)    Buyer and its Affiliates and representatives may conclusively and absolutely rely, without inquiry, upon the action of the Company as the action of each Seller (and may ignore any action taken or notice given by any Seller other than the Company) in all matters relating to this Agreement, the Transaction Documents or the transactions contemplated hereby and thereby.  Any document delivered or notice delivered by or on behalf of Buyer or its Affiliates to, or action taken by or on behalf of Buyer or its Affiliates with respect to, the Company shall be deemed to have been delivered to, or taken with respect to, all Sellers.  Any amounts to be paid by Buyer to Sellers pursuant to this Agreement shall be divided by Sellers among themselves, but may be paid by Buyer to the Company.  Sellers shall be jointly and severally liable for any amounts due to be paid or owed by Sellers to Buyer pursuant to this Agreement.

*[Signature pages follow.]*

IN WITNESS WHEREOF, the Parties have caused this Asset Purchase Agreement to be executed and delivered by their duly authorized representatives, all as of the Execution Date.

HOSPITAL ACQUISITION LLC

By: _____
Name:
Title:


LCI HOLDCO, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOLDINGS, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


CRESCENT CITY HOSPITALS, L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

LIFECARE HOSPITALS, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF NORTH
CAROLINA, L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF NEW
ORLEANS, L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE MANAGEMENT SERVICES,
L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF CHESTER
COUNTY, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

LIFECARE HOSPITALS OF DAYTON, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOLDING COMPANY OF TEXAS, L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF PITTSBURGH, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE INVESTMENTS, L.L.C.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF NORTH TEXAS, L.P.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

LIFECARE HOSPITALS OF FT. WORTH,
L.P.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


SAN ANTONIO SPECIALTY HOSPITAL,
LTD.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF
MILWAUKEE, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF NORTHERN
NEVADA,
    INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF SOUTH
TEXAS, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

LIFECARE REIT 1, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE REIT 2, INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


NEXTCARE SPECIALTY HOSPITAL OF
DENVER,
    INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS OF
MECHANICSBURG, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE HOSPITALS AT TENAYA,
LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

LIFECARE HOSPITALS OF SARASOTA,
LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE INVESTMENTS 2, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


LIFECARE SPECIALTY HOSPITAL OF
NORTH
    LOUISIANA, LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


PITTSBURGH SPECIALTY HOSPITAL,
LLC

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer


NEXTCARE HOSPITALS / MUSKEGON,
INC.

By: _____
Name: Phillip B. Douglas
Title: Chief Executive Officer

HOSPITAL ACQUISITION LLC

By: _Zachary Lewis_
Name: Zachary Lewis
Title: Authorized Person

**EXHIBIT E**

**CURE NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                          :
In re:                                    :    Chapter 11
                                          :
LCI HOLDING COMPANY, INC., et al.,        :    Case No. 12-13319 (___)
                                          :
                    Debtors.[1]           :    Joint Administration Pending
                                          :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**NOTICE OF CURE AMOUNT WITH RESPECT TO EXECUTORY CONTRACTS OR
UNEXPIRED LEASES TO BE ASSUMED AND ASSIGNED**

PLEASE TAKE NOTICE THAT:

        1.      Pursuant to the **Order (I) Establishing Bidding Procedures Relating to
the Sale of Substantially All of the Debtors' Assets; (II) Approving Expense
Reimbursement; (III) Establishing Procedures Relating to the Assumption and Assignment
of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure
Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections,
Schedules and Agreements, (V) Scheduling a Hearing to Consider the Proposed Sale; and
VI Granting Certain Related Relief** entered by the United States Bankruptcy Court for the
District of Delaware on January [●], 2013, the above captioned debtors and debtors in possession
(collectively, the "Debtors") hereby provide notice that they may seek to assume and assign the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: LCI
Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279),
Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI
Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company
of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare
Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc.
(2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957),
LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare
Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals
of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San
Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc.
(5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management
Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty
Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE
Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty
Hospital, Ltd. (5386). The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4
– Suite 150, Plano, TX 75024.

unexpired leases or executory contracts (the "Assigned Contract") listed on Exhibit A attached hereto to the Successful Bidder (capitalized terms not otherwise defined in this notice shall have the meaning given to them in the Bidding Procedures approved as part of the Bidding Procedures Order).

   2. If the Debtors seek to assume and assign the Assigned Contract, on the Closing Date, or as soon thereafter as practicable, the Successful Bidder will pay you the amount the Debtors' records reflect is owing for prepetition arrearages as set forth on Exhibit A (the "Cure Amount").  The Debtors' records reflect that all postpetition amounts owing under your Assigned Contract have been paid and will continue to be paid until the assumption and assignment of the Assigned Contract, and that other than the Cure Amount, there are no other defaults under the Assigned Contract.

   3. Objections, if any, to the proposed Cure Amount or assumption and assignment must be made in writing and (i) state the basis for such objection and (ii) state with specificity what cure amount you believe is required (in all cases with appropriate documentation in support thereof) and be filed with the Bankruptcy Court 824 North Market Street, [●] Floor, Courtroom [●], Wilmington, Delaware 19801, and served on the Debtors' counsel (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Dr., Chicago, IL 60606, Attn: Felicia Gerber Perlman and Matthew N. Kriegel), and the Stalking Horse Purchaser's counsel (Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. and Scott Alberino, Esq.) so as to be received within fifteen (15) days of the date of this Notice (the "Objection Deadline").

   4. If an objection to the Cure Amount or assumption and assignment is timely filed and not resolved by the parties, a hearing with respect to the objection will be held before the Honorable [●], United States Bankruptcy Judge, in the Bankruptcy Court, 824 North Market Street, [●] Floor, Courtroom [●], Wilmington, Delaware 19801 at the Sale Hearing or at a later hearing, as determined by the Debtors.  A hearing regarding the Cure Amount, if any, may be continued at the sole discretion of the Debtors until after the Closing Date.

   5. After the Auction, the Debtors will file, but not serve, a notice that identifies the Successful Bidder.

   6. At the Sale Hearing, the Debtors shall present evidence necessary to demonstrate adequate assurance of future performance by the Successful Bidder.  If the Successful Bidder is not the Stalking Horse Purchaser, then the deadline to object to assumption and assignment shall be extended to the date of the Sale Hearing; provided, however, that the deadline to object to the Cure Amount shall not be extended.  You will have the opportunity to evaluate and, if necessary, challenge the ability of any Successful Bidder to provide adequate assurance of future performance under the Assigned Contracts.

7.      The Debtors reserve all of their rights, claims and causes of action with respect to the contracts and agreements listed on Exhibit A hereto.

Dated:  Wilmington, Delaware
      [●]

                    SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                    Anthony W. Clark (I.D. No. 2051)
                    One Rodney Square
                    P.O. Box 636
                    Wilmington, Delaware 19899-0636
                    Telephone: (302) 651-3000
                    Fax: (302) 651-3001

                    - and -

                    Kenneth S. Ziman (*pro hac vice admission pending*)
                    Four Times Square
                    New York, New York 10036-6522
                    Telephone: (212) 735-3000
                    Fax: (212) 735-2000

                    - and -

                    Felicia Gerber Perlman (*pro hac vice admission pending*)
                    Matthew N. Kriegel (*pro hac vice admission pending*)
                    155 N. Wacker Dr.
                    Chicago, Illinois 60606
                    Telephone: (312) 407-0700
                    Fax: (312) 407-0411

                    Proposed Counsel for Debtors and Debtors in Possession

**EXHIBIT F**

**SALE NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :    Chapter 11
                                              :
LCI HOLDING COMPANY, INC., et al.,            :    Case No. 12-13319 (___)
                                              :
                    Debtors.¹                 :    Joint Administration Pending
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
```

**NOTICE OF AUCTION AND SALE HEARING**

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

       1.    Commencing on [●], the above-captioned debtors and debtors in possession (collectively, the "Debtors"), each filed voluntary petitions for relief pursuant to chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").

       2.    On December 11, 2012, the Debtors filed a motion (the "Bidding Procedures Motion"), pursuant to sections 363 and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006, seeking entry of an order (the "Bidding Procedures Order")² (a) approving procedures (the "Bidding Procedures") for submitting competing bids for substantially all of the Debtors' assets (the "Acquired Assets") pursuant to the Asset Purchase Agreement (the "Asset Purchase Agreement") with the Debtors' Prepetition Lenders to act as a "stalking horse" (the "Stalking Horse Purchaser") for the sale of the Acquired Assets; (b) scheduling an auction

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows: LCI Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty Hospital, Ltd. (5386). The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 – Suite 150, Plano, TX 75024.

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Bidding Procedures Motion or the Bidding Procedures Order.

(the "Auction") for the Acquired Assets and a hearing to approve the sale of the Acquired Assets (the "Sale Hearing"); (c) authorizing the Debtors to reimburse, pursuant to the terms and conditions of the Asset Purchase Agreement, the Stalking Horse Purchaser for its reasonable and documented out-of-pocket costs and expenses incurred in connection with negotiating the Asset Purchase Agreement, in an amount not to exceed $1,000,000.00 (the "Expense Reimbursement"); (d) approving the form and manner of notice of the Auction and the Sale Hearing; and (e) approving procedures for the assumption and assignment of contracts and leases to any purchaser(s) of the Acquired Assets, including notice of Cure Amount, and/or to resolve any objections thereto.

3.       On January ___, 2013 the United States Bankruptcy Court for the District of Delaware entered the Bidding Procedures Order. Pursuant to the Bidding Procedures Order, if the Debtors receive any Qualified Bids, for the Acquired Assets, the Auction shall take place on March ___, 2013 at ____ _.m. (Eastern Daylight Time) at the offices of Skadden, Arps, Slate, Meagher & Flom, 4 Times Square, New York, NY 10036. Only parties that have submitted a Qualified Bid, as set forth in the Bidding Procedures Order, by no later than February ___, 2013 at 5:00 p.m. (Eastern Daylight Time) (the "Bid Deadline") may participate at the Auction. Any party that wishes to take part in this process and submit a bid for the Acquired Assets must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.

4.       The Sale Hearing to consider approval of the sale of the Acquired Assets to the Stalking Horse Purchaser or to the Successful Bidder at the Auction, as applicable, free and clear of all liens, claims, and encumbrances, will be held before the Honorable [●], United States Bankruptcy Judge, 824 North Market Street, Wilmington, Delaware 19801 on March ___, 2013 at ____ _.m. (Eastern Daylight Time), or at such other time thereafter as counsel may be heard. The Sale Hearing may be adjourned from time to time without further notice to creditors or parties in interest other than by announcement of the adjournment in open court on the date scheduled for the Sale Hearing.

5.       Objections, if any, to the sale, must: (a) be in writing; (b) comply with the Bankruptcy Rules and Local Bankruptcy Rules; and (c) be filed with the clerk of the Bankruptcy Court for the District of Delaware, Third Floor, 824 North Market Street, Wilmington, Delaware 19801, on or before [●] (Eastern Daylight Time) on [●]; and be served upon: (1) the Debtors, LifeCare Holdings, Inc., 5340 Legacy Drive, Suite 150, Building 4, Plano, TX 750024, Attn: Erik Pahl, general counsel (erik.pahl@lifecare-hospitals.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, Attn. Ken Ziman, Esq. (ken.ziman@skadden.com) and Felicia Perlman, Esq. (felicia.perlman@skadden.com); (3) financial advisor to the Debtors, Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@rothschild.com) and Stephen Antinelli (stephen.antinelli@rothschild.com); (4) counsel to the Official Committee of Unsecured Creditors (if one has been appointed) (the "Committee"); (5) counsel to the Stalking Horse Purchaser and the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Scott Alberino, Esq. (salberino@akingump.com); (6) financial advisor to the Stalking Horse Purchaser, Alvarez & Marsal; 600 Madison Avenue, 7th Floor, New York, NY 10022 Attn: Vin Batra (vbatra@alvarezandmarsal.com) and George

Varughese (gvarughese@alvarezandmarsal.com); and (7) counsel to the Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba, Esq. (squsba@stblaw.com) and Morris Massel Esq. (mmassel@stblaw.com); so as to be received no later than [●] (Eastern Daylight Time) on [●]; provided, however, that to the extent the winning bidder at the Auction is an entity other than the Stalking Horse Purchaser, any supplemental or further objections to the sale to the winning bidder shall be filed and served so as to be received no later than [●] (Eastern Daylight Time) on [●]. UNLESS AN OBJECTION IS TIMELY SERVED AND FILED IN ACCORDANCE WITH THIS NOTICE, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT AND THE BANKRUPTCY COURT MAY GRANT THE RELIEF REQUESTED WITHOUT FURTHER HEARING AND NOTICE.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

6.       This Notice and the Sale Hearing is subject to the fuller terms and conditions of the Bidding Procedures Motion and the Bidding Procedures Order, which shall control in the event of any conflict, and the Debtors encourage parties-in-interest to review such documents in their entirety.  Parties interested in receiving more information regarding the sale of the Acquired Assets and/or copies of any related document, including the Asset Purchase Agreement, the Bidding Procedures Motion, or the Bidding Procedures Order, may make a written request to counsel for the Debtors, (Skadden, Arps, Slate, Meagher & Flom LLP, 155 N. Wacker Dr., Chicago, IL 60606, Attn: Felicia Gerber Perlman and Matthew N. Kriegel).  In addition, copies of the Bidding Procedures Motion, the Bidding Procedures Order and this Notice can be found on (i) the Court's website, www.deb.uscourts.gov; and (ii) [●], and are on file with the Clerk of the Bankruptcy Court, Third Floor, 824 Market Street, Wilmington, Delaware 19801.

Dated:  Wilmington, Delaware
         [●]

                                SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

                                Anthony W. Clark (I.D. No. 2051)
                                One Rodney Square
                                P.O. Box 636
                                Wilmington, Delaware 19899-0636
                                Telephone: (302) 651-3000
                                Fax: (302) 651-3001

                                - and -

                                Kenneth S. Ziman (*pro hac vice admission pending*)
                                Four Times Square
                                New York, New York 10036-6522
                                Telephone: (212) 735-3000
                                Fax: (212) 735-2000

                                - and -

                                Felicia Gerber Perlman (*pro hac vice admission pending*)
                                Matthew N. Kriegel (*pro hac vice admission pending*)
                                155 N. Wacker Dr.
                                Chicago, Illinois 60606
                                Telephone: (312) 407-0700
                                Fax: (312) 407-0411


                                Proposed Counsel for Debtors and Debtors in Possession

4

**EXHIBIT G**

**PUBLICATION NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                    :
In re:                              :    Chapter 11
                                    :
LCI HOLDING COMPANY, INC., et al.,  :    Case No. 12-13319 (___)
                                    :
            Debtors.[1]             :    Joint Administration Pending
                                    :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SALE OF CERTAIN ASSETS

PLEASE TAKE NOTICE OF THE FOLLOWING:

1.    Pursuant to the **Order (I) Establishing Bidding Procedures Relating to
the Sale of Substantially All of the Debtors' Assets; (II) Approving Expense
Reimbursement; (III) Establishing Procedures Relating to the Assumption and Assignment
of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure
Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections,
Schedules and Agreements, (V) Scheduling a Hearing to Consider the Proposed Sale, and
(VI) Granting Certain Related Relief** (the "Bidding Procedures Order") entered by the United
States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on January [●],
2013, the above captioned debtors and debtors in possession (collectively, the "Debtors") are
selling substantially all of their assets (the "Acquired Assets").

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  LCI
Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279),
Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI
Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company
of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare
Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc.
(2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957),
LifeCare Hospitals of Milwaukee, Inc. (4291), LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare
Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals
of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San
Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc.
(5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management
Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty
Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE
Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty
Hospital, Ltd. (5386).  The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4
– Suite 150, Plano, TX 75024.

2.      All interested parties are invited to make offers to purchase any of the Acquired Assets in accordance with the terms and conditions approved by the Bankruptcy Court (the "Bidding Procedures"). Pursuant to the Bidding Procedures, the Debtors will conduct an auction for the Assets (the "Auction"), beginning on March ___, 2013 at _____ _.m. (Eastern Daylight Time) at the offices of Skadden, Arps, Slate, Meagher & Flom, 4 Times Square, New York, NY 10036, or such other place and time as the Debtors decide.

3.      Participation at the Auction is subject to the Bidding Procedures and the Bidding Procedures Order. Any person that wishes to participate in the bidding process must become a "Qualified Bidder." The procedures for being deemed a Qualified Bidder are contained in the Bidding Procedures. A Qualified Bidder that desires to make a bid shall deliver written copies of its bid to (1) the Debtors, LifeCare Holdings, Inc., 5340 Legacy Drive, Suite 150, Building 4, Plano, TX 750024, Attn: Erik Pahl, general counsel (erik.pahl@lifecare-hospitals.com); (2) counsel for the Debtors, Skadden, Arps, Slate, Meagher & Flom LLP, 4 Times Square, New York, NY 10036, Attn. Ken Ziman, Esq. (ken.ziman@skadden.com) and Felicia Perlman, Esq. (felicia.perlman@skadden.com); (3) financial advisor to the Debtors, Rothschild Inc., 1251 Avenue of the Americas, 51st Floor, New York, NY 10020, Attn: Neil A. Augustine (neil.augustine@rothschild.com) and Stephen Antinelli (stephen.antinelli@rothschild.com); (4) counsel to the Official Committee of Unsecured Creditors (if one has been appointed) (the "Committee"); (5) counsel to the Stalking Horse Purchaser and the Steering Committee, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira Dizengoff, Esq. (idizengoff@akingump.com) and Scott Alberino, Esq. (salberino@akingump.com); (6) financial advisor to the Stalking Horse Purchaser, Alvarez & Marsal; 600 Madison Avenue, 7th Floor, New York, NY 10022 Attn: Vin Batra (vbatra@alvarezandmarsal.com); and George Varughese (gvarughese@alvarezandmarsal.com); and (7) counsel to the Agent, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandeep Qusba, Esq. (squsba@stblaw.com) and Morris Massel Esq. (mmassel@stblaw.com) not later than 5:00 p.m. (Eastern Daylight Time) on February ___, 2013 (the "Bid Deadline").

4.      A hearing to approve the Sale Transaction (the "Sale Hearing") to any Successful Bidder will be held at _____ _.m. (Eastern Daylight Time) on March ___, 2013, unless otherwise continued by the Debtors pursuant to terms of the Bidding Procedures. The Sale Hearing will be held before the Honorable [●], United States Bankruptcy Judge, in the United States Bankruptcy Court for the District of Delaware, 824 North Market Street, [●] Floor, [●], Wilmington, Delaware 19801.

3

5.     This notice is qualified in its entirety by the Bidding Procedures Order.

Dated:  Wilmington, Delaware
        [●]

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
Matthew N. Kriegel (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

4

**EXHIBIT H**

**POST AUCTION NOTICE**

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                :

In re:                           :    Chapter 11
                                :

LCI HOLDING COMPANY, INC., et al.,   :    Case No. 12-13319 (___)
                                :

         Debtors.[1]         :    Joint Administration Pending
                                :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## NOTICE OF SUCCESSFUL BIDDER AND OF ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACT OR UNEXPIRED LEASE

PLEASE TAKE NOTICE THAT:

        1.      Pursuant to the **Order (I) Establishing Bidding Procedures Relating to the Sale of Substantially All of the Debtors' Assets; (II) Approving Expense Reimbursement; (III) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, Including Notice of Proposed Cure Amounts; (IV) Approving Form and Manner of Notice of All Procedures, Protections, Schedules and Agreements, (V) Scheduling a Hearing to Consider the Proposed Sale, and (VI) Granting Certain Related Relief** entered by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on January [●], 2013, the above captioned debtors and debtors in possession (collectively, the "Debtors") have accepted the bid of [●] for the

---

[1]    The Debtors and the last four digits of their respective taxpayer identification numbers are as follows:  LCI Holding Company, Inc. (7662), Boise Intensive Care Hospital, Inc. (2686), CareRehab Services, L.L.C. (2279), Crescent City Hospitals, L.L.C. (2012), LCI Healthcare Holdings, Inc. (3557), LCI Holdco, LLC (3233), LCI Intermediate Holdco, Inc. (7709), LifeCare Ambulatory Surgery Center, Inc. (N/A), LifeCare Holding Company of Texas, LLC (9174), LifeCare Holdings, Inc. (2090), LifeCare Hospital at Tenaya, LLC (8443), LifeCare Hospitals, LLC (9674), LifeCare Hospitals of Chester County, Inc. (6062), LifeCare Hospitals of Dayton, Inc. (2086), LifeCare Hospitals of Fort Worth, L.P. (5272), LifeCare Hospitals of Mechanicsburg, LLC (5957), LifeCare Hospitals of Milwaukee, Inc. (4291),  LifeCare Hospitals of New Orleans, L.L.C. (4151), LifeCare Hospitals of North Carolina, L.L.C. (1857), LifeCare Hospitals of North Texas, L.P. (2743), LifeCare Hospitals of Northern Nevada, Inc. (0990), LifeCare Hospitals of Pittsburgh, LLC (9672), LifeCare Hospitals of San Antonio, LLC (6312), LifeCare Hospitals of Sarasota, LLC (7045), LifeCare Hospitals of South Texas, Inc. (5457), LifeCare Investments, L.L.C. (5041), LifeCare Investments 2, LLC (4598), LifeCare Management Services, L.L.C. (4309), LifeCare REIT 1, Inc. (3708), LifeCare REIT 2, Inc. (2075), LifeCare Specialty Hospital of North Louisiana, LLC (2585), NextCARE Specialty Hospital of Denver, Inc. (8584), NextCARE Hospitals/Muskegon, Inc. (1802), Pittsburgh Specialty Hospital, LLC (6725) and San Antonio Specialty Hospital, Ltd. (5386).  The address of the Company's corporate headquarters is 5340 Legacy Drive, Building 4 – Suite 150, Plano, TX 75024.

2

purchase of substantially all of the Debtors' assets. The terms of the bid are set forth in the asset purchase agreement (the "Asset Purchase Agreement"), dated as of [●] between the Debtors and [●] (the "Purchaser"), substantially in the form attached hereto as Exhibit A.

2.    At the Sale Hearing to be held on March ___, 2013 at _____ _.m. (Eastern Daylight Time) before the Honorable [●], United States Bankruptcy Judge, in the Bankruptcy Court, 824 North Market Street, [●] Floor, Courtroom [●], Wilmington, Delaware 19801, the Debtors will seek (i) entry of an order (the "Sale Order"), approving the sale of all of the Debtors' assets and (ii) pursuant to the terms of the Asset Purchase Agreement, to assume and assign the contracts and leases set forth on Exhibit B hereto.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

3

3.      Pursuant to 11 U.S.C. § 365 there is adequate assurance of the Purchaser's future performance under the executory contract or unexpired lease to be assumed and assigned because of the significant resources of the Purchaser.  Moreover, if necessary, the Debtors will adduce facts at the hearing on any objection demonstrating the financial wherewithal of the Purchaser, and their willingness and ability to perform under the contracts to be assumed and assigned by them.

Dated:  Wilmington, Delaware
        [●]

SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP

Anthony W. Clark (I.D. No. 2051)
One Rodney Square
P.O. Box 636
Wilmington, Delaware 19899-0636
Telephone: (302) 651-3000
Fax: (302) 651-3001

- and -

Kenneth S. Ziman (*pro hac vice admission pending*)
Four Times Square
New York, New York 10036-6522
Telephone: (212) 735-3000
Fax: (212) 735-2000

- and -

Felicia Gerber Perlman (*pro hac vice admission pending*)
Matthew N. Kriegel (*pro hac vice admission pending*)
155 N. Wacker Dr.
Chicago, Illinois 60606
Telephone: (312) 407-0700
Fax: (312) 407-0411

Proposed Counsel for Debtors and Debtors in Possession

4