1

2   UNITED STATES BANKRUPTCY COURT

3   DISTRICT OF DELAWARE

4   Case No. 12-13319 (KG)

5   - - - - - - - - - - - - - - - - - - - -x

6   In the Matter of:

7

8   LCI HOLDING COMPANY, INC., ET AL.,

9

10              Debtors.

11

12   - - - - - - - - - - - - - - - - - - - -x

13

14              United States Bankruptcy Court

15              824 North Market Street

16              Wilmington, Delaware

17

18              January 23, 2013

19              3:34 PM

20

21   B E F O R E:

22   HON. KEVIN GROSS

23   U.S. BANKRUPTCY JUDGE

24

25   ECR OPERATOR:  GINGER MACE

1

2  Notice of Hearing on Debtors' Motion for Orders:  (A)(I)

3  Establishing Bidding procedures Relating to the Sale of

4  Substantially All of the Debtors' Assets; Approving Expense

5  Reimbursement; (III) Establishing Procedures Relating to the

6  Assumption and Assignment of Certain Executory Contracts and

7  Unexpired Leases, Including Notice of Proposed Cure Amounts;

8  (IV) Approving form and Manner of Notice of All Procedures,

9  Protections, Schedules and Agreements and (V) Scheduling a

10 Hearing to Consider the Proposed Sale and (B)(I) Approving the

11 Sale of Substantially All of the Debtors' Assets; (II)

12 Authorizing the Assumption and Assignment of Certain Executory

13 Contracts and Unexpired Leases; and (III) Granting Certain

14 Related Relief (Docket No. 78)

15

16

17

18

19

20

21

22

23

24

25

1

2  Notice of Entry of Interim Order and Final Hearing regarding

3  Debtors' Motion Under 11 U.S. C. Sections 105, 361, 362,

4  363(c), 363(m), 364(e) and 507 of Fed. R. Bankr. P. 2002 and

5  4001 for (A) an Interim Order (I) Authorizing the Debtors to

6  Use Cash Collateral, (II) Granting Adequate Protection to Pre-

7  petition Secured Lenders, (III) Scheduling a Hearing for the

8  Approval of Post-petition Financing Pursuant to Fed. R. Bankr.

9  P. 4001(b) and 4001(c), and (IV) Granting Relief and (B) A

10  Final Order (I) Authorizing the Debtors to Use Cash Collateral,

11  (II) Granting Adequate Protection to Pre-petition Secured

12  Lenders, and (III) Authorizing the Debtors to Obtain Post-

13  petition Financing (Docket No. 81)

14

15

16

17

18

19

20

21

22

23

24

25  Transcribed by:  Sharona Shapiro

1

2   A P P E A R A N C E S :

3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4         Attorneys for Debtors

5   BY:   FELICIA GERBER PERLMAN, ESQ.

6         KRISTHY M. PEGUERO, ESQ.

7         KEN ZIMAN, ESQ.

8         MATTHEW KRIEGEL, ESQ. (TELEPHONICALLY)

9

10

11  LOOPER, REED AND MCGRAW, P.C.

12        Attorneys for MPT of Dallas, LTACH, L.P.

13  BY:   H. JOSEPH ACOSTA, ESQ.

14

15

16  MORRIS JAMES LLP

17        Attorneys for MPT of Dallas, LTACH, L.P.

18  BY:   BRETT FALLON, ESQ.

19

20

21  RICHARDS, LAYTON & FINGER, P.A.

22        Attorneys for JPMorgan Chase Bank, N.A.

23  BY:   L. KATHERINE GOOD, ESQ.

24

25

1

2    SIMPSON THACHER & BARTLETT LLP

3         Attorneys for JPMorgan Chase Bank, N.A.

4    BY:   MORRIS MASSEL, ESQ.

5

6

7    AKIN GUMP STRAUSS HAUER & FELD LLP

8         Attorneys for Steering Committee of Secured Lenders

9    BY:   SCOTT L. ALBERINO, ESQ.

10        ASHLEIGH L. BLAYLOCK, ESQ.

11

12

13   BLANK ROME LLP

14        Attorneys for the Steering Committee

15   BY:   STANLEY TARR, ESQ.

16

17

18   PACHULSKI STANG ZIEHL & JONES LLP

19        Attorneys for Committee of Unsecured Creditors

20   BY:   LAURA DAVIS JONES, ESQ.

21

22

23

24

25

1  U.S. DEPARTMENT OF JUSTICE

2        Office of the U.S. Trustee

3  BY:   DAVID L. BUCHBINDER, ESQ.

4        MATTHEW J. TROY, ESQ. (TELEPHONICALLY)

5        CHRISTOPHER J. WILLIAMSON (TELEPHONICALLY)

6

7

8  TEXAS ATTORNEY GENERAL'S OFFICE

9        Texas State Health Services

10 BY:   J. CASEY ROY, ESQ. (TELEPHONICALLY)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        P R O C E E D I N G S

2              THE CLERK:  All rise.

3              THE COURT:  Good afternoon, everyone.  Thank you and

4     please be seated.  I see Mr. Ziman here.

5              MR. ZIMAN:  Mr. Ziman, yes, Your Honor.

6              THE COURT:  To what do I owe the pleasure?

7              MR. ZIMAN:  Well, you scheduled a hearing and we

8     decided to show up.

9              THE COURT:  That's right.  That's it.

10             MR. ZIMAN:  Ken Ziman, Skadden Arps on behalf of the

11    debtor LifeCare Holdings and its affiliates, including LCI

12    Holding Company.

13             Your Honor, I guess I've got some good news to report

14    and then we'll probably have to deal with at least a couple

15    others.

16             THE COURT:  That's fine.

17             MR. ZIMAN:  Start with the good news?

18             THE COURT:  Yes.

19             MR. ZIMAN:  I would say, generally, as to the majority

20    objections filed to the bid procedures and DIP financing,

21    they've been consensually resolved.

22             THE COURT:  Okay.

23             MR. ZIMAN:  There's an issue we'll take up, I think,

24    with MPT -- it relates to discovery -- which I was just advised

25    is actually an issue.

1    And I think Mr. Morris may be on the phone from the

2  Texas Attorney's General Office, and he may have an issue with

3  one provision of the DIP that, when we get there, he can be

4  heard on that issue, if that's okay.

5    THE COURT:  That will be fine, and I want to

6  acknowledge and compliment everyone for consensually agreeing

7  upon the appointment of the patient care ombudsman.

8    MR. ZIMAN:  Yes, Your Honor.  Thank you very much for

9  entering that order.

10    THE COURT:  You bet.

11    MR. ZIMAN:  Mr. Buchbinder may have some comments on

12  that, but I believe the U.S. Trustee's in the process now of

13  interviewing potential candidates and will be making its

14  decision in the near term.

15    THE COURT:  All right.  Do you want to do it now, Mr.

16  Buchbinder?  Sure.  Because it's not technically on the agenda

17  any longer.

18    MR. BUCHBINDER:  While we're on the subject, Your

19  Honor --

20    THE COURT:  Yes.

21    MR. BUCHBINDER:  -- before we all forget.  Dave

22  Buchbinder on behalf of the United States Trustee.

23    Everything Mr. Ziman just put on the record regarding

24  a patient care ombudsman is correct.  My client has begun

25  conducting interviews, and she is hopeful of having an

1  appointment made by, if not Friday, Monday.

2          THE COURT:  Wonderful.  All right, well, thank you,

3  Mr. Buchbinder.  That's encouraging.

4          MR. ZIMAN:  Okay, Your Honor, could I --

5          THE COURT:  All right, Mr. Ziman?

6          MR. ZIMAN:  Could I approach?

7          THE COURT:  Yes, please, you sure may.

8          MR. ZIMAN:  I believe I have some blacklines for you.

9          THE COURT:  All right.

10         MR. ZIMAN:  These are blacklines and revised forms of

11 order relating to the bid procedures and the DIP financing.

12         THE COURT:  Thank you.

13         MR. ZIMAN:  So taking a look at the agenda itself,

14 Your Honor --

15         THE COURT:  Yes.

16         MR. ZIMAN:  -- the first item is an adjourned matter.

17 That relates to the -- we'll call it the final hearing, if you

18 will, relating to bonuses that were payable for calendar and

19 fiscal 2012.  That matter, as you know, has been adjourned to

20 February 11th.

21         THE COURT:  All right.

22         MR. ZIMAN:  As a housekeeping matter we can come back

23 to that.  We still have two hearings on that Friday and Monday,

24 so we might want to get rid of that February 8th hearing.

25         THE COURT:  All right, we'll take a look.  Thank you.

1          MR. ZIMAN:  As to the matters going forward, Your
2    Honor, as we said, there are three on the calendar.  Item
3    number 2 is the bidding procedures motion.  I think what might
4    be the easiest, Your Honor, is just lay out what was done in
5    terms of the record that was made.
6          Mr. Augustine, our declarant, is actually in the
7    courtroom, so I would move the admission of his declaration.  I
8    can do that in a second, if you'd like.
9          THE COURT:  Okay.
10         MR. ZIMAN:  And then just maybe walk Your Honor
11   through the changes that I think address the objections that
12   were filed.
13         THE COURT:  All right.
14         MR. ZIMAN:  So in terms of the bid procedures, Your
15   Honor, we had filed an original motion back at the time of the
16   filing of the cases to establish bid procedures.  This was
17   originally scheduled for the 10th of January; at the request of
18   the unsecured creditors' committee we adjourned that matter to
19   the 23rd.
20         Objections were filed by the committee on Friday the
21   18th.  We also received objections prior to that time from MPT
22   of Dallas relating to the sale hearing, not so much the bid
23   procedures.  We also had objections -- an informal objection
24   from the U.S. Attorney's Office on behalf of the Centers for
25   Medicare & Medicaid Services --

1          THE COURT:  Right.

2          MR. ZIMAN:  -- CMS.  So we filed a reply to those

3    objections, Your Honor, that listed the resolution of many of

4    those items as of that time.

5          We also filed the declaration of Mr. Augustine; that's

6    at docket number 278.  As I just indicated, I would move that

7    declaration into evidence in support of that relief as well as

8    the DIP financing relief.

9          THE COURT:  And would you like to do that -- are you

10   doing that now?

11         MR. ZIMAN:  I'm doing that now.

12         THE COURT:  Okay, Mr. Ziman.

13         Does anyone object to the introduction into evidence

14   of the declaration?

15         All right, hearing no one, it is then admitted into

16   evidence.

17   (Declaration of Mr. Augustine was hereby received into

18   evidence, as of this date.)

19         MR. ZIMAN:  So Your Honor, as set forth in the papers

20   and Mr. Augustine's declaration --

21         THE COURT:  Yes.

22         MR. ZIMAN:  -- I think we've put together a process

23   here that, essentially, is reasonable and appropriate in the

24   circumstances.  It takes into account that these businesses

25   have been marketed for some time prior to the bankruptcy

1  filing.  It establishes what we think is a reasonably long

2  time, a sufficient time to market them on a post-petition

3  basis, to hopefully attract a higher and better bid than the

4  stalking horse bid that we have in hand.

5          In addition to -- well, I'll get to it when I go

6  through the changes, Your Honor.  And if I could, maybe we'll

7  just turn, then, to the blacklines of the bidding procedures

8  order and the bidding procedures.  As we go through, there are

9  some blanks that we'll need to fill in with revised dates for

10 sale hearing, bid deadline, auction and objection deadlines.

11         THE COURT:  Okay.

12         MR. ZIMAN:  So first on the order, Your Honor, there

13 were changes made to accommodate the committee's objection as

14 well as to accommodate an expanded time line, at the request,

15 essentially, of both the committee and the company.

16         The first change, Your Honor, is really just going to

17 be a change to the bid deadline.  We're going to move that out

18 about two weeks, and we're proposing to take it from February

19 27 to March 13.

20         THE COURT:  All right.

21         MR. ZIMAN:  Really the next change, Your Honor, just

22 in the order, really relates to when the sale hearing -- we had

23 originally asked Your Honor for a March 12 date.  I believe you

24 held that date.  It might make sense to hold that as an

25 omnibus, if that's okay, since you otherwise don't have a

1  hearing.

2          What we're proposing as to the hearing is the

3  following: to have a hearing on April 2nd, if there is in fact

4  an auction because a higher qualifying bid is submitted, but if

5  not, to go ahead and hold a hearing a week following that bid

6  deadline.  So it's a March 20th kind of alternative date.  Say

7  it again:  April 2nd, if there is an auction; March 20th, if

8  there is not.  And I would send out notice on March 13th

9  advising people as to whether the hearing will go forward on

10 the 20th or on the 2nd.

11         And you'll see what we do with the objections is to

12 create a staggered objection deadline, one for the stalking

13 horse purchaser and one as to any successful over bidder to

14 accommodate those two different dates, if that's okay.

15         THE COURT:  I'm going to see how we look here, Mr.

16 Ziman --

17         MR. ZIMAN:  I don't mean to run rush out over your

18 calendar, of course.

19         THE COURT:  We're doing fine.  You know, I have -- on

20 April 2nd I've got an all-day hearing.

21         MR. ZIMAN:  April 2nd.

22         THE COURT:  But I sure as heck am hoping it won't take

23 all day, so I'm a little bit of -- I'll gamble a little bit,

24 because otherwise we're going -- I'm going to -- I'm also

25 thinking of -- the 4th would also work, but -- well, why not

1  April 1st?

2          MR. ZIMAN:  The only reason we didn't go with April

3  1st, Your Honor --

4          THE COURT:  Yes.

5          MR. ZIMAN:  -- was it's the day after Easter.

6          THE COURT:  Okay.

7          MR. ZIMAN:  And to the extent we actually have a

8  contested hearing --

9          THE COURT:  You bet.

10          MR. ZIMAN:  -- that's going to --

11          THE COURT:  You bet.  I appreciate that.

12          MR. ZIMAN:  On the week before, Your Honor -- we went

13  round and round the week before; it has two days of Passover.

14          THE COURT:  Yes.

15          MR. ZIMAN:  And I believe also the 1st and the 2nd

16  would be the seventh and eighth days of Passover, which for the

17  observant are also holidays.

18          THE COURT:  Okay.  All right.  And let's do -- I

19  recognize there's always the risk of a contested hearing, but

20  could we do 3 o'clock on the 2nd of April?  It's either then or

21  we could do 9 o'clock on the 4th of April.

22          MR. ZIMAN:  Yeah.

23          THE COURT:  Your preference.  3 o'clock?

24          MR. ZIMAN:  Yeah.

25          THE COURT:  Okay.  And that is if there is an auction.

1          MR. BUCHBINDER:  Your Honor, David --

2          THE COURT:  Go ahead.

3          MR. BUCHBINDER:  -- Buchbinder again, on behalf of the

4    U.S. Trustee.

5          This might be a good opportunity to also use the April

6    2 date for the first patient care ombudsman's report, because

7    under Section 333 of the Code, the ombudsman is to provide a

8    report to the court within sixty days.  If we make an

9    appointment on Monday, that is January 28th, and April 2nd is

10   about sixty-four days, but we'll have him file his report

11   within sixty days and have the report hearing in sixty-four

12   days, and I will be optimistic for everyone, and everyone's

13   hoping that the report will be nonproblematic and we'll proceed

14   from that point.

15         THE COURT:  Okay.  All right.  Let's do --

16         MR. BUCHBINDER:  Thank you.

17         THE COURT:  Let's do that.

18         MR. BUCHBINDER:  Thank you, Your Honor.

19         THE COURT:  You bet.  I've been known to go past 5

20   o'clock, so if we have a problem we'll finish.  Okay?

21         Now, that is if we have an auction.

22         MR. ZIMAN:  Right, so if you look at paragraph 9 and

23   paragraph -- if we don't have an auction, what we would propose

24   to do is we would be holding the auction on March 20th.  That's

25   not a date that would otherwise impact, Your Honor.  If there

 1   is no auction, does Your Honor have time on March 20th to hold

 2   a sale hearing?

 3           THE COURT:  Let's see, I've got -- I've got this trial

 4   that I'll be involved in on that whole week, and a confirmation

 5   hearing -- I would say that's a tough one.  The 21st -- would

 6   the 21st be acceptable?  I'm a little concerned because I

 7   have --

 8           MR. ZIMAN:  Yeah, the 21st is fine, Your Honor.

 9           THE COURT:  And we'll do that at 3 o'clock as well.

10   All right.  Does that work for people?

11           All right.

12           MR. ZIMAN:  So I think, as I'm reading this now, we're

13   going to have to reform paragraph 8 to make it work, and we'll

14   submit that under certification, if that's okay.

15           THE COURT:  That will be fine; sure.

16           MR. ZIMAN:  So just continuing through the order, Your

17   Honor, to accommodate the potential of having an earlier

18   hearing as to the stalking horse purchaser, we would propose to

19   have objections to the stalking horse purchaser transaction --

20   I'm trying to think -- by March 25th -- sorry, March 1st; I'm

21   sorry, I got that backwards, March 1st.

22           THE COURT:  All right.

23           MR. ZIMAN:  And to the extent, again, that we have an

24   alternative bid, there's an auction, there's a successful

25   bidder, of if there's any objections to the conduct of the

1   auction, even if the stalking horse were to be the successful

2   bidder, we would make those objections due on March 25th.

3          THE COURT:  Okay.  All right.  Do we still have some

4   objections, though, to the bidding procedures?

5          MR. ZIMAN:  We do not, Your Honor.

6          THE COURT:  Oh, okay.  They've all been --

7          MR. ZIMAN:  If I could just go through the rest of the

8   markup, I apologize, to do the housekeeping stuff, but if we

9   can just -- so if you look on --

10         THE COURT:  A gentleman has stood up in the back, but

11  we'll hear from you in a minute, okay?  I won't -- move on.

12         MR. ZIMAN:  I will let him speak.  On page 9 --

13         THE COURT:  Yes.

14         MR. ZIMAN:  -- paragraph 18 and paragraph 17, one of

15  the accommodations that the stalking horse purchaser made in

16  connection with the discussions that took place over the

17  weekend and yesterday was to reduce the proposed expense

18  reimbursement from a million dollars to 750.

19         THE COURT:  Okay.

20         MR. ZIMAN:  And that's an up-to number, that's not --

21  that is a reasonable and documented expenses up to.

22         THE COURT:  That's a cap, yes.

23         MR. ZIMAN:  Yes.  And as an accommodation to all the

24  parties, there's a procedure in paragraph 18 as to how that

25  would get, basically, reviewed by parties-in-interest in the

1  event it became payable.

2          THE COURT:  All right.  Yes.

3          MR. ZIMAN:  We also added some language on paragraph

4  21, to accommodate some of the interests of the U.S. Trustee

5  and the health care regulators, regarding record disposal being

6  in accordance with Section 351, should that become relevant.

7          THE COURT:  Okay.

8          MR. ZIMAN:  And paragraph 23 was in response to

9  concerns expressed by CMS relating to the position -- their

10  position as to Medicare provider agreements.  I don't think

11  it's a particularly controversial position, but it just

12  provides notice and an indication of the need to assume and

13  assign those agreements to any successful buyer.

14          THE COURT:  Okay.  Obviously important provisions.

15  Thank you.  I thank you --

16          MR. ZIMAN:  Paragraph 25 also contains some language,

17  a proviso that was added at the request of CMS --

18          THE COURT:  Yes.

19          MR. ZIMAN:  -- relating to jurisdiction.

20          THE COURT:  You bet.

21          MR. ZIMAN:  The changes in the bid procedures, we

22  won't belabor the housekeeping items.

23          THE COURT:  No.

24          MR. ZIMAN:  But as to the substantive items, let's

25  see.  I'll point Your Honor to --

1          THE COURT:  It looks like page 9?

2          MR. ZIMAN:  -- paragraph -- it's the backup bidder

3   provisions.

4          THE COURT:  Yes, exactly.

5          MR. ZIMAN:  There's nine -- there's just a -- I mean,

6   there was a little concern expressed by the committee that the

7   length of time that the backup bidder had to remain in place

8   could drag on --

9          THE COURT:  Yes.

10          MR. ZIMAN:  -- a little bit too long.

11          THE COURT:  Yes.

12          MR. ZIMAN:  So there was an effort here to kind of

13   condense that time and cause the successful bidder to move

14   through the regulatory process as quickly as possible and use

15   their good-faith efforts to do so, so that's expressed there.

16          THE COURT:  Okay.

17          MR. ZIMAN:  And also if you'll recall, Your Honor -- I

18   think I pointed this out originally when we filed the bid

19   procedures motion -- that there was a provision to be put into

20   the order, which was somewhat unusual, that we essentially made

21   it clear that our stalking horse purchaser, which is an

22   affiliate of several of the lenders --

23          THE COURT:  Correct.

24          MR. ZIMAN:  -- but the affiliates themselves as

25   lenders could engage with potential bidders to provide

 1   financing.

 2            THE COURT:  Right.

 3            MR. ZIMAN:  And we wanted that to be clear and above

 4   board and out in the open.  The committee expressed some

 5   concern that that should be the nature of the discussions, that

 6   of course there wouldn't be discussions that could have the

 7   effect of depressing the purchase price or otherwise be,

 8   essentially, contrary to the interests of the estates in

 9   maximizing value.  I don't  think that's an issue; nonetheless,

10   for belts and suspenders, we added some language here to

11   address that concern as well.

12            THE COURT:  Okay.

13            MR. ZIMAN:  So I guess if Mr. Acosta, I believe, has

14   something on the bid procedures, why don't I stop there and let

15   him address the Court.

16            THE COURT:  Thank you.

17            Mr. Acosta, good afternoon, sir.

18            MR. ACOSTA:  Good afternoon, Your Honor.  Joe Acosta

19   of Looper, Reed for MPT of Dallas.

20            THE COURT:  Yes.

21            MR. ACOSTA:  Your Honor, we -- I don't know how much

22   history the Court wants.

23            THE COURT:  I'll take as much as you want to give me.

24            MR. ACOSTA:  Well, this actual dispute started back in

25   August of 2012, and maybe a little earlier.  The debtors had

1  made public filings in their 2Q or 3Q -- 2Q, and said that they
2  weren't going to make interest payments on their notes, and
3  that would create a default.  So MPT, who had negotiated a very
4  strong lease with the debtors many years ago, and the lease
5  contains sufficient protections for MPT, credit protections,
6  guarantees, security protections, letters of credit, et cetera,
7  was concerned about the condition of the debtor.  And they
8  asked for assurances from the debtor that this default was not
9  going to go forward.

10       Well, that didn't happen, so on September 17th of
11  2012, MPT, pursuant to Section 16 of the lease, terminated the
12  lease.  Now, under Texas law, Your Honor, which the lease is
13  governed by -- because the lease says where the property's
14  located, that's the law governing -- under Texas law that's all
15  you need to do.  You don't need to obtain a judicial
16  determination.  You don't need to obtain a declaratory action.
17  You don't need to do any of that stuff; you just have to comply
18  with the terms of the lease, and MPT believes they did so.

19       Notwithstanding the clear termination -- and I think
20  the termination letter was attached to our sale objection --
21  the debtors did not acknowledge that the lease was terminated.
22  So a month later, MPT of Dallas commenced a lawsuit against the
23  debtors -- and it's one of the debtors, but I'm speaking
24  loosely -- to say that the lease was in fact terminated.

25       That was in October.  They filed an answer in

1   November.  On December 10th they filed bankruptcy.  On December

2   11th they filed the sale motion, asking for a sale by March

3   14th, because I believe that's a condition under the asset

4   purchase agreement.

5         Of course MPT was concerned.  There are no schedules

6   attached to the sale motion, so it didn't know if its lease was

7   included.  There was an opportunity for my office to discuss

8   with Mr. Ziman, and he confirmed that they were intending to

9   actually assume and assign our lease.

10         So the original objection deadline was January 3rd.

11   On January 3rd, MPT of Dallas filed an objection, and the

12   objection isn't limited to the sale, just as the motion isn't

13   limited to the sale; the objection also addresses the bidding

14   procedures.  And it is a huge concern of ours, Your Honor, that

15   the debtors are marketing a lease that has terminated, to

16   potential buyers, and then leaving that very, very unclear as

17   to potential buyers as to what they're going to do.  We don't

18   believe that you can assign the lease and then unscramble that

19   later on based on the issue of termination.  We firmly believe

20   that this Court will have to decide the issue of termination if

21   this lease is going to be a part of the sale.

22         And there are other complications in that respect,

23   Your Honor.  And one of those complications -- the debtors have

24   tried to discuss with us permutations on how we can proceed

25   with the sale without the lease, and we don't believe that's

1    possible because the debtors work as an integrated company.

2    The actual lessee under the lease is one of the debtors.  That

3    debtor alone does not have licenses to operate the facility on

4    that lease.  The people that have licenses actually work with

5    several hospitals.  The buyers want to buy the entity that has

6    the licenses.  So once the buyer buys that, the lessee will

7    have no authority to stay on that lease, absolutely none.  And

8    it is our concern that that will cause a number of bad problems

9    when running that hospital.

10          Now, MPT feels comfortable that it can find the

11   appropriate credit-worthy person to move into that lease and to

12   take over the lease.  The debtors want to include it in the

13   sale process, and I understand they want to realize value, but

14   unfortunately, we didn't get this issue addressed by September

15   17th, and the lease is now terminated.  We believe -- so

16   after --

17          THE COURT:  What do they operate at this site?  Is it

18   offices?

19          MR. ACOSTA:  No, it's a hospital.

20          THE COURT:  It is the hospital itself, okay.

21          MR. ACOSTA:  That's correct. And we're not asking

22   someone to move out tomorrow, and we want to probably --

23   there's probably a transition plan that needs to take place so

24   that everything runs smoothly, and we're willing to engage in

25   those discussions.  But they've refused to acknowledge that the

1  lease is terminated, and we believe it has.

2          So four days after we filed our sale objection, Your

3  Honor, we attempted -- we reached out to the debtors and the

4  buyer and said, look, you guys want to go forward with the sale

5  on March 14th, well, okay, let's figure this out real quickly

6  because we've got a lot to do between now and then.  We didn't

7  hear anything.  We sent them a letter; we didn't hear anything.

8          On January 7th and on January 8th we served them with

9  discovery asking for a shorter time frame for them to respond,

10  just by a week, Your Honor, by a week, and we didn't hear

11  anything.  So then we filed our motion for expedited hearing --

12  for expedited discovery, and we filed a motion for expedited

13  hearing.  The Court granted it and said that we can have a

14  hearing today.

15          To my knowledge, they have not filed a response to our

16  motion for expedited hearing, so the only thing the Court needs

17  to do is enter the order acknowledging that they need to

18  respond to our discovery by next week, by January 31st.  And in

19  our original motion for expedited discovery, we didn't believe

20  that we needed to address other scheduling matters with the

21  debtors.  Usually the way these things work is you arrange

22  something so that the court's not involved in this type of

23  discussion, but I've got serious doubts that we are going to

24  enter into an agreed scheduling order prior to the March 14th

25  sale hearing, or now the March 20th sale hearing.  And so while

1  there's nothing before the Court, I anticipate having something

2  before the Court very shortly, on an expedited process for

3  discovery, in the event the debtors don't want to agree to some

4  type of scheduling.

5         So long story short, we do not believe, as part of the

6  bidding -- we believe that as part of the bidding procedures

7  the debtors need to clarify, and the buyers need to clarify

8  that this lease is not part of the things that people are

9  bidding on.  That is misleading, Your Honor, and if they don't

10 believe it's misleading, then we need to litigate that issue

11 prior to the bid -- auction even occurring.

12        THE COURT:  All right.  I'll hear from Mr. Ziman.

13        MR. ZIMAN:  Yes, Your Honor.  So I think that was

14 partially right.  There's a lease; the lease has a provision in

15 it that says that certain things happen and there's a default.

16 They contend that that thing -- I don't have the lease in front

17 of me and we're not getting into the merits --

18        THE COURT:  Right, the merits.

19        MR. ZIMAN:  -- but they contend the thing happened and

20 they sent us a letter of termination.  We contend the thing

21 didn't happen, and we said it's not terminated.  That was what

22 transpired in a series of correspondence in or around September

23 of 2012, after Mr. Acosta said we announced that we had reached

24 a forbearance agreement with some but not all of our

25 bondholders.

1        THE COURT:  Okay.

2        MR. ZIMAN:  And the language that's in dispute was

3   very heavily negotiated, so I don't dispute the idea that there

4   is some discovery relevant to the meaning of that language, if

5   in fact we have to litigate whether or not this lease is in

6   existence.

7        I think we're perfectly fine.  The schedules to our

8   APA indicate that this litigation that Mr. Acosta referred to,

9   the state litigation, is out there.  We're not going to hide

10  the ball as to people.  And I think, as Your Honor -- we were

11  on the phone with Your Honor last week around these issues, and

12  I was expecting a return call yesterday to tell me kind of

13  where we were.  I'm a little surprised that Mr. Acosta is

14  asking the Court to enter the order on the motion to compel.  I

15  thought there would be further discussions before we came back

16  on that basis, Your Honor.

17        THE COURT:  Well, let me ask a question, because

18  judges don't always know the whole picture of what's going on

19  in a case, but you're operating a hospital --

20        MR. ZIMAN:  Yes.

21        THE COURT:  -- and you --

22        MR. ZIMAN:  Well, not me personally, but the debtors.

23        THE COURT:  Not you personally, obviously, but the

24  debtors are operating a hospital, and you're hoping to sell to

25  somebody who's going to continue to operate a hospital.

1      MR. ZIMAN:  Yes, and we have to resolve this issue

2  before it can be done.

3      THE COURT:  And Mr. Acosta's client, it would seem to

4  me, is going to be hard-pressed to go out and find another

5  hospital to operate in this space.

6      MR. ZIMAN:  Well, not while we're sitting there, no.

7      THE COURT:  Right.

8      MR. ZIMAN:  I mean, so --

9      THE COURT:  But in any event, so really aren't we

10  talking about really what the dollars are?

11      MR. ZIMAN:  Well, Your Honor, this is -- a little bit

12  it's about that.  I think -- and I don't want to put words in

13  his client's mouth.  There had been discussions on a business

14  level.  We're actually expecting a term sheet that his client

15  told my client was going to be forthcoming today; it didn't get

16  there yet, but this is about what the terms of an amended and a

17  restated lease would be.  That would obviate the need to

18  litigate the issue.

19      THE COURT:  Right.

20      MR. ZIMAN:  And so what we had proposed was to say,

21  look, we can go through with the sale process, we can get to a

22  bid deadline, we can negotiate between now and then as to

23  whether or not if the stalking horse purchaser is the

24  successful bidder what the terms of a go-forward lease would

25  be.

1          THE COURT:  Exactly.

2          MR. ZIMAN:  If we get to a point where that

3   conversation breaks down, we could join issue on the litigation

4   as to whether or not we can do this without their consent and

5   just assume and assign, and whether or not they can actually

6   enforce the termination that they claim occurred.

7          Alternatively, we get to the bid deadline and there's

8   an over-bidder.

9          THE COURT:  Um-hum.

10          MR. ZIMAN:  We go through an auction process, we go

11   through a sale hearing, and we know who the new bidder is.  We

12   would carve out from the sale hearing proceedings the

13   assumption and assignment of this lease.

14          THE COURT:  Yes.

15          MR. ZIMAN:  There is at least a sixty-day, if not a

16   ninety-day post-closing period before we can affect the change

17   of control under applicable state and federal regulations.

18          THE COURT:  Okay.

19          MR. ZIMAN:  That, to me, seems to be ample time to

20   litigate the lease existence issue, if it needs to be

21   litigated.  So I think -- you know, as much as Mr. Acosta seems

22   to think things have to get litigated right now, I'm just not a

23   believer in that process, and I think there's a commercial

24   conversation happening that may well obviate that.  So I'm a

25   little perplexed that we just heard the presentation from him

1  that we did.

2          As to responding to discovery, you know, Your Honor,

3  we just moved the calendar out two weeks.

4          THE COURT:  Right.

5          MR. ZIMAN:  So the extra week shortening period is

6  sort of irrelevant at this point.  So I would ask the Court to

7  deny his motion to compel and to expedite discovery.  He served

8  discovery on us.  If we have to respond to it, if we don't work

9  something out between now and the normal response deadline of

10 thirty days, then we'll serve objections and responses and

11 we'll produce what's nonobjectionable, nonprivileged documents.

12 And if there's an issue at that point, then there's a process

13 to resolve it.

14          But I think there is a commercial resolution here that

15 suggests that there should be a little more conversation, and

16 certainly there should be a conversation between us as to a

17 discovery schedule --

18          THE COURT:  Yes.

19          MR. ZIMAN:  -- before he's filing a motion to create

20 an expedited one.

21          THE COURT:  I mean, that is what I'm hearing, and

22 that's why I made the statement I made about what's really sort

23 of happening.

24          MR. ZIMAN:  Yeah.

25          THE COURT:  And I'm not asking anybody to --

1          MR. ZIMAN:  Was it about -- it might be about money;
2   it might be about terms, Your Honor.
3          THE COURT:  Sure.
4          MR. ZIMAN:  I think everyone wants to know that --
5   they want to know who they're doing business with, and often
6   landlords don't have a choice because 365 says what it says.
7   There's a legal issue here; it's factual and legal.  But that
8   gives this landlord more of a say in who their go-forward
9   operator is than others, perhaps.  And so I think we're willing
10  to accommodate MPT's kind of different position by, if we need
11  to when we get to a sale hearing, making sure the sale order
12  doesn't apply, there's no assumption and assignment of their
13  lease, and if we need to come back and do that on a separate
14  basis, we will.
15         THE COURT:  That's my concern, that there not be any
16  prejudice to MPT and that the sale hearing have a few
17  alternatives.
18         MR. ZIMAN:  And I'm very hopeful, Your Honor, that
19  over the next couple of weeks, and hopefully in advance of when
20  we need to respond to the discovery that's been served --
21         THE COURT:  Yes.
22         MR. ZIMAN:  -- we'll be able to work something out
23  that gets Mr. Acosta and his client comfortable that there will
24  be no prejudice and that we can litigate these issues if and
25  when we need to, and in the meantime dual tracking doesn't

1    really make a lot of sense when you're talking about engaging

2    in a fact-intensive litigation, while you're trying to also

3    hammer out a commercial deal, in a circumstance where there's

4    plenty of time to have that happen later.

5              THE COURT:  Well, here --

6              MR. ZIMAN:  But there's no scenario, as Mr. Acosta

7    painted, where we're going to close on the entirety of the rest

8    of the transaction without having dealt with MPT.  And if -- I

9    think that interested parties, or certainly the current buyer

10   is fully aware of the issue.  And other buyers will be made

11   aware of --

12             THE COURT:  Yes.

13             MR. ZIMAN:  -- the litigation dispute.  It's in the

14   schedules, as I said, and it's certainly not something we're

15   going to -- you know, he's on record now in the case, so by

16   that basis alone, it's available and for them to understand

17   that there's an issue around the ability of the debtors to

18   assume and assign the MPT lease.

19             THE COURT:  Sure.

20             MR. ZIMAN:  We think we'll win that at the end of the

21   day, if we have to, but it's not as if the -- with all due

22   respect, neither Mr. Acosta nor MPT is the judge that gets to

23   decide whether that lease terminated.  They sent a letter, they

24   staked out a position; we respectfully disagree with it as both

25   a contractual and a factual matter.

1          THE COURT:  Okay.  Well, here's where we are.  I want

2    to assure MPT that if your objection is still in play, the sale

3    order will not include your property, and we will then resolve

4    it through litigation.  But what I'd like to do is give you a

5    week or so to try and work out a schedule with Mr. Ziman.  To

6    the extent you're unable to, you'll get me on the phone and

7    we'll work it out over the phone.

8          MR. ACOSTA:  Your Honor, with respect to Mr. Ziman's

9    optimism and --

10          THE COURT:  Yes.

11          MR. ACOSTA:  -- the ability to have faith that

12    something's going to get work out, unfortunately, what we're

13    doing right now is -- it's not about dollars and cents; it's

14    about the credit-worthiness of the assignee.  That was the

15    issue back in October, and the issue could have been resolved

16    back in October of 2012.  It wasn't resolved then, it wasn't

17    resolved in November, it wasn't resolved in December; I didn't

18    get a call until maybe yesterday from Mr. Ziman.

19          So I'm sorry, Your Honor, I spent yesterday styling

20    eight bankruptcy schedules and eight statement financial

21    affairs in addition to a 54 lift-stay response at 1 o'clock in

22    the morning.  So I apologize to Mr. Ziman if I couldn't get

23    back to him.  However, he could have called me on Friday and we

24    could have figured out what would have been an appropriate

25    thing to do.  In addition to that, I think Mr. Ziman should

1  have at least filed a response to our motion, because the

2  deadline was yesterday, when he didn't hear back from me, which

3  is what the prudent thing to do would be.

4          Now, I don't think -- let me clarify something for the

5  record, Your Honor.

6          THE COURT:  Yes.

7          MR. ACOSTA:  MPT wants them out of the lease right

8  now.  MPT can find a credit-worthy assignee right now.  Every

9  day that the debtor is in that lease, every single day, MPT is

10  being prejudiced, because the future of that lease, long-term

11  plans for that lease are jeopardized every single day.

12          Now, if we wait until March -- what, March 19th,

13  before Mr. Ziman announces to the Court:  Well, Your Honor, we

14  tried but we just couldn't get anything else, so we'll just

15  take it out of the lease; that leave us entirely -- that leaves

16  a three-month process -- two-month process where we could have

17  marketed this lease, we could have found an assignee, we could

18  have found someone to take over the licenses or to have

19  licenses to operate this lease.  We won't have that opportunity

20  on March 19th right before a sale hearing.  All we'll know is,

21  oops, well, we're moving out, or we'll litigate that issue

22  later on.

23          And by the way, if they go forward with the sale and

24  they try to carve out this lease, it won't work, because they

25  have affiliated entities that have licenses that permit the

1    actual lessee/debtor from operating in that lease.  Those
2    licenses -- that entity also works with a bunch of other
3    affiliated debtors.  That entity, presumably, the buyer wants,
4    and the buyer will acquire as a part of the sale.  So as soon
5    as the closing occurs, the lessee is going to be immediate
6    default.  And we're talking about a two-month period there
7    before they close, and that will make MPT's situation a lot
8    worse, because you have -- I don't know how we're going to
9    transition the patients in the hospitals out any more.  Whereas
10   now, if we get this issue resolved, the Court can be assured,
11   A, that it's not marketing a lease that's terminated, and B,
12   that the lessor is not going to get prejudiced.
13        So we ask the Court to enter the unopposed motion for
14   expedited discovery.  We want to get this matter resolved.  If
15   the Court wants us to file an adversary proceeding we will, to
16   make this issue go faster.  We thought that the motion for
17   expedited hearing on a contested matter was enough.  From my
18   understanding, the Delaware Local Rules are very -- very
19   generous in that respect.  We've tried to work it out before.
20   Just because we couldn't work it out yesterday doesn't mean
21   that our motion shouldn't be granted today, Your Honor.  So
22   with all due respect, Your Honor, we ask the Court to enter the
23   motion granting MPT's -- the order granting MPT's motion for
24   expedited discovery because that motion was unopposed.
25        THE COURT:  All right.  Well, it's opposed today, and

1  what I would like the parties to do is work out a schedule.  If
2  you can't work out a schedule, you'll get me on the phone and I
3  will -- you won't have to travel back to Wilmington, and I will
4  decide the motion at that time.  All right?  But I didn't quite
5  understand all the arguments you were making about the
6  affiliates and that sort of thing.  This is one lease, as I
7  understand it, in one hospital, and if it can't be assigned
8  because the lease is invalid at that point, then that will
9  obviously not be part of the sale.

10         MR. ACOSTA:  Well, Your Honor, we're prejudiced
11  waiting for that decision right before a sale where they assign
12  all the other assets.  Once they assign these affiliated
13  entities that have licenses to operate that hospital, the
14  lessee/debtor can no longer be in that hospital.  They can't
15  inject a needle to a patient, they can't operate a hospital,
16  doctors can't show up; that's a critical issue, and that is
17  something that they're glossing over.  And in the hopes that,
18  potentially, we can reach a deal, which should have been
19  reached back in November.

20         MR. ZIMAN:  Okay.  Your Honor, this whole motion in
21  November, Mr. Acosta's missing the point that we were --

22         THE COURT:  You don't believe that the lease has been
23  terminated.

24         MR. ZIMAN:  Well, one, we didn't believe it was
25  terminated, and two, what were we going to negotiate on the

1   basis of?  We didn't have a buyer in November.  We didn't have
2   an ability to present MPT a recapitalized operator of the
3   business that would satisfy their credit concerns.  We were a
4   company, as we are today, with 470 million dollars of funded
5   debt --

6         THE COURT:  Right.

7         MR. ZIMAN:  -- plus a little bit more, and a number of
8   other obligations that we can't satisfy.  The outcome of this
9   process will be to create a new operator.  It might well be,
10  sort of, the same business owned by the lender.  It might be a
11  strategic combination with a third-party buyer, if one shows
12  up, but it will be a new operator that will actually be credit-
13  worthy and will presumably be able to, we believe, satisfy
14  MPT's driving concerns, which is to have a credit-worthy tenant
15  in its facility.

16        So I mean, I didn't follow the argument either, Your
17  Honor, so you and I are in the same place.  I think all Your
18  Honor is saying is:  No, the debtor has the full thirty days to
19  respond to your pending discovery requests.  You two get on the
20  phone and figure out whether, in fact, this needs to be -- you
21  know, MPT's insistent on litigating the termination issue pre-
22  sale.  If they remain adamant --

23        THE COURT:  Then I will --

24        MR. ZIMAN:  -- set up a schedule to do it, and if you
25  can't agree on a schedule, come back to you.

1          THE COURT:  Right.

2          MR. ZIMAN:  That's the lesson -- that's the

3     instruction I just got from Your Honor.

4          THE COURT:  That's right.  And Mr. Acosta, I am not

5     saying I won't schedule something in advance, but --

6          MR. ACOSTA:  We're just talking about seven days, Your

7     Honor, seven days, and we sent them a letter on March -- on

8     January 7th, asking them to agree to this.  So seven days --

9          THE COURT:  When did you serve your discovery?

10         MR. ACOSTA:  We served it on January 7th and on

11    January 8th, and on January 7th we asked them to give us a

12    call, enter into a scheduling order, agree to a January 31st

13    deadline.  And this is the first time that the Court's hearing

14    that the parties can possibly enter into some type of

15    scheduling order, Your Honor.

16         MR. ZIMAN:  Well, there's two different issues, Your

17    Honor.

18         THE COURT:  So sixteen --

19         MR. ZIMAN:  There's a motion --

20         THE COURT:  So sixteen days have already expired on

21    the discovery, so we're talking about fourteen days.  I think

22    you can talk this through and get it resolved.

23         MR. ZIMAN:  We'll either -- Your Honor, very clear.

24    We will either respond to discovery in the time allotted by the

25    rules --

1           THE COURT:  Yes.

2           MR. ZIMAN:  -- without shortening it, or we'll have a

3    deal on how it's going to proceed.  And as to the litigation of

4    the merits of the issue, leaving the discovery response to the

5    side, we'll agree on that schedule too, and if not, we'll come

6    back to Your Honor.

7           THE COURT:  Right.

8           MR. ACOSTA:  Your Honor, can we schedule a hearing for

9    that so we can announce either the scheduling order or that we

10   need help from the Court?

11          THE COURT:  I would hope that you would call me by --

12   if you need a hearing, you'll call me by next Thursday.  All

13   right?  You'll call chambers and we'll get you a hearing.

14          MR. ACOSTA:  Thank you, Your Honor.

15          THE COURT:  You bet.

16          MR. ZIMAN:  I'm sorry, Your Honor; Mr. Alberino

17   distracted me.  The date you just gave us, Your Honor, was?

18          THE COURT:  By next Thursday the parties will report

19   whether a hearing is necessary on a schedule.

20          MR. ZIMAN:  Thank you, Your Honor.

21          THE COURT:  Yes.

22          Oh, yes, Ms. Jones?

23          MS. JONES:  Good afternoon, Your Honor.

24          THE COURT:  Good afternoon.

25          MS. JONES:  Laura Davis Jones on behalf of the

 1  official committee of unsecured creditors.

 2          THE COURT:  Are you a calming influence, Ms. Jones?

 3          MS. JONES:  I hope so, Your Honor.

 4          THE COURT:  All right.

 5          MS. JONES:  I tend to be.  Your Honor, I'm just rising

 6  before we finish off with the bidding procedures, so just kind

 7  of going back to that.

 8          THE COURT:  Absolutely.

 9          MS. JONES:  Your Honor, Mr. Ziman's correct that the

10  committee did raise a number of issues with respect to the

11  bidding procedures.  I am pleased that we were able to work

12  them out.

13          Your Honor, obviously we have issues that we reserve

14  for the sale hearing, ranging from deciding what's a highest

15  and best offer, valuation issues, what happens to avoidance

16  actions and the like.

17          THE COURT:  Yes.

18          MS. JONES:  But those we'll reserve for the sale

19  hearing, Your Honor.

20          THE COURT:  All right, that's fine.

21          MS. JONES:  Thank you, Your Honor.

22          THE COURT:  Thank you.  I certainly understand that,

23  Ms. Jones.  Those issues are reserved.

24          MR. ZIMAN:  So Your Honor, we will submit under

25  certification, then, the bidding procedures order with the

 1  dates --

 2         THE COURT:  Yes.

 3         MR. ZIMAN:  -- we just talked about, and the bidding

 4  procedures as an exhibit to that.

 5         THE COURT:  Excellent.  All right.

 6         MR. ZIMAN:  Your Honor, can we then take up the DIP

 7  financing?

 8         THE COURT:  Yes.

 9         MR. WILLIAMSON:  Your Honor, I'm sorry, I apologize.

10  This is Christopher Williamson from the United States

11  Department of Justice --

12         THE COURT:  Oh, yes, sir.

13         MR. WILLIAMSON:  -- for the United States.

14         THE COURT:  Yes, good afternoon.

15         MR. WILLIAMSON:  I just want to -- good afternoon to

16  you.  I just want to jump in on one point with regard to the

17  bidding procedures before we move on, just to sort of put it

18  out there.

19         The point of the bidding procedures is to end up

20  getting a sale of these assets.  As of right now, the United

21  States does not have a claim in this case, but when that

22  sale -- if that sale is effected, there will end up being a

23  very large tax liability that's outstanding, which while we

24  don't know exactly what it would be since we don't have the

25  information necessary to compute it ourselves, we've been told

1  it might be upwards of twenty-four million dollars.

2          Our concern is setting up some procedure by which that

3  liability could be paid.  And I'm not sure if this Court has

4  the ability to compel a resolution of that issue.  Yet at the

5  same time, can the United States object completely to the sale?

6  And I have concerns about that as well.

7          So I'm just raising at this point that there's this

8  issue out there that could throw a monkey wrench in everything,

9  and I just wanted everyone to be aware of it and to just raise

10  that point here.

11          THE COURT:  I hear you.  I'm not sure that I need to

12  make any ruling on that, but I'm sure Mr. Ziman heard that

13  there may be a tax liability --

14          MR. ZIMAN:  Well, actually --

15          THE COURT:  -- and there may be --

16          MR. ZIMAN:  -- Mr. Williamson and I have spoken

17  before.  So there's --

18          THE COURT:  Okay.  All right.

19          MR. ZIMAN:  We've been in some discussions with Mr.

20  Williamson, and we are desirous of finding a way to see our way

21  through that potential tax liability.  That was something that

22  we flagged, Your Honor, on day one.

23          THE COURT:  That's right.

24          MR. ZIMAN:  It's a product of just what we're worth,

25  in some respects, and the fact that we have a basis in assets

1  of a certain amount.

2          So if Mr. Williamson is articulating a standing issue,

3  I don't think that we're suggesting that the United States

4  doesn't have standing because there's no claim today.  I don't

5  think that's what he's saying, necessarily, but just to make

6  sure that was clear.  Other than that, I'm not exactly sure

7  what he's asking for either, Your Honor.

8          MR. WILLIAMSON:  No, I'm not -- I'm definitely not

9  asking for a ruling today.  My concern, however, is that

10  because the United States can't know what the amount of the

11  liability is as of right now, and can't know until the sale is

12  effected, I'm not sure whether the liability issue can be

13  decided before the sale of the assets, which I believe will

14  have had to be scheduled as being set up for the bidding

15  procedures and for the order of sale.  And as of right now,

16  given what we have, it's impossible for the United States to

17  evaluate the issues, as they're going to be, with regard to the

18  tax liability.

19          THE COURT:  Well, I assume between now and the sale,

20  that work will have been completed by the United States?

21          MR. WILLIAMSON:  Well, we're relying on the debtors to

22  provide us information.

23          THE COURT:  I see.

24          MR. WILLIAMSON:  So for example, the tax statements of

25  the current assets, you know, we'd need to know that, and

1   there's no way for us to know that, given what the United
2   States has as of today.  And I'm not sure how quickly debtors
3   can get that information to us and how long that process will
4   take to evaluate.
5           THE COURT:  All right.
6           MR. ZIMAN:  Just, I mean, Your Honor, we supplied --
7           THE COURT:  Mr. Ziman, yes.
8           MR. ZIMAN:  I think we supplied Mr. Williamson with
9   some very high level information --
10          THE COURT:  Okay.
11          MR. ZIMAN:  -- conclusory would be a good way to
12  describe it.
13          THE COURT:  Okay, yes.
14          MR. ZIMAN:  We said here's a basis.  We've gone back
15  and talked to the company's accountants.  We'll be in a
16  position to supply Mr. Williamson with additional work papers
17  from the accountants and other materials, if not by the end of
18  this week, certainly by the beginning of next week.  And we'll
19  work with the Department of Justice and the Service to see if
20  we can't come to a negotiated outcome.  Otherwise, they have
21  whatever rights they have --
22          THE COURT:  Exactly.
23          MR. ZIMAN:  -- under the Code to participate in the
24  sale hearing.
25          THE COURT:  Exactly.  All right.

1        MR. ACOSTA:  Your Honor, I --

2        THE COURT:  Yes, Mr. Acosta.

3        MR. ACOSTA:  -- I apologize.  I mixed apples and

4   oranges.  I was talking about our discovery motion and you were

5   still on bidding procedures.  Our objection to the bidding

6   procedures still stands; that is, that this lease shouldn't be

7   marketed as a lease that's not encumbered.  So I think, at the

8   very minimum -- well, I would like two things, Your Honor.

9   First of all, there should be notification to all potential

10  bidders that there is this encumbrance out there and there is

11  this landlord with a feisty Hispanic Dallas attorney that's

12  going to fight this issue.

13       THE COURT:  Okay.

14       MR. ACOSTA:  And then the second thing is, to the

15  extent that Mr. Ziman really wants to get a deal between any

16  potential assignee and us, I would ask us to be allowed to be

17  included in the auction, so as soon as we know there's a

18  potential interested party we can start negotiating about

19  whether they're credit-worthy to come into this lease.

20       THE COURT:  Well, I don't think that you're marketing

21  the -- is it being market -- it's not being marketed as if this

22  was not an issue, is that correct?

23       MR. ZIMAN:  I think that was pretty clear in my

24  remarks, that one, everybody who's going to make a proposal is

25  going to get the schedules to the asset purchase agreement.

 1  They will have access to those.

 2          THE COURT:  Yes.

 3          MR. ZIMAN:  They clearly identify the litigation

 4  that's pending between the parties.

 5          THE COURT:  Right.

 6          MR. ZIMAN:  In our disclosure, we will be sure that

 7  every bidder knows that there is an issue around the landlord's

 8  position.  Their position's also now a matter of public record

 9  because they've filed the papers and they've filed a docket.  I

10  can't imagine anyone who's participating in the auction and is

11  going to put in a bid will not have reviewed the docket as

12  well.  So I don't think there's any mystery around -- and now

13  with 4:19:11 proceedings, either the issue or the feisty

14  lawyer.

15          THE COURT:  Right.

16          MR. ZIMAN:  I think we've got both of those covered

17  and they're well out in the public domain.  So I don't know

18  there's anything more that we can or need to do to address the

19  concern that we're hiding the ball as to MPT.

20          And as far as MPT -- I mean, I don't know what that

21  means.  I think we will certainly direct -- you know, one,

22  they're be aware; two, I think what we're proposing and would

23  like to see happen is to engage MPT on the terms of the amended

24  lease, should the stalking horse purchaser be the successful

25  buyer.

1           THE COURT:  Yes.

2           MR. ZIMAN:  That's obviously going to require the

3   stalking horse purchaser to provide financial information to

4   satisfy MPT.

5           THE COURT:  Right.

6           MR. ZIMAN:  That's a process that we understand we

7   know we need to do.  Once the bid deadline comes, if there are

8   bids, we can certainly supply information to MPT, as and when

9   that arrives, because it's in our interest.  I mean, we're

10  going to get more money if we sell, and are able to transfer

11  and assign the Dallas facility than if we're not.

12          THE COURT:  Of course.  Now, Mr. Acosta wants to sit

13  in the auction, I think --

14          MR. ZIMAN:  Mr. Acosta --

15          THE COURT:  -- and I don't think that that's

16  appropriate.

17          MR. ZIMAN:  You know --

18          THE COURT:  Unless you -- if you say yes.

19          MR. ZIMAN:  Well, I don't think there's anything for

20  MPT or Mr. Acosta to do between today and the bid deadline,

21  other than deal with us and deal with the stalking horse

22  purchaser --

23          THE COURT:  Right.

24          MR. ZIMAN:  -- because there's nobody else at the

25  table.  I mean, if someone actually gets firm and puts in a

1    bid, then that creates a different issue.  And if the

2    auction -- obviously at the conclusion of the auction, what I'd

3    love to be able to do is, yes, at the bid deadline I will

4    tell -- he will know, I promise, if a bid has come in.  And we

5    will provide adequate assurance type information to his client

6    as to every qualified bid.

7              THE COURT:  Yes.

8              MR. ZIMAN:  Then hopefully between that day and an

9    auction, using the -- you want to call it the template of an

10   amended lease that we hope to have negotiated vis-a-vis the

11   stalking horse purchaser, that they'd be prepared to step into

12   the shoes on that.

13             MR. ACOSTA:  I think Your Honor can fix it by just

14   having them providing us -- inserting in the order saying that

15   any bidder, they have to notify us immediately the day after a

16   bid's placed, of the identity of the bidder and if he's a

17   qualified bidder to proceed in the auction.  It's an easy

18   resolution.  And we won't contact them until the auction is

19   concluded, but if we're going to have a discussion with a

20   potential assignee of the lease, it's better to start

21   immediately than wait till the end.

22             MR. ZIMAN:  I don't know what immediately and the end

23   is.  We don't have any bidders --

24             THE COURT:  Yeah, I --

25             MR. ZIMAN:  -- until the bid deadline.

1          THE COURT:  Right.

2          MR. ZIMAN:  And on the bid deadline, I don't think it

3    needs to be in an order.

4          THE COURT:  No.

5          MR. ZIMAN:  I'm telling Your Honor and I'm telling you

6    that we will tell you every qualified bidder we get, and we

7    will tell you who the bidder is.

8          THE COURT:  And really, I think your objection --

9    MPT's objection, Mr. Acosta, is really more of a sale objection

10   than it is a bidding objection or a bid procedures objection.

11         MR. ACOSTA:  It could be, Your Honor, but if we're

12   right, then they're using the sale and the bidding process to

13   revive a lease that's been terminated.  And I think legions of

14   courts have said that you can't use bankruptcy for that.

15         THE COURT:  You see, and if they're right, though,

16   then you're using this as an opportunity to place undue

17   pressure on the debtor, if they're right and the lease is not

18   terminated.  I haven't determined that yet.  That has to be

19   determined still.  Okay?  So I'm going to overrule your

20   objection; I think it goes to the sale.  And it really is

21   incumbent upon the debtor and in the debtors' best interest,

22   and obviously in any bidder's best interest to resolve your

23   concerns before the sale hearing.  That has to happen.  That

24   clearly has to happen, all right?

25         MR. ACOSTA:  Thank you, Your Honor.

1          THE COURT:  Thank you.

2          All right.  Mr. Ziman, I guess --

3          MR. ZIMAN:  I think now we're limping towards the DIP

4     financing, Your Honor?

5          THE COURT:  Yes.

6          MR. ZIMAN:  So on this, Your Honor, again, we had

7     filed our papers originally -- or we filed a motion to use cash

8     collateral and to obtain DIP financing.  On the first day of

9     the case Your Honor entered a cash collateral order on that

10    first day.  That order was extended when we agreed to adjourn

11    what was the January 10 hearing on those matters to today.

12         We did get objections relating to the DIP, to be

13    clear, from the Texas Department of State Health Services.

14         THE COURT:  Right.

15         MR. ZIMAN:  Mr. Morris represents them.  The committee

16    filed an objection as well.  We had some, again, informal

17    comments from the United States Trustee's Office --

18         THE COURT:  Yes.

19         MR. ZIMAN:  -- relating to the 506(c) issue, which we

20    believe we've resolved with Mr. Buchbinder.  I'm pleased to

21    report that as to the committee, Your Honor, we've resolved

22    those objections --

23         THE COURT:  Okay.

24         MR. ZIMAN:  -- consensually.  We have some changes to

25    the order that I can walk you through in a moment.  The

1  remaining issue relates to the 506(c) and the breadth of the --

2  there's a 506(c) waiver.  That said, there's a limitation on

3  that waiver expressed in the order that relates to what I would

4  call 503(b)(8) issues, basically the right of state and federal

5  regulators to seek administrative claims relating to the

6  shutdown or patient record storage or other issues regarding

7  healthcare facilities.

8          THE COURT:  Right.

9          MR. ZIMAN:  So --

10          THE COURT:  And that's the Texas Department's

11  objection?

12          MR. ZIMAN:  And Mr. Buchbinder gave us some language

13  regarding that issue --

14          THE COURT:  Okay.

15          MR. ZIMAN:  -- as well, and so we've incorporated a

16  concept that's satisfactory to the United States Trustee, it's

17  satisfactory to the pre-petition lender; I believe the Texas

18  AG's Office has an issue with it, and we can get there in just

19  a moment.

20          Just for the record, Your Honor, we did file the

21  motion they said we filed with Mr. Augustine's declaration that

22  addressed the marketing of the DIP.  The process we went

23  through from, call it a fall into the filing time --

24          THE COURT:  Yes.

25          MR. ZIMAN:  -- we, I think, have established a record

1   that, one, this DIP satisfies the statutory requirements that

2   we can't get unsecured credit, we can't get credit without

3   incurring the administrative and priority liens and claims that

4   we propose to incur.

5          I think we've also established a record that the terms

6   and conditions of the DIP financing are reasonable and

7   appropriate in the circumstances, and that with the

8   modifications made, that the adequate protection package

9   provided the pre-petition lenders for the use of their cash

10  collateral is also appropriate and reasonable in the

11  circumstances.

12         THE COURT:  All right.  Is anyone challenging those

13  issues at this point?

14         MR. ZIMAN:  No.  At this point, no.

15         THE COURT:  Okay.  Very well.

16         MR. ZIMAN:  So that was just their --

17         THE COURT:  Okay.

18         MR. ZIMAN:  -- little record-making profit.

19         THE COURT:  Good.

20         MR. ZIMAN:  So with that, I would just turn and walk

21  through the order, if that's okay.

22         THE COURT:  All right.

23         MR. ZIMAN:  And there aren't many changes, Your Honor.

24  If it's easiest, I'll just go page by page.

25         THE COURT:  In the blackline, yes.

1        MR. ZIMAN:  Do you have it in front of you?

2        THE COURT:  I do.

3        MR. ZIMAN:  Okay.  So on page 2, we just made a change

4  to reflect the filing of the form of the DIP credit agreement.

5  That was filed at docket number 160.

6        THE COURT:  Okay.  And that form -- there have been

7  some minor modifications; I would call them mostly

8  administerial.  So we don't intend to -- we're not filing a new

9  form today because there have been no substantive changes to

10  that.

11        I next go to page 13.  Again, that's just a factual

12  reference regarding the --

13        THE COURT:  Yes, there we go, docket number.

14        MR. ZIMAN:  Okay.  The first substantive change, Your

15  Honor, appears on page 17, and it relates to the collateral

16  securing a portion of the DIP obligations.  You'll recall that

17  the DIP is comprised of both a revolving and a term facility.

18  The revolving facility is a ten million dollar facility solely

19  for the issuance of letters of credit.  And what we're doing is

20  we're taking the pre-petition letters of credit and deeming

21  them to be post-petition, and having a little bit more

22  availability.  So there's about nine million of existing LCs

23  that are rolling up into DIP LCs.

24        THE COURT:  Um-hum.

25        MR. ZIMAN:  Mr. Augustine's declaration explained why

1    this makes sense for us.  That being said, in order to address

2    some of the committee's concerns, there was an agreement

3    reached between those lenders and the committee and the debtors

4    to, essentially, not include as collateral --

5              THE COURT:  The avoidance.

6              MR. ZIMAN:  -- for those pre-petition obligations,

7    avoidance actions, or any leasehold interest, which is another

8    element of unencumbered property as of the petition date.

9              THE COURT:  Okay.

10             MR. ZIMAN:  And that's reflected in the

11   "notwithstanding" language on page 17.

12             THE COURT:  All right.  And that was the committee's

13   request, and it's been agreed upon.

14             MR. ZIMAN:  Yeah.

15             THE COURT:  Good.

16             MR. ZIMAN:  On page 20, Your Honor, is the language I

17   was referring to that was included in paragraph 12, that

18   essentially provides an exception to the 506(c) waiver in

19   favor, essentially, of federal agencies or state agencies or a

20   Chapter 7 Trustee, to essentially pursue an administrative

21   claim under 503(b)(8), and for the right of the pre-petition

22   lenders to defend against that claim under the 506(c) law as it

23   states.

24             THE COURT:  All right.

25             MR. ZIMAN:  Why don't we -- to the extent Mr. Morris

1   wants to be heard on that, why don't we just come back to it

2   and just finish the rest?

3          THE COURT:  Fine.  And I think -- is this language

4   that Mr. Buchbinder suggested?

5          MR. ZIMAN:  I think it was suggested by us and

6   approved by Mr. Buchbinder.

7          MR. BUCHBINDER:  Your Honor, Dave Buchbinder on behalf

8   of the U.S. Trustee.

9          THE COURT:  Yes.

10          MR. BUCHBINDER:  We had invited the debtor and the

11   lender to suggest some flexible language because we felt that

12   in this situation a fixed amount, as a carve-out for patient

13   issues, would undoubtedly be the wrong number, without saying

14   whether it would be too much or too little.

15          THE COURT:  That's right.

16          MR. BUCHBINDER:  And so I invited them to come up with

17   language that would account for that possibility, but

18   acknowledge the rights of the various parties concerned.  And I

19   think that the language that they proposed accommodates those

20   concerns.

21          THE COURT:  Very well.  Okay, thank you. &&

22          MR. ZIMAN:  And, Your Honor, if you skip over to

23   paragraph 20 --

24          THE COURT:  Yes.

25          MR. ZIMAN:  -- on page 30, this is the last of the

1   changes other than the 506(c) language.  There was just an

2   agreement -- there was discussion around an extension of the

3   challenge period.  I think ultimately, what was agreed was that

4   the concept here that as the committee's doing its work, if it

5   finds -- it's in a position to have a discussion with the pre-

6   petition lenders, it doesn't need to be core proceedings, to

7   extend that challenge period, if there's reason to do so.  And

8   if the parties can't agree, they can come back to court -- the

9   committee can come to court.  But it can be extended by

10  essentially written consent.

11          THE COURT:  All right.  Sure.

12          MR. ZIMAN:  I guess, then, if Mr. Morris wants to be

13  heard on the 506(c) issue, I would yield to him at that point.

14          THE COURT:  All right.  Mr. Morris, good afternoon.

15          MR. ROY:  Actually, Your Honor, it's Casey Roy, the

16  last name's R-O-Y, with the Texas Attorney General's Office, on

17  behalf of the Department of State and Health Services.  Mr.

18  Morris had a conflict today in an unrelated matter.

19          THE COURT:  All right, Mr. Roy.  It's good to hear

20  from you.

21          MR. ROY:  Thank you, Your Honor.  I appreciate

22  allowing me to appear by phone.

23          THE COURT:  You bet.

24          MR. ROY:  Well, Your Honor, as Mr. Ziman pointed out,

25  I believe we just have a very minor dispute regarding the

1   language in the order relating to the 506(c) waiver.  I think,

2   at the end of the day, we're all trying to get to the same

3   place.  The proposed language that was provided to us by the

4   debtors certainly references a carve-out, if you will, from the

5   506(c) waiver for costs contemplated by Section 503(b)(8) of

6   the Code relating to hospital closure.

7          The problem we have with this, Your Honor, is we don't

8   know actually what is or isn't covered by 503(b)(8), and think

9   it's unfair at the front end to potentially saddle a trustee

10  with expenses that we pretty much know that he or she won't

11  have the funds to cover.  As we noted in our pleadings, this

12  case is being prosecuted pretty much solely for the benefit of

13  the secured creditors, so we believe it's only fair that in the

14  unlikely event that a trustee is appointed, that that trustee

15  can argue for a 506(c) surcharge against the secured creditors'

16  collateral for all expenses related to closure to one or more

17  of the debtors' facilities.

18         Your Honor, we proposed language to counsel for the

19  debtor yesterday for circulation to the other parties that we

20  believe simply preserves that ability so that the surcharge can

21  be done for all costs of closure, and of course, also

22  importantly, preserves any party-in-interest's right to contest

23  that claim.  And it really is that simple.

24         We understand the other party's position that they

25  think reference to 503(b)(8) gets us there.  But I don't know

1   whether that's true.  And, Your Honor, this isn't an academic

2   exercise for a couple of reasons.  One, we had other hospital

3   cases involving closure where power gets cut off, and the

4   pathology lab literally becomes a toxic waste site that

5   suddenly, under the regulation of this commission on

6   environmental quality, and if that happens, then the trustee's

7   got a quality problem on their hand.  And I just simply don't

8   know whether, for example, payment of the lights falls under

9   503(b)(8), but certainly paying the light bill, is direct

10  benefit to the estate, since the example I gave, prevents the

11  potential for serious additional problems.  And the same can

12  hold true with issues relating to, for example, closure of the

13  pharmacy and disposal of narcotics.

14          And by the way, thinking about this, the problem is

15  exacerbated by the way that the sale transaction is set up.  As

16  I read the documents, the purchaser can exclude specific

17  facilities from the sale with as little notice as five days

18  prior to closing, which leaves open the very real possibility

19  that one or more of the debtors' facilities will be the subject

20  of a Chapter 7 after the sale.  And I think that the Court just

21  needs to look at earlier discussions with counsel regarding --

22  as an example of one facility of one facility in Texas, that

23  might be excluded.

24          So in light of all of that, Judge, we believe the

25  order should be drafted so that notwithstanding anything else

1   in the order, that any trustee can seek a 506 claim -- a 506(c)

2   claim for all costs related to hospital closure, and preserves

3   all parties-in-interest, the right to contest a claim.  And

4   Your Honor, we're happy to submit competing language to the

5   Court for your consideration.

6           THE COURT:  All right.  I thank you, Mr. Roy.  That

7   was very articulate.

8           And, yes, Mr. Alberino.  Good afternoon.

9           MR. ALBERINO:  Good afternoon, Your Honor.  Scott

10  Alberino from Akin Gump on behalf of the steering committee

11  members, purchaser, and the DIP term lenders.

12          THE COURT:  Yes.

13          MR. ALBERINO:  Your Honor, I guess I would like to

14  respond briefly to some of the comments raised with respect to

15  the waiver to the -- the carve-out to the 506(c) waiver that

16  we're discussing.  But first, I would like to just state for

17  the record that on behalf of our clients, we're grateful that

18  we were able to work everything out today with the Office of

19  the United States Trustee and the creditors' committee, and

20  make this a fully -- for the most part, a fully consensual

21  hearing on the bid procedures and the DIP financing.

22          Your Honor, with respect to the argument we're having

23  now with respect to the 506(c) waiver --

24          THE COURT:  Yes.

25          MR. ALBERINO:  -- I guess there are two points I'd

1  like to respond to.  Number one, it's somewhat unusual for a
2  secured lender, in the context of a case where there's a
3  significant carve-out that's put into place, to agree to any
4  exception to the surcharge waiver.  In this case, we are
5  mindful of the sensitivities given the type of business this
6  debtor is involved in, the statements from Your Honor.  And as
7  you can see, I believe we have worked with the company and the
8  other stakeholders with respect to the PCO.

9          And when the APA was negotiated, we also were mindful
10  to some of the issues and concerns that the State of Texas
11  raises.  For instance, with respect to this notion of closing
12  down the facility --

13          THE COURT:  Yes.

14          MR. ALBERINO:  -- our APA currently is set up to
15  acquire all the company's operations with one exception.  There
16  is a carve-out that gives the stalking-horse purchaser the
17  ability to exclude one facility.  And it's not five days before
18  closing.  I believe it's five days before our bid deadline, to
19  notify the company of our intent to exclude one facility, which
20  would give the company the ability -- given the fact that there
21  will be some significant runway between when the company might
22  be notified, if it is notified, and when a transaction might
23  close.  Mr. Ziman alluded to a sixty- to ninety-day closing
24  period.

25          THE COURT:  Yes.

1      MR. ALBERINO:  So we're looking at probably a three to

2 four month period under which the company will have received

3 notification, will continue to operate under the DIP and cash

4 collateral order that we've consented to, and will be managing

5 an orderly wind-down and closure of that facility, if that's

6 what the stalking-horse purchaser decides to do, based upon its

7 rights under the APA.

8      On top of that, we've also agreed through the APA to

9 fund a wind-down budget of a sig -- of three million, one and a

10 half of which will be reserved -- will be reserved for pure

11 kind of wind-down costs of the estate.  So there's additional

12 funds that we're providing through the bid, in the event the

13 company's unable to complete the closure within what I'd say

14 about a three- to four-month period.

15      You know, they're in line -- most patients, I believe,

16 are out of the facility -- out of the facility in a much

17 shorter period of time.  But our view -- and it's an informed

18 view, based upon our discussions with management and all the

19 advisors -- is that the window of time that we provided the

20 company to notify them would provide the company with more than

21 enough sufficient time to complete the closure under the guises

22 of the DIP financing order, so that the company has adequate

23 cash and financing to complete the wind-down.

24      THE COURT:  Okay.

25      MR. ALBERINO:  But leaving that aside, given the

1    concerns, we have agreed to this limited carve-out.  Now,

2    503(b)(8) is a special section of the Code that provides for

3    administrative expense status -- priority status for the actual

4    necessary costs and expenses of closing a health care business

5    incurred by a trustee or by a federal agency or a department or

6    agency of a state or political subdivision thereof, including

7    any costs or expenses incurred; and then it lists, through two

8    subsections, what those sections might be.

9            We all know, as bankruptcy practitioners, that when we

10   see the word "including" in the Bankruptcy Code, it is not a

11   limiting term.

12           THE COURT:  Correct.

13           MR. ALBERINO:  So the waiver that we've agreed -- the

14   exception to the waiver that we're agreeing to, will pick up

15   all actual and necessary costs and expenses of closing a health

16   care business.  Now, then we're still left with the ability to

17   contest the allowance of that claim on the merits given the

18   506(c) surcharge case law.  But we are giving -- we're giving a

19   Chapter 7 trustee or state agency or a federal agency the

20   ability to come into court and argue that any costs that may be

21   picked up within the confines of Section 503(b)(8), including

22   the examples that the State of Texas are making, if those

23   examples are actually covered by this statute, that's what

24   we're agreeing to do.

25           And I think under the circumstances, Your Honor, I

 1  think the lenders have gone out on a limb a little bit, to

 2  appease the U.S. Trustee and to appease the State of Texas.  I

 3  think what the language they're asking for may go -- the

 4  language they're asking for, again, they have told us

 5  informally, well, we don't know where the lines are for

 6  503(b)(8).  Where do they end?

 7        Neither do we, Judge.  But at the end of the day, if

 8  there's an issue and we have to fight it -- fight about it,

 9  we'll all come in and all rights are reserved for all parties

10  on the scope and meaning of 503(b)(8).  And all rights are

11  reserved under 506(c) merits.

12        So we think that the accommodation we made is

13  appropriate, and we would ask Your Honor to approve the

14  language as proposed by the company.

15        THE COURT:  Well, let me ask -- let me first ask Mr.

16  Roy this question.  Mr. Roy, is one of your concerns not so

17  much the costs related to the closing, but the costs also

18  relating to the operation of the facility or facilities,

19  pending the closing?  Is that --

20        MR. ROY:  Your Honor, that's a very good question.

21  And I would couch it in terms of whatever costs are incurred

22  kind of in wind-down mode during the kind-of closure process.

23        THE COURT:  So in other words --

24        MR. ROY:  And I --

25        THE COURT:  -- paying the electric bill while they're

1  in the process of winding down, is something that would be of

2  concern to the State?

3        MR. ROY:  Exactly, Your Honor.  And I think Mr.

4  Alberino just proved our point, because he said, you know,

5  within the confines of 503(b)(8).  And I just simply don't know

6  if those types of costs would fall under what that statute

7  contemplates.

8        THE COURT:  And your language was what?  Because I

9  haven't actually heard your precise language that you were

10 suggesting, Mr. Roy.

11       MR. ROY:  Do you want me just to read it to you?

12       THE COURT:  Sure.

13       MR. ROY:  Okay, Your Honor.  What we had proposed is

14 as follows.  "Notwithstanding any other provision of the motion

15 or this order to the contrary, nothing herein shall affect the

16 right of any subsequently appointed Chapter 11 or Chapter 7

17 trustee to assert a claim under 506(c) of the Bankruptcy Code,

18 ("506(c) claim") for the actual necessary costs of closing any

19 of the debtors' facilities, in accordance with applicable law,

20 including but not limited to costs associated with:  1) the

21 maintenance and disposal of patient medical records; 2) closure

22 of any pathology lab or the disposal of medical waste; and 3)

23 closure of any pharmacy or disposal of any pharmaceuticals.

24       "The debtors and any other party-in-interest expressly

25 reserve their right to contest such 506(c) assertion, if/when a

1    506(c) claim is brought.  The Texas Attorney General's Office,

2    having raised this issue in a timely fashion" -- I'm sorry --

3    "in a timely filed objection to the motion, shall expressly

4    have standing to be heard with respect to a 506(c) claim

5    if/when brought."

6            THE COURT:  All right, thank you.  Unacceptable?

7            MR. ALBERINO:  Your Honor, I think that all of -- I

8    think that the language was prefaced with "expenses incurred in

9    connection with closing a facility", including X, Y and Z as

10   proposed.

11           THE COURT:  Right.

12           MR. ALBERINO:  We don't know -- as I think the State

13   of Texas acknowledges -- where the line is under 503(b)(8).  We

14   don't believe that's something that needs to be decided in

15   connection with determining this -- determining whether the

16   exception to the waiver is appropriate.  We believe the State

17   of Texas has been given -- the State of Texas, the Chapter 7

18   trustee, any federal agency that incurs costs in connection

19   with closing a facility, they have the ability to argue that

20   all those costs are picked up within 503(b)(8).

21           We are not agreeing to just a blanket exception to the

22   surcharge waiver.  We are agreeing to an exception to the

23   surcharge waiver that picks up -- that picked up the priority

24   claims mandated by Congress with respect to closure of a health

25   care facility.  So --

1            THE COURT:  Which may include those claims that the --

2            MR. ALBERINO:  Which may or may not include those

3    claims.  So that's our position, Your Honor.

4            THE COURT:  All right.  Well --

5            MR. ZIMAN:  Your Honor, could I just be heard on the

6    same issue?

7            THE COURT:  Certainly, Mr. Ziman.

8            MR. ZIMAN:  So in response to where the State of Texas

9    is.  I think that the protections that Mr. Alberino went

10   through shouldn't be overlooked.  The fact that we, the

11   debtors, will know if there's an excluded facility well in

12   advance of kind of any time when we're no longer running that

13   facility -- running the entire business.

14           THE COURT:  Right.

15           MR. ZIMAN:  And I think Mr. Alberino probably short

16   circuited it when he said three to four months.  I think it's

17   more like five months.

18           Either way, in addition to the -- there's also, on top

19   of the wind-down expense budget, there's a separate excluded

20   facility wind-down budget that would, to the extent, somehow,

21   some cost wasn't picked up in closing down a facility, if and

22   when it became excluded, during that up to five month period,

23   there's nonetheless a special set-aside to cover those costs in

24   addition.  I believe it's a half million dollars.  I don't -- I

25   think under the asset purchase agreement.

1           So I think we're arguing about the angels on the head

2    of the pin, whatever this very esoteric issue we've gotten

3    ourselves into.  And when you step back and look at the

4    totality of the circumstances, 506(c) waivers have become

5    routine when pre-petition lenders are allowing their cash

6    collateral to be used to essentially administer a case.

7           THE COURT:  Yes.

8           MR. ZIMAN:  That's the fact pattern we have here.

9           THE COURT:  That's right.

10          MR. ZIMAN:  The fact that the benefit of this case

11   runs primarily to the pre-petition lenders, I think that's been

12   overplayed.  I think, look, the company's only worth what it's

13   worth.  It's got a lot of secured debt.  And as we stand today,

14   based on every indication we have, unfortunately, the secured

15   debt's greater than the value.  Hopefully someone shows up and

16   proves us wrong, and we'd be dying to have that happen so we

17   can generate a recovery for other stakeholders --

18          THE COURT:  Well, hopefully there are other

19   beneficiaries, namely --

20          MR. ZIMAN:  I was going to say, Your Honor --

21          THE COURT:  -- patients, you know, and --

22          MR. ZIMAN:  Obviously patients are getting services.

23          THE COURT:  -- the doctors and the nurses that work in

24   those hospitals and so on.

25          MR. ZIMAN:  -- there are other stakeholders here in

1    terms of --

2            THE COURT:  Right.

3            MR. ZIMAN:  -- our employee population, our landlord

4    population, notwithstanding what Mr. Acosta thinks, that are

5    benefiting by these cases being run in the manner they're being

6    run.

7            THE COURT:  Yes.

8            MR. ZIMAN:  So at some point, there's just -- you've

9    got to draw a line.  Decisions come to Your Honor.  I would

10   submit that here, this carve-out is somewhat unprecedented.  It

11   is a health care case.  So I get why it's here.

12           THE COURT:  Right.

13           MR. ZIMAN:  I think there was a nice give-and-take

14   between the debtors, the lenders, and Mr. Buchbinder, to arrive

15   at this language.  I appreciate the sentiment that Mr. Roy

16   expresses.  I don't think it's any different, though, than what

17   the language actually says, at the end of the day, except for

18   whether it's grounded in 503(b)(8) or grounded in the ether.

19           And I think since we're in bankruptcy court, where

20   grounding it in the statute is most appropriate, it represents

21   a fair compromise of the issue before Your Honor.

22           THE COURT:  All right.  Thank you, Mr. Ziman.

23           Here's what I would say.  I am certainly not

24   insensitive to the concerns of the Texas Department, but I

25   think that the language that has been proposed provides

1   sufficient protection, particularly given the lead time that

2   there will be for the closure of any facility.  And as I've

3   indicated, I am sensitive to the issue and I would certainly be

4   prepared to hear the matter on a very expedited basis, should

5   any problems arise.

6         But we don't have a problem today.  We may not have a

7   problem.  And we don't have to deal with it at this particular

8   moment, I think, is probably the answer, particularly given the

9   language that's been proposed in paragraph 12.

10        So Mr. Roy, I am overruling your objection today, but

11  I am not leaving you without at least some source of redress if

12  it becomes a problem.

13        MR. ROY:  Thank you, Your Honor.

14        THE COURT:  All right.  Mr. Ziman, I think --

15        MR. ZIMAN:  I think we're done, Your Honor, except, I

16  guess --

17        THE COURT:  Is that all of it?

18        MR. ZIMAN:  -- just the February 8th date, you might

19  want to just take that off your calendar, because we'll be

20  before Your Honor --

21        THE COURT:  Let's take a look.

22        MR. ZIMAN:  -- on February 11th.

23        THE COURT:  All right, let's see.  I don't even

24  remember.  That's good news.  The problem is, Ms. Jones will

25  probably have something she wants scheduled in another case

 1    that day.

 2              MS. JONES:  Exactly.

 3              THE COURT:  All right.  So February 8th is now off.

 4              MR. ZIMAN:  Is now off.

 5              THE COURT:  All right.  Terrific.  And I have -- let

 6    me just make sure that I have here the final order for the

 7    debtor-in-possession financing.

 8              MR. ZIMAN:  I think the DIP financing order --

 9              THE COURT:  Yes.

10              MR. ZIMAN:  -- you have.  And could I approach Your

11    Honor?  I just what to double check to make sure that --

12              THE COURT:  Please.

13              MR. ZIMAN:  -- an exhibit on that.

14              THE COURT:  Yes, please do.  There is an exhibit.

15              MR. ZIMAN:  There should be one that has two pages.

16              THE COURT:  Okay, I think it is.

17              MR. ZIMAN:  You're right, Your Honor.

18              THE COURT:  Great.  I will sign this order and we'll

19    get it on the docket today.  And I will be getting, I guess,

20    the bid procedures order --

21              MR. ZIMAN:  Yes, we'll turn that tonight --

22              THE COURT:  -- revised?

23              MR. ZIMAN:  - hopefully get it to you by either later

24    on this evening -- I wouldn't wait on it, Your Honor.  But --

25              THE COURT:  All right.

1        MR. ZIMAN:  -- tomorrow morning's fine.

2        THE COURT:  I'll be here.

3        MR. ZIMAN:  Great.

4        THE COURT:  I'm not going anywhere.  All right.

5   Anything else?

6        MR. ZIMAN:  No, Your Honor, that's it for today.

7        THE COURT:  Thank you --

8        MR. ZIMAN:  Thank you very much.

9        THE COURT:  -- everyone.  I wish you a good evening

10   and a safe trip home, and we'll stand in recess.  Good evening.

11   Good evening, everyone.

12        (Whereupon these proceedings were concluded at 4:49 PM)

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                                    **I N D E X**

3

4                              RULINGS

5                                                   Page     Line

6   DIP order approved.                             69       18

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7                                        January 24, 2013

8    _____        _____

9    SHARONA SHAPIRO                        DATE

10   AAERT Certified Electronic Transcriber CET**D-492

11

12   eScribers, LLC

13   700 West 192nd Street, Suite #607

14   New York, NY 10040

15

16

17

18

19

20

21

22

23

24

25

LCI HOLDING COMPANY, INC., ET AL.
Case No. 12-13319 (KG)

January 23, 2013

**&**

**&& (1)**
54:21

**A**

**ability (10)**
31:17;32:11;36:2;
41:4;56:20;59:17,
20;61:16,20;64:19

**able (6)**
30:22;36:13;
39:11;46:10;47:3;
58:18

**above (1)**
20:3

**absolutely (2)**
23:7;39:8

**academic (1)**
57:1

**acceptable (1)**
16:6

**access (1)**
45:1

**accommodate (6)**
12:13,14;13:14;
16:17;18:4;30:10

**accommodates (1)**
54:19

**accommodation (2)**
17:23;62:12

**accommodations (1)**
17:15

**accordance (2)**
18:6;63:19

**account (2)**
11:24;54:17

**accountants (2)**
43:15,17

**acknowledge (4)**
8:6;21:21;23:25;
54:18

**acknowledges (1)**
64:13

**acknowledging (1)**
24:17

**Acosta (36)**
20:13,17,18,18,21,
24;23:19,21;25:23;
26:8,13;28:21;
30:23;31:6,22;32:8,
11;33:7;35:10;37:4,
6,10;38:8,14;44:1,2,
3,14;46:12,14,20;
47:13;48:9,11,25;
67:4

**Acosta's (2)**
27:3;35:21

**acquire (2)**
34:4;59:15

**action (1)**

**21:16**

**actions (2)**
39:16;53:7

**actual (6)**
20:24;23:2;34:1;
61:3,15;63:18

**actually (15)**
7:25;10:6;14:7;
22:9;23:4;27:14;
28:5;36:12;41:14;
46:25;55:15;56:8;
61:23;63:9;67:17

**adamant (1)**
36:22

**added (3)**
18:3,17;20:10

**addition (5)**
12:5;32:21,25;
65:18,24

**additional (3)**
43:16;57:11;60:11

**address (6)**
10:11;20:11,15;
24:20;45:18;53:1

**addressed (2)**
23:14;50:22

**addresses (1)**
22:13

**adequate (3)**
47:5;51:8;60:22

**adjourn (1)**
49:10

**adjourned (3)**
9:16,19;10:18

**administer (1)**
66:6

**administerial (1)**
52:8

**administrative (4)**
50:5;51:3;53:20;
61:3

**admission (1)**
10:7

**admitted (1)**
11:15

**advance (3)**
30:19;37:5;65:12

**adversary (1)**
34:15

**advised (1)**
7:24

**advising (1)**
13:9

**advisors (1)**
60:19

**affairs (1)**
32:21

**affect (2)**
28:16;63:15

**affiliate (1)**
19:22

**affiliated (3)**
33:25;34:3;35:12

**affiliates (3)**
7:11;19:24;35:6

**afternoon (10)**
7:3;20:17,18;
38:23,24;40:14,15;
55:14;58:8,9

**again (7)**
13:7;15:3;16:23;
49:6,16;52:11;62:4

**against (3)**
21:22;53:22;56:15

**agencies (2)**
53:19,19

**agency (5)**
61:5,6,19,19;64:18

**agenda (2)**
8:16;9:13

**ago (1)**
21:4

**agree (7)**
25:3;36:25;37:8,
12;38:5;55:8;59:3

**agreed (7)**
24:24;49:10;
53:13;55:3;60:8;
61:1,13

**agreeing (5)**
8:6;61:14,24;
64:21,22

**agreement (7)**
22:4;25:24;44:25;
52:4;53:2;55:2;
65:25

**agreements (2)**
18:10,13

**AG's (1)**
50:18

**ahead (2)**
13:5;15:2

**AKIN (2)**
5:7;58:10

**ALBERINO (17)**
5:9;38:16;58:8,9,
10,13,25;59:14;60:1,
25;61:13;63:4;64:7,
12;65:2,9,15

**all-day (1)**
13:20

**allotted (1)**
37:24

**allowance (1)**
61:17

**allowed (1)**
44:16

**allowing (2)**
55:22;66:5

**alluded (1)**
59:23

**alone (2)**
23:3;31:16

**alternative (2)**
13:6;16:24

**Alternatively (1)**

**28:7**

**alternatives (1)**
30:17

**always (2)**
14:19;26:18

**amended (3)**
27:16;45:23;47:10

**amount (3)**
42:1,10;54:12

**ample (1)**
28:19

**angels (1)**
66:1

**announce (1)**
38:9

**announced (1)**
25:23

**announces (1)**
33:13

**anticipate (1)**
25:1

**APA (5)**
26:8;59:9,14;60:7,
8

**apologize (4)**
17:8;32:22;40:9;
44:3

**appear (1)**
55:22

**appears (1)**
52:15

**appease (2)**
62:2,2

**apples (1)**
44:3

**applicable (2)**
28:17;63:19

**apply (1)**
30:12

**appointed (2)**
56:14;63:16

**appointment (3)**
8:7;9:1;15:9

**appreciate (3)**
14:11;55:21;67:15

**approach (2)**
9:6;69:10

**appropriate (9)**
11:23;23:11;
32:24;46:16;51:7,
10;62:13;64:16;
67:20

**approve (1)**
62:13

**approved (1)**
54:6

**April (10)**
13:3,7,20,21;14:1,
2,20,21;15:5,9

**argue (3)**
56:15;61:20;64:19

**arguing (1)**
66:1

**argument (2)**
36:16;58:22

**arguments (1)**
35:5

**arise (1)**
68:5

**around (6)**
25:22;26:11;
31:17;45:7,12;55:2

**Arps (1)**
7:10

**arrange (1)**
24:21

**arrive (1)**
67:14

**arrives (1)**
46:9

**articulate (1)**
58:7

**articulating (1)**
42:2

**ASHLEIGH (1)**
5:10

**aside (1)**
60:25

**assert (1)**
63:17

**assertion (1)**
63:25

**asset (1)**
22:3;44:25;65:25

**assets (5)**
35:12;40:20;
41:25;42:13,25

**assign (8)**
18:13;22:9,18;
28:5;31:18;35:11,
12;46:11

**assigned (1)**
35:7

**assignee (5)**
32:14;33:8,17;
44:16;47:20

**assignment (2)**
28:13;30:12

**associated (1)**
63:20

**assume (5)**
18:12;22:9;28:5;
31:18;42:19

**assumption (2)**
28:13;30:12

**assurance (1)**
47:5

**assurances (1)**
21:8

**assure (1)**
32:2

**assured (1)**
34:10

**attached (1)**
21:20;22:6

**attempted (1)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

24:3
**ATTORNEY (4)**
6:8;44:11;55:16;
64:1
**Attorneys (4)**
5:3,8,14,19
**Attorney's (2)**
8:2;10:24
**attract (1)**
12:3
**auction (20)**
12:10;13:4,7;
14:25;15:21,23,24;
16:1,24;17:1;25:11;
28:10;44:17;45:10;
46:13;47:2,2,9,17,18
**August (1)**
20:25
**Augustine (3)**
10:6;11:5,17
**Augustine's (3)**
11:20;50:21;52:25
**authority (1)**
23:7
**availability (1)**
52:22
**available (1)**
31:16
**avoidance (3)**
39:15;53:5,7
**aware (4)**
31:10,11;41:9;
45:22

**B**

**back (19)**
9:22;10:15;17:10;
20:24;26:15;30:13;
32:15,16,23;33:2;
35:3,19;36:25;38:6;
39:7;43:14;54:1;
55:8;66:3
**backup (2)**
19:2,7
**backwards (1)**
16:21
**bad (1)**
23:8
**ball (2)**
26:10;45:19
**Bank (1)**
5:3
**bankruptcy (8)**
11:25;22:1;32:20;
48:14;61:9,10;
63:17;67:19
**BARTLETT (1)**
5:2
**based (4)**
22:19;60:6,18;
66:14
**basically (2)**

17:25;50:4

**basis (8)**
12:3;26:16;30:14;
31:16;36:1;41:25;
43:14;68:4
**became (2)**
18:1;65:22
**become (2)**
18:6;66:4
**becomes (2)**
57:4;68:12
**beginning (1)**
43:18
**begun (1)**
8:24
**behalf (9)**
7:10;8:22;10:24;
15:3;38:25;54:7;
55:17;58:10,17
**belabor (1)**
18:22
**believer (1)**
28:23
**believes (1)**
21:18
**belts (1)**
20:10
**beneficiaries (1)**
66:19
**benefit (3)**
56:12;57:10;66:10
**benefiting (1)**
67:5
**best (3)**
39:15;48:21,22
**bet (7)**
8:10;14:9,11;
15:19;18:20;38:15;
55:23
**better (2)**
12:3;47:20
**bid (32)**
7:20;9:11;10:14,
16,22;12:3,4,10,17;
13:4,5;16:24;18:21;
19:18;20:14;25:11;
27:22;28:7;45:11;
46:7,20;47:1,3,4,6,
25;48:2,10;58:21;
59:18;60:12;69:20
**bidder (14)**
13:13;16:25;17:2;
19:2,7,13;27:24;
28:11;45:7;47:15,16,
17;48:6,7
**bidders (3)**
19:25;44:10;47:23
**bidder's (1)**
48:22
**bidding (19)**
10:3;12:7,8;17:4;
22:13;25:6,6,9;39:6,
11,25;40:3,17,19;

42:14;44:5,5;48:10,
12
**bids (1)**
46:8
**bid's (1)**
47:16
**bill (2)**
57:9;62:25
**bit (7)**
13:23,23;19:10;
27:11;36:7;52:21;
62:1
**blackline (1)**
51:25
**blacklines (3)**
9:8,10;12:7
**BLANK (1)**
5:13
**blanket (1)**
64:21
**blanks (1)**
12:9
**BLAYLOCK (1)**
5:10
**board (1)**
20:4
**bondholders (1)**
25:25
**bonuses (1)**
9:18
**both (4)**
12:15;31:24;
45:16;52:17
**breadth (1)**
50:1
**breaks (1)**
28:3
**briefly (1)**
58:14
**brought (2)**
64:1,5
**BUCHBINDER (21)**
6:3;8:11,16,18,21,
22;9:3;15:1,3,3,16,
18;49:20;50:12;
54:4,6,7,7,10,16;
67:14
**budget (3)**
60:9;65:19,20
**bunch (1)**
34:2
**business (8)**
27:13;30:5;36:3,
10;59:5;61:4,16;
65:13
**businesses (1)**
11:24
**buy (1)**
23:5
**buyer (9)**
18:13;23:6;24:4;
31:9;34:3,4;36:1,11;
45:25

**buyers (5)**
22:16,17;23:5;
25:7;31:10
**buys (1)**
23:6

**C**

**calendar (5)**
9:18;10:2;13:18;
29:3;68:19
**call (11)**
9:17;26:12;32:18;
37:12;38:11,12,13;
47:9;50:4,23;52:7
**called (1)**
32:23
**calming (1)**
39:2
**came (1)**
26:15
**can (44)**
8:3;9:22;10:8;
17:9;22:18,24;
23:10;24:13;27:2,21,
21,22;28:4,5,16;
30:24;33:8;34:10;
35:14,18;37:14,22;
38:8;9;40:6;41:5;
42:12;43:3;44:18;
45:18;46:8;47:13;
49:25;50:18;55:8,9,
9;56:15,20;57:11,16;
58:1;59:7;66:17
**candidates (1)**
8:13
**cap (1)**
17:22
**care (8)**
8:7,24;15:6;18:5;
61:4,16;64:25;67:11
**carve (1)**
28:12;33:24
**carve-out (7)**
54:12;56:4;58:15;
59:3,16;61:1;67:10
**case (12)**
26:19;31:15;
40:21;49:9;56:12;
59:2,4;61:18;66:6,
10;67:11;68:25
**cases (3)**
10:16;57:3;67:5
**CASEY (2)**
6:10;55:15
**cash (6)**
49:7,9;51:9;60:3,
23;66:5
**cause (2)**
19:13;23:8
**Centers (1)**
10:24
**cents (1)**

32:13
**certain (2)**
25:15;42:1
**certainly (12)**
29:16;31:9,14;
39:22;43:18;45:21;
46:8;56:4;57:9;65:7;
67:23;68:3
**certification (1)**
16:14;39:25
**cetera (1)**
21:6
**challenge (2)**
55:3,7
**challenging (1)**
51:12
**chambers (1)**
38:13
**change (6)**
12:16,17,21;
28:16;52:3,14
**changes (8)**
10:11;12:6,13;
18:21;49:24;51:23;
52:9;55:1
**Chapter (6)**
53:20;57:20;
61:19;63:16,16;
64:17
**Chase (1)**
5:3
**check (1)**
69:11
**choice (1)**
30:6
**CHRISTOPHER (2)**
6:5;40:10
**circuited (1)**
65:16
**circulation (1)**
56:19
**circumstance (1)**
31:3
**circumstances (5)**
11:24;51:7,11;
61:25;66:4
**claim (14)**
28:6;40:21;42:4;
53:21,22;56:23;58:1,
2,3;61:17;63:17,18;
64:1,4
**claims (5)**
50:5;51:3;64:24;
65:1,3
**clarify (3)**
25:7,7;33:4
**clear (7)**
19:21;20:3;21:19;
37:23;42:6;44:23;
49:13
**clearly (2)**
45:3;48:24
**CLERK (1)**

7:2
**client (6)**
   8:24;27:3,14,15;
   30:23;47:5
**clients (1)**
   58:17
**client's (1)**
   27:13
**close (3)**
   31:7;34:7;59:23
**closing (13)**
   34:5;57:18;59:11,
   18,23;61:4,15;62:17,
   19;63:18;64:9,19;
   65:21
**closure (14)**
   56:6,16,21;57:3,
   12;58:2;60:5,13,21;
   62:22;63:21,23;
   64:24;68:2
**CMS (3)**
   11:2;18:9,17
**Code (6)**
   15:7;43:23;56:6;
   61:2,10;63:17
**collateral (8)**
   49:8,9;51:10;
   52:15;53:4;56:16;
   60:4;66:6
**combination (1)**
   36:11
**comfortable (2)**
   23:10;30:23
**commenced (1)**
   21:22
**comments (3)**
   8:11;49:17;58:14
**commercial (3)**
   28:23;29:14;31:3
**commission (1)**
   57:5
**Committee (16)**
   5:8,14,19;10:18,
   20;12:15;19:6;20:4;
   39:1,10;49:15,21;
   53:3;55:9;58:10,19
**committee's (4)**
   12:13;53:2,12;
   55:4
**Company (13)**
   7:12;12:15;23:1;
   36:4;59:7,19,20,21;
   60:2,20,20,22;62:14
**company's (4)**
   43:15;59:15;
   60:13;66:12
**compel (3)**
   26:14;29:7;41:4
**competing (1)**
   58:4
**complete (3)**
   60:13,21,23
**completed (1)**

42:20
**completely (1)**
   41:5
**complications (2)**
   22:22,23
**compliment (1)**
   8:6
**comply (1)**
   21:17
**comprised (1)**
   52:17
**compromise (1)**
   67:21
**compute (1)**
   40:25
**concept (2)**
   50:16;55:4
**concern (10)**
   19:6;20:5,11;
   22:14;23:8;30:15;
   41:2;42:9;45:19;
   63:2
**concerned (4)**
   16:6;21:7;22:5;
   54:18
**concerns (11)**
   18:9;36:3,14;41:6;
   48:23;53:2;54:20;
   59:10;61:1;62:16;
   67:24
**concluded (2)**
   47:19;70:12
**conclusion (1)**
   47:2
**conclusory (1)**
   43:11
**condense (1)**
   19:13
**condition (2)**
   21:7;22:3
**conditions (1)**
   51:6
**conduct (1)**
   16:25
**conducting (1)**
   8:25
**confines (2)**
   61:21;63:5
**confirmation (1)**
   16:4
**confirmed (1)**
   22:8
**conflict (1)**
   55:18
**Congress (1)**
   64:24
**connection (4)**
   17:16;64:9,15,18
**consensual (1)**
   58:20
**consensually (3)**
   7:21;8:6;49:24
**consent (2)**

28:4;55:10
**consented (1)**
   60:4
**consideration (1)**
   58:5
**contact (1)**
   47:18
**contains (2)**
   18:16;21:5
**contemplated (1)**
   56:5
**contemplates (1)**
   63:7
**contend (3)**
   25:16,19,20
**contest (4)**
   56:22;58:3;61:17;
   63:25
**contested (3)**
   14:8,19;34:17
**context (1)**
   59:2
**continue (2)**
   26:25;60:3
**continuing (1)**
   16:16
**contractual (1)**
   31:25
**contrary (2)**
   20:8;63:15
**control (1)**
   28:17
**controversial (1)**
   18:11
**conversation (4)**
   28:3,24;29:15,16
**core (1)**
   55:6
**correspondence (1)**
   25:22
**cost (1)**
   65:21
**costs (17)**
   56:5,21;58:2;
   60:11;61:4,7,15,20;
   62:17,17,21;63:6,18,
   20;64:18,20;65:23
**couch (1)**
   62:21
**counsel (2)**
   56:18;57:21
**couple (3)**
   7:14;30:19;57:2
**course (3)**
   13:18;20:6;22:5;
   46:12;56:21
**COURT (254)**
   7:3,6,9,16,18,22;
   8:5,10,15,20;9:2,5,7,
   9,12,15,21,25;10:9,
   13;11:1,9,12,21;
   12:11,20;13:15,19,
   22;14:4,6,9,11,14,18,

23,25;15:2,8,15,17,
   19;16:3,9,15,22;
   17:3,6,10,13,19,22;
   18:2,7,14,18,20,23;
   19:1,4,9,11,16,23;
   20:2,12,15,16,20,22,
   23;22:20;23:17,20;
   24:13,16;25:1,2,12,
   18;26:1,14,17,21,23;
   27:3,7,9,19;28:1,9,
   14,18;29:4,6,18,21,
   25;30:3,15,21;31:5,
   12,19;32:1,10;33:6,
   13;34:10,13,15,22,
   25;35:22;36:6,23;
   37:1,4,9,18,20;38:1,
   7,10,11,15,18,21,24;
   39:2,4,8,17,20,22;
   40:2,5,8,12,14;41:3,
   11,15,18,23;42:19,
   23;43:5,7,10,13,22,
   25;44:2,13,20;45:2,
   5,15;46:1,5,12,15,18,
   23;47:7,24;48:1,4,8,
   15;49:1,5,14,18,23;
   50:8,10,14,24;51:12,
   15,17,19,22,25;52:2,
   6,13,24;53:5,9,12,15,
   24;54:3,9,15,21,24;
   55:8,9,11,14,19,23;
   57:20;58:5,6,12,24;
   59:13,25;60:24;
   61:12,20;62:15,23,
   25;63:8,12;64:6,11;
   65:1,4,7,14;66:7,9,
   18,21,23;67:2,7,12,
   19,22;68:14,17,21,
   23;69:3,5,9,12,14,16,
   18,22,25;70:2,4,7,9
**courtroom (1)**
   10:7
**courts (1)**
   48:14
**court's (2)**
   24:22;37:13
**cover (2)**
   56:11;65:23
**covered (3)**
   45:16;56:8;61:23
**create (4)**
   13:12;21:3;29:19;
   36:9
**creates (1)**
   47:1
**credit (8)**
   21:5,6;36:3;51:2,
   2;52:4,19,20
**credit- (1)**
   36:12
**Creditors (3)**
   5:19;39:1;56:13
**creditors' (3)**
   10:18;56:15;58:19

**credit-worthiness (1)**
   32:14
**credit-worthy (4)**
   23:11;33:8;36:14;
   44:19
**critical (1)**
   35:16
**current (2)**
   31:9;42:25
**currently (1)**
   59:14
**cut (1)**
   57:3

---

## D

**Dallas (6)**
   10:22;20:19;
   21:22;22:11;44:11;
   46:11
**date (9)**
   11:18;12:23,24;
   13:6;15:6,25;38:17;
   53:8;68:18
**dates (3)**
   12:9;13:14;40:1
**Dave (2)**
   8:21;54:7
**DAVID (2)**
   6:3;15:1
**DAVIS (2)**
   5:20;38:25
**day (15)**
   13:23;14:5;31:21;
   33:9,9,11;41:22;
   47:8,15;49:8,10;
   56:2;62:7;67:17;
   69:1
**days (17)**
   14:13,16;15:8,10,
   11,12;24:2;29:10;
   36:18;37:6,7,8,20,
   21;57:17;59:17,18
**deadline (16)**
   12:10,17;13:6,12;
   22:10;27:22;28:7;
   29:9;33:2;37:13;
   46:7,20;47:3,25;
   48:2;59:18
**deadlines (1)**
   12:10
**deal (8)**
   7:14;31:3;35:18;
   38:3;44:15;46:21,
   21;68:7
**dealt (1)**
   31:8
**debt (2)**
   36:5;66:13
**debtor (11)**
   7:11;21:7,8;23:3;
   33:9;36:18;48:17,
   21;54:10;56:19;59:6

debtor-in-possession (1)
69:7
debtors (25)
20:25;21:4,21,23,
23;22:15,23;23:1,2,
12;24:3,21;25:3,7;
26:22,24;31:17;
34:3;42:21;43:2;
53:3;56:4;63:24;
65:11;67:14
debtors' (4)
48:21;56:17;
57:19;63:19
debt's (1)
66:15
December (3)
22:1,1;32:17
decide (3)
22:20;31:23;35:4
decided (3)
7:8;42:13;64:14
decides (1)
60:6
deciding (1)
39:14
decision (2)
8:14;35:11
Decisions (1)
67:9
declarant (1)
10:6
declaration (8)
10:7;11:5,7,14,17,
20;50:21;52:25
declaratory (1)
21:16
deeming (1)
52:20
default (4)
21:3,8;25:15;34:6
defend (1)
53:22
definitely (1)
42:8
Delaware (1)
34:18
deny (1)
29:7
DEPARTMENT (7)
6:1;40:11;43:19;
49:13;55:17;61:5;
67:24
Department's (1)
50:10
depressing (1)
20:7
describe (1)
43:12
desirous (1)
41:20
determination (1)
21:16
determined (2)

48:18,19
determining (2)
64:15,15
different (5)
13:14;30:10;
37:16;47:1;67:16
DIP (20)
7:20;8:3;9:11;
11:8;40:6;49:3,8,12;
50:22;51:1,6;52:4,
16,17,23;58:11,21;
60:3,22;69:8
direct (2)
45:21;57:9
disagree (1)
31:24
disclosure (1)
45:6
discovery (20)
7:24;24:9,12,18,
19;25:3;26:4;29:2,7,
8,17;30:20;34:14,24;
36:19;37:9,21,24;
38:4;44:4
discuss (2)
22:7,24
discussing (1)
58:16
discussion (4)
24:23;47:19;55:2,
5
discussions (9)
17:16;20:5,6;
23:25;26:15;27:13;
41:19;57:21;60:18
disposal (5)
18:5;57:13;63:21,
22,23
dispute (5)
20:24;26:2,3;
31:13;55:25
distracted (1)
38:17
docket (6)
11:6;45:9,11;52:5,
13;69:19
doctors (2)
35:16;66:23
documented (1)
17:21
documents (2)
29:11;57:16
dollar (1)
52:18
dollars (6)
17:18;27:10;
32:13;36:4;41:1;
65:24
domain (1)
45:17
done (4)
10:4;27:2;56:21;
68:15

double (1)
69:11
doubts (1)
24:23
down (4)
28:3;59:12;63:1;
65:21
drafted (1)
57:25
drag (1)
19:8
draw (1)
67:9
driving (1)
36:14
dual (1)
30:25
due (3)
17:2;31:21;34:22
during (2)
62:22;65:22
dying (1)
66:16

## E

earlier (3)
16:17;20:25;57:21
easiest (2)
10:4;51:24
Easter (1)
14:5
easy (1)
47:17
effect (1)
20:7
effected (2)
40:22;42:12
effort (1)
19:12
efforts (1)
19:15
eight (2)
32:20,20
eighth (1)
14:16
either (9)
14:20;36:16;
37:23,24;38:9;42:7;
45:13;65:18;69:23
electric (1)
62:25
element (1)
53:8
else (4)
33:14;46:24;
57:25;70:5
employee (1)
67:3
encouraging (1)
9:3
encumbered (1)
44:7

encumbrance (1)
44:10
end (11)
31:20;40:19,22;
43:17;47:21,22;56:2,
9;62:6,7;67:17
enforce (1)
28:6
engage (3)
19:25;23:24;45:23
engaging (1)
31:1
enough (2)
34:17;60:21
enter (7)
24:17,24;26:14;
34:13,22;37:12,14
entered (1)
49:9
entering (1)
8:9
entire (1)
65:13
entirely (1)
33:15
entirety (1)
31:7
entities (2)
33:25;35:13
entity (3)
23:5;34:2,3
environmental (1)
57:6
esoteric (1)
66:2
ESQ (8)
5:4,9,10,15,20;6:3,
4,10
essentially (10)
11:23;12:15;
19:20;20:8;53:4,18,
19,20;55:10;66:6
establish (1)
10:16
established (2)
50:25;51:5
establishes (1)
12:1
estate (2)
57:10;60:11
estates (1)
20:8
et (1)
21:6
ether (1)
67:18
evaluate (2)
42:17;43:4
even (3)
17:1;25:11;68:23
evening (1)
69:24;70:9,10,11
event (5)

18:1;25:3;27:9;
56:14;60:12
everybody (1)
44:24
everyone (7)
7:3;8:6;15:12;
30:4;41:9;70:9,11
everyone's (1)
15:12
evidence (4)
11:7,13,16,18
exacerbated (1)
57:15
exactly (8)
19:4;28:1;40:24;
42:6;43:22,25;63:3;
69:2
example (5)
42:24;57:8,10,12,
22
examples (2)
61:22,23
Excellent (1)
40:5
except (2)
67:17;68:15
exception (7)
53:18;59:4,15;
61:14;64:16,21,22
exclude (3)
57:16;59:17,19
excluded (4)
57:23;65:11,19,22
exercise (1)
57:2
exhibit (3)
40:4;69:13,14
existence (2)
26:6;28:20
existing (1)
52:22
expanded (1)
12:14
expecting (2)
26:12;27:14
expedite (1)
29:7
expedited (11)
24:11,12,12,16,19;
25:2;29:20;34:14,17,
24;68:4
expense (3)
17:17;61:3;65:19
expenses (7)
17:21;56:10,16;
61:4,7,15;64:8
expired (1)
37:20
explained (1)
52:25
expressed (5)
18:9;19:6,15;20:4;
50:3

**expresses (1)**
67:16
**expressly (2)**
63:24;64:3
**extend (1)**
55:7
**extended (2)**
49:10;55:9
**extension (1)**
55:2
**extent (6)**
14:7;16:23;32:6;
44:15;53:25;65:20
**extra (1)**
29:5

**F**

**facilities (6)**
50:7;56:17;57:17,
19;62:18;63:19
**facility (23)**
23:3;36:15;46:11;
52:17,18,18;57:22,
22;59:12,17,19;60:5,
16,16;62:18;64:9,19,
25;65:11,13,20,21;
68:2
**fact (9)**
13:3;21:24;26:5;
36:20;41:25;59:20;
65:10;66:8,10
**fact-intensive (1)**
31:2
**factual (3)**
30:7;31:25;52:11
**fair (2)**
56:13;67:21
**faith (1)**
32:11
**fall (2)**
50:23;63:6
**falls (1)**
57:8
**far (1)**
45:20
**fashion (1)**
64:2
**faster (1)**
34:16
**favor (1)**
53:19
**February (6)**
9:20,24;12:18;
68:18,22;69:3
**federal (6)**
28:17;50:4;53:19;
61:5,19;64:18
**feels (1)**
23:10
**feisty (1)**
44:11;45:13
**FELD (1)**

5:7
**felt (1)**
54:11
**few (1)**
30:16
**fight (3)**
44:12;62:8,8
**figure (2)**
24:5;36:20
**figured (1)**
32:24
**file (3)**
15:10;34:15;50:20
**filed (24)**
7:20;10:12,15,20;
11:2,5;19:18;21:25;
22:1,2,11;24:2,11,
12,15;33:1;45:9,9;
49:7,7,16;50:21;
52:5;64:3
**filing (6)**
10:16;12:1;29:19;
50:23;52:4,8
**filings (1)**
21:1
**fill (1)**
12:9
**final (2)**
9:17;69:6
**financial (2)**
32:20;46:3
**financing (13)**
7:20;9:11;11:8;
20:1;40:7;49:4,8;
51:6;58:21;60:22,
23;69:7,8
**find (1)**
23:10;27:4;33:8
**finding (1)**
41:20
**finds (1)**
55:5
**fine (9)**
7:16;8:5;13:19;
16:8,15;26:7;39:20;
54:3;70:1
**finish (3)**
15:20;39:6;54:2
**firm (1)**
46:25
**firmly (1)**
22:19
**first (11)**
9:16;12:12,16;
15:6;37:13;44:9;
49:8,10;52:14;
58:16;62:15
**fiscal (1)**
9:19
**five (5)**
57:17;59:17,18;
65:17,22
**fix (1)**

47:13
**fixed (1)**
54:12
**flagged (1)**
41:22
**flexible (1)**
54:11
**follow (1)**
36:16
**following (2)**
13:3,5
**follows (1)**
63:14
**forbearance (1)**
25:24
**forget (1)**
8:21
**form (3)**
52:4,6,9
**forms (1)**
9:10
**forth (1)**
11:19
**forthcoming (1)**
27:15
**forward (5)**
10:1;13:9;21:9;
24:4;33:23
**found (2)**
33:17,18
**four (3)**
24:2;60:2;65:16
**four-month (1)**
60:14
**fourteen (1)**
37:21
**frame (1)**
24:9
**Friday (4)**
9:1,23;10:20;
32:23
**front (3)**
25:16;52:1;56:9
**full (1)**
36:18
**fully (3)**
31:10;58:20,20
**fund (1)**
60:9
**funded (1)**
36:4
**funds (2)**
56:11;60:12
**further (1)**
26:15
**future (1)**
33:10

**G**

**gamble (1)**
13:23
**gave (3)**

38:17;50:12;57:10
**General (1)**
8:2
**generally (1)**
7:19
**GENERAL'S (3)**
6:8;55:16;64:1
**generate (1)**
66:17
**generous (1)**
34:19
**gentleman (1)**
17:10
**gets (5)**
30:23;31:22;
46:25;56:25;57:3
**give-and-take (1)**
67:13
**given (9)**
42:16;43:1;59:5,
20;60:25;61:17;
64:17;68:1,8
**gives (2)**
30:8;59:16
**giving (2)**
61:18,18
**glossing (1)**
35:17
**goes (1)**
48:20
**go-forward (2)**
27:24;30:8
**Good (22)**
7:3,13,17;15:5;
20:17,18;38:23,24;
40:14,15;43:11;
51:19;53:15;55:14,
19;58:8,9;62:20;
68:24;70:9,10,11
**good-faith (1)**
19:15
**governed (1)**
21:13
**governing (1)**
21:14
**granted (2)**
24:13;34:21
**granting (2)**
34:23,23
**grateful (1)**
58:17
**Great (2)**
69:18;70:3
**greater (1)**
66:15
**grounded (2)**
67:18,18
**grounding (1)**
67:20
**guarantees (1)**
21:6
**guess (8)**
7:13;20:13;49:2;

55:12;58:13,25;
68:16;69:19
**guises (1)**
60:21
**GUMP (2)**
5:7;58:10
**guys (1)**
24:4

**H**

**half (2)**
60:10;65:24
**hammer (1)**
31:3
**hand (2)**
12:4;57:7
**happen (8)**
21:10;25:15,21;
31:4;45:23;48:23,
24;66:16
**happened (1)**
25:19
**happening (2)**
28:24;29:23
**happens (2)**
39:15;57:6
**happy (1)**
58:4
**hard-pressed (1)**
27:4
**HAUER (1)**
5:7
**head (1)**
66:1
**Health (8)**
6:9;18:5;49:13;
55:17;61:4,15;
64:24;67:11
**healthcare (1)**
50:7
**hear (9)**
17:11;24:7,7,10;
25:12;33:2;41:11;
55:19;68:4
**heard (7)**
8:4;28:25;41:12;
54:1;55:13;63:9;
64:4;65:5
**hearing (43)**
7:7;9:17,24;10:22;
11:15;12:10,22;13:1,
2,3,5,9,20;14:8,19;
15:11;16:2,5,18;
24:11,13,14,16,25,
25;28:11,12;29:21;
30:11,16;33:20;
34:17;37:13;38:8,12,
13,19;39:14,19;
43:24;48:23;49:11;
58:21
**hearings (1)**
9:23

**heavily (1)**
26:3
**heck (1)**
13:22
**held (1)**
12:24
**help (1)**
38:10
**hereby (1)**
11:17
**herein (1)**
63:15
**here's (2)**
32:1;43:14;67:23
**hide (1)**
26:9
**hiding (1)**
45:19
**high (1)**
43:9
**higher (2)**
12:3;13:4
**highest (1)**
39:14
**Hispanic (1)**
44:11
**history (1)**
20:22
**hold (4)**
12:24;13:5;16:1;
57:12
**Holding (2)**
7:12;15:24
**Holdings (1)**
7:11
**holidays (1)**
14:17
**home (1)**
70:10
**Honor (123)**
7:5,13;8:8,19;9:4,
14;10:2,4,10,15;
11:3,19;12:6,12,16,
21,23;14:3,12;15:1,
18,25;16:1,8,17;
17:5;18:25;19:17;
20:18,21;21:12;
22:14,23;24:3,10;
25:9,13;26:10,11,16;
27:11;29:2;30:2,18;
32:8,19;33:5,13;
34:21,22;35:10,20;
36:17,18;37:3,7,15,
17,23;38:6,8,14,16,
17,20,23;39:3,5,9,13,
19,21,24;40:6,9;
41:22;42:7;43:6;
44:1,8;47:13;48:5,
11,25;49:4,6,9,21;
50:20;51:23;52:15;
53:16;54:7,22;55:15,
21,24;56:7,18;57:1;
58:4,9,13,22;59:6;

61:25;62:13,20;63:3,
13;64:7;65:3,5;
66:20;67:9,21;68:13,
15,20;69:11,17,24;
70:6
**hope (3)**
38:11;39:3;47:10
**hopeful (2)**
8:25;30:18
**hopefully (6)**
12:3;30:19;47:8;
66:15,18;69:23
**hopes (1)**
35:17
**hoping (3)**
13:22;15:13;26:24
**horse (12)**
12:4;13:13;16:18,
19;17:1,15;19:21;
27:23;45:24;46:3,
21;47:11
**hospital (14)**
23:9,19,20;26:19,
24,25;27:5;35:7,13,
14,15;56:6;57:2;
58:2
**hospitals (3)**
23:5;34:9;66:24
**housekeeping (3)**
9:22;17:8;18:22
**huge (1)**
22:14

**I**

**idea (1)**
26:3
**identify (1)**
45:3
**identity (1)**
47:16
**if/when (2)**
63:25;64:5
**imagine (1)**
45:10
**immediate (1)**
34:5
**immediately (3)**
47:15,21,22
**impact (1)**
15:25
**important (1)**
18:14
**importantly (1)**
56:22
**impossible (1)**
42:16
**include (5)**
23:12;32:3;53:4;
65:1,2
**included (3)**
22:7;44:17;53:17
**including (6)**

7:11;61:6,10,21;
63:20;64:9
**incorporated (1)**
50:15
**incumbent (1)**
48:21
**incur (1)**
51:4
**incurred (4)**
61:5,7;62:21;64:8
**incurring (1)**
51:3
**incurs (1)**
64:18
**indicate (1)**
26:8
**indicated (2)**
11:6;68:3
**indication (2)**
18:12;66:14
**influence (1)**
39:2
**informal (2)**
10:23;49:16
**informally (1)**
62:5
**information (7)**
40:25;42:22;43:3,
9;46:3,8;47:5
**informed (1)**
60:17
**inject (1)**
35:15
**insensitive (1)**
67:24
**inserting (1)**
47:14
**insistent (1)**
36:21
**instance (1)**
59:11
**instruction (1)**
37:3
**integrated (1)**
23:1
**intend (1)**
52:8
**intending (1)**
22:8
**intent (1)**
59:19
**interest (5)**
21:2;46:9;48:21,
22;53:7
**interested (2)**
31:9;44:18
**interests (2)**
18:4;20:8
**interviewing (1)**
8:13
**interviews (1)**
8:25
**into (18)**

11:7,13,15,17,24;
19:19;23:11;24:24;
25:17;37:12,14;
44:19;47:11;50:23;
52:23;59:3;61:20;
66:3
**introduction (1)**
11:13
**invalid (1)**
35:8
**invited (2)**
54:10,16
**involved (3)**
16:4;24:22;59:6
**involving (1)**
57:3
**irrelevant (1)**
29:6
**issuance (1)**
52:19
**issue (45)**
7:23,25;8:2,4;
20:9;22:19,20;
23:14;25:10;27:1,
18;28:3,20;29:12;
30:7;31:10,17;32:15,
15;33:21;34:10,16;
35:16;36:21;38:4;
41:4,8;42:2,12;
44:12,22;45:7,13;
47:1;49:19;50:1,13,
18;55:13;62:8;64:2;
65:6;66:2;67:21;
68:3
**issues (14)**
26:11;30:24;
37:16;39:10,13,15,
23;42:17;50:4,6;
51:13;54:13;57:12;
59:10
**item (2)**
9:16;10:2
**items (3)**
11:4;18:22,24

**J**

**January (13)**
10:17;15:9;22:10,
11;24:8,8,18;37:8,
10,11,11,12;49:11
**jeopardized (1)**
33:11
**Joe (1)**
20:18
**join (1)**
28:3
**JONES (15)**
5:18,20;38:22,23,
25,25;39:2,3,5,9,18,
21,23;68:24;69:2
**JPMorgan (1)**
5:3

**judge (3)**
31:22;57:24;62:7
**judges (1)**
26:18
**judicial (1)**
21:15
**jump (1)**
40:16
**jurisdiction (1)**
18:19
**JUSTICE (3)**
6:1;40:11;43:19

**K**

**Ken (1)**
7:10
**kind (8)**
13:6;19:12;26:12;
30:10;39:6;60:11;
62:22;65:12
**kind-of (1)**
62:22
**knowledge (1)**
24:15
**known (1)**
15:19
**knows (1)**
45:7

**L**

**lab (2)**
57:4;63:22
**landlord (3)**
30:8;44:11;67:3
**landlords (1)**
30:6
**landlord's (1)**
45:7
**language (27)**
18:3,16;20:10;
26:2,4;50:12;53:11,
16;54:3,11,17,19;
55:1;56:1,3,18;58:4;
62:3,4,14;63:8,9;
64:8;67:15,17,25;
68:9
**large (1)**
40:23
**last (3)**
26:11;54:25;55:16
**later (5)**
21:22;22:19;31:4;
33:22;69:23
**LAURA (2)**
5:20;38:25
**law (6)**
21:12,14,14;
53:22;61:18;63:19
**lawsuit (1)**
21:22
**lawyer (1)**

45:14

**lay (1)**
10:4

**LCI (1)**
7:11

**LCs (2)**
52:22,23

**lead (1)**
68:1

**lease (55)**
21:4,4,11,12,12,
13,18,21,24;22:6,9,
15,18,21,25;23:2,4,7,
11,12,15;24:1;25:8,
14,14,16;26:5;27:17,
24;28:13,20;30:13;
31:18,23;33:7,9,10,
11,15,17,19,24;34:1,
11;35:6,8,22;44:6,7,
19;45:24;47:10,20;
48:13,17

**leasehold (1)**
53:7

**least (4)**
7:14;28:15;33:1;
68:11

**leave (1)**
33:15

**leaves (2)**
33:15;57:18

**leaving (4)**
22:16;38:4;60:25;
68:11

**left (1)**
61:16

**legal (2)**
30:7,7

**legions (1)**
48:13

**lender (4)**
36:10;50:17;
54:11;59:2

**Lenders (12)**
5:8;19:22,25;51:9;
53:3,22;55:6;58:11;
62:1;66:5,11;67:14

**length (1)**
19:7

**lessee (3)**
23:2,6;34:5

**lessee/debtor (2)**
34:1;35:14

**lesson (1)**
37:2

**lessor (1)**
34:12

**letter (5)**
21:20;24:7;25:20;
31:23;37:7

**letters (3)**
21:6;52:19,20

**level (2)**
27:14;43:9

**liability (7)**
40:23;41:3,13,21;
42:11,12,18

**licenses (8)**
23:3,4,6;33:18,19,
25;34:2;35:13

**liens (1)**
51:3

**LifeCare (1)**
7:11

**lift-stay (1)**
32:21

**light (2)**
57:9,24

**lights (1)**
57:8

**limb (1)**
62:1

**limitation (1)**
50:2

**limited (4)**
22:12,13;61:1;
63:20

**limiting (1)**
61:11

**limping (1)**
49:3

**line (4)**
12:14;60:15;
64:13;67:9

**lines (1)**
62:5

**listed (1)**
11:3

**lists (1)**
61:7

**literally (1)**
57:4

**litigate (6)**
25:10;26:5;27:18;
28:20;30:24;33:21

**litigated (2)**
28:21,22

**litigating (1)**
36:21

**litigation (8)**
26:8,9;28:3;31:2,
13;32:4;38:3;45:3

**little (16)**
13:23,23;16:6;
19:6,10;20:25;
26:13;27:11;28:25;
29:15;36:7;51:18;
52:21;54:14;57:17;
62:1

**LLP (4)**
5:2,7,13,18

**Local (1)**
34:18

**located (1)**
21:14

**long (4)**
12:1;19:10;25:5;

43:3

**longer (3)**
8:17;35:14;65:12

**long-term (1)**
33:10

**look (11)**
9:13,25;13:15;
15:22;17:9;24:4;
27:21;57:21;66:3,
12;68:21

**looking (1)**
60:1

**looks (1)**
19:1

**Looper (1)**
20:19

**loosely (1)**
21:24

**lot (4)**
24:6;31:1;34:7;
66:13

**love (1)**
47:3

# M

**maintenance (1)**
63:21

**majority (1)**
7:19

**makes (1)**
53:1

**making (4)**
8:13;30:11;35:5;
61:22

**management (1)**
60:18

**managing (1)**
60:4

**mandated (1)**
64:24

**manner (1)**
67:5

**many (3)**
11:3;21:4;51:23

**March (19)**
12:19,23;13:6,7,8;
15:24;16:1,20,20,21;
17:2;22:2;24:5,24,
25;33:12,12,20;37:7

**market (2)**
12:2;44:21

**marketed (4)**
11:25;33:17;44:7,
21

**marketing (4)**
22:15;34:11;
44:20;50:22

**markup (1)**
17:8

**MASSEL (1)**
5:4

**materials (1)**

43:17

**matter (10)**
9:16,19,22;10:18;
31:25;34:14,17;
45:8;55:18;68:4

**matters (3)**
10:1;24:20;49:11

**MATTHEW (1)**
6:4

**maximizing (1)**
20:9

**may (13)**
8:1,2,11;9:7;
28:24;41:13,15;
61:20;62:3;65:1,2,2;
68:6

**maybe (4)**
10:10;12:6;20:25;
32:18

**mean (10)**
13:17;19:5;27:8;
29:21;34:20;36:16;
43:6;45:20;46:9,25

**meaning (2)**
26:4;62:10

**means (1)**
45:21

**meantime (1)**
30:25

**Medicaid (1)**
10:25

**medical (2)**
63:21,22

**Medicare (2)**
10:25;18:10

**members (1)**
58:11

**merits (5)**
25:17,18;38:4;
61:17;62:11

**might (14)**
9:24;10:3;12:24;
15:5;30:1,2;36:9,10;
41:1;57:23;59:21,
22;61:8;68:18

**million (7)**
17:18;36:4;41:1;
52:18,22;60:9;65:24

**mindful (2)**
59:5,9

**minimum (1)**
44:8

**minor (2)**
52:7;55:25

**minute (1)**
17:11

**misleading (2)**
25:9,10

**missing (1)**
35:21

**mixed (1)**
44:3

**mode (1)**

62:22

**modifications (2)**
51:8;52:7

**moment (1)**
49:25;50:19;68:8

**Monday (3)**
9:1,23;15:9

**money (2)**
30:1;46:10

**monkey (1)**
41:8

**month (3)**
21:22;60:2;65:22

**months (2)**
65:16,17

**more (7)**
29:15;30:8;34:9;
36:7;45:18;46:10;
48:9;52:21;56:16;
57:19;60:20;65:17

**morning (1)**
32:22

**morning's (1)**
70:1

**MORRIS (7)**
5:4;8:1;49:15;
53:25;55:12,14,18

**most (3)**
58:20;60:15;67:20

**mostly (1)**
52:7

**motion (28)**
10:3,15;19:19;
22:2,6,12;24:11,12,
16,19;26:14;29:7,19;
33:1;34:13,16,21,23,
23,24;35:4,20;37:19;
44:4;49:7;50:21;
63:14;64:3

**mouth (1)**
27:13

**move (8)**
10:7;11:6;12:17;
17:11;19:13;23:11,
22;40:17

**moved (1)**
29:3

**moving (1)**
33:21

**MPT (26)**
7:24;10:21;20:19;
21:3,5,11,18,22;
22:5,11;23:10;
30:16;31:8,18,22;
32:2;33:7,8,9;36:2;
45:19,20,23;46:4,8,
20

**MPT's (7)**
30:10;34:7,23,23;
36:14,21;48:9

**much (11)**
8:8;10:22;20:21;
23:28,21;54:14;

56:10,12;60:16;
62:17;70:8
**mystery (1)**
45:12

## N

**NA (1)**
5:3
**namely (1)**
66:19
**name's (1)**
55:16
**narcotics (1)**
57:13
**nature (1)**
20:5
**near (1)**
8:14
**necessarily (1)**
42:5
**necessary (5)**
38:19;40:25;61:4,
15;63:18
**need (22)**
12:9;18:12;21:15,
15,16,17;24:17;25:7,
7,10;27:17;30:10,13,
20,25;38:10,12;
41:11;42:25;45:18;
46:7;55:6
**needed (1)**
24:20
**needle (1)**
35:15
**needs (7)**
23:23;24:16;
28:20;36:20;48:3;
57:21;64:14
**negotiate (2)**
27:22;35:25
**negotiated (5)**
21:3;26:3;43:20;
47:10;59:9
**negotiating (1)**
44:18
**neither (2)**
31:22;62:7
**new (4)**
28:11;36:9,12;
52:8
**news (3)**
7:13,17;68:24
**next (7)**
12:21;24:18;
30:19;38:12,18;
43:18;52:11
**nice (1)**
67:13
**nine (2)**
19:5;52:22
**ninety-day (2)**
28:16;59:23

**nobody (1)**
46:24
**none (1)**
23:7
**nonetheless (2)**
20:9;65:23
**nonobjectionable (1)**
29:11
**nonprivileged (1)**
29:11
**nonproblematic (1)**
15:13
**nor (1)**
31:22
**normal (1)**
29:9
**noted (1)**
56:11
**notes (1)**
21:2
**notice (3)**
13:8;18:12;57:17
**notification (2)**
44:9;60:3
**notified (2)**
59:22,22
**notify (3)**
47:15;59:19;60:20
**notion (1)**
59:11
**Notwithstanding (5)**
21:19;53:11;
57:25;63:14;67:4
**November (5)**
22:1;32:17;35:19,
21;36:1
**number (10)**
10:3;11:6;17:20;
23:8;36:7;39:10;
52:5,13;54:13;59:1
**nurses (1)**
66:23

## O

**object (2)**
11:13;41:5
**objection (22)**
10:23;12:10,13;
13:12;21:20;22:10,
11,12,13;24:2;32:2;
44:5;48:8,9,9,10,10,
20;49:16;50:11;
64:3;68:10
**objections (14)**
7:20;10:11,20,21,
23;11:3;13:11;
16:19,25;17:2,4;
29:10;49:12,22
**obligations (3)**
36:8;52:16;53:6
**observant (1)**
14:17

**obtain (3)**
21:15,16;49:8
**obviate (2)**
27:17;28:24
**Obviously (8)**
18:14;26:23;35:9;
39:13;46:2;47:2;
48:22;66:22
**occurred (1)**
28:6
**occurring (1)**
25:11
**occurs (1)**
34:5
**o'clock (6)**
14:20,21,23;
15:20;16:9;32:21
**October (3)**
21:25;32:15,16
**off (5)**
39:6;57:3;68:19;
69:3,4
**offer (1)**
39:15
**Office (10)**
6:2,8;8:2;10:24;
22:7;49:17;50:18;
55:16;58:18;64:1
**offices (1)**
23:18
**official (1)**
39:1
**often (1)**
30:5
**ombudsman (3)**
8:7,24;15:7
**ombudsman's (1)**
15:6
**omnibus (1)**
12:25
**once (3)**
23:6;35:12;46:7
**one (31)**
8:3;11:15;13:12,
13;16:5;17:14;
21:23;22:23;23:2;
29:20;35:6,7,24;
36:11;40:16;41:22;
44:24;45:21;51:1;
56:16;57:2,19,22,22;
59:1,15,17,19;60:9;
62:16;69:15
**only (4)**
14:2;24:16;56:13;
66:12
**oops (1)**
33:21
**open (2)**
20:4;57:18
**operate (8)**
23:3,17;26:25;
27:5;33:19;35:13,
15;60:3

**operating (3)**
26:19,24;34:1
**operation (1)**
62:18
**operations (1)**
59:15
**operator (4)**
30:9;36:2,9,12
**opportunity (4)**
15:5;22:7;33:19;
48:16
**opposed (1)**
34:25
**optimism (1)**
32:9
**optimistic (1)**
15:12
**oranges (1)**
44:4
**order (36)**
8:9;9:11;12:8,12,
22;16:16;19:20;
24:17,24;26:14;
30:11;32:3;34:23;
37:12,15;38:9;
39:25;42:15;47:14;
48:3;49:9,10,25;
50:3;51:21;53:1;
56:1;57:25;58:1;
60:4,22;63:15;69:6,
8,18,20
**orderly (1)**
60:5
**original (3)**
10:15;22:10;24:19
**originally (4)**
10:17;12:23;
19:18;49:7
**others (2)**
7:15;30:9
**otherwise (5)**
12:25;13:24;
15:25;20:7;43:20
**ours (1)**
22:14
**ourselves (2)**
40:25;66:3
**out (41)**
10:4;12:17;13:8,
17;19:18;20:4;
23:22;24:3,5;26:9;
27:4;28:12;29:3,9;
30:22;31:3,24;32:5,
7,12,24;33:7,15,21,
24;34:9,19,20;35:1,
2;36:20;39:12;
40:18;41:8;44:10;
45:17;55:24;58:18;
60:16,16;62:1
**outcome (2)**
36:8;43:20
**outstanding (1)**
40:23

**over (9)**
13:13,17;17:16;
23:12;30:19;32:7;
33:18;35:17;54:22
**over-bidder (1)**
28:8
**overlooked (1)**
65:10
**overplayed (1)**
66:12
**overrule (1)**
48:19
**overruling (1)**
68:10
**owe (1)**
7:6
**owned (1)**
36:10

## P

**PACHULSKI (1)**
5:18
**package (1)**
51:8
**page (10)**
17:12;19:1;51:24,
24;52:3,11,15;53:11,
16;54:25
**pages (1)**
69:15
**paid (1)**
41:3
**painted (1)**
31:7
**papers (4)**
11:19;43:16;45:9;
49:7
**paragraph (13)**
15:22,23;16:13;
17:14,14,24;18:3,8,
16;19:2;53:17;
54:23;68:9
**part (7)**
22:21;25:5,6,8;
34:4;35:9;58:20
**partially (1)**
25:14
**participate (1)**
43:23
**participating (1)**
45:10
**particular (1)**
68:7
**particularly (3)**
18:11;68:1,8
**parties (10)**
17:24;31:9;35:1;
37:14;38:18;45:4;
54:18;55:8;56:19;
62:9
**parties-in-interest (2)**
17:25;58:3

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

**party (1)**
44:18
**party-in-interest (1)**
63:24
**party-in-interest's (1)**
56:22
**party's (1)**
56:24
**Passover (2)**
14:13,16
**past (1)**
15:19
**pathology (2)**
57:4;63:22
**patient (7)**
8:7,24;15:6;35:15;
50:6;54:12;63:21
**patients (4)**
34:9;60:15;66:21,
22
**pattern (1)**
66:8
**payable (2)**
9:18;18:1
**paying (2)**
57:9;62:25
**payment (1)**
57:8
**payments (1)**
21:2
**PCO (1)**
59:8
**pending (3)**
36:19;45:4;62:19
**people (5)**
13:9;16:10;23:4;
25:8;26:10
**perfectly (1)**
26:7
**perhaps (1)**
30:9
**period (10)**
28:16;29:5;34:6;
55:3,7;59:24;60:2,
14,17;65:22
**permit (1)**
33:25
**permutations (1)**
22:24
**perplexed (1)**
28:25
**person (1)**
23:11
**personally (2)**
26:22,23
**petition (2)**
53:8;55:6
**pharmaceuticals (1)**
63:23
**pharmacy (2)**
57:13;63:23
**phone (7)**
8:1;26:11;32:6,7;

35:2;36:20;55:22
**pick (1)**
61:14
**picked (4)**
61:21;64:20,23;
65:21
**picks (1)**
64:23
**picture (1)**
26:18
**pin (1)**
66:2
**place (7)**
17:16;19:7;23:23;
36:17;48:16;56:3;
59:3
**placed (1)**
47:16
**plan (1)**
23:23
**plans (1)**
33:11
**play (1)**
32:2
**pleadings (1)**
56:11
**please (4)**
7:4;9:7;69:12,14
**pleased (2)**
39:11;49:20
**pleasure (1)**
7:6
**plenty (1)**
31:4
**plus (1)**
36:7
**PM (1)**
70:12
**point (16)**
15:14;18:25;28:2;
29:6,12;35:8,21;
40:16,19;41:7,10;
51:13,14;55:13;
63:4;67:8
**pointed (2)**
19:18;55:24
**points (1)**
58:25
**political (1)**
61:6
**population (2)**
67:3,4
**portion (1)**
52:16
**position (10)**
18:9,10,11;30:10;
31:24;43:16;45:8;
55:5;56:24;65:3
**position's (1)**
45:8
**possibility (2)**
54:17;57:18
**possible (2)**

19:14;23:1
**possibly (1)**
37:14
**post-closing (1)**
28:16
**post-petition (2)**
12:2;52:21
**potential (11)**
8:13;16:17;19:25;
22:16,17;41:21;44:9,
16,18;47:20;57:11
**potentially (2)**
35:18;56:9
**power (1)**
57:3
**practitioners (1)**
61:9
**pre- (2)**
36:21;55:5
**precise (1)**
63:9
**prefaced (1)**
64:8
**preference (1)**
14:23
**prejudice (2)**
30:16,24
**prejudiced (3)**
33:10;34:12;35:10
**prepared (2)**
47:11;68:4
**pre-petition (7)**
50:17;51:9;52:20;
53:6,21;66:5,11
**present (1)**
36:2
**presentation (1)**
28:25
**preserves (3)**
56:20,22;58:2
**pressure (1)**
48:17
**presumably (2)**
34:3;36:13
**pretty (3)**
44:23;56:10,12
**prevents (1)**
57:10
**price (1)**
20:7
**primarily (1)**
66:11
**prior (5)**
10:21;11:25;
24:24;25:11;57:18
**priority (3)**
51:3;61:3;64:23
**probably (7)**
7:14;23:22,23;
60:1;65:15;68:8,25
**problem (8)**
15:20;56:7;57:7,
14;68:6,7,12,24

**problems (3)**
23:8;57:11;68:5
**procedure (2)**
17:24;41:2
**procedures (26)**
7:20;9:11;10:3,14,
16,23;12:7,8;17:4;
18:21;19:19;20:14;
22:14;25:6;39:6,11,
25;40:4,17,19;42:15;
44:5,6;48:10;58:21;
69:20
**proceed (2)**
15:13;22:24;38:3;
47:17
**proceeding (1)**
34:15
**proceedings (4)**
28:12;45:13;55:6;
70:12
**process (18)**
8:12;11:22;19:14;
23:13;25:2;27:21;
28:10,23;29:12;
33:16,16;36:9;43:3;
46:6;48:12;50:22;
62:22;63:1
**produce (1)**
29:11
**product (1)**
41:24
**profit (1)**
51:18
**promise (1)**
47:4
**property (2)**
32:3;53:8
**property's (1)**
21:13
**proposal (1)**
44:24
**propose (3)**
15:23;16:18;51:4
**proposed (10)**
17:17;27:20;
54:19;56:3,18;
62:14;63:13;64:10;
67:25;68:9
**proposing (3)**
12:18;13:2;45:22
**prosecuted (1)**
56:12
**protection (2)**
51:8;68:1
**protections (4)**
21:5,5,6;65:9
**proved (1)**
63:4
**proves (1)**
66:16
**provide (6)**
15:7;19:25;42:22;
46:3;47:5;60:20

**provided (3)**
51:9;56:3;60:19
**provider (1)**
18:10
**provides (4)**
18:12;53:18;61:2;
67:25
**providing (2)**
47:14;60:12
**provision (4)**
8:3;19:19;25:14;
63:14
**provisions (2)**
18:14;19:3
**proviso (1)**
18:17
**prudent (1)**
33:3
**public (3)**
21:1;45:8,17
**purchase (4)**
20:7;22:4;44:25;
65:25
**purchaser (14)**
13:13;16:18,19;
17:15;19:21;27:23;
45:24;46:3,22;
47:11;57:16;58:11;
59:16;60:6
**pure (1)**
60:10
**pursuant (1)**
21:11
**pursue (1)**
53:20
**put (7)**
8:23;11:22;19:19;
27:12;40:17;45:11;
59:3
**puts (1)**
46:25

**Q**

**qualified (3)**
47:6,17;48:6
**qualifying (1)**
13:4
**quality (2)**
57:6,7
**quickly (3)**
19:14;24:5;43:2
**quite (1)**
35:4

**R**

**raise (2)**
39:10;41:9
**raised (2)**
58:14;64:2
**raises (1)**
59:11

**raising (1)**
41:7
**ranging (1)**
39:14
**reach (1)**
35:18
**reached (4)**
24:3;25:23;35:19;
53:3
**read (2)**
57:16;63:11
**reading (1)**
16:12
**real (2)**
24:5;57:18
**realize (1)**
23:13
**really (12)**
12:16,21,22;27:9,
10;29:22;31:1;
44:15;48:8,9,20;
56:23
**reason (2)**
14:2;55:7
**reasonable (4)**
11:23;17:21;51:6,
10
**reasonably (1)**
12:1
**reasons (1)**
57:2
**recall (2)**
19:17;52:16
**recapitalized (1)**
36:2
**received (3)**
10:21;11:17;60:2
**recess (1)**
70:10
**recognize (1)**
14:19
**record (11)**
8:23;10:5;18:5;
31:15;33:5;45:8;
50:6,20,25;51:5;
58:17
**record-making (1)**
51:18
**records (1)**
63:21
**recovery (1)**
66:17
**redress (1)**
68:11
**reduce (1)**
17:17
**Reed (1)**
20:19
**reference (2)**
52:12;56:25
**references (1)**
56:4
**referred (1)**

**26:8**
**referring (1)**
53:17
**reflect (1)**
52:4
**reflected (1)**
53:10
**reform (1)**
16:13
**refused (1)**
23:25
**regard (2)**
40:16;42:17
**regarding (7)**
8:23;18:5;50:6,13;
52:12;55:25;57:21
**regulation (1)**
57:5
**regulations (1)**
28:17
**regulators (2)**
18:5;50:5
**regulatory (1)**
19:14
**reimbursement (1)**
17:18
**related (3)**
56:16;58:2;62:17
**relates (6)**
7:24;9:17;12:22;
50:1,3;52:15
**relating (12)**
9:11,18;10:22;
18:9,19;49:12,19;
50:5;56:1,6;57:12;
62:18
**relevant (2)**
18:6;26:4
**relief (2)**
11:7,8
**relying (1)**
42:21
**remain (2)**
19:7;36:22
**remaining (1)**
50:1
**remarks (1)**
44:24
**remember (1)**
68:24
**reply (1)**
11:2
**report (8)**
7:13;15:6,8,10,11,
13;38:18;49:21
**represents (2)**
49:15;67:20
**request (4)**
10:17;12:14;
18:17;53:13
**requests (1)**
36:19
**require (1)**

**46:2**
**requirements (1)**
51:1
**reserve (3)**
39:13,18;63:25
**reserved (5)**
39:23;60:10,10;
62:9,11
**resolution (4)**
11:3;29:14;41:4;
47:18
**resolve (4)**
27:1;29:13;32:3;
48:22
**resolved (10)**
7:21;32:15,16,17,
17;34:10,14;37:22;
49:20,21
**respect (13)**
22:22;31:22;32:8;
34:19,22;39:10;
58:14,22,23;59:8,11;
64:4,24
**respectfully (1)**
31:24
**respects (1)**
41:25
**respond (8)**
24:9,18;29:8;
30:20;36:19;37:24;
58:14;59:1
**responding (1)**
29:2
**response (7)**
18:8;24:15;29:9;
32:21;33:1;38:4;
65:8
**responses (1)**
29:10
**rest (3)**
17:7;31:7;54:2
**restated (1)**
27:17
**return (1)**
26:12
**reviewed (2)**
17:25;45:11
**revised (3)**
9:10;12:9;69:22
**revive (1)**
48:13
**revolving (2)**
52:17,18
**rid (1)**
9:24
**right (91)**
7:9;8:15;9:2,5,9,
21,25;10:13;11:1,15;
12:20;14:18;15:15,
22;16:10,11,22;17:3;
18:2;20:2;25:12,14,
18;27:7,19;28:22;
29:4;32:13;33:7,8,

20;34:25;35:4,11;
36:6;37:1,4;38:7,13;
39:4,20;40:5,20;
41:18,23;42:11,15;
43:5,25;45:5,15;
46:5,23;48:1,12,15,
17,24;49:2,14;50:4,
8;51:12,22;53:12,21,
24;54:15;55:11,14,
19;56:22;58:3,6;
63:16,25;64:6,11;
65:4,14;66:9;67:2,
12,22;68:14,23;69:3,
5,17,25;70:4
**rights (5)**
43:21;54:18;60:7;
62:9,10
**rise (1)**
7:2
**rising (1)**
39:5
**risk (1)**
14:19
**rolling (1)**
52:23
**ROME (1)**
5:13
**round (2)**
14:13,13
**routine (1)**
66:5
**ROY (18)**
6:10;55:15,15,19,
21,24;58:6;62:16,16,
20,24;63:3,10,11,13;
67:15;68:10,13
**R-O-Y (1)**
55:16
**Rules (2)**
34:18;37:25
**ruling (2)**
41:12;42:9
**run (3)**
13:17;67:5,6
**running (3)**
23:9;65:12,13
**runs (2)**
23:24;66:11
**runway (1)**
59:21
**rush (1)**
13:17**

**S**

**saddle (1)**
56:9
**safe (1)**
70:10
**sale (48)**
10:22;12:10,22;
16:2;21:20;22:2,2,6,
12,13,21,25;23:13;

24:2,4,25,25;27:21;
28:11,12;30:11,11,
16;32:2;33:20,23;
34:4;35:9,11;36:22;
39:14,18;40:20,22,
22;41:5;42:11,13,15,
19;43:24;48:9,12,20,
23;57:15,17,20
**same (6)**
36:10,17;41:5;
56:2;57:11;65:6
**satisfactory (2)**
50:16,17
**satisfies (1)**
51:1
**satisfy (4)**
36:3,8,13;46:4
**saying (5)**
36:18;37:5;42:5;
47:14;54:13
**scenario (1)**
31:6
**schedule (10)**
29:17;32:5;35:1,2;
36:24,25;37:5;38:5,
8,19
**scheduled (4)**
7:7;10:17;42:14;
68:25
**schedules (5)**
22:5;26:7;31:14;
32:20;44:25
**scheduling (5)**
24:20,24;25:4;
37:12,15;38:9
**scope (1)**
62:10
**SCOTT (2)**
5:9;58:9
**seated (1)**
7:4
**second (2)**
10:8;44:14
**Section (6)**
15:7;18:6;21:11;
56:5;61:2,21
**sections (1)**
61:8
**Secured (6)**
5:8;56:13,15;59:2;
66:13,14
**securing (1)**
52:16
**security (1)**
21:6
**seek (2)**
50:5;58:1
**seem (1)**
27:3
**seems (2)**
28:19,21
**sell (2)**
26:24;46:10

**send (1)**
13:8
**sense (3)**
12:24;31:1;53:1
**sensitive (1)**
68:3
**sensitivities (1)**
59:5
**sent (4)**
24:7;25:20;31:23;
37:7
**sentiment (1)**
67:15
**separate (2)**
30:13;65:19
**September (3)**
21:10;23:14;25:22
**series (1)**
25:22
**serious (2)**
24:23;57:11
**serve (2)**
29:10;37:9
**served (4)**
24:8;29:7;30:20;
37:10
**Service (1)**
43:19
**Services (5)**
6:9;10:25;49:13;
55:17;66:22
**set (5)**
11:19;36:24;
42:14;57:15;59:14
**set-aside (1)**
65:23
**setting (1)**
41:2
**seven (3)**
37:6,7,8
**seventh (1)**
14:16
**several (2)**
19:22;23:5
**shall (2)**
63:15;64:3
**sheet (1)**
27:14
**shoes (1)**
47:12
**short (2)**
25:5;65:15
**shortening (2)**
29:5;38:2
**shorter (2)**
24:9;60:17
**shortly (1)**
25:2
**show (2)**
7:8;35:16
**shows (2)**
36:11;66:15
**shutdown (1)**

**side (1)**
38:5
**sig (1)**
60:9
**sign (1)**
69:18
**significant (2)**
59:3,21
**simple (1)**
56:23
**simply (3)**
56:20;57:7;63:5
**SIMPSON (1)**
5:2
**single (2)**
33:9,11
**sit (1)**
46:12
**site (2)**
23:17;57:4
**sitting (1)**
27:6
**situation (2)**
34:7;54:12
**sixteen (2)**
37:18,20
**sixty (2)**
15:8,11
**sixty- (1)**
59:23
**sixty-day (1)**
28:15
**sixty-four (2)**
15:10,11
**Skadden (1)**
7:10
**skip (1)**
54:22
**smoothly (1)**
23:24
**solely (2)**
52:18;56:12
**somebody (1)**
26:25
**somehow (1)**
65:20
**someone (4)**
23:22;33:18;
46:25;66:15
**something's (1)**
32:12
**somewhat (3)**
19:20;59:1;67:10
**soon (2)**
34:4;44:17
**sorry (6)**
16:20;21:32:19;
38:16;40:9;64:2
**sort (5)**
29:6,22;35:6;
36:10;40:17
**source (1)**

**space (1)**
27:5
**speak (1)**
17:12
**speaking (1)**
21:23
**special (2)**
61:2;65:23
**specific (1)**
57:16
**spent (1)**
32:19
**spoken (1)**
41:16
**staggered (1)**
13:12
**staked (1)**
31:24
**stakeholders (3)**
59:8;66:17,25
**stalking (12)**
12:4;13:12;16:18,
19;17:1,15;19:21;
27:23;45:24;46:3,
21;47:11
**stalking-horse (2)**
59:16;60:6
**stand (2)**
66:13;70:10
**standing (3)**
42:2,4;64:4
**stands (1)**
44:6
**STANG (1)**
5:18
**STANLEY (1)**
5:15
**Start (3)**
7:17;44:18;47:20
**started (1)**
20:24
**State (18)**
6:9;26:9;28:17;
49:13;50:4;53:19;
55:17;58:16;59:10;
61:6,19,22;62:2;
63:2;64:12,16,17;
65:8
**statement (2)**
29:22;32:20
**statements (2)**
42:24;59:6
**States (14)**
8:22;40:10,13,21;
41:5;42:3,10,16,20;
43:2;49:17;50:16;
53:23;58:19
**status (2)**
61:3,3
**statute (3)**
61:23;63:6;67:20
**statutory (1)**

**stay (1)**
23:7
**Steering (3)**
5:8,14;58:10
**step (2)**
47:11;66:3
**still (7)**
9:23;17:3;32:2;
44:5,6;48:19;61:16
**stood (1)**
17:10
**stop (1)**
20:14
**storage (1)**
50:6
**story (1)**
25:5
**strategic (1)**
36:11
**STRAUSS (1)**
5:7
**strong (1)**
21:4
**stuff (2)**
17:8;21:17
**styling (1)**
32:19
**subdivision (1)**
61:6
**subject (2)**
8:18;57:19
**submit (4)**
16:14;39:24;58:4;
67:10
**submitted (1)**
13:4
**subsections (1)**
61:8
**subsequently (1)**
63:16
**substantive (3)**
18:24;52:9,14
**successful (7)**
13:13;16:24;17:1;
18:13;19:13;27:24;
45:24
**suddenly (1)**
57:5
**sufficient (4)**
12:2;21:5;60:21;
68:1
**suggest (1)**
54:11
**suggested (2)**
54:4,5
**suggesting (2)**
42:3;63:10
**suggests (1)**
29:15
**supplied (2)**
43:6,8
**supply (2)**

**51:1**
**stay (1)** — 

**43:16;46:8
**support (1)**
11:7
**surcharge (6)**
56:15,20;59:4;
61:18;64:22,23
**Sure (19)**
8:16;9:7;13:22;
16:15;30:3,11;
31:19;41:3,11,12;
42:6,6,12;43:2;45:6;
55:11;63:12;69:6,11
**surprised (1)**
26:13
**suspenders (1)**
20:10

---

**T**

**table (1)**
46:25
**talk (1)**
37:22
**talked (2)**
40:3;43:15
**talking (6)**
27:10;31:1;34:6;
37:6,21;44:4
**TARR (1)**
5:15
**tax (5)**
40:23;41:13,21;
42:18,24
**technically (1)**
8:16
**TELEPHONICALLY (3)**
6:4,5,10
**telling (2)**
48:5,5
**template (1)**
47:9
**ten (1)**
52:18
**tenant (1)**
36:14
**tend (1)**
39:5
**term (5)**
8:14;27:14;52:17;
58:11;61:11
**terminated (13)**
21:11,21,24;
22:15;23:15;24:1;
25:21;31:23;34:11;
35:23,25;48:13,18
**termination (7)**
21:19,20;22:19,
20;25:20;28:6;36:21
**terms (10)**
10:5,14;21:18;
27:16,24;30:2;
45:23;51:5;62:21;
67:1

**Terrific (1)**
69:5
**TEXAS (19)**
6:8,9;8:2;21:12,
14;49:13;50:10,17;
55:16;57:22;59:10;
61:22;62:2;64:1,13,
17,17;65:8;67:24
**THACHER (1)**
5:2
**thereof (1)**
61:6
**thinking (2)**
13:25;57:14
**third-party (1)**
36:11
**thirty (2)**
29:10;36:18
**though (3)**
17:4;48:15;67:16
**thought (2)**
26:15;34:16
**three (4)**
10:2;60:1,9;65:16
**three- (1)**
60:14
**three-month (1)**
33:16
**throw (1)**
41:8
**Thursday (2)**
38:12,18
**till (1)**
47:21
**timely (2)**
64:2,3
**today (18)**
24:14;27:15;
34:21,25;36:4;42:4,
9;43:2;46:20;49:11;
52:9;55:18;58:18;
66:13;68:6,10;
69:19;70:6
**together (1)**
11:22
**told (3)**
27:15;40:25;62:4
**tomorrow (2)**
23:22;70:1
**tonight (1)**
69:21
**took (1)**
17:16
**top (2)**
60:8;65:18
**totality (1)**
66:4
**tough (1)**
16:5
**towards (1)**
49:3
**toxic (1)**
57:4

**tracking (1)**
30:25
**transaction (4)**
16:19;31:8;57:15;
59:22
**transfer (1)**
46:10
**transition (2)**
23:23;34:9
**transpired (1)**
25:22
**travel (1)**
35:3
**trial (1)**
16:3
**tried (3)**
22:24;33:14;34:19
**trip (1)**
70:10
**TROY (1)**
6:4
**true (2)**
57:1,12
**Trustee (17)**
6:2;8:22;15:4;
18:4;50:16;53:20;
54:8;56:9,14,14;
58:1,19;61:5,19;
62:2;63:17;64:18
**Trustee's (3)**
8:12;49:17;57:6
**try (2)**
32:5;33:24
**trying (3)**
16:20;31:2;56:2
**turn (3)**
12:7;51:20;69:21
**twenty-four (1)**
41:1
**two (13)**
9:23;12:18;13:14;
14:13;29:3;35:25;
36:19;37:16;44:8;
45:22;58:25;61:7;
69:15
**two-month (2)**
33:16;34:6
**type (5)**
24:22;25:4;37:14;
47:5;59:5
**types (1)**
63:6

**U**

**ultimately (1)**
55:3
**Um-hum (2)**
28:9;52:24
**unable (2)**
32:6;60:13
**Unacceptable (1)**
64:6

**unclear (1)**
22:16
**under (23)**
15:7;16:14;21:12,
14;22:3;23:2;28:17;
39:24;43:23;53:21,
22;57:5,8;60:2,3,7,
21;61:25;62:11;
63:6,17;64:13;65:25
**undoubtedly (1)**
54:13
**undue (1)**
48:16
**unencumbered (1)**
53:8
**unfair (1)**
56:9
**unfortunately (3)**
23:14;32:12;66:14
**United (13)**
8:22;40:10,13,20;
41:5;42:3,10,16,20;
43:1;49:17;50:16;
58:19
**Unless (1)**
46:18
**unlikely (1)**
56:14
**unopposed (2)**
34:13,24
**unprecedented (1)**
67:10
**unrelated (1)**
55:18
**unscramble (1)**
22:18
**Unsecured (4)**
5:19;10:18;39:1;
51:2
**unusual (2)**
19:20;59:1
**up (24)**
7:8,23;17:10,21;
35:16;36:12,24;40:6,
19,22;41:2;42:14;
52:23;54:16;57:15;
59:14;61:14,21;
64:20,23,23;65:21,
22;66:15
**upon (5)**
8:7;48:21;53:13;
60:6,18
**up-to (1)**
17:20
**upwards (1)**
41:1
**use (5)**
15:5;19:14;48:14;
49:7;51:9
**used (1)**
66:6
**using (3)**
47:9;48:12,16

**Usually (1)**
24:21

**V**

**valuation (1)**
39:15
**value (3)**
20:9;23:13;66:15
**various (1)**
54:18
**view (2)**
60:17,18
**vis-a-vis (1)**
47:10

**W**

**wait (3)**
33:12;47:21;69:24
**waiting (1)**
35:11
**waiver (14)**
50:2,3;53:18;56:1,
5;58:15,15,23;59:4;
61:13,14;64:16,22,
23
**waivers (1)**
66:4
**walk (3)**
10:10;49:25;51:20
**wants (10)**
20:22;30:4;33:7;
34:3,15;44:15;
46:12;54:1;55:12;
68:25
**waste (2)**
57:4;63:22
**way (9)**
24:21;33:23;
41:20,20;43:1,11;
57:14,15;65:18
**week (12)**
13:5;14:12,13;
16:4;24:10,10,18;
26:11;29:5;32:5;
43:18,18
**weekend (1)**
17:17
**weeks (3)**
12:18;29:3;30:19
**weren't (1)**
21:2
**what's (4)**
26:18;29:11,22;
39:14
**Whereas (1)**
34:9
**Whereupon (1)**
70:12
**whole (3)**
16:4;26:18;35:20
**who's (3)**

**26:25;44:24;45:10
WILLIAMSON (13)**
6:5;40:9,10,13,15;
41:16,20;42:2,8,21,
24;43:8,16
**willing (2)**
23:24;30:9
**Wilmington (1)**
35:3
**win (1)**
31:20
**wind-down (7)**
60:5,9,11,23;
62:22;65:19,20
**winding (1)**
63:1
**window (1)**
60:19
**wish (1)**
70:9
**within (6)**
15:8,11;60:13;
61:21;63:5;64:20
**without (7)**
22:25;28:4;31:8;
38:2;51:2;54:13;
68:11
**Wonderful (1)**
9:2
**word (1)**
61:10
**words (2)**
27:12;62:23
**work (23)**
13:25;16:10,13;
23:1,4;24:21;29:8;
30:22;32:5,7,12;
33:24;34:19,20;35:1,
2;39:11;42:20;
43:16,19;55:4;
58:18;66:23
**worked (1)**
59:7
**works (1)**
34:2
**worse (1)**
34:8
**worth (3)**
41:24;66:12,13
**worthy (1)**
36:13
**wrench (1)**
41:8
**written (1)**
55:10
**wrong (2)**
54:13;66:16

**Y**

**years (1)**
21:4
**yesterday (7)**

**LCI HOLDING COMPANY, INC., ET AL.**
**Case No. 12-13319 (KG)**

17:17;26:12;
32:18,19;33:2;
34:20;56:19
**yield (1)**
55:13

## Z

**ZIEHL (1)**
5:18
**Ziman (197)**
7:4,5,5,7,10,10,17,
19,23;8:8,11,23;9:4,
5,6,8,10,13,16,22;
10:1,10,14;11:2,11,
12,19,22;12:12,21;
13:16,17,21;14:2,5,
7,10,12,15,22,24;
15:22;16:8,12,16,23;
17:5,7,12,14,20,23;
18:3,8,16,19,21,24;
19:2,5,10,12,17,24;
20:3,13;22:8;25:12,
13,19;26:2,20,22;
27:1,6,8,11,20;28:2,
10,15,19;29:5,19,24;
30:1,4,18,22;31:6,
13,20;32:5,18,22,25;
33:13;35:20,24;36:7,
24;37:2,16,19,23;
38:2,16,20;39:24;
40:3,6;41:12,14,16,
19,24;43:6,7,8,11,14,
23;44:15,23;45:3,6,
16;46:2,6,14,17,19,
24;47:8,22,25;48:2,
5;49:2,3,6,15,19,24;
50:9,12,15,25;51:14,
16,18,20,23;52:1,3,
14,25;53:6,10,14,16,
25;54:5,22,25;55:12,
24;59:23;65:5,7,8,
15;66:8,10,20,22,25;
67:3,8,13,22;68:14,
15,18,22;69:4,8,10,
13,15,17,21,23;70:1,
3,6,8
**Ziman's (2)**
32:8;39:9

## 1

**1 (2)**
32:21;63:20
**10 (1)**
49:11
**10th (2)**
10:17;22:1
**11 (1)**
63:16
**11th (3)**
9:20;22:2;68:22
**12 (3)**

12:23;53:17;68:9
**13 (2)**
12:19;52:11
**13th (1)**
13:8
**14th (3)**
22:3;24:5,24
**16 (1)**
21:11
**160 (1)**
52:5
**17 (3)**
17:14;52:15;53:11
**17th (2)**
21:10;23:15
**18 (2)**
17:14,24
**18th (1)**
10:21
**19th (2)**
33:12,20
**1st (5)**
14:1,3,15;16:20,21

## 2

**2 (4)**
10:3;15:6;52:3;
63:21
**20 (2)**
53:16;54:23
**2012 (5)**
9:19;20:25;21:11;
25:23;32:16
**20th (6)**
13:6,7,10;15:24;
16:1;24:25
**21 (1)**
18:4
**21st (3)**
16:5,6,8
**23 (1)**
18:8
**23rd (1)**
10:19
**25 (1)**
18:16
**25th (2)**
16:20;17:2
**27 (1)**
12:19
**278 (1)**
11:6
**28th (1)**
15:9
**2nd (8)**
13:3,7,10,20,21;
14:15,20;15:9
**2Q (2)**
21:1,1

## 3

**3 (4)**
14:20,23;16:9;
63:22
**30 (1)**
54:25
**31st (2)**
24:18;37:12
**333 (1)**
15:7
**351 (1)**
18:6
**365 (1)**
30:6
**3Q (1)**
21:1
**3rd (2)**
22:10,11

## 4

**4:19:11 (1)**
45:13
**4:49 (1)**
70:12
**470 (1)**
36:4
**4th (2)**
13:25;14:21

## 5

**5 (1)**
15:19
**503b8 (14)**
50:4;53:21;56:5,8,
25;57:9;61:2,21;
62:6,10;63:5;64:13,
20;67:18
**506 (1)**
58:1
**506c (21)**
49:19;50:1,2;
53:18,22;55:1,13;
56:1,5,15;58:1,15,
23;61:18;62:11;
63:17,18,25;64:1,4;
66:4
**54 (1)**
32:21

## 7

**7 (5)**
53:20;57:20;
61:19;63:16;64:17
**750 (1)**
17:18
**7th (4)**
24:8;37:8,10,11

## 8

**8 (1)**

16:13
**8th (5)**
9:24;24:8;37:11;
68:18;69:3

## 9

**9 (4)**
14:21;15:22;
17:12;19:1