1

2    UNITED STATES BANKRUPTCY COURT

3    DISTRICT OF DELAWARE

4    Case No. 12-13319(KG)

5    - - - - - - - - - - - - - - - - - - - -x

6    In the Matter of:

7

8    LCI HOLDING COMPANY, INC., et al.,

9

10            Debtors.

11

12    - - - - - - - - - - - - - - - - - - - -x

13

14            United States Bankruptcy Court

15            824 North Market Street

16            Wilmington, Delaware

17

18            April 2, 2013

19            3:06 PM

20

21    B E F O R E:

22    HON. KEVIN GROSS

23    CHIEF U.S. BANKRUPTCY JUDGE

24

25    ECR OPERATOR:  GINGER MACE

1

2  Notice of Hearing on Debtors' Motion for Orders: (A)(I)

3  Establishing Bidding Procedures Relating to the Sale of

4  Substantially All of the Debtors' Assets; Approving Expense

5  Reimbursement; (III) Establishing Procedures Relating to the

6  Assumption and Assignment of Certain Executory Contracts and

7  Unexpired Leases, Including Notice of Proposed Cure Amounts;

8  (IV) Approving form and Manner of Notice of All Procedures,

9  Protections, Schedules and Agreements and (V) Scheduling a

10  Hearing to Consider the Proposed Sale and (B)(I) Approving the

11  Sale of Substantially All of the Debtors' Assets; (II)

12  Authorizing the Assumption and Assignment of Certain Executory

13  Contracts and Unexpired Leases; and (III) Granting Certain

14  Related Relief (Docket No. 78)

15

16  Notice of Cure Amount with Respect to Executory Contracts or

17  Unexpired Leases to be Assumed and Assigned (Docket No. 337)

18

19

20

21

22

23

24

25

1

2  Debtors' Motion for Entry of Orders: (A)(I) Approving the

3  Settlement Agreement with Health Care REIT, Inc., (II)

4  Authorizing the Execution and Delivery of the Interim Facility

5  Management Agreement, (III) Scheduling a Hearing to Consider

6  the Proposed Boise Sale Transaction and (IV) Granting Certain

7  Related Relief; and (B)(I) Authorizing the Sale of Certain

8  Assets Free and Clear of Liens, Claims, Interests and

9  Encumbrances, (II) Authorizing the Assumption and Assignment of

10 Certain Executory Contracts and Unexpired Leases, (III)

11 Authorizing the Rejection of an Unexpired Lease of

12 Nonresidential Real Property with Health Care REIT, Inc.

13 and Allowing Rejection Damage Claims in Connection Therewith

14 and (IV) Granting Certain Related Relief (Docket No. 574)

15

16

17

18

19

20

21

22

23

24

25 Transcribed by:  Sharona Shapiro

1

2   A P P E A R A N C E S:

3   SKADDEN, ARPS, SLATE, MEAGHER & FLOM, LLP

4        Attorneys for Debtors

5   BY:  ANTHONY W. CLARK, ESQ.

6        MATTHEW N. KRIEGEL, ESQ.

7        KENNETH S. ZIMAN, ESQ.

8        FELICIA PERLMAN, ESQ.

9        CANDICE KORKIS, ESQ. (TELEPHONICALLY)

10       KRISTHY M. PEGUERO, ESQ. (TELEPHONICALLY)

11

12

13  SIMPSON THACHER & BARTLETT LLP

14       Attorneys for JPMorgan Chase Bank, N.A.

15  BY:  TERRY SANDERS, ESQ.

16

17

18  RICHARDS, LAYTON & FINGER, P.A.

19       Attorneys for JPMorgan Chase Bank, N.A.

20  BY:  L. KATHERINE GOOD, ESQ.

21

22

23  DLA PIPER LLP (US)

24       Attorneys for West Penn Allegheny Health System, Inc.

25  BY:  LAUREN GENVERT, ESQ.

1

2   PACHULSKI STANG ZIEHL & JONES LLP

3        Attorneys for Official Creditors' Committee

4   BY:   LAURA DAVIS JONES, ESQ.

5        BRADFORD J. SANDLER, ESQ.

6

7

8   BLANK ROME LLP

9        Attorneys for Steering Committee/Stalking Horse

10  BY:   STANLEY TARR, ESQ.

11

12

13  AKIN GUMP STRAUSS HAUER & FELD LLP

14        Attorneys for Steering Committee/Stalking Horse

15  BY:   SCOTT L. ALBERINO, ESQ.

16        KRISTEN HOWARD, ESQ.

17

18

19  GREENBERG TRAURIG, LLP

20        Attorneys for Patient Care Ombudsman

21  BY:   DENNIS A. MELORO, ESQ.

22        NANCY PETERMAN, ESQ. (TELEPHONICALLY)

23

24

25

1

2  ASHBY & GEDDES, P.A.

3        Attorneys for Health Care REIT

4  BY:   LEIGH ANNE RAPORT, ESQ.

5

6

7  MORRIS JAMES LLP

8        Attorneys for AFCO

9  BY:   STEPHEN M. MILLER, ESQ.

10

11

12  MORRIS JAMES LLP

13        Attorneys for Quest Diagnostics, Inc. and

14         Turner Windham, LLC

15  BY:   BRETT FALLON, ESQ.

16

17

18  UNITED STATES DEPARTMENT OF JUSTICE

19        Tax Division

20  BY:   CHRISTOPHER J. WILLIAMSON, ESQ.

21

22

23  UNITED STATES DEPARTMENT OF JUSTICE

24        Office of the United States Trustee

25  BY:   DAVID L. BUCHBINDER, ESQ.

```
 1
 2    UNITED STATES DEPARTMENT OF JUSTICE
 3          Civil Division
 4    BY:   MATTHEW J. TROY, ESQ.
 5
 6
 7    YOUNG CONAWAY STARGATT & TAYLOR, LLP
 8          Attorneys for Vibra Healthcare
 9    BY:   ROBERT BRADY, ESQ.
10
11
12    FOX ROTHSCHILD, LLP
13          Attorneys for Owens & Minor Distribution, Inc.
14    BY:   L. JOHN BIRD, ESQ.
15
16
17    ARNOLD & PORTER LLP
18          Attorneys for Health Care REIT, Inc.
19    BY:   MICHAEL BERNSTEIN, ESQ.
20          CHARLES MALLOY, ESQ.
21
22
23    EDWARDS WILDMAN PALMER LLP
24          Attorneys for Continental Casualty Company (CNA)
25    BY:   PAUL J. LABOV, ESQ.
```

1

2  HIRSCHLER FLEISCHER, A PROFESSIONAL CORPORATION

3         Attorneys for Owens & Minor Distribution, Inc.

4  BY:   JAMES TIMKO, ESQ.

5

6  CONNOLLY GALLAGHER LLP

7         Attorneys for Cigna

8  BY:   JEFFREY WISLER, ESQ.

9

10

11  HALPERIN BATTAGLIA RAICHT, LLP

12         Attorneys for Creditor BMA

13  BY:   WALTER BENZIJA, ESQ. (TELEPHONICALLY)

14

15

16  SHULMAN HODGES & BASTIAN LLP

17         Attorneys for Prima Healthcare Services,

18           St. Mary Regional medical Center

19  BY:   MARK BRADSHAW, ESQ. (TELEPHONICALLY)

20

21

22  SULLIVAN HAZELTINE ALLINSON LLC

23         Attorneys for Continental Casualty Company (CNA)

24  BY:   ELIHU EZEKIEL ALLINSON, III,ESQ.

25

1

2  ALSO PRESENT:

3        SUZANNE KOENIG, Patient Care Ombudsman

4        TOM DURKIN, Vice President Vibra Healthcare

5        KEVIN GLODOWSKI, Rothschild, Inc. (TELEPHONICALLY)

6        NEIL AUGUSTINE, Rothschild, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    P R O C E E D I N G S

2                THE CLERK:  Please rise.

3                THE COURT:  Good afternoon, everyone.  Thank you and

4    please be seated.

5                MR. ZIMAN:  Good afternoon, Your Honor.

6                THE COURT:  Mr. Ziman?

7                MR. ZIMAN:  Ken Ziman from Skadden Arps on behalf of

8    the debtors.

9                THE COURT:  You've drawn a crowd.

10               MR. ZIMAN:  We have drawn a crowd today.  I thought

11   this was uncontested, Your Honor.

12               We have in the courtroom, joining me today, my

13   colleagues Felicia Perlman and Tony Clark.

14               THE COURT:  Yes.

15               MR. ZIMAN:  Mr. Kriegel is here somewhere, but I think

16   he might be out in the hall trying to fix a couple of last

17   minute things --

18               THE COURT:  All right.

19               MR. ZIMAN:  -- if that's okay.

20               Also from the company, Mr. Douglas, our CEO, and one

21   of our declarants today.

22               THE COURT:  Good afternoon.

23               MR. ZIMAN:  Chris (sic) Walker, our chief financial

24   officer.

25               THE COURT:  Welcome.

1          MR. ZIMAN:  And Neil Augustine from Rothschild, our

2     investment banker, is in the back of the room.

3          THE COURT:  There you are.  Good to see you again.

4          MR. ZIMAN:  Mr. Augustine is also a declarant --

5          THE COURT:  Yes.

6          MR. ZIMAN:  -- for today's matters.

7          So Your Honor, there are three items that are on the

8     agenda.  There's really -- I mean, two run together, between

9     the sale motion and the notice of cure.

10         THE COURT:  Yes.

11         MR. ZIMAN:  And the third matter is the matter that

12    Your Honor heard some scheduling issues with early -- or late

13    last week.  That's our debtors' motion to enter into a

14    settlement with Health Care REIT and to provide for the interim

15    management of the Boise facility by Vibra Healthcare, and then

16    also to set up procedures with respect to the sale of those

17    assets to Vibra Healthcare.

18         THE COURT:  Yes.

19         MR. ZIMAN:  If it's okay with Your Honor, we're just

20    going to go in order.

21         THE COURT:  That's fine; I think that makes sense

22    here.

23         MR. ZIMAN:  So I'm pleased to report, Your Honor, that

24    on the sale matters, for the most part, we're down to what I

25    think is one objection, and then an issue that's come up with

1    respect to the arrangements between the secured lenders and the

2    committee that Mr. Buchbinder raised some concerns around, and

3    that will be the subject, I believe, of some argument before

4    Your Honor --

5              THE COURT:  All right.

6              MR. ZIMAN:  -- ultimately.  But just to set the

7    background for Your Honor, we did file our sale motion back at

8    the beginning of the case.  Your Honor heard bidding procedures

9    in January on that matter.  We filed a notice of auction and

10   sale hearing on the docket at the end of January, and we had

11   publication notice provided for the sale and the related

12   assumption and assignment of contracts.  That was served out,

13   and that affidavit of publication was filed on February 13th.

14             More recently, Your Honor, we ultimately filed a

15   notice of Hospital Acquisition, LLC, our stalking horse bidder,

16   as the successful bidder.  We did not receive a qualified bid

17   by the March 13th bid deadline -- it might be March 12th.  In

18   response to various objections that we'll get to in a moment,

19   the debtors did file certain papers late last week.  We filed a

20   reply, along with a notice of proposed order.  We also filed a

21   declaration of Mr. Douglas and a declaration of Mr. Augustine.

22             The lenders -- I should say the purchaser, to be

23   clear, to be distinct.  The purchasers also filed a declaration

24   of George Varughese --

25             THE COURT:  Yes.

1        MR. ZIMAN:  -- in support of adequate assurance of
2   future performance, and that's at docket number 590.
3        So just as a housekeeping matter, our intent would be
4   to submit the declarations into evidence, Your Honor, and then
5   make those parties available for cross-exam.  And I would
6   propose that we would just go ahead and not have any opening
7   argument on the sale, but just go ahead and do that, see if
8   there's going to be cross-examination, and if not, then we
9   could just go into arguing the parties' relative positions.  Is
10  that okay?
11       THE COURT:  That's certainly acceptable to me, but
12  let's see what happens when you go to move the declarations
13  into evidence.
14       MR. ZIMAN:  Well, with that, Your Honor, I'm going to
15  go ahead and ask Your Honor to move into evidence, for this
16  hearing purposes, the declaration of Mr. Douglas, which is
17  docket number 586, Mr. Augustine's declaration, at number 587,
18  and Mr. Varughese's declaration at number 590.  Each of those
19  three persons are in the courtroom --
20       THE COURT:  Yes.
21       MR. ZIMAN:  -- and are available to be cross-examined
22  if anyone wishes to do so.
23       THE COURT:  All right.  Thank you, Mr. Ziman.
24       Does anyone object to the admission into evidence of
25  those declarations -- or any or all of them?

1        MR. BERNSTEIN:  Good afternoon, Your Honor.

2        THE COURT:   Good --

3        MR. BERNSTEIN:  For the record, Michael Bernstein of

4    Arnold & Porter --

5        THE COURT:  Yes.

6        MR. BERNSTEIN:  -- on behalf of Health Care REIT.

7        THE COURT:  Nice to see you, Mr. Bernstein.

8        MR. BERNSTEIN:  Good to see you, Your Honor.

9        So we'll probably get to this at some point when Mr.

10   Ziman discusses the sale.  We are a landlord -- Health Care

11   REIT is a landlord under a couple of leases, including a master

12   lease, which governs six of the LTACH facilities.

13       THE COURT:  Yes.

14       MR. BERNSTEIN:  And the proposal is to assume and

15   assign that lease, that master lease, in connection with the

16   sale.  We have an issue we've been discussing with respect to

17   adequate assurance of future performance under that lease.  We

18   have received some of the information that we have requested,

19   including some information we received this morning.  There's

20   other information that we have not yet received, and we're

21   working cooperatively with the buyer and the debtor to resolve

22   the issue, and we're hopeful that it will get resolved.

23       But for today's purposes, we do reserve our right to

24   object to adequate assurance of future performance under our

25   lease.  Fortunately we have some time to resolve this, and as I

1    say, the parties are working cooperatively in an effort to

2    resolve that issue.

3            And the reason I'm standing now, which I hadn't

4    intended to do, relates to the one declaration that goes to the

5    issue of adequate assurance of future performance.  If we were

6    contesting adequate assurance of future performance, I would

7    object to the entry of that declaration, and I would seek to

8    cross-examine the witness.  I don't really want to do that now,

9    because I think that I'm hopeful and optimistic that we will be

10   able to resolve our adequate assurance of future performance

11   once we get the additional information that we're seeking, some

12   of which relates to the financing that's not yet in place.  So

13   I don't want to object to the declaration now.

14           THE COURT:  I think the issue, Mr. Bernstein, is do

15   you object to the admission -- you would still reserve your

16   right to cross-examine, but the only issue is whether or not we

17   admit it, in effect, as direct testimony.

18           MR. BERNSTEIN:  Yeah, I mean I -- if I were contesting

19   the matter today --

20           THE COURT:  Yes.

21           MR. BERNSTEIN:  -- I would object to the admission of

22   the declaration.  But I don't think we have to -- what I'd like

23   to do and what I'd propose to Your Honor is that we -- for

24   purposes of our adequate assurance issue, that we reserve our

25   right to object to the admission of the declaration for those

1    limited purposes, for the purposes only of our dispute, and
2    that we reserve the right to cross-examine the witness.  And
3    again, I think this may well never be an issue, because as I
4    say, the parties are working cooperatively to resolve the
5    adequate assurance issue, and as I say, we've got some of the
6    information that we've asked for.  There's a continuing
7    dialogue, there's a relationship between the business people,
8    and I'm hopeful we'll resolve.  But I would like to reserve my
9    objection to the admission of the declaration and my right to
10   cross-examine the witness solely with respect to Health Care
11   REIT's adequate assurance issue.
12           THE COURT:  All right.  Let me ask Mr. Ziman if that
13   is acceptable.
14           MR. ZIMAN:  Fine by --
15           THE COURT:  It makes --
16           MR. ZIMAN:  Fine by me.
17           THE COURT:  All right.
18           MR. BERNSTEIN:  Thanks, Your Honor.
19           THE COURT:  Then your reservation of rights is
20   accepted.
21           MR. BERNSTEIN:  Thank you, Your Honor.
22           THE COURT:  All right.  Thank you, Mr. Bernstein.
23           MR. ZIMAN:  Your Honor, on that point -- I think Mr.
24   Bernstein raised a fair point.  I think there are -- you know,
25   there are twenty-three different responses to the notice of

1  cure --

2          THE COURT:  Right.

3          MR. ZIMAN:  -- that went out.  Most of those have been

4  dealt with.  Most of those were just about amounts, and we've

5  reconciled amounts with the counter-parties.  There were, in

6  addition to Health Care REIT, I think, a couple others that

7  went to adequate assurance.  And I think that there's -- at the

8  end of -- I think as part of this process, you know, we'll ask,

9  perhaps, lender's counsel just to make sure that we have all

10  that clear on the record, so that to the extent there are other

11  issues like Mr. Bernstein's, the Court's made aware of those.

12          THE COURT:  Okay.

13          MR. ZIMAN:  So I think --

14  (Declarations of Mr. Douglas, Mr. Augustine, and George

15  Varughese were hereby received into evidence, as of this date.)

16          THE COURT:  All right.  So those -- let me just say

17  then, all of the three declarations are admitted into evidence

18  in support of your motion, Mr. Ziman.

19          MR. ZIMAN:  Well, thank you very much, Your Honor.  So

20  I mean, that brings us to where we are now, which Your Honor,

21  this has sort of been the culmination of this case.  We filed

22  these cases in December after undertaking what I think, and

23  what I think the record reflects, is a thorough and exhaustive

24  process to find a strategic outcome for these debtors.  At that

25  time, of course, they weren't yet debtors, but for these

 1  businesses.

 2          THE COURT:  Right.

 3          MR. ZIMAN:  They were burdened by too much debt, they

 4  had maturity dates that were looming, they couldn't refinance

 5  in the marketplace.  So with the help of Rothschild, the

 6  company engaged -- and with the oversight of the board of

 7  directors -- in a really thorough, five-month undertaking to

 8  try and find a party other than the purchaser, which is an

 9  affiliate of our secured lenders, to come in and provide a

10  solution here.  And as the record reflects, that process did

11  not yield a proposal, and certainly not a bona fide offer that

12  even remotely approached the level of our pre-petition secured

13  indebtedness, let alone our unsecured indebtedness.

14          So that put us in the position of having very little

15  alternatives to how these cases were going to proceed.  We had

16  a one-trick pony, we rode that pony into bankruptcy, being a

17  deal with Hospital Acquisition, LLC, our stalking horse

18  purchaser.  You'll recall, Your Honor, and I think this is in

19  the record, that we spent time post-petition, pre-bid

20  procedures order, entertaining interests from a strategic

21  party, actually Vibra Health Care.

22          As that process developed, it became apparent that

23  that deal was not going to come together, and we came back to

24  Your Honor to have the bid procedures approved in late January.

25  Since that time, again, as the declaration of Mr. Augustine

1    makes clear, Rothschild essentially reengaged and expanded the

2    process they had undertaken pre-bankruptcy to, again, look for

3    an alternative buyer, someone to propose a higher and better

4    offer that that which was on the table.

5           No qualified bid was received.  We're proceeding with

6    the transaction with Hospital Acquisition, LLC because it is

7    the best alternative for these debtors.  It is the means by

8    which these debtors will continue to operate, will continue to

9    serve their patients, will continue to employ over 4,500

10   people, and otherwise provide a counter-party to numerous

11   unsecured creditors that have business dealings with the

12   companies today and will do so going forward.

13          In addition, as the record makes clear, there's an

14   awful lot of value being provided, not just to the lenders in

15   terms of contribution of their indebtedness, but there's a

16   substantial amount of value being provided to the stakeholders

17   I just mentioned, as well as to those parties -- lease counter-

18   parties, as well as contractual counter-parties who are having

19   their contracts assumed.  I mean, all together, there's

20   probably an assumption of approximately fifty million dollars

21   of -- I'll call it business operations claims associated with

22   this transaction, above and beyond the credit bid here.

23          So on that basis, Your Honor, I think that we've

24   satisfied the applicable standard for approving a sale under

25   363(b).  The Delaware & Hudson Railway case, Lionel, they all

1  set forth the standard of a sound business purpose, proper

2  notice, a fair sales prices, and the good faith of the

3  purchaser.

4          THE COURT:  Yes.

5          MR. ZIMAN:  And there's really nothing in the record

6  contesting the last three of those.  I think what I just

7  recounted -- right contested -- and ample support for those

8  three items.  As to the sound business purpose, I think I just

9  recounted for Your Honor the company's position that the relief

10 being sought here is justified by a sound business purpose.  We

11 haven't hidden anything here, Your Honor.  We can't confirm a

12 Chapter 11 plan --

13         THE COURT:  Right.

14         MR. ZIMAN:  -- you know, on the facts and

15 circumstances presented.  So the alternative is to take

16 advantage of Section 363, which is not under Chapter 11, and

17 keep these businesses operating, keep them doing what they do

18 in serving patients in the communities that they are located,

19 versus the alternatives, which, in the view of Mr. Douglas, our

20 chief executive officer, are not viable alternatives.  To go

21 through some out-of-court ownership transition to the secured

22 lenders would not have the same salutary effects of the

23 transaction before Your Honor.  There would be disruption,

24 there would, essentially, be loss of employees.  That could

25 have negative effects on patient care.  And there would not

1    only be a loss in value to the lenders, but I think a loss to

2    the community served by these hospitals, and issues relative to

3    patient care would arise that aren't arising in today's

4    circumstances.

5            The IRS objection, essentially, goes to the notion

6    that we're not complying with Chapter 11 plan requirements to

7    pay admin claims, therefore we shouldn't be able to sell our

8    assets under 363.  That's just not the law.  The Chapter 11

9    plan says what it says; 1129(b) says what -- actually, 1129(a)

10   says what it says.  And 363 is different and distinct, and

11   that's the relief we're seeking here.

12           I think the IRS also complains that there are

13   provisions in the asset purchase agreement under which the

14   secured -- the purchaser is making available property to pay,

15   essentially, some of the administrative costs of this

16   transaction, including professional fees and including some

17   committee professional fees.  That's their prerogative, Your

18   Honor.  That's not estate property.  That property is not there

19   for administrative creditors or, candidly, for other unsecured

20   creditors.  It was earmarked and set aside, and it continues

21   and perpetuates the paradigm that courts have been using for

22   years and years, probably at least as long as I've been

23   practicing, which is twenty-three years, which is if you want

24   professionals to assist in the transactions under Chapter 11,

25   you need to provide payment for those folks.  There's carve-

1    outs provided in the first-day financing order.  Effectively,

2    all that the asset purchase agreement does is recognize those

3    carve-outs and memorialize them in a way that then allows the

4    credit bid to go forward, since essentially that carve-out gave

5    the estate professionals, essentially, what amounted to a

6    senior property interest to protect their unpaid fees.

7             I don't know that I need to address it, but I will.

8    The IRS makes arguments, essentially, suggesting that

9    conversion or dismissal is a more appropriate course.  And

10   there's no motion pending, so it's not really ripe to be

11   addressed, but just it's not an appropriate course, Your Honor.

12   We went through -- I went through, and the papers go through at

13   great length, I think, what I would describe as the parade of

14   horribles that could ensue, were those alternatives pursued

15   without first transacting the sale.  I think that the record is

16   replete that that's not a value maximizing strategy; it's not

17   required by the Code.  363, again, shows up in Chapter 3 or

18   Article 3, and it's separate and distinct from the requirements

19   that the IRS seeks to impose on the transaction here.

20            So with that, Your Honor, I will allow Mr. Williamson,

21   from the Department of Justice, to --

22            THE COURT:  All right.  Thank you.  Thank you, Mr.

23   Ziman.

24            Good afternoon.

25            MR. WILLIAMSON:  Good afternoon, Your Honor.  I get

1   the feeling that I might be the one person on this side; a lot

2   of people on the other side, but I'm here.

3          THE COURT:  It is a lonely position, isn't it, Mr.

4   Williamson?

5          MR. WILLIAMSON:  That's what they told me when I

6   joined the Department of Justice.  What can I say?

7          THE COURT:  Well, we're glad to have you.

8          MR. WILLIAMSON:  Thank you, sir.  Like you said, my

9   name is Christopher Williamson from the United States

10  Department of Justice Tax Division, on behalf of the United

11  States.  And that's, to begin with, a distinction that's

12  important as well.  I'm here on behalf of the United States,

13  not on behalf of the IRS.

14         THE COURT:  Okay.

15         MR. WILLIAMSON:  This is not the IRS' claim; this is

16  the United States' potential claim, and that has effects

17  throughout the entire government.  And as these are hospitals

18  that are going to be relying on the government for a variety of

19  things, including Medicare and Medicaid assistance, that is an

20  important distinction.

21         But in essence, the United States' objection is that

22  no provision is being made for the payment of any part of the

23  substantial tax liability that will accrue as a result of this

24  sale, despite the fact that provisions are being made for

25  payment of other claims, both other administrative claims and

1  claims that would be junior, including those of the unsecured
2  creditors.

3          My position has two points.  The first is that under
4  363 you can't have a sale that would otherwise try to get an
5  end around the provisions of 1129.  You can certainly try to
6  get a sale where a plan cannot be confirmed, but the provisions
7  of the proposed sale cannot directly conflict with the
8  provisions of 1129, as was set forth in the case of General
9  Motors, and we would contend that that is the case here.

10          Our second point is if this sale was to be approved,
11  if the Court decides the sale is appropriate, the Court should
12  at least order the pro rata distribution of administrative
13  claims.

14          Before turning to substance, I'd like to point out a
15  couple of background points.  As Mr. Ziman said, this case
16  exists for the purposes of this sale.  I think he said this was
17  the climax of the case.  There was never an intention to get a
18  confirmed plan here under 11 or 7.  That was not what this case
19  was about; it was about getting this sale through.

20          THE COURT:  Or a sale.

21          MR. WILLIAMSON:  Or a sale; exactly.  It could have
22  been to a different purchaser, but to sell these assets.

23          THE COURT:  Right.

24          MR. WILLIAMSON:  We would contend the debtors could
25  have done this sale outside of bankruptcy, and they don't need

1   this Court's approval to do it.  They might prefer it, and the

2   purchaser might prefer it, but it's not necessary.  But they're

3   asking this Court to lend its approval to the sale, and forever

4   strip any liens or encumbrances that might otherwise encumber

5   the assets so the purchaser can take them with the approval of

6   this Court.

7          And that's the primary motivating factor of this case.

8   The purchaser, in this instance, and probably whoever else

9   could have come to the table, was concerned about the potential

10  tax.  That was the thing that motivated this case, and you can

11  see that in all of the papers that have been filed.  Now,

12  debtors estimate, and of course the United States doesn't know

13  yet, but the debtors estimate that the liability may be as much

14  as twenty-four million dollars.  I think the number is 23.8

15  that debtors are estimating.

16          THE COURT:  Yes.

17          MR. WILLIAMSON:  But that liability only accrues at

18  the time of the sale.  We don't know what it is; we're not

19  going to know what it is until a later time.  The concern is

20  that if this tax accrues through the sale, that somehow the

21  United States could go after the purchaser for debtors' tax

22  liability.  And that's the motivating factor, and I would

23  contend that that is not an issue in this case.

24          And finally, I want to note that the United States is

25  the only administrative claimant, if this sale is approved, the

1   United States is the only administrative claimant that will not

2   get paid any portion of its claim.

3           I'd like to turn to Section 363 now.  We can see that

4   363 would permit a sale in this type of context, as long as the

5   debtor sets forth a sound business judgment reason for the

6   sale.  But 363 does not permit a debtor to enter into a

7   transaction that would amount to an attempt to circumvent the

8   Chapter 11 requirements for confirmation, and that's important.

9   You can have a sale.  You can try to go through this.  There

10  can be reasons why this happens.  But you can't get through a

11  363 sale what you would not otherwise have been able to get if

12  you had gone through the confirmation process.  And we would

13  contend that what's going on here is exactly that.  Other

14  creditors are getting more, because of this sale, than the

15  United States is.  If this sale had occurred after

16  confirmation, all administrative claims would have to be paid

17  if it stayed in Chapter 11.  If Chapter 11 was impossible and

18  we went to 7, then at least a pro rata portion would have to be

19  paid.  But by the terms of the sale order before Your Honor,

20  that's not happening here.  The United States is being

21  specifically carved out, to its detriment.

22          Now, I know that Mr. Ziman has his witnesses and a lot

23  of facts about why the continuation of these hospitals is a

24  good thing, and I don't disagree that continuing the operation

25  of these hospitals is a good thing.  But I would contend that

1   that is not debtors' business reason for the transaction.

2   Debtors are not going to continue to operate these businesses

3   after the sale is consummated.  They are selling these assets.

4   The question before Your Honor is:  Is there a sound business

5   decision, under 363, for these debtors to enter into the sale?

6   What is the estate getting as a result of this sale?  Not: Is

7   this business going to continue?  That could be a factor.  That

8   is certainly one of the stakeholders in this case, are the

9   doctors and employees of the business as well as the patients,

10  but that's essentially their concern.  What is it that the

11  estate is getting from this?

12          As the unsecured committee stated in its objection to

13  the bidding procedures, quote, "The pre-petition lenders are

14  using the bankruptcy court to conduct a veiled foreclosure with

15  no benefit to other creditors which will leave the estate

16  administratively insolvent."  Of course they've now changed

17  that position after their settlement, but that's still what

18  they said.  And so it's not just the United States that sees

19  what's going on here.  This is a concerted attempt to,

20  essentially, effectuate a foreclosure but get the benefit of

21  the stripping of liens and encumbrances.

22          Debtors assert that absent this Court's approval, this

23  transaction could not have occurred.  But I contend that that's

24  not the case.  They could have sold these assets outside of

25  bankruptcy.  Now, they wouldn't have received this Court's

1  approval of the sale, which they could point to if someone
2  else, including the United States, attempted to go after them
3  at a later date, but in essence, legally they'd be in the same
4  position.

5         In the revised sale order, it makes clear that debtors
6  are contending that this sale is occurring in good faith, at
7  arm's length, it's not a fraudulent transfer, and does not
8  involve any insider issues.  I do not profess to be a complete
9  expert in tax law or anything like that, but I cannot see a
10 reason how or a basis for the United States to assert, in some
11 proceeding later, that the tax liability that would have
12 accrued to LCI, had it sold these assets outside of bankruptcy,
13 would somehow have gone with the assets upon the sale.  And
14 that's just not the way these things happen.  If you buy a
15 house, and there's not a federal tax lien owing, and then the
16 person who sold it ended up making a whole lot of money and
17 owed tax, that tax doesn't go with the sale of the house,
18 because the tax doesn't occur until the asset is sold.  So
19 there's nothing tagging these assets beforehand.  The tax only
20 arises once the asset leaves debtors' hands, and that's where
21 the capital gains, which is the concern here, accrues.  And so
22 I don't see how the purchaser could have ever been tagged with
23 the liability.
24        THE COURT:  Let me ask a question.  What is -- just so
25 I'm clear, what is your assertion that the United States has an

1 administrative claim?

2          MR. WILLIAMSON:  Right, and this is one of the

3 complications, procedurally, of this case.  The United States

4 will have an administrative claim in this case when the sale

5 occurs.  At that point, debtors have said that they will accrue

6 a capital gains tax of approximately twenty-four million

7 dollars.  Before these cases started, debtors came to the IRS

8 and said can we -- we're contemplating this sale -- this is

9 before the petition was filed -- we're contemplating this sale;

10 can we potentially work out something where we could resolve

11 this tax liability, because we will not be able to pay twenty-

12 four million dollars, or whatever it was; at the time they

13 thought it might be up to fifty million dollars.  The IRS said

14 it's too premature, we don't know the details, we can't make a

15 decision right now on that.  So then the case gets filed;

16 they've now asked you to approve the sale.  If you approve the

17 sale, when the sale goes through, before this case is

18 dismissed, the claim will accrue.  It will be a post-petition

19 liability, which is an administrative claim stemming from the

20 sale of these assts.

21          THE COURT:  Okay.  So as a practical matter, the IRS

22 forced these debtors into bankruptcy, because the assets could

23 not have been sold outside of bankruptcy, as a practical

24 matter.

25          MR. WILLIAMSON:  I disagree, because if the assets had

1  been sold outside of bankruptcy, LCI would have taken on a tax
2  liability, as they've said they were insolvent before they
3  declared bankruptcy.  They would have declared bankruptcy, come
4  to court, and said we have no assets to pay this liability.
5  They still could have sold it.  The purchaser still could have
6  purchased it.  They just would have ended up with a tax
7  liability they can't pay, which is not a problem.  You can
8  still -- you can accrue a tax liability --
9          THE COURT:  They would have also --
10         MR. WILLIAMSON:  -- and then declare bankruptcy.
11         THE COURT:  The would have also had a secured lien
12  against the property which would have had to be paid.
13         MR. WILLIAMSON:  Right, they could have sold it to the
14  current purchaser, which is essentially what's happening.  They
15  are satisfying that secured lien by choosing the stalking horse
16  bidder.  So in effect, the same thing is happening which they
17  had been contemplating beforehand.  The same thing is
18  happening; the only difference is that they're asking for this
19  Court to grant approval of the sale.
20         In addition to those problems, the sale purports to
21  allocate certain expenses and exclude others, which violates
22  Section 1129.  Had the debtors made no mention of paying
23  certain claims and not other claims, this wouldn't have been a
24  problem, they wouldn't be violating 1129.  But that's what
25  they're doing here; they're saying we will pay these claims and

1   we will not pay these other claims.  And as we've been

2   discussing, the United States will have an administrative claim

3   that will not be paid, whereas the professional fees will be

4   paid, the wind-down expenses will be paid, and now, because of

5   the settlement, the unsecured creditors will receive a payment

6   as well.  And this is, again, what General Motors was saying;

7   they're trying to get around the requirements of 1129 through

8   the sale.  You, Your Honor, would not have approved this in a

9   plan proposal because it clearly violates the provision.  What

10  they're trying to do here in 363 is sort of shoehorn in these

11  impermissible provisions into a situation where they've

12  admitted they cannot confirm a plan at any point.

13        And we would contend that this Court should not

14  approve the sale for those reasons.  Now, if the Court does

15  decide to approve the sale, we argue that administrative claims

16  should be distributed on a pro rata basis, because of a couple

17  of reasons.  And at this point I'd like to clarify a couple of

18  things which I probably -- are probably due to imprecise

19  drafting on my part.

20        We are not asking this Court, at this time, to dismiss

21  the case or convert the case to Chapter 7.

22        THE COURT:  Right.

23        MR. WILLIAMSON:  We have not moved for that.  What I

24  was trying to make clear in our papers is that if there is a

25  sale that is approved, and if this liability accrues, the

1  estate will be administratively insolvent, at which point

2  conversion to 7 or dismissal is appropriate.  At that point,

3  the sale would have already gone through, because only if the

4  sale is consummated does the tax liability accrue, which is why

5  we haven't moved to dismiss yet or for conversion.

6          If Your Honor does grant the sale motion, at that time

7  we'll move to convert or dismiss because then the estate will

8  be administratively insolvent.  We just know, as a matter of

9  course, that based on the procedure of this case, the case will

10 be administratively insolvent if the order is granted.  So

11 we're not arguing that that's what should happen here.  I would

12 agree that that's not the best outcome, to dismiss the case, as

13 opposed to grant the motion.

14         THE COURT:  All right.

15         MR. WILLIAMSON:  We're asking for two separate things:

16 Don't grant the sale.  If you grant the sale, then we move to

17 dismiss.

18         Secondly, we're not asking for disgorgement of the

19 fees paid to the doctors or anything like that.  I know there

20 was an argument raised by both debtors' counsel and by the

21 unsecured creditors.  That is not what we're asking for.  Our

22 argument is related to the escrow accounts that are

23 specifically set forth as part of the purchase price of these

24 assets.

25         Debtors argue that those provisions, these escrow

1    accounts -- which are for their professional fees, the

2    unsecured creditors' professional fees, and certain wind-down

3    provisions -- are carve-outs and not part of the estate.  And

4    they cite other cases where unsecured creditors -- or secured

5    creditors, after receiving distributions, decide to give money

6    to other creditors and things like that.

7              What's going on here is that as part of the purchase

8    price, in the asset purchase agreement, which they're asking

9    you to approve, these are specifically laid out as parts of the

10   purchase price.  Debtors are trying to sell these assets for

11   the benefit of the estate.  And what they're getting in return

12   is debt forgiveness and these escrow accounts, in essence, when

13   they're asking this Court to approve that sale and approve the

14   asset purchase agreement, which contains these escrow accounts.

15   If these accounts were not part of the estate, they wouldn't

16   have to ask Your Honor for approval to include them.  They

17   could just do it outside of bankruptcy.  They wouldn't have to

18   come to the Court and ask for anything.  But they're asking you

19   to say that this is the sales price and this is okay.  They're

20   asking you to also set forth how these will be funded, how

21   they'll be -- when they'll be funded, how they'll be funded,

22   and how they'll be distributed.

23             THE COURT:  Well, these are funds that would otherwise

24   go to the secured lender.

25             MR. WILLIAMSON:  That's absolutely true, but in this

1   case what they've done, through the bargain, is to say we will

2   give you this instead, as part of our purchase price, and by

3   doing that, they're putting it into the estate.  They could

4   have not done that, but that's not what happened.  They're

5   choosing to fund these accounts as part of the bargain they

6   struck with the estate.

7          So we would contend that yes, they are part of the

8   estate, and that if they are a part of the estate, the only

9   possible outcome is that they're distributed on a pro rata

10  basis.  Now, my understanding is that debtors would not contest

11  that; they've raised no argument saying that if the accounts

12  were somehow part of the estate, pro rata distribution would

13  not be appropriate.  Their argument is that they're not part of

14  the estate.  We contend they are part of the estate.  If

15  they're part of the estate, pro rata distribution is the only

16  thing that could possibly be allowed.

17         Now, we would also argue that the recent settlement

18  with the unsecured creditors is also impermissible, because

19  through that settlement they are jumping the absolute

20  priorities of the United States and other creditors.  As Your

21  Honor is well aware, you've got administrative claims, secured

22  claims, priority claims, general claims.  And here they're

23  saying, okay, here's this pot of money, we're going to give

24  that to them through the bankruptcy -- again, that's part of

25  what they're asking you to approve -- and that's okay, even

1  though it's clearly excluding the United States from receiving
2  anything, when it would have an otherwise valid administrative
3  claim.

4         Unless Your Honor has any more questions, I rest my
5  case.

6         THE COURT:  No, I don't.  Thank you, Mr. Williamson.
7         Mr. Sandler, good afternoon.

8         MR. SANDLER:  Good afternoon, Your Honor.  For the
9  record, Brad Sandler, Pachulski Stang Ziehl & Jones, on behalf
10 of the committee.

11        Your Honor, let me start off by clarifying something
12 that has been referred to by the government as a settlement
13 with the unsecured creditors' committee.

14        THE COURT:  Right.

15        MR. SANDLER:  There is no settlement with the
16 unsecured creditors' committee.  The APA has been modified to
17 include what is paragraph 38, to essentially sweeten the deal.
18 But there are no claims which are being released.  There is no
19 settlement.  Everybody's claims are what they are as of today,
20 as of right now.  So there is no, quote, "settlement".

21        What the committee has been able to do -- as is common
22 in cases, there's a tit for tat that often goes on between the
23 committee and purchasers or debtors or lenders.  In this case
24 it was with all of the major constituency.  And we were able to
25 get what the APA contemplated.  The APA contemplated -- and

1    actually, I didn't intend to make this argument right now, but

2    I've fallen into it.  The APA contemplated that the purchaser

3    would be able to assume various liabilities at different times

4    or in different amounts at any time, in fact up until closing,

5    under section 2.3 of the APA.  And in fact, pursuant to the

6    APA, they can modify schedule 2.3(g) whenever they wish, up

7    until closing.  The only thing that the committee has been able

8    to do, and I use that term "only" in quotes --

9              THE COURT:  Yes.

10             MR. SANDLER:  -- is we have gotten now what will be a

11   schedule that will be a fulsome schedule of parties that are

12   not having their contracts assumed and assigned.  Obviously,

13   those parties -- and we're thrilled to see parties, vendors or

14   landlords, have their contracts assumed and assigned.  But

15   there are others in this case that aren't as fortunate, and the

16   committee has been able to get every unsecured creditor in this

17   case that will ultimately be listed on 2.3(g) by virtue of an

18   assumption of liabilities, in an amount as set forth in the

19   term sheet, which is 3.5 million dollars, subject to the terms

20   of that.

21             So I just really -- again, I did not intend to go here

22   right now.  I was going to actually save this for an argument

23   that I think Mr. Buchbinder is going to raise, but there you

24   are, we're here now.

25             THE COURT:  Okay.

1          MR. SANDLER:  So --

2          THE COURT:  Talk to me a little bit about the

3    circumvention that Mr. Williamson has argued of Section 1129.

4          MR. SANDLER:  That's correct.

5          THE COURT:  Yes.

6          MR. SANDLER:  That's correct, Your Honor.  And by the

7    way, even if it was -- even if it was a settlement, I think

8    there's enough precedent in this jurisdiction to say that a

9    purchaser or secured creditor can do whatever it wants with its

10   collateral.  That's not the case here, but even if it was.  So

11   I don't really think that that argument holds much water.

12          In terms of the sound business purpose --

13          THE COURT:  Yes.

14          MR. SANDLER:  -- certainly, Your Honor, I think it's

15   as clear as can be, and I think that Mr. Ziman laid it out

16   beautifully.  There are many, many parties here that are

17   benefitting, frankly, from the bankruptcy.

18          THE COURT:  Well, the debtors are maintaining the

19   going concern.

20          MR. SANDLER:  Absolutely.  It's  -- jobs are being

21   preserved.  Importantly, while it's not part of our

22   constituency, you know, we've been focused on the patients as

23   well because of the nature of this case.  Parties are having

24   contracts assumed and assigned, so they're getting payment in

25   full that would have not happened outside of the bankruptcy.

1   We now have other parties that are getting pre-petition claims

2   paid that would not have happened outside of the bankruptcy.

3   Again, that will be the modification to the APA, schedule

4   2.3(g).  Obviously we're saving thousands of jobs.  So Your

5   Honor, customers will have -- vendors will have customers,

6   landlords will have a tenant.  I mean, it's just clear that

7   this -- I don't think there are too many other cases that have

8   a clear business purpose of a sale as we have in this case.

9        Your Honor, in terms of this argument that somehow

10  1129 is implicated, I, frankly, don't think that the law is

11  there.  In addition, I will tell you that certainly in this

12  jurisdiction, as well as many others, cases come before

13  bankruptcy courts, knowing at the end of the day they're trying

14  to preserve value, they're trying to preserve jobs and other

15  value, and at the end of the day, from the get-go, just as was

16  the case here, debtors come before the Court and they say, Your

17  Honor, we're not going to get to a plan, but we are going to do

18  our best to maximize value and preserve value, and that's

19  really what has happened here.

20       And certainly some cases that come to mind, some of

21  them that I've been involved in, others not, Bowe Systec, in

22  front of Judge Walsh, day one it was presented that it was

23  going to end up as a structured dismissal or a conversion,

24  which it ended up as a structured dismissal.  In the Ritz

25  Camera case, which recently converted, again, that was another

1  case where they were trying to preserve value; it didn't

2  happen, but the sale went forward.  Now, that was actually

3  through a GOB process, but still, it was preserving value.

4  G.I. Joe was another case where that happened.  I mean, there

5  are countless cases.

6          Over the last five years, six years, the majority of

7  the cases that we see are 363 sale cases.  They're fast moving

8  cases.  They come before this Court, and sometimes you're lucky

9  enough to get to a liquidating plan, and other times you're

10 not.  But debtors try to maximize value, and that's exactly

11 what's been done here.

12          With that, Your Honor, I think I'll sit down and I'll

13 just listen to what other people have to say.

14          THE COURT:  I'm at a little bit of a loss here about

15 one thing, Mr. Sandler, and that is the IRS does not have a

16 claim today.

17          MR. SANDLER:  That's right, Your Honor.

18          THE COURT:  So I'm just trying to figure out.

19 It's --

20          MR. SANDLER:  That's right, Your Honor.

21          THE COURT:  -- a peculiar argument to be making.

22          MR. SANDLER:  It's a -- you know, I suppose, at best,

23 maybe it's a contingent claim, because they really don't have a

24 claim, as we sit here today.  It's a claim only if closing

25 occurs.  And after all, closing is not going to occur, it's not

1  anticipated to occur for months down the road --

2           THE COURT:  Right.

3           MR. SANDLER:  -- subject to certain regulatory

4  conditions being satisfied --

5           THE COURT:  Yes.

6           MR. SANDLER:  -- as well as other conditions.  And we

7  don't know whether the IRS really will or will not have a

8  claim.  I think as we are arguing today, we're assuming that

9  they do have a claim, but the fact of the matter is, as Your

10 Honor correctly pointed out, is as we all are before you today,

11 the IRS does not have a claim.

12          THE COURT:  Right.  Thank you.

13          MR. SANDLER:  Thank you, Your Honor.

14          THE COURT:  Thank you, Mr. Sandler.

15          MR. BUCHBINDER:  Good afternoon, Your Honor.

16          THE COURT:  Mr. --

17          MR. BUCHBINDER:  David Buchbinder on behalf of the

18 United States Trustee.

19          I want to start by not surprising anyone and not

20 getting anyone overly excited.  The United States Trustee has

21 not opposed the sale.  We have discussed the order with the

22 debtors and we have agreed on the terms of the order, but for

23 paragraph 38, that the Court has already heard reference to.

24          I was going to make comments in connection with the

25 order, but given the tone that the arguments and the discussion

1   has had, I think that my comments can be particularly helpful

2   to the Court now, even though they concern the order.

3            THE COURT:  All right.

4            MR. BUCHBINDER:  What's been proposed is a sale of

5   substantially all of the debtors' assets, the twenty-seven

6   hospitals, minus one, minus the Boise hospital --

7            THE COURT:  Right.

8            MR. BUCHBINDER:  -- to the Hospital Acquisition, LLC.

9   That's what was proposed to be sold.  I read the order, which

10  was filed at 9 o'clock last Wednesday night, which given that

11  today's hearing is Tuesday, is not too bad.  But I want to

12  refresh the Court's memory that also at about 9 or 10 o'clock

13  last Wednesday night, the debtor filed ex parte motions to

14  approve the Vibra deal.  The U.S. Trustee did act prudently to

15  oppose the request to shorten time.  The Court denied the

16  request, but the key parties, as the Court will learn, have had

17  an opportunity to investigate the issues relative to that

18  motion, and the concern was that the issues be vetted.  But

19  that's another motion.

20           But counsel, at the status conference we held

21  telephonically in that matter --

22           THE COURT:  Yes.

23           MR. BUCHBINDER:  -- indicated that it wasn't

24  intentional that they filed these pleadings just before Holy

25  Thursday and Easter weekend; it just was how things worked out.

1          And so we get to the proposed order, which I will

2      confess, I did not read on Thursday of last week because I

3      didn't think I needed to; I have more than one case on my

4      plate, as does the Court.  But I did read it yesterday, and I

5      was much surprised to get to paragraph 38, which reads -- and

6      I'm quite surprised to hear Mr. Sandler stand up here and tell

7      us that it's not a settlement, because it reads:  "The terms of

8      the settlement (The Settlement)" -- how about that -- "between

9      the creditors' committee, Highland Capital Management, L.P.,

10     and its affiliated entities, in their capacity as holders of

11     the nine and a quarter percent senior subordinated notes due

12     2013, collectively, Highland, the pre-petition lenders, and the

13     purchasers, collectively, the settlement parties."  But it's

14     not a settlement.  "As set forth in Exhibit C hereto, are

15     hereby approved and adopted as if fully set forth herein.  The

16     settlement parties are authorized to execute such documents and

17     take all other actions as may be necessary to effectuate the

18     settlement."

19         I got Exhibit C, I found it and I went to the term

20     sheet.  And every case is different, Your Honor.

21         THE COURT:  You bet.

22         MR. BUCHBINDER:  This case has a creditors' committee

23     which has three members.  One of the members is the indenture

24     trustee of the bonds.  The essential terms of this term sheet

25     are that there's going to be 3.5 million dollars put into a

1    fund, one and a half million is going to go to the general

2    unsecured creditors, but two million is going to go to the

3    bondholders.  Nobody told us why.  Nobody told us how.  And it

4    looks like this also is an agreement to either sell or not

5    pursue Chapter 5 claims in this case.  There's a procedure for

6    claims reconciliation.  And the Court doesn't stay the close of

7    the sale.  But I notice in the proposed order there's no 60-04

8    waiver, and if there were, I would need to oppose it at this

9    point.  And the creditors' committee is going to reconcile the

10   claims and pay dividends.  This was never noticed to the

11   creditors.  This certainly is not part of this sale.  It's not

12   germane to this sale.  The sale can be approved, and this

13   settlement that Mr. Sandler wants to explain to us is not a

14   settlement, despite what the language of the proposed order

15   says, is totally outside the realm of this particular motion. &

16          Section 102(1) requires that parties get notice as is

17   appropriate under the circumstances.  Slipping in a settlement

18   of what might amount to the remaining assets of this estate at

19   the back of the sale order is not appropriate notice under the

20   circumstances, particularly when the proposed sale order was

21   filed at almost 10 o'clock at night on the eve of a long

22   holiday weekend for a hearing the day after the long holiday

23   weekend if you are a devout Catholic or Christian.

24          Section 363 involves sales.

25          THE COURT:  Right.

1        MR. BUCHBINDER:  Not settlements.  The procedure for

2   approving settlements is Bankruptcy Rule of Procedure 9019.

3   There isn't one shred of evidence that has been placed before

4   this Court this afternoon to suggest that any of the 9019

5   standards have even attempted to be complied with.  I would

6   also submit that if either the debtor or the creditors'

7   committee stands up after I sit down to explain to us what

8   those reasons are, that that's trial by ambush and is certainly

9   not notice appropriate under the circumstances.

10        This district had a case a number of years ago by the

11   name of Louise's, Inc., 211 B.R. 798, in which Judge Farnan

12   looked at the appeal of a motion to terminate exclusivity, and

13   as part of the settlement of the exclusivity motion the parties

14   agreed to an appointment of a trustee and the appeal followed.

15   Judge Farnan held that you couldn't tie a settlement that

16   involved appointing a trustee to an exclusivity motion, because

17   the two were totally unrelated.

18        The committee has not opposed this sale.  The

19   committee has brought no claims against the lenders.  I

20   appreciate the fact, and I'm sure all the parties in the

21   courtroom would appreciate the fact, that the committee is

22   doing its job and is negotiating the best deal it can for the

23   unsecured creditors, but before that deal can be approved and

24   get the imprimatur of the Court, it has to be vetted through

25   the creditors, who have to be given notice and an opportunity

1  to be heard on the motion.

2           And that is why I rise at this point, even though the

3  U.S. Trustee has not opposed the sale.  It does oppose

4  paragraph 38 of the sale order.  The proposed settlement

5  between the committee and the lenders should not be part of

6  this particular sale order.  It should be vetted separately on

7  a separately noticed motion, and I have already proposed to the

8  parties that if they need to include a provision in their sale

9  order that the parties will use their best efforts to bring the

10 settlement on for a hearing before the Court, we would not be

11 opposed to that.  But the Court should not take any action

12 today with respect to the proposed committee settlement for all

13 the reasons stated.

14          And I would add that factually an agreement like this

15 between the committee and the debtor, in which one committee

16 member is going to get the lion's share of the money and the

17 other committee members and all the other unsecured creditors

18 are going to get the rest, we're not here to investigate and

19 analyze that issue today, but it does raise a number of

20 questions.

21          Thank you, Your Honor.

22          THE COURT:  Thank you, Mr. Buchbinder.

23          MR. ZIMAN:  Your Honor, actually, I'm not going to

24 respond to Mr. Buchbinder since we're not a party to that

25 settlement.  That agreement, settlement agreement, however you

1   want to call it, is something that was worked out between the

2   purchaser and the lenders, on the one hand, and the committee

3   on the other.

4           We obviously support it to the extent it eliminates

5   litigation and uncertainty around this process, but again, I

6   think it's something that -- it's not estate property at issue.

7   It's not something the debtors took a position on.  And I think

8   I'll allow Mr. Sandler to address Mr. Buchbinder's comments on

9   that.

10          So if you want to hear that first I'll sit back down,

11  or if I can respond to Mr. Williamson, I'll do that.

12          THE COURT:  You know, my concern today is with the

13  sale.

14          MR. ZIMAN:  Me, too.

15          THE COURT:  And that is a separate issue from the

16  settlement.

17          MR. ZIMAN:  Yes.  So it's just -- I think on this --

18          THE COURT:  So I would like to address the sale,

19  because this settlement is not going to be a term in this

20  order.

21          MR. ZIMAN:  Okay.

22          THE COURT:  And given the way it has happened, it's

23  going to be a problem, but we'll address that another day.  So

24  let's deal with the sale issue.

25          MR. ZIMAN:  Okay.  So I think Mr. Williamson's biggest

1    problem is with the Congress, okay?  The law says what it says.

2              THE COURT:  Right.

3              MR. ZIMAN:  If Mr. Williamson wants different laws,

4    I'm not sure he's capable of doing it since he's a government

5    employee, but they should lobby the Congress.  Congress didn't

6    say that you have to comply with 1129 in order to effect a 363

7    sale.  Congress didn't say that secured parties must pay tax

8    claims as a condition to voluntarily paying the claims of other

9    nontax administrative creditors.

10             So what we have, I think, is something that is fairly

11   routine that comes before this Court and courts in other

12   jurisdictions that is a debtor's effort to maximize value of

13   the FIS or the res (ph.).  And here that's exactly what these

14   debtors have done.  They ran a process to maximize the value

15   and find the best possible transaction.  Mr. Williamson said we

16   could have done it out of court.  Mr. Williamson doesn't have

17   any evidence to support the notion we could have done it out of

18   court; the evidence says the contrary.  We couldn't do it out

19   of court.  We can't sell assets subject to secured liens

20   without the consent of every single -- you can't sell a

21   business subject to 120 million of bond debt without providing

22   for that bond debt, because counterparties don't engage in

23   those transactions.  So I think it's a little bit of a fiction

24   to suggest there was a transaction that was available to these

25   debtors that it could have effected out of court and given rise

1  to the claim pre-bankruptcy.

2            In theory, that would have been great.  Then it just

3  would have been a priority claim instead of an administrative

4  claim.  We still wouldn't be able to pay it, so I'm not sure

5  what it does for the Department of Justice or the United States

6  that we would have sold it outside and not been able to pay

7  claims.  Zero is zero, then and now.

8            Mr. Williamson also made some mention of -- let me

9  just come back to that.  The notion that these cases were filed

10 to deal with the tax claim, I think, is absurd.  The record

11 doesn't support that, and there is no evidence that Mr.

12 Williamson has provided to suggest that.  I think what the

13 record suggests, as I just said, is that the debtors engaged in

14 the process to maximize the value of their enterprise, to

15 preserve their business as a going concern, to preserve their

16 jobs, to provide opportunities for their employees to continue

17 their employment, and for their hospitals to continue to serve

18 their communities.

19            There's also the "woe is me" line of reasoning.  The

20 United States, unfortunately, is not alone in its not being

21 paid on the administrative front.  We're not able to pay all of

22 our 503(b)(9) creditors also, I mean, so there are other

23 administrative creditors that aren't getting paid here.  That's

24 not a good thing.  That's just a fact.

25            And on the flip side, the United States is actually

1    one of the parties-in-interest here that's substantially

2    benefitting.  This company has an ongoing relationship with

3    Medicare and Medicaid, and the Centers for Medicaid & Medicare

4    Services under which there are cost reports that are filed and

5    reviewed and monies go back and forth between these debtors and

6    the federal government on those issues, and as to every

7    provider agreement that is being assumed there may well be

8    liabilities that are pre-bankruptcy liabilities, and/or post,

9    that are being picked up by the purchaser in the ordinary

10   course of business.  I think that would fall into the bucket of

11   that fifty million that I was talking about earlier, Your

12   Honor.

13           So I, kind of, come back to where we started, which is

14   the standard here is -- under 363 is to show a sound business

15   purpose, to show good faith on the part of the purchaser, to

16   show we gave notice, and to show a fair price, and I think

17   we've met that standard in spades, and I would ask Your Honor

18   to approve the sale.

19           THE COURT:  Thank you.  Anyone else?  Mr. Williamson?

20   Yes.

21           MR. WILLIAMSON:  Thank you, Your Honor.  I just want

22   to address a couple of points that were made.  I would object

23   to or contest the characterization that the secured purchaser

24   is -- well, the purchaser is doing whatever it wants with its

25   own collateral.  As I said before, all of these provisions are

1   specifically part of the asset purchase agreement, so I do not

2   think it's doing whatever it wants with its own collateral.  It

3   is what is paying for these assets.  This is not like the other

4   cases cited by the parties, where after a sale occurred, at

5   some point the purchaser then sends money somewhere else, at

6   that point that is outside of the provisions of the bankruptcy

7   court.  That's not what's going on here.

8          I would like to address Your Honor's concern about the

9   United States' contingent claim.  I guess the biggest concern

10  we would have if we had no standing to object here is at what

11  point would the United States ever be able to object to a sale

12  like this where there is no doubt that -- and some folks have

13  argued that there may be no tax liability here -- but debtors'

14  own admission it's going to be at least twenty-three million

15  dollars.  I guess maybe it could be a little less than that,

16  say.  It's still going to be a lot of money.  It's not 50,000

17  dollars, which might suddenly go away.  This is based on the

18  cost basis that they have the property at and the sale price.

19  Estimate their cost basis in the 200 million dollar range, and

20  they're selling it for over 300 million dollars, so I think

21  there's little doubt that there will be a tax consequence to

22  this transaction if it's approved.  And so what's being asked

23  is can this sale be approved, and what we're saying is one of

24  the things that will happen if this sale is approved is the tax

25  liability will accrue, which will be an administrative claim.

1  So if this sale is to occur it has to contemplate that claim.
2  And it doesn't, which is what our objection is.
3          Now, admittedly that has not yet occurred --
4          THE COURT:  Right.
5          MR. WILLIAMSON:  -- because the Court has not agreed
6  to enter the sale, but we're stuck.  At what point could we
7  ever object to that, if we couldn't object until the sale
8  occurred, at which point, how would we undo the sale?  It goes
9  back around in a circle.
10          THE COURT:  Without the sale there's no claim.
11          MR. WILLIAMSON:  Correct.
12          THE COURT:  Okay?  So the sale has to proceed, and
13  then you have a claim.  You know you can't always collect on
14  your claim, but you'll have a claim.
15          MR. WILLIAMSON:  But how can we object to the sale at
16  that point?
17          THE COURT:  The sale will be done.  You will have an
18  administrative claim against the debtors' estate, much as any
19  number of claimants will have, I presume, and it may not be
20  worth anything.
21          MR. WILLIAMSON:  I agree that that claim, after the
22  fact, may not be worth anything.  That's absolutely true.  But
23  I maintain that there is a valid basis for argument.
24          THE COURT:  Well, I'm analyzing -- and I appreciate
25  your arguments, Mr. Williamson, and I know it's a difficult

1  position to be in, and it's not easy to be by yourself, in

2  particular.  But the fact of the matter is I have to analyze

3  this under Section 363 today, that we're not here on a

4  confirmation of a plan.  We're here on a sale of all or

5  substantially all of the assets.  It is not unfamiliar to this

6  Court that a case proceed this way.

7          Your situation is unusual, but looking at the motion,

8  I do see a sound business purpose.  Not just the continuation

9  of these businesses as a going concern, not just the importance

10 of it to the patients and to the communities in which these

11 hospitals exist and do business, but there is an assumption of

12 operating liabilities.  There are a number of sound business

13 purposes.  And as far as the other tests that we analyze in a

14 sale it has clearly been proposed in good faith.  There is no

15 motion to dismiss or convert these cases.  And I think that it

16 is in the -- certainly in the best interests of the debtors'

17 estate that the Court approve the sale, and I'm going to

18 approve the sale, and what will happen in your case to your

19 claim -- there may be some remedies that you will be able to

20 perceive in the coming days that I don't want to be suggesting,

21 but you will be, at some point, a claimant, and can pursue your

22 remedies as such.

23          MR. WILLIAMSON:  Can I ask, at what point do you think

24 the United States will be a claimant?  When the sale was

25 finalized or now that the sale is approved?

1        THE COURT:  I don't know that I want to necessarily

2    answer that legal question.

3        MR. WILLIAMSON:  Fair enough.

4        THE COURT:  But --

5        MR. WILLIAMSON:  I thought I could ask.

6        THE COURT:  But you ask your experts.

7        MR. WILLIAMSON:  Okay.

8        THE COURT:  All right.  So I'm overruling your

9    objection.

10        MR. WILLIAMSON:  Okay.

11        THE COURT:  And I will approve the sale.  Yes.  But we

12    have an issue with the order, and -- Mr. Sandler?

13        MR. SANDLER:  We do, Your Honor.

14        THE COURT:  Yes.

15        MR. SANDLER:  And I heard what Your Honor said.  I do

16    want to just make some clarifying comments.

17        THE COURT:  Yes.

18        MR. SANDLER:  I think Mr. Buchbinder's terms, there's

19    something nefarious going on, why are certain creditors getting

20    more?

21        THE COURT:  It's not an issue of nefarious, because I

22    think parties take a practical approach, and I try to take a

23    practical approach, and I understand that the committee was

24    attempting to extract value for the unsecured creditors.  But

25    that hasn't been put before me, I don't think, in a proper

1  manner.

2           MR. SANDLER:  I appreciate that, Your Honor, and

3  certainly I hear Your Honor loud and clear.  I can tell you it

4  is important for the committee to have some type of finality so

5  that we also know that value is going to be forthcoming to our

6  constituency.

7           I guess what I would propose is that if I take a very

8  short break, a two-minute break, just so I can speak with

9  counsel for the debtors, as well as for the purchaser, so we

10 can talk about maybe timing of a, say, 9019 motion.  I'm

11 assuming that's what Your Honor --

12          THE COURT:  I'll leave that to you as to how to

13 proceed.

14          MR. SANDLER:  Okay.  Let --

15          THE COURT:  I'm just saying it's not part of the sale

16 motion.

17          MR. SANDLER:  Let me just present an idea that I'm --

18 just coming to the top of the head.  I'll vet it --

19          THE COURT:  See, there's nothing to settle.  The

20 committee didn't even object to the sale.  I don't have even an

21 objection that's being resolved here today.

22          MR. SANDLER:  Understood, Your Honor.  If we were to,

23 say, service on negative notice, would that alleviate -- so, in

24 other words, if the parties could have a period to object to

25 that paragraph, say, whatever the time period is that Your

1  Honor is happy with, five days, seven days, whatever that time

2  period is, and if they did not object, then we could file a

3  notice of effectiveness of that paragraph.  That would be, I

4  suppose, one way to handle it.

5          THE COURT:  Well, I know we're going to get at least

6  one objection.  At least one.

7          MR. SANDLER:  I'm anticipating -- I'm anticipating

8  that, Your Honor.

9          THE COURT:  So --

10          MR. SANDLER:  But that's one idea that's --

11          THE COURT:  So my sense is that it would --

12          MR. SANDLER:  Second idea.

13          THE COURT:  I think it has to be served up

14  appropriately.

15          MR. SANDLER:  Okay.

16          THE COURT:  And I must tell you, I do have some

17  concern about how the settlement fund is being divided and the

18  fact that other creditors have not had an opportunity to weigh

19  in on that and the like.  It's not quite as simple a matter as

20  it's being portrayed.

21          MR. SANDLER:  Your Honor, I appreciate that, and I

22  appreciate your concerns, and I think maybe it would be helpful

23  if we did have a motion so that we could put something before

24  Your Honor so, in particular, Your Honor felt comfortable with

25  the terms of the settlement.

1          THE COURT:  Sure.

2          MR. SANDLER:  And not the settlement.  The terms of

3  the resolution.

4          THE COURT:  Yes.

5          MR. SANDLER:  Everybody's been using that term so

6  much, but as we said they're mentioning --

7          THE COURT:  It's your term.

8          MR. SANDLER:  And, Your Honor, so we'll talk to the

9  other constituents about how to proceed in that manner together

10 in front of you.

11         THE COURT:  Okay.  Thank you, Mr. --

12         MR. SANDLER:  Thank you, Your Honor.

13         THE COURT:  Yes, Mr. Sandler, but in the meantime

14 we'll extract that paragraph.

15         Mr. Ziman?

16         MR. ZIMAN:  Well, Your Honor we have a sale order.

17 There have been a few changes since the version that was filed

18 in the dark of night.

19         THE COURT:  Yes.

20         MR. ZIMAN:  And if I could approach, I'll hand you

21 that blackline.

22         THE COURT:  Yes, please.

23         MR. ZIMAN:  And then I'm going to --

24         THE COURT:  There was a blackline in my binder, but

25 is --

1          MR. ZIMAN:  This is --

2          THE COURT:  Are there additional changes?

3          MR. ZIMAN:  Yes.

4          THE COURT:  Okay.

5          MR. ZIMAN:  Mr. Kriegel is advising.

6          THE COURT:  Thank you, Mr. Kriegel.  I'm glad that --

7          MR. KRIEGEL:  This is the one where you're going to X

8  out a paragraph.

9          THE COURT:  Okay.  All right.

10          MR. KRIEGEL:  This is the blackline.

11          THE COURT:  Good.  All right.  Let's see what we've

12  got.

13      (Pause)

14          MR. ZIMAN:  Your Honor, I apologize.  Mr. Kriegel's

15  just giving folks a copy.

16          THE COURT:  Oh, fine.

17          MR. ZIMAN:  And if I could just give you a headline on

18  the changes there's --

19          THE COURT:  The first one I see is at page 17.

20          MR. ZIMAN:  Yes, the changes were really in response

21  to some comments that Mr. Buchbinder supplied.

22          THE COURT:  Okay.

23          MR. ZIMAN:  And then there's one large change that was

24  an accommodation worked out between the purchaser/secured

25  lenders and the patient care ombudsman -- person, and for

1   counsel to deal with, essentially, provision for professional

2   fees for the ombudsperson in this matter.

3           THE COURT:  All right.

4           MR. ZIMAN:  To make sure there's no uncertainty

5   regarding that.  But the other changes that you see running

6   throughout, and they're relatively minor, were in response to

7   comments from Mr. Buchbinder.  Mr. Buchbinder has reviewed this

8   version and has signed off on it but for --

9           THE COURT:  It looks like the big change you're

10  talking about is at page 34.

11          MR. ZIMAN:  Yes, Your Honor.

12          THE COURT:  Okay, because the other changes I saw and

13  certainly agree with.

14          MR. ZIMAN:  I'm sorry.  The change is on page 34,

15  paragraph 36.

16          THE COURT:  Right.  Mr. Buchbinder, yes, sir?

17          MR. BUCHBINDER:  Yes, Your Honor.  Just to comment

18  briefly to help the Court out here.  Exclusive of paragraph 38,

19  which I think we've now dealt with and --

20          THE COURT:  Yes.

21          MR. BUCHBINDER:  -- and disposed of for today, most of

22  the changes that we suggested concern some ambiguities in the

23  language as to how Section 1146(a) would be handled, and the

24  language that is mostly changed in this revision is to account

25  for the fact that Section 1146(a) is not being impacted by this

1    order.

2              THE COURT:  Yes.

3              MR. BUCHBINDER:  There was another small -- there were

4    some other small comments about Section 525 as well, and the

5    order has been tweaked as well to make it clear that Section

6    525 is not being implicated except to the extent that parties

7    can later argue it.  And if I've misstated anything, Mr. Ziman

8    can certainly correct me.  But those are the changes that we

9    requested, and that's what they reflect.

10             THE COURT:  And I appreciate that.  Thank you, Mr.

11   Buchbinder.

12             All right.

13             MR. ZIMAN:  Your Honor, I think Mr. Alberino's going

14   to address the Court on a couple of those adequate assurance

15   issues that I mentioned earlier.

16             THE COURT:  And where we are on those and where -- how

17   are we handling the cure issues, Mr. Ziman?

18             MR. ZIMAN:  Well, essentially, we've resolved

19   virtually all the cure objections.

20             THE COURT:  Okay.

21             MR. ZIMAN:  I think there are a couple that might be

22   continued.  I'm looking at Mr. Kriegel.  There's a couple of

23   cure matters that --

24             MR. KRIEGEL:  That is correct.

25             MR. ZIMAN:  Can I defer this --

1          THE COURT:  I didn't mean to jump ahead.  I thought

2     while I was waiting for others to come forward I would just --

3          MR. ZIMAN:  We, essentially, agreed to continue cure

4     matters where there's not a resolution of dollars.  We'll

5     continue those --

6          THE COURT:  Right.

7          MR. ZIMAN:  -- for a later date.  To the extent that

8     we can't reach agreement, we'll come back before Your Honor on

9     notice.

10          THE COURT:  Super.  That's fine.  That works for me.

11          MR. ZIMAN:  I mean, as to some of the adequate

12     assurance issues, akin to what Mr. Bernstein had raised, I

13     think Mr. Alberino's going to address, Your Honor.

14          THE COURT:  All right.  Anyone on the cure issues,

15     I'll hear from you after Mr. Alberino.

16          MR. ALBERINO:  All right.  Good afternoon, Your Honor.

17     Scott --

18          THE COURT:  Good afternoon.

19          MR. ALBERINO:  Good afternoon.  Scott Alberino from

20     Akin Gump on behalf of the --

21          THE COURT:  Yes, sir.

22          MR. ALBERINO:  -- senior lenders and the purchaser.

23     Your Honor, I'll be very brief.  We were responsible for

24     handling resolution of certain of the objections, in particular

25     those dealing with adequate assurance issues.  I wanted to just

1   put two things quickly on the record, one with respect to the

2   adequate assurance issues raised by Health Care REIT --

3             THE COURT:  Yes.

4             MR. ALBERINO:  -- and the other dealing with the

5   adequate assurance issues raised by West Penn, another one of

6   our landlords.

7             Both of those entities, as Mr. Bernstein alluded to

8   earlier, had raised certain adequate assurance issues.  The

9   purchaser is comfortable kind of rolling those objections on a

10  go-forward basis until our financing is ultimately finalized on

11  a pre-closing basis.  We're fine with Health Care REIT as well

12  as West Penn reserving rights to come back to Your Honor if

13  there are adequate assurance issues raised by where we

14  ultimately end up on our financing.  As Mr. Bernstein knows,

15  Health Care REIT, under their master lease agreement, has

16  certain financial covenants, our financing, that will be put in

17  place and which we're in the process of putting in place.

18  Ultimately we'll have to comply with that, so we think it's

19  appropriate to provide those rights to Health Care REIT to come

20  back before Your Honor if there are any issues that pop up on

21  the adequate assurance side down the road.

22            THE COURT:  Okay.

23            MR. ALBERINO:  With that, Your Honor --

24            THE COURT:  Thank you.  And I assume everyone with

25  adequate assurance concerns is fine with that, as well.  All

1  right.

2          MR. BERNSTEIN:  Yes, Your Honor.  Thank you.

3          THE COURT:  Thank you, Mr. Bernstein.

4          Good afternoon.

5          MS. GENVERT:  Hi, there.  Lauren Genvert, DLA Piper,

6  on behalf of West Penn Allegheny Health System.

7          THE COURT:  Yes.

8          MS. GENVERT:  I just wanted to, again, reiterate what

9  he just said and say that West Penn has removed its objections,

10 contingent on the fact that it does reserve its rights to

11 object to adequate assurance capitalization at a later date.

12         THE COURT:  All right.

13         MS. GENVERT:  Thank you.

14         THE COURT:  Very well.  Thank you.

15         Mr. Wisler, did you want to be heard first or are you

16 going to respond to Mr. Kriegel?

17         MR. WISLER:  I think we're going to speak about the

18 same thing, Your Honor.

19         THE COURT:  All right.  Mr. Kriegel?  Yes, sir.

20         MR. KRIEGEL:  There are actually a couple of

21 additional objections that we've reserved some rights on, and I

22 think I can let Mr. -- Paul, if you could address yours?

23         THE COURT:  Good afternoon.

24         MR. LABOV:  Good afternoon, Your Honor.  Paul Labov,

25 Edwards Wildman Palmer.  First, let me thank you for moving my

1  admission into this court --

2           THE COURT:  Sure.

3           MR. LABOV:  -- late yesterday.  I represent CNA and

4  certain of its affiliated entities, Your Honor.

5           THE COURT:  Yes.

6           MR. LABOV:  And we had filed a supplemental objection

7  which did include some adequate assurance issues and, of

8  course, the cure notice.

9           THE COURT:  Right.

10          MR. LABOV:  To the extent Your Honor is going to enter

11 the order today, which looks like it's on its way with some

12 modifications, we've had some discussions back and forth with

13 debtors' counsel that the cure is going to be put off.  We'll

14 come up with that number at some point prior to assumption if

15 that's going to occur, or not.  Other than that, I think we're

16 happy tabling the objection at this point.

17          THE COURT:  All right.  Thank you, Mr. Labov.

18          MR. LABOV:  Thank you.

19          THE COURT:  Thank you, sir.

20          MR. KRIEGEL:  And, Your Honor, we'll come back before

21 you if there are any issues resolving that.

22          And, in addition, Cigna filed an objection.

23          THE COURT:  Yes.

24          MR. KRIEGEL:  And on the Cigna objection I believe

25 that we are going to add some language to the order reserving

1    Cigna's rights with respect to a number of the objections, and

2    we will effectively kick the can down the road on that one.

3              THE COURT:  All right.  All right, Mr. Kriegel.

4    That's fine.  Mr. Wisler?

5              MR. WISLER:  Thank you, Your Honor.  That's correct.

6              THE COURT:  All right.  Good to see you, Mr. Wisler.

7    Thank you.

8              MR. WISLER:  You as well, Your Honor.

9              THE COURT:  Are you going to do some handwriting, or

10   should we -- to address the Cigna concern or --

11             MR. ZIMAN:  I think we'll actually go ahead and do

12   that on the computer, Your Honor.

13             THE COURT:  Okay.

14             MR. ZIMAN:  And we'll send you something after

15   circulating to the parties --

16             THE COURT:  Fine.

17             MR. ZIMAN:  -- under a CNO if that's okay.

18             THE COURT:  That'll work.  That'll work fine.

19             MR. ZIMAN:  Your Honor, could we get maybe ten minutes

20   before you go on to the Boise matter?

21             THE COURT:  Yes.

22             MR. ZIMAN:  Is that okay?

23             THE COURT:  I think that's wise.  Let's do it.

24             MR. ZIMAN:  Okay.

25             THE COURT:  Ten minutes.  I'll be back in around 4:30.

1          MR. ZIMAN:  Thank you very much, Your Honor.

2          THE COURT:  Yes.  Thank you.

3      (Recess from 4:19 p.m. until 4:35 p.m.)

4          THE CLERK:  Please rise.

5          THE COURT:  Thank you, everyone.  Please be seated.

6          MR. ZIMAN:  Your Honor, thank you very much.

7          THE COURT:  All right, Mr. Ziman.

8          MR. ZIMAN:  Okay.

9          THE COURT:  I think I'm ready for you.

10         MR. ZIMAN:  I think you are.  So for the record, Ken

11  Ziman on behalf of the debtors.  We can turn to item 3 on the

12  agenda, which is the debtors made a motion for the entry of

13  orders approving a settlement agreement with Health Care REIT,

14  authorizing an interim management agreement with Vibra

15  Healthcare for the Boise facility, and then, basically,

16  scheduling a sale transaction --

17         THE COURT:  Yes.

18         MR. ZIMAN:  -- a transfer transaction with Vibra for

19  the Boise assets that are owned by the debtors.

20             As the title of the motion alludes to, the transaction

21  is basically a three-party transaction, and it stems out of the

22  relationship that the Boise debtors -- and there's two Boise

23  debtors, there's an operating entity, Boise Intensive Care --

24  I'm going to get the name wrong -- I'll come back.  There's a

25  Boise operating entity and the Boise holding company.  They are

1   parties to a master lease with Health Care REIT for that

2   facility to lease with an extended term.  It carries about a

3   twenty million dollar obligation.

4           The operations there for the debtors have always been

5   a little bit challenged.  As Your Honor remembers, the asset

6   purchase agreement with Hospital Acquisition provided for the

7   exclusion of a facility.  At a certain point in advance of the

8   bid deadline the purchaser did exercise that right to exclude

9   the Boise business, the Boise assets from the sale transaction.

10  That put us in the position of needing to find an alternative

11  solution, and that solution was going to be one of two things

12  as it played out, either the transaction that's before Your

13  Honor or a wind-down of that facility.

14          So that's, sort of, the bigger picture backdrop.  We

15  did file a motion to shorten time.  Your Honor did grant that

16  after a telephonic hearing on Thursday of last week.  We when

17  left that hearing Your Honor said, I think, a couple of things:

18  that you left open the objection deadline until right now --

19          THE COURT:  That's right.

20          MR. ZIMAN:  -- and no one's objecting, which is a good

21  thing.  Two, that you wanted to have some testimony in the

22  record, both from the debtors and from Vibra; from the debtors

23  as to the rationale for the transaction and its comfort level

24  around patient care issues, and from Vibra as to, essentially,

25  its bona fide stat as the manager for this facility.

1          I have a proffer from Mr. Douglas that I could read
2      into the record in a moment.  I believe Mr. Brady can do the
3      same for an executive from Vibra who -- both men are here in
4      the courtroom --
5          THE COURT:  That's fine.
6          MR. ZIMAN:  -- and can be cross-examined if anyone
7      would like to do that.  We've had further dialogue with the
8      U.S. Trustee's office on these matters.  He, in turn, and we,
9      have had dialogue, as has Vibra, with Ms. Koenig, our patient
10     care ombudsperson --
11         THE COURT:  Yes.  Yes.
12         MR. ZIMAN:  I think she's here as well and will, I
13     think, represent to Your Honor that she's satisfied with the
14     steps being taken here to preserve patient care or patient
15     records and continuity of the facility.
16         So if I could read a proffer in for Mr. Douglas I
17     think we could start there, Your Honor.
18         THE COURT:  Yes.  I think that's fine.  Just to be
19     clear, it wasn't that I had large concerns myself, but things
20     were happening fairly quickly.  We're dealing with patients.  I
21     just wanted to be certain that there were no concerns from
22     anyone about Vibra's ability to manage the facility.
23         MR. ZIMAN:  Yes.  The third part of that trinity, I
24     think, was actually the State of Idaho.
25         THE COURT:  Yes.

1          MR. ZIMAN:  And I think that I'm going to let Mr.

2    Brady report on those conversations, since they were largely

3    between his client and the State.  We've got some e-mail

4    traffic that confirms the State's fine --

5          THE COURT:  Good.

6          MR. ZIMAN:  -- with the interim management transaction

7    proceeding.

8          THE COURT:  I didn't hear from Idaho, and --

9          MR. ZIMAN:  We offered them the opportunity to

10   participate by call.

11         THE COURT:  Yes.  And they're not on the phone, so I'm

12   satisfied that they are not concerned.

13         MR. ZIMAN:  Great.  So I'm going to go ahead and

14   proffer Mr. Douglas' testimony.  As the record reflects

15   already, he's the chairman and chief executive officer of LCI

16   Holding and its subsidiary debtors.  He's got personal

17   knowledge of what I'm about to relate.

18         If called as a witness he would testify that the Boise

19   assets were marketed to potential purchasers along with the

20   debtors' other assets, beginning in mid-2012.  This marketing

21   process continued during the debtors' Chapter 11 cases.

22         No competing bids were received for the debtors'

23   assets, and Hospital Acquisition was named the successful

24   purchaser.  Prior to that time Hospital Acquisition notified

25   the debtors of its election, pursuant to the APA, to exclude

1   Boise from the larger sale transaction.

2           As a consequence, in the absence of an alternative,

3   the debtors would have wound down Boise.  The effects of a

4   wind-down would have been distressing, a loss of about 160

5   jobs.  There would have been the need to transfer patients out

6   of the Boise facility into other facilities, either short-

7   TACs -- a short-term acute care hospital or another long-term

8   acute care facility.

9           There would have been a substantial amount of

10  rejection damage claims created, and there was the possibility

11  of significant employee-related claims, given that we would

12  have had potentially a WARN Act-related -- a WARN Act-covered

13  closure of a facility.

14          THE COURT:  Yes.

15          MR. ZIMAN:  Mr. Douglas would testify that he was

16  concerned that the filing of the sale order relating to the

17  debtors' sale to the stalking horse purchaser could have had a

18  destabilizing effect on the Boise operations unless we were

19  also able to simultaneously disclose the proposed transaction

20  with Vibra.

21          In addition, as discussed, Health Care REIT has two

22  relationships, not just the Boise relationship but the

23  relationship on the six-property master lease.  Health Care

24  REIT had a, sort of, substantial cure claims with respect to

25  both leases, but, in particular, the master lease, and this

1    transaction proved a way to resolve those issues, as well as

2    deal with the patient issues at Boise.

3           The debtors did determine that it was in the best

4    interests of their estate to proceed in the expedited manner

5    that we are now proceeding to provide certain of the patients

6    and their families, the employees and vendors and referral

7    sources regarding the future of the Boise operations.

8           The net result of the interim facility management

9    agreement with Vibra is that the financial responsibility,

10   essentially, for the operations of Boise, including rent,

11   transfer, effectively, to Vibra after the effective date of the

12   management agreement.

13          That said, the employment of, essentially, the

14   existing clinical staff and other employees will be continued.

15   They will remain employees of the Boise debtors for the time

16   being.  This, of course, will ensure the continuity of patient

17   care we've been talking about, and as I said avoid the

18   potential claims under the WARN Act and for severance.  In

19   addition, obviously, vendors and other stakeholders will be

20   benefitted by the ongoing operation of the business.

21          The debtors will retain all control over patient

22   records during the interim management period.  At closing the

23   transactions, in fact, it does close those records to be

24   transferred to Vibra as the buyer and successor.

25          The three-way deal here involves, obviously, the

1  settlement resolution issues with Health Care REIT.  Those, I

2  think, it goes without saying, are abundantly beneficial, Mr.

3  Douglas would testify, to the debtors that it remove the

4  potential litigation of legal and factual issues around the

5  cure objections on the six-property master lease as part of

6  resolving all these issues.

7          So in Mr. Douglas' view, he would say that the interim

8  facility management agreement and the health care resettlement

9  are in the best interests of the debtors and are proper

10 exercises of the debtors' business judgment.

11         THE COURT:  All right.

12         MR. ZIMAN:  So, Your Honor, maybe I'll allow Mr. Brady

13 to come up and make a proffer.

14         THE COURT:  Yes.  Also, Mr. Douglas will be available

15 for cross-examination if anyone has any interest in doing so.

16         MR. ZIMAN:  Actually, Your Honor, if I could, as a

17 housekeeping matter, if you invite that now, because Mr.

18 Douglas actually -- or if you have questions for Mr. Douglas,

19 of course.  I'm trying to get him to make a plane.

20         THE COURT:  Fine.  Let's do that first.  Does anyone

21 have any cross-examination for Mr. Douglas?

22         All right.  Hearing no one, the proffer is admitted

23 into evidence, and Mr. Douglas is free to go.

24     (Mr. Douglas' proffer was hereby received into evidence,

25 as of this date.)

1          THE COURT:  Thank you, Mr. Douglas.

2          MR. DOUGLAS:  Thank you, Your Honor.

3          THE COURT:  Yes.  Mr. Brady?

4          MR. BRADY:  Good afternoon, Your Honor.

5          THE COURT:  Good afternoon.

6          MR. BRADY:  Robert Brady on behalf of Vibra

7    Healthcare, LLC, and I do have a proffer of Mr. Tom Durkin.

8          THE COURT:  Durkin, D-U-R-K-I-N?

9          MR. BRADY:  D-U-R-K-I-N.

10          THE COURT:  Thank you.

11          MR. BRADY:  And, Your Honor, if called to testify Mr.

12    Durkin, who is in the courtroom, would testify that he is

13    currently the executive vice president of operations and

14    clinical services for Vibra Healthcare, LLC.

15          Mr. Durkin's education background is as follows.  He

16    received a bachelor of science degree from Temple University in

17    1974.  In 1976 Mr. Durkin received a professional nursing

18    diploma from the Albert Einstein Medical Center School of

19    Nursing and became a registered nurse.  In 2002 Mr. Durkin

20    obtained his MHA degree, that's a master in healthcare

21    administration --

22          THE COURT:  Yes.

23          MR. BRADY:  -- from Saint Joseph's University.

24          Mr. Durkin has more than thirty-seven years of

25    experience in nursing and hospital operations and

1    administration.  Mr. Durkin served as a vice president with

2    Novacare/Polaris Group from 1993 through 1999 in the hospital

3    and consulting divisions.  At that point, Mr. Durkin joined

4    Moss Rehab, in 1995 (sic) as a program director in a position

5    he maintained until 2005, when he joined Vibra Healthcare as a

6    vice president of clinical services.

7           Vibra was founded in 2004 and is based in

8    Mechanicsburg, Pennsylvania.  Vibra Healthcare owns or manages

9    twenty hospitals in ten states throughout the country and is

10   the largest nonpublic hospital operator in the United States.

11          Mr. Durkin would testify that Vibra Healthcare's

12   management team has more than a century of combined experience

13   in the development and operation of freestanding acute medical

14   rehabilitation hospitals and long-term acute care hospitals.

15   Vibra is dedicated to providing patient care with a commitment

16   to clinical services.  The company offers a vision of elevating

17   patient care to ambitious new levels and is positioned among

18   the industry's most respected organizations.

19          Vibra Healthcare estimates its 2013 revenues will

20   exceed 400 million dollars.  It's capitalized for growth.  It

21   has extensive hospital development and turnaround experience.

22          Mr. Durkin is familiar with the interim facility

23   management agreement negotiated with the debtor, Boise

24   Intensive Care Hospital.  Mr. Durkin would testify that Vibra

25   Healthcare has assumed the operations of several hospitals in

1    financial distress over the last five years, and he and his

2    team have successfully transferred facility management over

3    short periods of time with little or no disruption to

4    operations.

5         Mr. Durkin would state that a key factor Vibra

6    Healthcare evaluates in determining whether it is feasible to

7    assume operations of a hospital midstream is the current level

8    of patient care.  Patient care must be at least satisfactory or

9    better or Vibra Healthcare would not generally attempt to

10   assume those operations.

11        Mr. Durkin personally visited the debtors' facility in

12   Meridian, Idaho approximately two weeks ago and met with staff

13   members, observed firsthand the facility, the operations, and

14   patient care, reviewed staffing levels, and evaluated patient

15   outcomes.

16        Based on Mr. Durkin's review, Vibra Healthcare

17   determined to proceed with negotiations on an interim facility

18   management agreement and ultimately the purchase of the

19   hospital's assets.

20        Last week, on less than twenty-four hours' notice,

21   after it appeared that the interim facility management

22   agreement would be executed, three members of Mr. Durkin's

23   staff were on the ground in Idaho, from Wednesday through

24   Thursday of last week, for the announcement and to prepare for

25   the potential transition.  Once senior member has remained in

1   Idaho since then, working with the debtors' employees, and he

2   will be joined by additional Vibra Healthcare employees

3   immediately if the interim facility management agreement is

4   approved by the Court.

5          Mr. Durkin's staff and outside professionals are

6   familiar with licensing transfer requirements at both the

7   federal and state level and are already working to facilitate

8   the transfers should the Court approve these transactions.

9          Mr. Durkin's team has established relationships with

10  the existing staff of the facility, and Mr. Durkin is confident

11  the transition will be smooth, with little or no disruption to

12  operations and no risk to patient care.

13         And that would conclude the proffer of Mr. Tom Durkin.

14         THE COURT:  Thank you, Mr. Brady.  Does anyone wish to

15  cross-examine Mr. Durkin or have any objection to the admission

16  into evidence of the proffer?

17         All right.  The proffer is admitted into evidence,

18  then, in support of the motion.  Thank you, Mr. Brady.

19     (Mr. Brady's proffer was hereby received into evidence, as

20  of this date.)

21         MR. BRADY:  And, Your Honor, the other item I have

22  is --

23         THE COURT:  Yes.

24         MR. BRADY:  I know Your Honor had raised the question

25  of what Idaho's position was.

1          THE COURT:  Yes.  Thank you.  Sure.

2          MR. BRADY:  Mr. Doug Yohe, who is general counsel of

3   Vibra Healthcare, had been in contact with Idaho and received

4   confirmation from a Sylvia Creswell, a co-supervisor of the

5   Non-Long Term Care section of the Bureau of Facility Standards

6   for Idaho, that they had no objection to Vibra Healthcare

7   assuming management responsibilities of the hospital commencing

8   April 3.

9          In full disclosure, Your Honor, we did receive an

10  e-mail earlier today from the State of Idaho Attorney General's

11  office that perhaps they were revisiting that decision.  There

12  was a conference call the commenced at 3:15.  Mr. Yohe, for

13  Vibra Healthcare, participated.  It was with the Bureau of Long

14  Term Care as well as the Attorney General's Office for Idaho,

15  and they have now confirmed, again, that their original

16  position is accurate and they have no objection to Vibra

17  Healthcare assuming management responsibilities at the hospital

18  commencing April 3.

19         THE COURT:  All right.  Mr. Brady, thank you.  Thank

20  you for that full disclosure.

21         All right.  The proffer is admitted into evidence, and

22  I think I was going to also hear from Ms. Koenig, if that's

23  correct.  It's good to see you again.  Good afternoon.

24         MS. KOENIG:  Thank you, Your Honor.  I want to report

25  that as of today we've visited seventeen of the hospitals, and

 1  during my visits I have really found no material issues

 2  relating to patient care.

 3        After the filing of the motion to approve the interim

 4  management agreement and the sale to Vibra, I immediately

 5  contacted the debtors' COO to discuss the issues and to discuss

 6  how they were going to deal with the patient care issues.  I've

 7  actually had several conversations with the debtors' COO, a

 8  phone call with the debtors' counsel and the general counsel,

 9  and I've had conversations with Mr. Durkin as well, besides

10  sitting next to me today also, and the debtors and Vibra have

11  been extremely cooperative in answering all my questions and

12  participating in any of the discussions.

13        I asked several questions about patient care in

14  relations to staff, patient records, supplies, and, really,

15  access to patient records and to anything that, really,

16  patients would need, and Mr. Durkin assured me that he had

17  staff in the facility on Wednesday and Thursday and who are

18  still there working with staff to be able to make a smooth

19  transition.

20        So based upon these discussions and review of the

21  papers filed in the court I have really not identified any

22  patient care issues that would affect the interim management

23  agreement with Vibra.

24        I do intend to visit the facility just to be sure --

25  during the process of the bankruptcy -- to be sure that there

1  will be a smooth transition and that patients will be taken

2  care of, and I've already talked to Mr. Durkin about that, so

3  in the next week or so -- I'd like to give him a week or so

4  just to get settled and then probably go out and visit with

5  them as well.

6           THE COURT:  All right.  Thank you very much, Ms.

7  Koenig.

8           MS. KOENIG:  Thank you.

9           THE COURT:  That's very comforting and helpful to

10 know.

11          MS. KOENIG:  Thank you.

12          THE COURT:  Yes.

13          MR. ZIMAN:  So, Your Honor, I think unless Your Honor

14 has questions I think I would ask Your Honor to go ahead and

15 approve the arrangements that we're entering into here with

16 Vibra and Health Care REIT.  I think the record now reflects

17 that these transactions are borne out of, one, good business

18 reasons.

19          THE COURT:  Yes.

20          MR. ZIMAN:  As to -- in both the shortened notice and

21 the use of the debtors' property in the fashion contemplated

22 and that the settlement with Health Care REIT is also an

23 exercise in debtors' good business judgment.

24          In fact, under the settlement we're not doing anything

25 other than having them withdraw a very large group of claims --

1           THE COURT:  Yes.  Yes.

2           MR. ZIMAN:  -- and providing for the rejection of the

3  Boise lease.

4           I think the order leaves open the amount of the

5  rejection damages claim for now.  The parties will try to work

6  it out.  If we can't we'll come back and figure it out in front

7  of Your Honor.

8           I think, as indicated, this is a, I think, a win-win,

9  and the company thinks it's a win-win in terms of dealing with

10  the Health Care REIT issues that allowed the sale to go

11  forward, similarly before, and now providing for the ongoing

12  operation of the Boise hospital --

13          THE COURT:  Yes.

14          MR. ZIMAN:  -- under Vibra's management.

15          And the only think we would need from Your Honor, if

16  you're inclined to approve it, then, is a date for a sale

17  hearing, which we would intend to put out on regular notice.

18          THE COURT:  All right.  All right, Mr. Ziman.

19  Wonderful.

20          Before I do that, does anyone wish to be heard on

21  this?

22          Well, I agree with everything you've said, Mr. Ziman.

23  I do think it is a positive result for everyone.  I was not

24  familiar with Vibra, and that was why I asked, and appreciate

25  very much your being here, Mr. Durkin, and now I am familiar

1   with Vibra and its outstanding services, and I'm very firm in

2   agreeing that this is a very fine transaction, and it certainly

3   makes sense from a business standpoint and from a patient

4   standpoint, as well.

5           MR. ZIMAN:  Your Honor, I have an order that hasn't

6   changed.

7           THE COURT:  Okay.

8           MR. ZIMAN:  May I approach?

9           THE COURT:  You sure may.  And let's look for a date

10  here.

11          MR. ZIMAN:  Two dates, for a sale hearing and an

12  objection deadline for the --

13          THE COURT:  Yes.  Thank you.  Thank you, Mr. Ziman.

14  All right.  I was looking to see if we have you scheduled any

15  time in the sort of near future.

16          MR. ZIMAN:  Your Honor, we actually have an omnibus

17  next week.  That's obviously too soon.

18          THE COURT:  Right.

19          MR. ZIMAN:  And I think our subsequent one is May -- I

20  don't want to misspeak.  It's early May.

21          THE COURT:  Mr. Kriegel?

22          UNIDENTIFIED SPEAKER:  It's May 7th.

23          THE COURT:  May 7th.

24          MR. ZIMAN:  Maybe we can do something --

25          THE COURT:  Yes, 3rd.  Is that --

1          MR. ZIMAN:  Could we do something before that,

2     earlier?  I think it might make sense.

3          THE COURT:  Would you like to do something before

4     then?

5          MR. ZIMAN:  The end of April or maybe the first couple

6     of days of May.

7          THE COURT:  Let's see.

8          MR. ZIMAN:  We would propose to get notice out by the

9     end of this week.

10          THE COURT:  I could do the 1st of May.

11          MR. ZIMAN:  Actually, you know what, Your Honor?  Why

12     crowd the calendar?  Why don't we just put it on for May 7th?

13          THE COURT:  That's fine.  Okay.

14          MR. ZIMAN:  And we'll just have objections due on May

15     1st.

16          THE COURT:  That's very helpful.  That's what we'll

17     do.

18          MR. ZIMAN:  Okay.  Great.

19          THE COURT:  I appreciate it.  I'm going to sign the

20     order.

21          MR. ZIMAN:  Thank you very much, Your Honor.

22          THE COURT:  Anything further for today?

23          MR. ZIMAN:  I don't think so, Your Honor.  I think

24     we're good.

25          THE COURT:  Counsel, thank you.

1          MR. ZIMAN:  Thank you very much, Your Honor.

2          THE COURT:  It was not an easy hearing but a very good

3     one, and I appreciate everyone's participation.  And we'll

4     stand in recess.  Good day to you.

5        (Whereupon these proceedings were concluded at 4:56 PM)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2                              I N D E X

3

4                         E X H I B I T S

5  DEBTORS'              DESCRIPTION            PAGE

6  --                    Declarations of Mr.     17

7                        Douglas, Mr. Augustine,

8                        and Mr. Varughese

9  COURT'S

10 --                    Mr. Douglas' proffer    71

11 --                    Mr. Brady's proffer     75

12

13

14                            RULINGS

15                                        Page      Line

16 Mr. Bernstein's rights are reserved to    16        19

17 cross-examine on the declarations with

18 respect to Health Care REIT's adequate

19 assurance issue

20 Bidding procedures' motion is granted     53        11

21 Motion approving the settlement agreement 79        21

22 with Health Care REIT is granted

23

24

25

1

2                    C E R T I F I C A T I O N

3

4    I, Sharona Shapiro, certify that the foregoing transcript is a

5    true and accurate record of the proceedings.

6

7          *Sharona Shapiro*

8                                        April 3, 2013

9    _____        _____

10   SHARONA SHAPIRO                         DATE

11   AAERT Certified Electronic Transcriber CET**D-492

12

13   eScribers, LLC

14   700 West 192nd Street, Suite #607

15   New York, NY 10040

16

17

18

19

20

21

22

23

24

25

**A**

**ability (1)**
67:22
**able (16)**
15:10;21:7;26:11;
29:11;35:21,24;36:3,
7,16;48:4,6,21;
50:11;52:19;69:19;
77:18
**above (1)**
19:22
**absence (1)**
69:2
**absent (1)**
27:22
**absolute (1)**
34:19
**absolutely (3)**
33:25;37:20;51:22
**absurd (1)**
48:10
**abundantly (1)**
71:2
**acceptable (2)**
13:11;16:13
**accepted (1)**
16:20
**access (1)**
77:15
**accommodation (1)**
57:24
**account (1)**
58:24
**accounts (7)**
32:22;33:1,12,14,
15;34:5,11
**accrue (6)**
23:23;29:5,18;
30:8;32:4;50:25
**accrued (1)**
28:12
**accrues (4)**
25:17,20;28:21;
31:25
**accurate (1)**
76:16
**Acquisition (7)**
12:15;18:17;19:6;
41:8;66:6;68:23,24
**act (2)**
41:14;70:18
**Act-covered (1)**
69:12
**action (1)**
45:11
**actions (1)**
42:17
**Act-related (1)**
69:12
**actually (15)**
18:21;21:9;36:1,

22;39:2;45:23;
48:25;62:20;64:11;
67:24;71:16,18;
77:7;80:16;81:11
**acute (4)**
69:7,8;73:13,14
**add (2)**
45:14;63:25
**addition (7)**
17:6;19:13;30:20;
38:11;63:22;69:21;
70:19
**additional (4)**
15:11;57:2;62:21;
75:2
**address (10)**
22:7;46:8,18,23;
49:22;50:8;59:14;
60:13;62:22;64:10
**addressed (1)**
22:11
**adequate (21)**
13:1;14:17,24;
15:5,6,10,24;16:5,
11;17:7;59:14;
60:11,25;61:2,5,8,
13,21,25;62:11;63:7
**admin (1)**
21:7
**administration (2)**
72:21;73:1
**administrative (20)**
21:15,19;23:25;
24:12;25:25;26:1,
16;29:1,4,19;31:2,
15;34:21;35:2;47:9;
48:3,21,23;50:25;
51:18
**administratively (4)**
27:16;32:1,8,10
**admission (8)**
13:24;15:15,21,
25;16:9;50:14;63:1;
75:15
**admit (1)**
15:17
**admitted (5)**
17:17;31:12;
71:22;75:17;76:21
**admittedly (1)**
51:3
**adopted (1)**
42:15
**advance (1)**
66:7
**advantage (1)**
20:16
**advising (1)**
57:5
**AFCO (1)**
6:8
**affect (1)**
77:22

**affidavit (1)**
12:13
**affiliate (1)**
18:9
**affiliated (2)**
42:10;63:4
**afternoon (19)**
10:3,5,22;14:1;
22:24,25;35:7,8;
40:15;44:4;60:16,18,
19;62:4,23,24;72:4,
5;76:23
**again (14)**
11:3;16:3;18:25;
19:2;22:17;31:6;
34:24;36:21;38:3,
25;46:5;62:8;76:15,
23
**against (3)**
30:12;44:19;51:18
**agenda (2)**
11:8;65:12
**ago (2)**
44:10;74:12
**agree (4)**
32:12;51:21;
58:13;79:22
**agreed (4)**
40:22;44:14;51:5;
60:3
**agreeing (1)**
80:2
**agreement (24)**
21:13;22:2;33:8,
14;43:4;45:14,25,25;
49:7;50:1;60:8;
61:15;65:13,14;
66:6;70:9,12;71:8;
73:23;74:18,22;
75:3;77:4,23
**ahead (7)**
13:6,7,15;60:1;
64:11;68:13;78:14
**AKIN (3)**
5:13;60:12,20
**ALBERINO (8)**
5:15;60:15,16,19,
19,22;61:4,23
**Alberino's (2)**
59:13;60:13
**Albert (1)**
72:18
**Allegheny (1)**
62:6
**alleviate (1)**
54:23
**ALLINSON (2)**
8:22,24
**allocate (1)**
30:21
**allow (3)**
22:20;46:8;71:12
**allowed (2)**

**34:16;79:10**
**allows (1)**
22:3
**alluded (1)**
61:7
**alludes (1)**
65:20
**almost (1)**
43:21
**alone (2)**
18:13;48:20
**along (2)**
12:20;68:19
**alternative (5)**
19:3,7;20:15;
66:10;69:2
**alternatives (4)**
18:15;20:19,20;
22:14
**always (2)**
51:13;66:4
**ambiguities (1)**
58:22
**ambitious (1)**
73:17
**ambush (1)**
44:8
**among (1)**
73:17
**amount (6)**
19:16;26:7;36:18;
43:18;69:9;79:4
**amounted (1)**
22:5
**amounts (3)**
17:4,5;36:4
**ample (1)**
20:7
**analyze (3)**
45:19;52:2,13
**analyzing (1)**
51:24
**and/or (1)**
49:8
**ANNE (1)**
6:4
**announcement (1)**
74:24
**anticipated (1)**
40:1
**anticipating (2)**
55:7,7
**APA (8)**
35:16,25,25;36:2,
5,6;38:3;68:25
**apologize (1)**
57:14
**apparent (1)**
18:22
**appeal (2)**
44:12,14
**appeared (1)**
74:21

**applicable (1)**
19:24
**appointing (1)**
44:16
**appointment (1)**
44:14
**appreciate (10)**
44:20,21;51:24;
54:2;55:21,22;
59:10;79:24;81:19;
82:3
**approach (4)**
53:22,23;56:20;
80:8
**approached (1)**
18:12
**appropriate (9)**
22:9,11;24:11;
32:2;34:13;43:17,
19;44:9;61:19
**appropriately (1)**
55:14
**approval (7)**
25:1,3,5;27:22;
28:1;30:19;33:16
**approve (17)**
29:16,16;31:14,
15;33:9,13,13;34:25;
41:14;49:18;52:17,
18;53:11;75:8;77:3;
78:15;79:16
**approved (13)**
18:24;24:10;
25:25;31:8,25;
42:15;43:12;44:23;
50:22,23,24;52:25;
75:4
**approving (3)**
19:24;44:2;65:13
**approximately (3)**
19:20;29:6;74:12
**April (3)**
76:8,18;81:5
**argue (1)**
31:15;32:25
**argued (2)**
37:3;50:13
**arguing (3)**
13:9;32:11;40:8
**argument (12)**
12:3;13:7;32:20,
22;34:11,13;36:1,22;
37:11;38:9;39:21;
51:23
**arguments (3)**
22:8;40:25;51:25
**arise (1)**
21:3
**arises (1)**
28:20
**arising (1)**
21:3

**arm's (1)**
28:7
**ARNOLD (2)**
7:17;14:4
**around (8)**
12:2;24:5;31:7;
46:5;51:9;64:25;
66:24;71:4
**Arps (1)**
10:7
**arrangements (2)**
12:1;78:15
**Article (1)**
22:18
**ASHBY (1)**
6:2
**aside (1)**
21:20
**assert (2)**
27:22;28:10
**assertion (1)**
28:25
**asset (8)**
21:13;22:2;28:18,
20;33:8,14;50:1;
66:5
**assets (25)**
11:17;21:8;24:22;
25:5;27:3,24;28:12,
13,19;29:22,25;30:4;
32:24;33:10;41:5;
43:18;47:19;50:3;
52:5;65:19;66:9;
68:19,20,23;74:19
**assign (1)**
14:15
**assigned (3)**
36:12,14;37:24
**assignment (1)**
12:12
**assist (1)**
21:24
**assistance (1)**
23:19
**associated (1)**
19:21
**assts (1)**
29:20
**assume (5)**
14:14;36:3;61:24;
74:7,10
**assumed (6)**
19:19;36:12,14;
37:24;49:7;73:25
**assuming (4)**
40:8;54:11;76:7,
17
**assumption (5)**
12:12;19:20;
36:18;52:11;63:14
**assurance (21)**
13:1;14:17,24;
15:5,6,10,24;16:5,

11;17:7;59:14;
60:12,25;61:2,5,8,
13,21,25;62:11;63:7
**assured (1)**
77:16
**attempt (2)**
26:7;27:19;74:9
**attempted (2)**
28:2;44:5
**attempting (1)**
53:24
**Attorney (2)**
76:10,14
**Attorneys (16)**
5:3,9,14,20;6:3,8,
13;7:8,13,18,24;8:3,
7,12,17,23
**auction (1)**
12:9
**AUGUSTINE (6)**
9:6;11:1,4;12:21;
17:14;18:25
**Augustine's (1)**
13:17
**authorized (1)**
42:16
**authorizing (1)**
65:14
**available (5)**
13:5,21;21:14;
47:24;71:14
**avoid (1)**
70:17
**aware (2)**
17:11;34:21
**away (1)**
50:17
**awful (1)**
19:14

**B**

**bachelor (1)**
72:16
**back (17)**
11:2;12:7;18:23;
43:19;46:10;48:9;
49:5,13;51:9;60:8;
61:12,20;63:12,20;
64:25;65:24;79:6
**backdrop (1)**
66:14
**background (3)**
12:7;24:15;72:15
**bad (1)**
41:11
**banker (1)**
11:2
**bankruptcy (20)**
18:16;24:25;
27:14,25;28:12;
29:22,23;30:1,3,3,
10;33:17;34:24;

37:17,25;38:2,13;
44:2;50:6;77:25
**bargain (2)**
34:1,5
**based (5)**
32:9;50:17;73:7;
74:16;77:20
**basically (2)**
65:15,21
**basis (9)**
19:23;28:10;
31:16;34:10;50:18,
19;51:23;61:10,11
**BASTIAN (1)**
8:16
**BATTAGLIA (1)**
8:11
**beautifully (1)**
37:16
**became (2)**
18:22;72:19
**beforehand (2)**
28:19;30:17
**begin (1)**
23:11
**beginning (2)**
12:8;68:20
**behalf (11)**
10:7;14:6;23:10,
12,13;35:9;40:17;
60:20;62:6;65:11;
72:6
**beneficial (1)**
71:2
**benefit (3)**
27:15,20;33:11
**benefitted (1)**
70:20
**benefitting (2)**
37:17;49:2
**BENZIJA (1)**
8:13
**BERNSTEIN (20)**
7:19;14:1,3,3,6,7,
8,14;15:14,18,21;
16:18,21,22,24;
60:12;61:7,14;62:2,3
**Bernstein's (1)**
17:11
**besides (1)**
77:9
**best (10)**
19:7;32:12;38:18;
39:22;44:22;45:9;
47:15;52:16;70:3;
71:9
**bet (1)**
42:21
**better (2)**
19:3;74:9
**beyond (1)**
19:22
**bid (7)**

12:16,17;18:24;
19:5,22;22:4;66:8
**bidder (3)**
12:15,16;30:16
**bidding (2)**
12:8;27:13
**bids (1)**
68:22
**big (1)**
58:9
**bigger (1)**
66:14
**biggest (2)**
46:25;50:9
**binder (1)**
56:24
**BIRD (1)**
7:14
**bit (4)**
37:2;39:14;47:23;
66:5
**blackline (3)**
56:21,24;57:10
**BLANK (1)**
5:8
**BMA (1)**
8:12
**board (1)**
18:6
**Boise (25)**
11:15;41:6;64:20;
65:15,19,22,22,23,
25,25;66:9,9;68:18;
69:1,3,6,18,22;70:2,
7,10,15;73:23;79:3,
12
**bona (2)**
18:11;66:25
**bond (2)**
47:21,22
**bondholders (1)**
43:3
**bonds (1)**
42:24
**borne (1)**
78:17
**both (8)**
23:25;32:20;61:7;
66:22;67:3;69:25;
75:6;78:20
**Bowe (1)**
38:21
**BR (1)**
44:11
**Brad (1)**
35:9
**BRADFORD (1)**
5:5
**BRADSHAW (1)**
8:19
**BRADY (17)**
7:9;67:2;68:2;
71:12;72:3,4,6,6,9,

11,23;75:14,18,21,
24;76:2,19
**Brady's (1)**
75:19
**break (2)**
54:8,8
**BRETT (1)**
6:15
**brief (1)**
60:23
**briefly (1)**
58:18
**bring (1)**
45:9
**brings (1)**
17:20
**brought (1)**
44:19
**BUCHBINDER (21)**
6:25;12:2;36:23;
40:15,17,17;41:4,8,
23;42:22;44:1;
45:22,24;57:21;58:7,
7,16,17,21;59:3,11
**Buchbinder's (2)**
46:8;53:18
**bucket (1)**
49:10
**burdened (1)**
18:3
**Bureau (2)**
76:5,13
**business (26)**
16:7;19:11,21;
20:1,8,10;26:5;27:1,
4,7,9;37:12;38:8;
47:21;48:15;49:10,
14;52:8,11,12;66:9;
70:20;71:10;78:17,
23;80:3
**businesses (4)**
18:1;20:17;27:2;
52:9
**buy (1)**
28:14
**buyer (3)**
14:21;19:3;70:24

**C**

**calendar (1)**
81:12
**call (5)**
19:21;46:1;68:10;
76:12;77:8
**called (2)**
68:18;72:11
**came (2)**
18:23;29:7
**Camera (1)**
38:25
**can (36)**
23:6;24:5;25:5,10,

26:3,9,9,10;29:8,10;
30:7,8;36:6;37:9,15;
41:1;43:12;44:22,
23;46:11;50:23;
51:15;52:21,23;54:3,
8,10;59:7,8,25;
62:22;64:2;65:11;
67:2,6;80:24
**candidly (1)**
21:19
**capable (1)**
47:4
**capacity (1)**
42:10
**capital (3)**
28:21;29:6;42:9
**capitalization (1)**
62:11
**capitalized (1)**
73:20
**Care (48)**
5:20;6:3;7:18;9:3;
11:14;14:6,10;
16:10;17:6;18:21;
20:25;21:3;57:25;
61:2,11,15,19;65:13,
23;66:1,24;67:10,14;
69:7,8,21,23;70:17;
71:1,8;73:14,15,17,
24;74:8,8,14;75:12;
76:5,14;77:2,6,13,
22;78:2,16,22;79:10
**carries (1)**
66:2
**carve- (1)**
21:25
**carved (1)**
26:21
**carve-out (1)**
22:4
**carve-outs (2)**
22:3;33:3
**case (41)**
12:8;17:21;19:25;
24:8,9,15,17,18;
25:7,10,23;27:8,24;
29:3,4,15,17;31:21,
21;32:9,9,12;34:1;
35:5,23;36:15,17;
37:10,23;38:8,16,25;
39:1,4;42:3,20,22;
43:5;44:10;52:6,18
**cases (16)**
17:22;18:15;29:7;
33:4;35:22;38:7,12,
20;39:5,7,7,8;48:9;
50:4;52:15;68:21
**Casualty (2)**
7:24;8:23
**Catholic (1)**
43:23
**Center (2)**
8:18;72:18

**Centers (1)**
49:3
**century (1)**
73:12
**CEO (1)**
10:20
**certain (13)**
12:19;30:21,23;
33:2;40:3;53:19;
60:24;61:8,16;63:4;
66:7;67:21;70:5
**certainly (14)**
13:11;18:11;24:5;
27:8;37:14;38:11,
20;43:11;44:8;
52:16;54:3;58:13;
59:8;80:2
**chairman (1)**
68:15
**challenged (1)**
66:5
**change (3)**
57:23;58:9,14
**changed (3)**
27:16;58:24;80:6
**changes (8)**
56:17;57:2,18,20;
58:5,12,22;59:8
**Chapter (12)**
20:12,16;21:6,8,
24;22:17;26:8,17,17;
31:21;43:5;68:21
**characterization (1)**
49:23
**CHARLES (1)**
7:20
**chief (3)**
10:23;20:20;68:15
**choosing (2)**
30:15;34:5
**Chris (1)**
10:23
**Christian (1)**
43:23
**CHRISTOPHER (2)**
6:20;23:9
**Cigna (4)**
8:7;63:22,24;
64:10
**Cigna's (1)**
64:1
**circle (1)**
51:9
**circulating (1)**
64:15
**circumstances (5)**
20:15;21:4;43:17,
20;44:9
**circumvent (1)**
26:7
**circumvention (1)**
37:3
**cite (1)**

33:4
**cited (1)**
50:4
**Civil (1)**
7:3
**claim (31)**
23:15,16;26:2;
29:1,4,18,19;31:2;
35:3;39:16,23,24,24;
40:8,9,11;48:1,3,4,
10;50:9,25;51:1,10,
13,14,14,18,21;
52:19;79:5
**claimant (4)**
25:25;26:1;52:21,
24
**claimants (1)**
51:19
**claims (31)**
19:21;21:7;23:25,
25;24:1,13;26:16;
30:23,23,25;31:1,15;
34:21,22,22,22;
35:18,19;38:1;43:5,
6,10;44:19;47:8,8;
48:7;69:10,11,24;
70:18;78:25
**clarify (1)**
31:17
**clarifying (2)**
35:11;53:16
**Clark (1)**
10:13
**clear (13)**
12:23;17:10;19:1,
13;28:5,25;31:24;
37:15;38:6,8;54:3;
59:5;67:19
**clearly (3)**
31:9;35:1;52:14
**CLERK (2)**
10:2;65:4
**client (1)**
68:3
**climax (1)**
24:17
**clinical (4)**
70:14;72:14;73:6,
16
**close (2)**
43:6;70:23
**closing (5)**
36:4,7;39:24,25;
70:22
**closure (1)**
69:13
**CNA (3)**
7:24;8:23;63:3
**CNO (1)**
64:17
**Code (1)**
22:17
**collateral (3)**

37:10;49:25;50:2
**colleagues (1)**
10:13
**collect (1)**
51:13
**collectively (2)**
42:12,13
**combined (1)**
73:12
**comfort (1)**
66:23
**comfortable (2)**
55:24;61:9
**comforting (1)**
78:9
**coming (2)**
52:20;54:18
**commenced (1)**
76:12
**commencing (2)**
76:7,18
**comment (1)**
58:17
**comments (7)**
40:24;41:1;46:8;
53:16;57:21;58:7;
59:4
**commitment (1)**
73:15
**Committee (27)**
5:3;12:2;21:17;
27:12;35:10,13,16,
21,23;36:7,16;42:9,
22;43:9;44:7,18,19,
21;45:5,12,15,15,17;
46:2;53:23;54:4,20
**Committee/Stalking (2)**
5:9,14
**common (1)**
35:21
**communities (3)**
20:18;48:18;52:10
**community (1)**
21:2
**companies (1)**
19:12
**Company (8)**
7:24;8:23;10:20;
18:6;49:2;65:25;
73:16;79:9
**company's (1)**
20:9
**competing (1)**
68:22
**complains (1)**
21:12
**complete (1)**
28:8
**complications (1)**
29:3
**complied (1)**
44:5
**comply (2)**

47:6;61:18
**complying (1)**
21:6
**computer (1)**
64:12
**CONAWAY (1)**
7:7
**concern (14)**
25:19;27:10;
28:21;37:19;41:2,
18;46:12;48:15;
50:8,9;52:9;55:17;
58:22;64:10
**concerned (3)**
25:9;68:12;69:16
**concerns (5)**
12:2;55:22;61:25;
67:19,21
**concerted (1)**
27:19
**conclude (1)**
75:13
**concluded (1)**
82:5
**condition (1)**
47:8
**conditions (2)**
40:4,6
**conduct (1)**
27:14
**conference (2)**
41:20;76:12
**confess (1)**
42:2
**confident (1)**
75:10
**confirm (2)**
20:11;31:12
**confirmation (5)**
26:8,12,16;52:4;
76:4
**confirmed (3)**
24:6,18;76:15
**confirms (1)**
68:4
**conflict (1)**
24:7
**Congress (4)**
47:1,5,5,7
**connection (2)**
14:15;40:24
**CONNOLLY (1)**
8:6
**consent (1)**
47:20
**consequence (2)**
50:21;69:2
**constituency (3)**
35:24;37:22;54:6
**constituents (1)**
56:9
**consulting (1)**
73:3

**consummated (2)**
27:3;32:4
**contact (1)**
76:3
**contacted (1)**
77:5
**contains (1)**
33:14
**contemplate (1)**
51:1
**contemplated (4)**
35:25,25;36:2;
78:21
**contemplating (3)**
29:8,9;30:17
**contend (9)**
24:9,24;25:23;
26:13,25;27:23;
31:13;34:7,14
**contending (1)**
28:6
**contest (2)**
34:10;49:23
**contested (1)**
20:7
**contesting (3)**
15:6,18;20:6
**context (1)**
26:4
**Continental (2)**
7:24;8:23
**contingent (3)**
39:23;50:9;62:10
**continuation (2)**
26:23;52:8
**continue (9)**
19:8,8,9;27:2,7;
48:16,17;60:3,5
**continued (3)**
59:22;68:21;70:14
**continues (1)**
21:20
**continuing (2)**
16:6;26:24
**continuity (2)**
67:15;70:16
**contracts (5)**
12:12;19:19;
36:12,14;37:24
**contractual (1)**
19:18
**contrary (1)**
47:18
**contribution (1)**
19:15
**control (1)**
70:21
**conversations (3)**
68:2;77:7,9
**conversion (4)**
22:9;32:2,5;38:23
**convert (3)**
31:21;32:7;52:15

**converted (1)**
38:25
**COO (2)**
77:5,7
**cooperative (1)**
77:11
**cooperatively (3)**
14:21;15:1;16:4
**copy (1)**
57:15
**CORPORATION (1)**
8:2
**correctly (1)**
40:10
**cost (3)**
49:4;50:18,19
**costs (1)**
21:15
**co-supervisor (1)**
76:4
**counsel (10)**
17:9;32:20;41:20;
54:9;58:1;63:13;
76:2;77:8,8;81:25
**counter- (1)**
19:17
**counterparties (1)**
47:22
**counter-parties (2)**
17:5;19:18
**counter-party (1)**
19:10
**countless (1)**
39:5
**country (1)**
73:9
**couple (13)**
10:16;14:11;17:6;
24:15;31:16,17;
49:22;59:14,21,22;
62:20;66:17;81:5
**course (10)**
17:25;22:9,11;
25:12;27:16;32:9;
49:10;63:8;70:16;
71:19
**COURT (241)**
10:3,6,9,14,18,22,
25;11:3,5,10,18,21;
12:5,25;13:11,20,23;
14:2,5,7,13;15:14,
20;16:12,15,17,19,
22;17:2,12,16;18:2;
20:4,13;22:22;23:3,
7,14;24:11,11,20,23;
25:3,6,16;27:14;
28:24;29:21;30:4,9,
11,19;31:13,14,20,
22;32:14;33:13,18,
23;35:6,14;36:9,25;
37:2,5,13,18;38:16;
39:8,14,18,21;40:2,
5,12,14,16,23;41:2,3,

7,15,16,22;42:4,21;
43:6,25;44:4,24;
45:10,11,22;46:12,
15,18,22;47:2,11,16,
18,19,25;49:19;50:7;
51:4,5,10,12,17,24;
52:6,17;53:1,4,6,8,
11,14,17,21;54:12,
15,19;55:5,9,11,13,
16;56:1,4,7,11,13,19,
22,24;57:2,4,6,9,11,
16,19,22;58:3,9,12,
16,18,20;59:2,10,14,
16,20;60:1,6,10,14,
18,21;61:3,22,24;
62:3,7,12,14,19,23;
63:1,2,5,9,17,19,23;
64:3,6,9,13,16,18,21,
23,25;65:2,5,7,9,17;
66:19;67:5,11,18,25;
68:5,8,11;69:14;
71:11,14,20;72:1,3,
5,8,10,22;75:4,8,14,
23;76:1,19;77:21;
78:6,9,12,19;79:1,
13,18;80:7,9,13,18,
21,23,25;81:3,7,10,
13,16,19,22,25;82:2
**courtroom (5)**
10:12;13:19;
44:21;67:4;72:12
**courts (3)**
21:21;38:13;47:11
**Court's (5)**
17:11;25:1;27:22,
25;41:12
**covenants (1)**
61:16
**created (1)**
69:10
**credit (2)**
19:22;22:4
**Creditor (3)**
8:12;36:16;37:9
**creditors (24)**
19:11;21:19,20;
24:2;26:14;27:15;
31:5;32:21;33:4,5,6;
34:18,20;43:2,11;
44:23,25;45:17;
47:9;48:22,23;53:19,
24;55:18
**Creditors' (8)**
5:3;33:2;35:13,16;
42:9,22;43:9;44:6
**Creswell (1)**
76:4
**cross-exam (1)**
13:5
**cross-examination (3)**
13:8;71:15,21
**cross-examine (5)**
15:8,16;16:2,10;

75:15
**cross-examined (2)**
13:21;67:6
**crowd (3)**
10:9,10;81:12
**culmination (1)**
17:21
**cure (11)**
11:9;17:1;59:17,
19,23;60:3,14;63:8,
13;69:24;71:5
**current (2)**
30:14;74:7
**currently (1)**
72:13
**customers (2)**
38:5,5

## D

**damage (1)**
69:10
**damages (1)**
79:5
**dark (1)**
56:18
**date (9)**
17:15;28:3;60:7;
62:11;70:11;71:25;
75:20;79:16;80:9
**dates (2)**
18:4;80:11
**DAVID (2)**
6:25;40:17
**DAVIS (1)**
5:4
**day (6)**
38:13,15,22;
43:22;46:23;82:4
**days (4)**
52:20;55:1,1;81:6
**deadline (4)**
12:17;66:8,18;
80:12
**deal (12)**
18:17,23;35:17;
41:14;44:22,23;
46:24;48:10;58:1;
70:2,25;77:6
**dealing (4)**
60:25;61:4;67:20;
79:9
**dealings (1)**
19:11
**dealt (2)**
17:4;58:19
**debt (4)**
18:3;33:12;47:21,
22
**debtor (7)**
14:21;26:5,6;
41:13;44:6;45:15;
73:23

**debtors (49)**
10:8;12:19;17:24,
25;19:7,8;24:24;
25:12,13,15;27:2,5,
22;28:5;29:5,7,22;
30:22;32:25;33:10;
34:10;35:23;37:18;
38:16;39:10;40:22;
46:7;47:14,25;
48:13;49:5;54:9;
65:11,12,19,22,23;
66:4,22,22;68:16,25;
69:3;70:3,15,21;
71:3,9;77:10
**debtors' (22)**
11:13;25:21;27:1;
28:20;32:20;41:5;
50:13;51:18;52:16;
63:13;68:20,21,22;
69:17;71:10;74:11;
75:1;77:5,7,8;78:21,
23
**debtor's (1)**
47:12
**December (1)**
17:22
**decide (2)**
31:15;33:5
**decides (1)**
24:11
**decision (3)**
27:5;29:15;76:11
**declarant (1)**
11:4
**declarants (1)**
10:21
**declaration (13)**
12:21,21,23;13:16,
17,18;15:4,7,13,22,
25;16:9;18:25
**declarations (5)**
13:4,12,25;17:14,
17
**declare (1)**
30:10
**declared (2)**
30:3,3
**dedicated (1)**
73:15
**defer (1)**
59:25
**degree (2)**
72:16,20
**Delaware (1)**
19:25
**denied (1)**
41:15
**DENNIS (1)**
5:21
**DEPARTMENT (7)**
6:18,23;7:2;22:21;
23:6,10;48:5
**describe (1)**

22:13
**despite (2)**
  23:24;43:14
**destabilizing (1)**
  69:18
**details (1)**
  29:14
**determine (1)**
  70:3
**determined (1)**
  74:17
**determining (1)**
  74:6
**detriment (1)**
  26:21
**developed (1)**
  18:22
**development (2)**
  73:13,21
**devout (1)**
  43:23
**Diagnostics (1)**
  6:13
**dialogue (3)**
  16:7;67:7,9
**difference (1)**
  30:18
**different (7)**
  16:25;21:10;
  24:22;36:3,4;42:20;
  47:3
**difficult (1)**
  51:25
**diploma (1)**
  72:18
**direct (1)**
  15:17
**directly (1)**
  24:7
**director (1)**
  73:4
**directors (1)**
  18:7
**disagree (2)**
  26:24;29:25
**disclose (1)**
  69:19
**disclosure (2)**
  76:9,20
**discuss (2)**
  77:5,5
**discussed (2)**
  40:21;69:21
**discusses (1)**
  14:10
**discussing (2)**
  14:16;31:2
**discussion (1)**
  40:25
**discussions (3)**
  63:12;77:12,20
**disgorgement (1)**
  32:18

**dismiss (6)**
  31:20;32:5,7,12,
  17;52:15
**dismissal (4)**
  22:9;32:2;38:23,
  24
**dismissed (1)**
  29:18
**disposed (1)**
  58:21
**dispute (1)**
  16:1
**disruption (3)**
  20:23;74:3;75:11
**distinct (3)**
  12:23;21:10;22:18
**distinction (2)**
  23:11,20
**distress (1)**
  74:1
**distressing (1)**
  69:4
**distributed (3)**
  31:16;33:22;34:9
**Distribution (5)**
  7:13;8:3;24:12;
  34:12,15
**distributions (1)**
  33:5
**district (1)**
  44:10
**divided (1)**
  55:17
**dividends (1)**
  43:10
**Division (3)**
  6:19;7:3;23:10
**divisions (1)**
  73:3
**DLA (1)**
  62:5
**docket (3)**
  12:10;13:2,17
**doctors (2)**
  27:9;32:19
**documents (1)**
  42:16
**dollar (2)**
  50:19;66:3
**dollars (12)**
  19:20;25:14;29:7,
  12,13;36:19;42:25;
  50:15,17,20;60:4;
  73:20
**done (8)**
  24:25;34:1,4;
  39:11;47:14,16,17;
  51:17
**doubt (2)**
  50:12,21
**Doug (1)**
  76:2
**Douglas (16)**

10:20;12:21;
  13:16;17:14;20:19;
  67:1,16;69:15;71:3,
  14,18,18,21,23;72:1,
  2
**Douglas' (3)**
  68:14;71:7,24
**down (8)**
  11:24;39:12;40:1;
  44:7;46:10;61:21;
  64:2;69:3
**drafting (1)**
  31:19
**drawn (2)**
  10:9,10
**due (3)**
  31:18;42:11;81:14
**during (4)**
  68:21;70:22;77:1,
  25
**DURKIN (21)**
  9:4;72:7,8,12,17,
  19,24;73:1,3,11,22,
  24;74:5,11;75:10,13,
  15;77:9,16;78:2;
  79:25
**D-U-R-K-I-N (2)**
  72:8,9
**Durkin's (5)**
  72:15;74:16,22;
  75:5,9

**E**

**earlier (5)**
  49:11;59:15;61:8;
  76:10;81:2
**early (2)**
  11:12;80:20
**earmarked (1)**
  21:20
**Easter (1)**
  41:25
**easy (2)**
  52:1;82:2
**education (1)**
  72:15
**EDWARDS (2)**
  7:23;62:25
**effect (4)**
  15:17;30:16;47:6;
  69:18
**effected (1)**
  47:25
**effective (1)**
  70:11
**Effectively (3)**
  22:1;64:2;70:11
**effectiveness (1)**
  55:3
**effects (2)**
  20:22,25;23:16;
  69:3

**effectuate (2)**
  27:20;42:17
**effort (2)**
  15:1;47:12
**efforts (1)**
  45:9
**Einstein (1)**
  72:18
**either (4)**
  43:4;44:6;66:12;
  69:6
**election (1)**
  68:25
**elevating (1)**
  73:16
**ELIHU (1)**
  8:24
**eliminates (1)**
  46:4
**else (4)**
  25:8;28:2;49:19;
  50:5
**e-mail (2)**
  68:3;76:10
**employ (1)**
  19:9
**employee (1)**
  47:5
**employee-related (1)**
  69:11
**employees (8)**
  20:24;27:9;48:16;
  70:6,14,15;75:1,2
**employment (2)**
  48:17;70:13
**encumber (1)**
  25:4
**encumbrances (2)**
  25:4;27:21
**end (9)**
  12:10;17:8;24:5;
  38:13,15,23;61:14;
  81:5,9
**ended (3)**
  28:16;30:6;38:24
**engage (1)**
  47:22
**engaged (2)**
  18:6;48:13
**enough (3)**
  37:8;39:9;53:3
**ensue (1)**
  22:14
**ensure (1)**
  70:16
**enter (5)**
  11:13;26:6;27:5;
  51:6;63:10
**entering (1)**
  78:15
**enterprise (1)**
  48:14
**entertaining (1)**

18:20
**entire (1)**
  23:17
**entities (1)**
  42:10;61:7;63:4
**entity (2)**
  65:23,25
**entry (2)**
  15:7;65:12
**escrow (4)**
  32:22,25;33:12,14
**ESQ (22)**
  5:4,5,10,15,16,21,
  22;6:4,9,15,20,25;
  7:4,9,14,19,20,25;
  8:4,8,13,19
**essence (3)**
  23:21;28:3;33:12
**essential (1)**
  42:24
**essentially (17)**
  19:1;20:24;21:5,
  15;22:4,5,8;27:10,
  20;30:14;35:17;
  58:1;59:18;60:3;
  66:24;70:10,13
**established (1)**
  75:9
**estate (23)**
  21:18;22:5;27:6,
  11,15;32:1,7;33:3,
  11,15;34:3,6,8,8,12,
  14,14,15;43:18;46:6;
  51:18;52:17;70:4
**estimate (3)**
  25:12,13;50:19
**estimates (1)**
  73:19
**estimating (1)**
  25:15
**evaluated (1)**
  74:14
**evaluates (1)**
  74:6
**eve (1)**
  43:21
**even (10)**
  18:12;34:25;37:7,
  7,10;41:2;44:5;45:2;
  54:20,20
**Everybody's (2)**
  35:19;56:5
**everyone (4)**
  10:3;61:24;65:5;
  79:23
**everyone's (1)**
  82:3
**evidence (16)**
  13:4,13,15,24;
  17:15,17;44:3;47:17,
  18;48:11;71:23,24;
  75:16,17,19;76:21
**ex (1)**

41:13
**exactly (4)**
24:21;26:13;
39:10;47:13
**exceed (1)**
73:20
**except (1)**
59:6
**excited (1)**
40:20
**exclude (3)**
30:21;66:8;68:25
**excluding (1)**
35:1
**exclusion (1)**
66:7
**Exclusive (1)**
58:18
**exclusivity (3)**
44:12,13,16
**execute (1)**
42:16
**executed (1)**
74:22
**executive (4)**
20:20;67:3;68:15;
72:13
**exercise (2)**
66:8;78:23
**exercises (1)**
71:10
**exhaustive (1)**
17:23
**Exhibit (2)**
42:14,19
**exist (1)**
52:11
**existing (2)**
70:14;75:10
**exists (1)**
24:16
**expanded (1)**
19:1
**expedited (1)**
70:4
**expenses (2)**
30:21;31:4
**experience (3)**
72:25;73:12,21
**expert (1)**
28:9
**experts (1)**
53:6
**explain (2)**
43:13;44:7
**extended (1)**
66:2
**extensive (1)**
73:21
**extent (5)**
17:10;46:4;59:6;
60:7;63:10
**extract (2)**

53:24;56:14
**extremely (1)**
77:11
**EZEKIEL (1)**
8:24

**F**

**facilitate (1)**
75:7
**facilities (2)**
14:12;69:6
**facility (24)**
11:15;65:15;66:2,
7,13,25;67:15,22;
69:6,8,13;70:8;71:8;
73:22;74:2,11,13,17,
21;75:3,10;76:5;
77:17,24
**fact (14)**
23:24;36:4,5;40:9;
44:20,21;48:24;
51:22;52:2;55:18;
58:25;62:10;70:23;
78:24
**factor (4)**
25:7,22;27:7;74:5
**facts (2)**
20:14;26:23
**factual (1)**
71:4
**factually (1)**
45:14
**fair (4)**
16:24;20:2;49:16;
53:3
**fairly (2)**
47:10;67:20
**faith (4)**
20:2;28:6;49:15;
52:14
**fall (1)**
49:10
**fallen (1)**
36:2
**FALLON (1)**
6:15
**familiar (4)**
73:22;75:6;79:24,
25
**families (1)**
70:6
**far (1)**
52:13
**Farnan (2)**
44:11,15
**fashion (1)**
78:21
**fast (1)**
39:7
**feasible (1)**
74:6
**February (1)**

12:13
**federal (3)**
28:15;49:6;75:7
**feeling (1)**
23:1
**fees (8)**
21:16,17;22:6;
31:3;32:19;33:1,2;
58:2
**FELD (1)**
5:13
**Felicia (1)**
10:13
**felt (1)**
55:24
**few (1)**
56:17
**fiction (1)**
47:23
**fide (2)**
18:11;66:25
**fifty (3)**
19:20;29:13;49:11
**figure (2)**
39:18;79:6
**file (4)**
12:7,19;55:2;
66:15
**filed (20)**
12:9,13,14,19,20,
23;17:21;25:11;
29:9,15;41:10,13,24;
43:21;48:9;49:4;
56:17;63:6,22;77:21
**filing (2)**
69:16;77:3
**finality (1)**
54:4
**finalized (2)**
52:25;61:10
**finally (1)**
25:24
**financial (4)**
10:23;61:16;70:9;
74:1
**financing (5)**
15:12;22:1;61:10,
14,16
**find (4)**
17:24;18:8;47:15;
66:10
**fine (16)**
11:21;16:14,16;
57:16;60:10;61:11,
25;64:4,16,18;67:5,
18;68:4;71:20;80:2;
81:13
**firm (1)**
80:1
**first (8)**
22:15;24:3;46:10;
57:19;62:15,25;
71:20;81:5

**first-day (1)**
22:1
**firsthand (1)**
74:13
**FIS (1)**
47:13
**five (3)**
39:6;55:1;74:1
**five-month (1)**
18:7
**fix (1)**
10:16
**FLEISCHER (1)**
8:2
**flip (1)**
48:25
**focused (1)**
37:22
**folks (3)**
21:25;50:12;57:15
**followed (1)**
44:14
**follows (1)**
72:15
**forced (1)**
29:22
**foreclosure (2)**
27:14,20
**forever (1)**
25:3
**forgiveness (1)**
33:12
**forth (10)**
20:1;24:8;26:5;
32:23;33:20;36:18;
42:14,15;49:5;63:12
**forthcoming (1)**
54:5
**fortunate (1)**
36:15
**Fortunately (1)**
14:25
**forward (5)**
19:12;22:4;39:2;
60:2;79:11
**found (2)**
42:19;77:1
**founded (1)**
73:7
**four (1)**
29:12
**FOX (1)**
7:12
**frankly (2)**
37:17;38:10
**fraudulent (1)**
28:7
**free (1)**
71:23
**freestanding (1)**
73:13
**front (4)**
38:22;48:21;

56:10;79:6
**full (3)**
37:25;76:9,20
**fully (1)**
42:15
**fulsome (1)**
36:11
**fund (3)**
34:5;43:1;55:17
**funded (3)**
33:20,21,21
**funds (1)**
33:23
**further (2)**
67:7;81:22
**future (8)**
13:2;14:17,24;
15:5,6,10;70:7;80:15

**G**

**gains (2)**
28:21;29:6
**GALLAGHER (1)**
8:6
**gave (2)**
22:4;49:16
**GEDDES (1)**
6:2
**General (6)**
24:8;31:6;34:22;
43:1;76:2;77:8
**generally (1)**
74:9
**General's (2)**
76:10,14
**GENVERT (4)**
62:5,5,8,13
**George (2)**
12:24;17:14
**germane (1)**
43:12
**get-go (1)**
38:15
**gets (1)**
29:15
**GI (1)**
39:4
**given (6)**
40:25;41:10;
44:25;46:22;47:25;
69:11
**giving (1)**
57:15
**glad (2)**
23:7;57:6
**GLODOWSKI (1)**
9:5
**GOB (1)**
39:3
**goes (6)**
15:4;21:5;29:17;
35:22;51:8;71:2

go-forward (1)
61:10
Good (38)
10:3,5,22;11:3;
14:1,2,8;20:2;22:24,
25;26:24,25;28:6;
35:7,8;40:15;48:24;
49:15;52:14;57:11;
60:16,18,19;62:4,23,
24;64:6;66:20;68:5;
72:4,5;76:23,23;
78:17,23;81:24;82:2,
4
government (5)
23:17,18;35:12;
47:4;49:6
governs (1)
14:12
grant (6)
30:19;32:6,13,16,
16;66:15
granted (1)
32:10
great (4)
22:13;48:2;68:13;
81:18
GREENBERG (1)
5:19
ground (1)
74:23
Group (2)
73:2;78:25
growth (1)
73:20
guess (3)
50:9,15;54:7
GUMP (2)
5:13;60:20

### H

half (1)
43:1
hall (1)
10:16
HALPERIN (1)
8:11
hand (2)
46:2;56:20
handle (1)
55:4
handled (1)
58:23
handling (2)
59:17;60:24
hands (1)
28:20
handwriting (1)
64:9
happen (5)
28:14;32:11;39:2;
50:24;52:18
happened (6)

34:4;37:25;38:2,
19;39:4;46:22
happening (5)
26:20;30:14,16,
18;67:20
happens (2)
13:12;26:10
happy (2)
55:1;63:16
HAUER (1)
5:13
HAZELTINE (1)
8:22
head (1)
54:18
headline (1)
57:17
Health (22)
6:3;7:18;11:14;
14:6,10;16:10;17:6;
18:21;61:2,11,15,19;
62:6;65:13;66:1;
69:21,23;71:1,8;
78:16,22;79:10
Healthcare (21)
7:8;8:17;9:4;
11:15,17;65:15;72:7,
14,20;73:5,8,19,25;
74:6,9,16;75:2;76:3,
6,13,17
Healthcare's (1)
73:11
hear (6)
42:6;46:10;54:3;
60:15;68:8;76:22
heard (7)
11:12;12:8;40:23;
45:1;53:15;62:15;
79:20
hearing (11)
12:10;13:16;
41:11;43:22;45:10;
66:16,17;71:22;
79:17;80:11;82:2
held (2)
41:20;44:15
help (2)
18:5;58:18
helpful (2)
41:1;55:22;78:9;
81:16
hereby (4)
17:15;42:15;
71:24;75:19
herein (1)
42:15
here's (1)
34:23
hereto (1)
42:14
Hi (1)
62:5
hidden (1)

20:11
higher (1)
19:3
Highland (2)
42:9,12
HIRSCHLER (1)
8:2
HODGES (1)
8:16
holders (1)
42:10
holding (2)
65:25;68:16
holds (1)
37:11
holiday (2)
43:22,22
Holy (1)
41:24
Honor (120)
10:5,11;11:7,12,
19,23;12:4,7,8,14;
13:4,14,15;14:1,8;
15:23;16:18,21,23;
17:19,20;18:18,24;
19:23;20:9,11,23;
21:18;22:11,20,25;
26:19;27:4;31:8;
32:6;33:16;34:21;
35:4,8,11;37:6,14;
38:5,9,17;39:12,17,
20;40:10,13,15;
42:20;45:21,23;
49:12,17,21;53:13,
15;54:2,3,11,22;
55:1,8,21,24,24;
56:8,12,16;57:14;
58:11,17;59:13;60:8,
13,16,23;61:12,20,
23;62:2,18,24;63:4,
10,20;64:5,8,12,19;
65:1,6;66:5,13,15,
17;67:13,17;71:12,
16;72:2,4,11;75:21,
24;76:9,24;78:13,13,
14;79:7,15;80:5,16;
81:11,21,23;82:1
Honor's (1)
50:8
hopeful (3)
14:22;15:9;16:8
horribles (1)
22:14
Horse (6)
5:9,14;12:15;
18:17;30:15;69:17
Hospital (18)
12:15;18:17;19:6;
41:6,8;66:6;68:23,
24;69:7;72:25;73:2,
10,21,24;74:7;76:7,
17;79:12
hospitals (12)

21:2;23:17;26:23,
25;41:6;48:17;
52:11;73:9,14,14,25;
76:25
hospital's (1)
74:19
hours' (1)
74:20
house (2)
28:15,17
housekeeping (1)
13:3;71:17
HOWARD (1)
5:16
Hudson (1)
19:25

### I

Idaho (9)
67:24;68:8;74:12,
23;75:1;76:3,6,10,14
Idaho's (1)
75:25
idea (3)
54:17;55:10,12
identified (1)
77:21
IIIESQ (1)
8:24
immediately (2)
75:3;77:4
impacted (1)
58:25
impermissible (2)
31:11;34:18
implicated (2)
38:10;59:6
importance (1)
52:9
important (4)
23:12,20;26:8;
54:4
Importantly (1)
37:21
impose (1)
22:19
impossible (1)
26:17
imprecise (1)
31:18
imprimatur (1)
44:24
Inc (7)
6:13;7:13,18;8:3;
9:5,6;44:11
inclined (1)
79:16
include (4)
33:16;35:17;45:8;
63:7
including (8)
14:11,19;21:16,

16;23:19;24:1;28:2;
70:10
indebtedness (1)
18:13,13;19:15
indenture (1)
42:23
indicated (2)
41:23;79:8
industry's (1)
73:18
information (5)
14:18,19,20;
15:11;16:6
insider (1)
28:8
insolvent (5)
27:16;30:2;32:1,8,
10
instance (1)
25:8
instead (2)
34:2;48:3
intend (2)
36:1,21;77:24;
79:17
intended (1)
15:4
Intensive (2)
65:23;73:24
intent (1)
13:3
intention (1)
24:17
intentional (1)
41:24
interest (2)
22:6;71:15
interests (4)
18:20;52:16;70:4;
71:9
interim (12)
11:14;65:14;68:6;
70:8,22;71:7;73:22;
74:17,21;75:3;77:3,
22
into (27)
11:13;13:4,9,13,
15,24;17:15,17;
18:16;26:6;27:5;
29:22;31:11;34:3;
36:2;42:25;49:10;
63:1;67:2;69:6;
71:23,24;75:16,17,
19;76:21;78:15
investigate (2)
41:17;45:18
investment (1)
11:2
invite (1)
71:17
involve (1)
28:8
involved (2)

38:21;44:16
**involves (2)**
43:24;70:25
**IRS (11)**
21:5,12;22:8,19;
23:13;29:7,13,21;
39:15;40:7,11
**IRS' (1)**
23:15
**issue (18)**
11:25;14:16,22;
15:2,5,14,16,24;
16:3,5,11;25:23;
45:19;46:6,15,24;
53:12,21
**issues (30)**
11:12;17:11;21:2;
28:8;41:17,18;49:6;
59:15,17;60:12,14,
25;61:2,5,8,13,20;
63:7,21;66:24;70:1,
2;71:1,4,6;77:1,5,6,
22;79:10
**item (2)**
65:11;75:21
**items (2)**
11:7;20:8

**J**

**JAMES (3)**
6:7,12;8:4
**January (3)**
12:9,10;18:24
**JEFFREY (1)**
8:8
**job (1)**
44:22
**jobs (5)**
37:20;38:4,14;
48:16;69:5
**Joe (1)**
39:4
**JOHN (1)**
7:14
**joined (4)**
23:6;73:3,5;75:2
**joining (1)**
10:12
**JONES (3)**
5:2,4;35:9
**Joseph's (1)**
72:23
**Judge (3)**
38:22;44:11,15
**judgment (1)**
26:5;71:10;78:23
**jump (1)**
60:1
**jumping (1)**
34:19
**junior (1)**
24:1

**jurisdiction (2)**
37:8;38:12
**jurisdictions (1)**
47:12
**JUSTICE (7)**
6:18,23;7:2;22:21;
23:6,10;48:5
**justified (1)**
20:10

**K**

**keep (2)**
20:17,17
**Ken (2)**
10:7;65:10
**KEVIN (1)**
9:5
**key (2)**
41:16;74:5
**kick (1)**
64:2
**kind (2)**
49:13;61:9
**knowing (1)**
38:13
**knowledge (1)**
68:17
**knows (1)**
61:14
**KOENIG (7)**
9:3;67:9;76:22,24;
78:7,8,11
**Kriegel (14)**
10:15;57:5,6,7,10;
59:22,24;62:16,19,
20;63:20,24;64:3;
80:21
**Kriegel's (1)**
57:14
**KRISTEN (1)**
5:16

**L**

**LABOV (8)**
7:25;62:24,24;
63:3,6,10,17,18
**laid (2)**
33:9;37:15
**landlord (2)**
14:10,11
**landlords (3)**
36:14;38:6;61:6
**language (4)**
43:14;58:23,24;
63:25
**large (3)**
57:23;67:19;78:25
**largely (1)**
68:2
**larger (1)**
69:1

**largest (1)**
73:10
**last (12)**
10:16;11:13;
12:19;20:6;39:6;
41:10,13;42:2;
66:16;74:1,20,24
**late (4)**
11:12;12:19;
18:24;63:3
**later (6)**
25:19;28:3,11;
59:7;60:7;62:11
**LAURA (1)**
5:4
**Lauren (1)**
62:5
**law (4)**
21:8;28:9;38:10;
47:1
**laws (1)**
47:3
**LCI (3)**
28:12;30:1;68:15
**learn (1)**
41:16
**lease (13)**
14:12,15,15,17,25;
19:17;61:15;66:1,2;
69:23,25;71:5;79:3
**leases (2)**
14:11;69:25
**least (7)**
21:22;24:12;
26:18;50:14;55:5,6;
74:8
**leave (2)**
27:15;54:12
**leaves (2)**
28:20;79:4
**left (2)**
66:17,18
**legal (2)**
53:2;71:4
**legally (1)**
28:3
**LEIGH (1)**
6:4
**lend (1)**
25:3
**lender (1)**
33:24
**lenders (14)**
12:1,22;18:9;
19:14;20:22;21:1;
27:13;35:23;42:12;
44:19;45:5;46:2;
57:25;60:22
**lender's (1)**
17:9
**length (2)**
22:13;28:7
**less (2)**

50:15;74:20
**level (4)**
18:12;66:23;74:7;
75:7
**levels (2)**
73:17;74:14
**liabilities (5)**
36:3,18;49:8,8;
52:12
**liability (16)**
23:23;25:13,17,
22;28:11,23;29:11,
19;30:2,4,7,8;31:25;
32:4;50:13,25
**licensing (1)**
75:6
**lien (3)**
28:15;30:11,15
**liens (3)**
25:4;27:21;47:19
**limited (1)**
16:1
**line (1)**
48:19
**Lionel (1)**
19:25
**lion's (1)**
45:16
**liquidating (1)**
39:9
**listed (1)**
36:17
**listen (1)**
39:13
**litigation (2)**
46:5;71:4
**little (9)**
18:14;37:2;39:14;
47:23;50:15,21;
66:5;74:3;75:11
**LLC (8)**
6:14;8:22;12:15;
18:17;19:6;41:8;
72:7,14
**LLP (13)**
5:2,8,13,19;6:7,12;
7:7,12,17,23;8:6,11,
16
**lobby (1)**
47:5
**located (1)**
20:18
**lonely (1)**
23:3
**long (5)**
21:22;26:4;43:21,
22;76:13
**long-term (2)**
69:7;73:14
**look (1)**
19:2;80:9
**looked (1)**
44:12

**looking (3)**
52:7;59:22;80:14
**looks (3)**
43:4;58:9;63:11
**looming (1)**
18:4
**loss (5)**
20:24;21:1,1;
39:14;69:4
**lot (5)**
19:14;23:1;26:22;
28:16;50:16
**loud (1)**
54:3
**Louise's (1)**
44:11
**LP (1)**
42:9
**LTACH (1)**
14:12
**lucky (1)**
39:8

**M**

**maintain (1)**
51:23
**maintained (1)**
73:5
**maintaining (1)**
37:18
**major (1)**
35:24
**majority (1)**
39:6
**makes (7)**
11:21;16:15;19:1,
13;22:8;28:5;80:3
**making (3)**
21:14;28:16;39:21
**MALLOY (1)**
7:20
**manage (1)**
67:22
**management (19)**
11:15;42:9;65:14;
68:6;70:8,12,22;
71:8;73:12,23;74:2,
18,21;75:3;76:7,17;
77:4,22;79:14
**manager (1)**
66:25
**manages (1)**
73:8
**manner (3)**
54:1;56:9;70:4
**many (4)**
37:16,16;38:7,12
**March (2)**
12:17,17
**MARK (1)**
8:19
**marketed (1)**

68:19
**marketing (1)**
68:20
**marketplace (1)**
18:5
**Mary (1)**
8:18
**master (8)**
14:11,15;61:15;
66:1;69:23,25;71:5;
72:20
**material (1)**
77:1
**matter (15)**
11:11,11;12:9;
13:3;15:19;29:21,
24;32:8;40:9;41:21;
52:2;55:19;58:2;
64:20;71:17
**matters (5)**
11:6,24;59:23;
60:4;67:8
**MATTHEW (1)**
7:4
**maturity (1)**
18:4
**maximize (5)**
38:18;39:10;
47:12,14;48:14
**maximizing (1)**
22:16
**may (18)**
16:3;25:13;42:17;
49:7;50:13;51:19,
22;52:19;80:8,9,19,
20,22,23;81:6,10,12,
14
**maybe (8)**
39:23;50:15;
54:10;55:22;64:19;
71:12;80:24;81:5
**mean (9)**
11:8;15:18;17:20;
19:19;38:6;39:4;
48:22;60:1,11
**means (1)**
19:7
**meantime (1)**
56:13
**Mechanicsburg (1)**
73:8
**Medicaid (3)**
23:19;49:3,3
**medical (3)**
8:18;72:18;73:13
**Medicare (3)**
23:19;49:3,3
**MELORO (1)**
5:21
**member (2)**
45:16;74:25
**members (5)**
42:23,23;45:17;

74:13,22
**memorialize (1)**
22:3
**memory (1)**
41:12
**men (1)**
67:3
**mention (2)**
30:22;48:8
**mentioned (2)**
19:17;59:15
**mentioning (1)**
56:6
**Meridian (1)**
74:12
**met (2)**
49:17;74:12
**MHA (1)**
72:20
**MICHAEL (2)**
7:19;14:3
**mid-2012 (1)**
68:20
**midstream (1)**
74:7
**might (11)**
10:16;12:17;23:1;
25:1,2,4;29:13;
43:18;50:17;59:21;
81:2
**MILLER (1)**
6:9
**million (16)**
19:20;25:14;29:6,
12,13;36:19;42:25;
43:1,2;47:21;49:11;
50:14,19,20;66:3;
73:20
**mind (1)**
38:20
**Minor (3)**
7:13;8:3;58:6
**minus (2)**
41:6,6
**minute (1)**
10:17
**minutes (2)**
64:19,25
**misspeak (1)**
80:20
**misstated (1)**
59:7
**modification (1)**
38:3
**modifications (1)**
63:12
**modified (1)**
35:16
**modify (1)**
36:6
**moment (2)**
12:18;67:2
**money (6)**

28:16;33:5;34:23;
45:16;50:5,16
**monies (1)**
49:5
**months (1)**
40:1
**More (8)**
12:14;22:9;26:14;
35:4;42:3;53:20;
72:24;73:12
**morning (1)**
14:19
**MORRIS (2)**
6:7,12
**Moss (1)**
73:4
**most (5)**
11:24;17:3,4;
58:21;73:18
**mostly (1)**
58:24
**motion (25)**
11:9,13;12:7;
17:18;22:10;32:6,
13;41:18,19;43:15;
44:12,13,16;45:1,7;
52:7,15;54:10,16;
55:23;65:12,20;
66:15;75:18;77:3
**motions (1)**
41:13
**motivated (1)**
25:10
**motivating (2)**
25:7,22
**Motors (2)**
24:9;31:6
**move (4)**
13:12,15;32:7,16
**moved (2)**
31:23;32:5
**moving (2)**
39:7;62:25
**much (13)**
17:19;18:3;25:13;
37:11;42:5;51:18;
56:6;65:1,6;78:6;
79:25;81:21;82:1
**must (3)**
47:7;55:16;74:8
**myself (1)**
67:19

## N

**name (3)**
23:9;44:11;65:24
**named (1)**
68:23
**NANCY (1)**
5:22
**nature (1)**
37:23

**near (1)**
80:15
**necessarily (1)**
53:1
**necessary (2)**
25:2;42:17
**need (8)**
21:25;22:7;24:25;
43:8;45:8;69:5;
77:16;79:15
**needed (1)**
42:3
**needing (1)**
66:10
**nefarious (2)**
53:19,21
**negative (2)**
20:25;54:23
**negotiated (1)**
73:23
**negotiating (1)**
44:22
**negotiations (1)**
74:17
**NEIL (2)**
9:6;11:1
**net (1)**
70:8
**new (1)**
73:17
**next (3)**
77:10;78:3;80:17
**Nice (1)**
14:7
**night (4)**
41:10,13;43:21;
56:18
**nine (1)**
42:11
**Nobody (2)**
43:3,3
**Non-Long (1)**
76:5
**nonpublic (1)**
73:10
**nontax (1)**
47:9
**note (1)**
25:24
**notes (1)**
42:11
**notice (21)**
11:9;12:9,11,15,
20;16:25;20:2;43:7,
16,19;44:9,25;49:16;
54:23;55:3;60:9;
63:8;74:20;78:20;
79:17;81:8
**noticed (2)**
43:10;45:7
**notified (1)**
68:24
**notion (3)**

21:5;47:17;48:9
**Novacare/Polaris (1)**
73:2
**number (11)**
13:2,17,17,18;
25:14;44:10;45:19;
51:19;52:12;63:14;
64:1
**numerous (1)**
19:10
**nurse (1)**
72:19
**nursing (3)**
72:17,19,25

## O

**object (17)**
13:24;14:24;15:7,
13,15,21,25;49:22;
50:10,11;51:7,7,15;
54:20,24;55:2;62:11
**objecting (1)**
66:20
**objection (18)**
11:25;16:9;21:5;
23:21;27:12;51:2;
53:9;54:21;55:6;
63:6,16,22,24;66:18;
75:15;76:6,16;80:12
**objections (9)**
12:18;59:19;
60:24;61:9;62:9,21;
64:1;71:5;81:14
**obligation (1)**
66:3
**observed (1)**
74:13
**obtained (1)**
72:20
**Obviously (6)**
36:12;38:4;46:4;
70:19,25;80:17
**occur (5)**
28:18;39:25;40:1;
51:1;63:15
**occurred (5)**
26:15;27:23;50:4;
51:3,8
**occurring (1)**
28:6
**occurs (2)**
29:5;39:25
**o'clock (2)**
41:10,12;43:21
**off (3)**
35:11;58:8;63:13
**offer (2)**
18:11;19:4
**offered (1)**
68:9
**offers (1)**
73:16

**Office (4)**
6:24;67:8;76:11,
14
**officer (3)**
10:24;20:20;68:15
**Official (1)**
5:3
**often (1)**
35:22
**Ombudsman (3)**
5:20;9:3;57:25
**ombudsperson (2)**
58:2;67:10
**omnibus (1)**
80:16
**once (3)**
15:11;28:20;74:25
**one (32)**
10:20;11:25;15:4;
23:1;27:8;29:2;
38:22;39:15;41:6;
42:3,23;43:1;44:3;
45:15;46:2;49:1;
50:23;55:4,6,6,10;
57:7,19,23;61:1,5;
64:2;66:11;71:22;
78:17;80:19;82:3
**one's (1)**
66:20
**one-trick (1)**
18:16
**ongoing (3)**
49:2;70:20;79:11
**only (15)**
15:16;16:1;21:1;
25:17,25;26:1;
28:19;30:18;32:3;
34:8,15;36:7,8;
39:24;79:15
**open (2)**
66:18;79:4
**opening (1)**
13:6
**operate (2)**
19:8;27:2
**operating (4)**
20:17;52:12;
65:23,25
**operation (4)**
26:24;70:20;
73:13;79:12
**operations (13)**
19:21;66:4;69:18;
70:7,10;72:13,25;
73:25;74:4,7,10,13;
75:12
**operator (1)**
73:10
**opportunities (1)**
48:16
**opportunity (4)**
41:17;44:25;
55:18;68:9

**oppose (3)**
41:15;43:8;45:3
**opposed (5)**
32:13;40:21;
44:18;45:3,11
**optimistic (1)**
15:9
**order (33)**
11:20;12:20;
18:20;22:1;24:12;
26:19;28:5;32:10;
40:21,22,25;41:2,9;
42:1;43:7,14,19,20;
45:4,6,9;46:20;47:6;
53:12;56:16;59:1,5;
63:11,25;69:16;
79:4;80:5;81:20
**orders (1)**
65:13
**ordinary (1)**
49:9
**organizations (1)**
73:18
**original (1)**
76:15
**others (6)**
17:6;30:21;36:15;
38:12,21;60:2
**otherwise (6)**
19:10;24:4;25:4;
26:11;33:23;35:2
**out (28)**
10:16;12:12;17:3;
24:14;26:21;29:10;
33:9;37:15;39:18;
40:10;41:25;46:1;
47:16,17,18,25;57:8,
24;58:18;65:21;
66:12;69:5;78:4,17;
79:6,6,17;81:8
**outcome (3)**
17:24;32:12;34:9
**outcomes (1)**
74:15
**out-of-court (1)**
20:21
**outs (1)**
22:1
**outside (12)**
24:25;27:24;
28:12;29:23;30:1;
33:17;37:25;38:2;
43:15;48:6;50:6;
75:5
**outstanding (1)**
80:1
**over (6)**
19:9;39:6;50:20;
70:21;74:1,2
**overly (1)**
40:20
**overruling (1)**
53:8

**oversight (1)**
18:6
**owed (1)**
28:17
**Owens (2)**
7:13;8:3
**owing (1)**
28:15
**own (3)**
49:25;50:2,14
**owned (1)**
65:19
**ownership (1)**
20:21
**owns (1)**
73:8

## P

**PA (1)**
6:2
**PACHULSKI (2)**
5:2;35:9
**page (3)**
57:19;58:10,14
**paid (11)**
26:2,16,19;30:12;
31:3,4,4;32:19;38:2;
48:21,23
**PALMER (2)**
7:23;62:25
**papers (5)**
12:19;22:12;
25:11;31:24;77:21
**parade (1)**
22:13
**paradigm (1)**
21:21
**paragraph (10)**
35:17;40:23;42:5;
45:4;54:25;55:3;
56:14;57:8;58:15,18
**part (26)**
11:24;17:8;23:22;
31:19;32:23;33:3,7,
15;34:2,5,7,8,12,13,
14,15,24;37:21;
43:11;44:13;45:5;
49:15;50:1;54:15;
67:23;71:5
**parte (1)**
41:13
**participate (1)**
68:10
**participated (1)**
76:13
**participating (1)**
77:12
**participation (1)**
82:3
**particular (6)**
43:15;45:6;52:2;
55:24;60:24;69:25

**particularly (2)**
41:1;43:20
**parties (27)**
13:5;15:1;16:4;
19:17,18;36:11,13,
13;37:16,23;38:1;
41:16;42:13,16;
43:16;44:13,20;45:8,
9;47:7;50:4;53:22;
54:24;59:6;64:15;
66:1;79:5
**parties' (1)**
13:9
**parties-in-interest (1)**
49:1
**parts (1)**
33:9
**party (3)**
18:8,21;45:24
**Patient (26)**
5:20;9:3;20:25;
21:3;57:25;66:24;
67:9,14,14;70:2,16,
21;73:15,17;74:8,8,
14,14;75:12;77:2,6,
13,14,15,22;80:3
**patients (10)**
19:9;20:18;27:9;
37:22;52:10;67:20;
69:5;70:5;77:16;
78:1
**PAUL (3)**
7:25;62:22,24
**Pause (1)**
57:13
**pay (2)**
21:7,14;29:11;
30:4,7,25;31:1;
43:10;47:7;48:4,6,21
**paying (3)**
30:22;47:8;50:3
**payment (5)**
21:25;23:22,25;
31:5;37:24
**peculiar (1)**
39:21
**pending (1)**
22:10
**Penn (4)**
61:5,12;62:6,9
**Pennsylvania (1)**
73:8
**people (4)**
16:7;19:10;23:2;
39:13
**perceive (1)**
52:20
**percent (1)**
42:11
**performance (6)**
13:2;14:17,24;
15:5,6,10
**perhaps (2)**

**17:9;76:11**
**period (4)**
54:24,25;55:2;
70:22
**periods (1)**
74:3
**Perlman (1)**
10:13
**permit (2)**
26:4,6
**perpetuates (1)**
21:21
**person (3)**
23:1;28:16;57:25
**personal (1)**
68:16
**personally (1)**
74:11
**persons (1)**
13:19
**PETERMAN (1)**
5:22
**petition (1)**
29:9
**ph (1)**
47:13
**phone (2)**
68:11;77:8
**picked (1)**
49:9
**picture (1)**
66:14
**Piper (1)**
62:5
**place (3)**
15:12;61:17,17
**placed (1)**
44:3
**plan (10)**
20:12;21:6,9;24:6,
18;31:9,12;38:17;
39:9;52:4
**plane (1)**
71:19
**plate (1)**
42:4
**played (1)**
66:12
**pleadings (1)**
41:24
**Please (5)**
10:2,4;56:22;65:4,
5
**pleased (1)**
11:23
**pm (3)**
65:3,3;82:5
**point (25)**
14:9;16:23,24;
24:10,14;28:1;29:5;
31:12,17;32:1,2;
43:9;45:2;50:5,6,11;
51:6,8,16;52:21,23;

63:14,16;66:7;73:3
**pointed (1)**
  40:10
**points (3)**
  24:3,15;49:22
**pony (2)**
  18:16,16
**pop (1)**
  61:20
**PORTER (2)**
  7:17;14:4
**portion (2)**
  26:2,18
**portrayed (1)**
  55:20
**position (12)**
  18:14;20:9;23:3;
  24:3;27:17;28:4;
  46:7;52:1;66:10;
  73:4;75:25;76:16
**positioned (1)**
  73:17
**positions (1)**
  13:9
**positive (1)**
  79:23
**possibility (1)**
  69:10
**possible (2)**
  34:9;47:15
**possibly (1)**
  34:16
**post (1)**
  49:8
**post-petition (2)**
  18:19;29:18
**pot (1)**
  34:23
**potential (6)**
  23:16;25:9;68:19;
  70:18;71:4;74:25
**potentially (2)**
  29:10;69:12
**practical (4)**
  29:21,23;53:22,23
**practicing (1)**
  21:23
**pre-bankruptcy (3)**
  19:2;48:1;49:8
**pre-bid (1)**
  18:19
**precedent (1)**
  37:8
**pre-closing (1)**
  61:11
**prefer (2)**
  25:1,2
**premature (1)**
  29:14
**prepare (1)**
  74:24
**pre-petition (4)**
  18:12;27:13;38:1;

42:12
**prerogative (1)**
  21:17
**PRESENT (2)**
  9:2;54:17
**presented (2)**
  20:15;38:22
**preserve (7)**
  38:14,14,18;39:1;
  48:15,15;67:14
**preserved (1)**
  37:21
**preserving (1)**
  39:3
**President (4)**
  9:4;72:13;73:1,6
**presume (1)**
  51:19
**price (7)**
  32:23;33:8,10,19;
  34:2;49:16;50:18
**prices (1)**
  20:2
**Prima (1)**
  8:17
**primary (1)**
  25:7
**prior (2)**
  63:14;68:24
**priorities (1)**
  34:20
**priority (2)**
  34:22;48:3
**pro (6)**
  24:12;26:18;
  31:16;34:9,12,15
**probably (7)**
  14:9;19:20;21:22;
  25:8;31:18,18;78:4
**problem (4)**
  30:7,24;46:23;
  47:1
**problems (1)**
  30:20
**procedurally (1)**
  29:3
**procedure (4)**
  32:9;43:5;44:1,2
**procedures (5)**
  11:16;12:8;18:20,
  24;27:13
**proceed (7)**
  18:15;51:12;52:6;
  54:13;56:9;70:4;
  74:17
**proceeding (4)**
  19:5;28:11;68:7;
  70:5
**proceedings (1)**
  82:5
**process (13)**
  17:8,24;18:10,22;
  19:2;26:12;39:3;

46:5;47:14;48:14;
61:17;68:21;77:25
**profess (1)**
  28:8
**PROFESSIONAL (8)**
  8:2;21:16,17;31:3;
  33:1,2;58:1;72:17
**professionals (3)**
  21:24;22:5;75:5
**proffer (12)**
  67:1,16;68:14;
  71:13,22,24;72:7;
  75:13,16,17,19;
  76:21
**program (1)**
  73:4
**proper (3)**
  20:1;53:25;71:9
**property (8)**
  21:14,18,18;22:6;
  30:12;46:6;50:18;
  78:21
**proposal (3)**
  14:14;18:11;31:9
**propose (5)**
  13:6;15:23;19:3;
  54:7;81:8
**proposed (13)**
  12:20;24:7;41:4,9;
  42:1;43:7,14,20;
  45:4,7,12;52:14;
  69:19
**protect (1)**
  22:6
**proved (1)**
  70:1
**provide (7)**
  11:14;18:9;19:10;
  21:25;48:16;61:19;
  70:5
**provided (6)**
  12:11;19:14,16;
  22:1;48:12;66:6
**provider (1)**
  49:7
**providing (4)**
  47:21;73:15;79:2,
  11
**provision (4)**
  23:22;31:9;45:8;
  58:1
**provisions (10)**
  21:13;23:24;24:5,
  6,8;31:11;32:25;
  33:3;49:25;50:6
**prudently (1)**
  41:14
**publication (2)**
  12:11,13
**purchase (11)**
  21:13;22:2;32:23;
  33:7,8,10,14;34:2;
  50:1;66:6;74:18

**purchased (1)**
  30:6
**purchaser (27)**
  12:22;18:8,18;
  20:3;21:14;24:22;
  25:2,5,8,21;28:22;
  30:5,14;36:2;37:9;
  46:2;49:9,15,23,24;
  50:5;54:9;60:22;
  61:9;66:8;68:24;
  69:17
**purchaser/secured (1)**
  57:24
**purchasers (4)**
  12:23;35:23;
  42:13;68:19
**purports (1)**
  30:20
**purpose (7)**
  20:1,8,10;37:12;
  38:8;49:15;52:8
**purposes (7)**
  13:16;14:23;
  15:24;16:1,1;24:16;
  52:13
**pursuant (2)**
  36:5;68:25
**pursue (2)**
  43:5;52:21
**pursued (1)**
  22:14
**put (10)**
  18:14;42:25;
  53:25;55:23;61:1,
  16;63:13;66:10;
  79:17;81:12
**putting (2)**
  34:3;61:17

## Q

**qualified (2)**
  12:16;19:5
**quarter (1)**
  42:11
**Quest (1)**
  6:13
**quickly (2)**
  61:1;67:20
**quite (2)**
  42:6;55:19
**quote (2)**
  27:13;35:20
**quotes (1)**
  36:8

## R

**RAICHT (1)**
  8:11
**Railway (1)**
  19:25
**raise (2)**

36:23;45:19
**raised (10)**
  12:2;16:24;32:20;
  34:11;60:12;61:2,5,
  8,13;75:24
**ran (1)**
  47:14
**range (1)**
  50:19
**RAPORT (1)**
  6:4
**rata (6)**
  24:12;26:18;
  31:16;34:9,12,15
**rationale (1)**
  66:23
**reach (1)**
  60:8
**read (5)**
  41:9;42:2,4;67:1,
  16
**reads (2)**
  42:5,7
**ready (1)**
  65:9
**really (15)**
  11:8;15:8;18:7;
  20:5;22:10;36:21;
  37:11;38:19;39:23;
  40:7;57:20;77:1,14,
  15,21
**realm (1)**
  43:15
**reason (4)**
  15:3;26:5;27:1;
  28:10
**reasoning (1)**
  48:19
**reasons (6)**
  26:10;31:14,17;
  44:8;45:13;78:18
**recall (1)**
  18:18
**receive (3)**
  12:16;31:5;76:9
**received (12)**
  14:18,19,20;
  17:15;19:5;27:25;
  68:22;71:24;72:16,
  17;75:19;76:3
**receiving (2)**
  33:5;35:1
**recent (1)**
  34:17
**recently (2)**
  12:14;38:25
**Recess (2)**
  65:3;82:4
**recognize (1)**
  22:2
**reconcile (1)**
  43:9
**reconciled (1)**

17:5
**reconciliation (1)**
43:6
**record (17)**
14:3;17:10,23;
18:10,19;19:13;
20:5;22:15;35:9;
48:10,13;61:1;
65:10;66:22;67:2;
68:14;78:16
**records (5)**
67:15;70:22,23;
77:14,15
**recounted (2)**
20:7,9
**reengaged (1)**
19:1
**reference (1)**
40:23
**referral (1)**
70:6
**referred (1)**
35:12
**refinance (1)**
18:4
**reflect (1)**
59:9
**reflects (4)**
17:23;18:10;
68:14;78:16
**refresh (1)**
41:12
**regarding (2)**
58:5;70:7
**Regional (1)**
8:18
**registered (1)**
72:19
**regular (1)**
79:17
**regulatory (1)**
40:3
**Rehab (1)**
73:4
**rehabilitation (1)**
73:14
**REIT (18)**
6:3;7:18;11:14;
14:6,11;17:6;61:2,
11,15,19;65:13;66:1;
69:21,24;71:1;78:16,
22;79:10
**reiterate (1)**
62:8
**REIT's (1)**
16:11
**rejection (3)**
69:10;79:2,5
**relate (1)**
68:17
**related (2)**
12:11;32:22
**relates (2)**

15:4,12
**relating (2)**
69:16;77:2
**relations (1)**
77:14
**relationship (5)**
16:7;49:2;65:22;
69:22,23
**relationships (2)**
69:22;75:9
**relative (3)**
13:9;21:2;41:17
**relatively (1)**
58:6
**released (1)**
35:18
**relief (2)**
20:9;21:11
**relying (1)**
23:18
**remain (1)**
70:15
**remained (1)**
74:25
**remaining (1)**
43:18
**remedies (2)**
52:19,22
**remembers (1)**
66:5
**remotely (1)**
18:12
**remove (1)**
71:3
**removed (1)**
62:9
**rent (1)**
70:10
**replete (1)**
22:16
**reply (1)**
12:20
**report (3)**
11:23;68:2;76:24
**reports (1)**
49:4
**represent (2)**
63:3;67:13
**request (2)**
41:15,16
**requested (2)**
14:18;59:9
**required (1)**
22:17
**requirements (5)**
21:6;22:18;26:8;
31:7;75:6
**requires (1)**
43:16
**res (1)**
47:13
**reservation (1)**
16:19

reserve (6)
14:23;15:15,24;
16:2,8;62:10
**reserved (1)**
62:21
**reserving (2)**
61:12;63:25
**resettlement (1)**
71:8
**resolution (4)**
56:3;60:4,24;71:1
**resolve (8)**
14:21,25;15:2,10;
16:4,8;29:10;70:1
**resolved (3)**
14:22;54:21;59:18
**resolving (2)**
63:21;71:6
**respect (8)**
11:16;12:1;14:16;
16:10;45:12;61:1;
64:1;69:24
**respected (1)**
73:18
**respond (3)**
45:24;46:11;62:16
**response (3)**
12:18;57:20;58:6
**responses (1)**
16:25
**responsibilities (2)**
76:7,17
**responsibility (1)**
70:9
**responsible (1)**
60:23
**rest (2)**
35:4;45:18
**result (4)**
23:23;27:6;70:8;
79:23
**retain (1)**
70:21
**return (1)**
33:11
**revenues (1)**
73:19
**review (2)**
74:16;77:20
**reviewed (3)**
49:5;58:7;74:14
**revised (1)**
28:5
**revision (1)**
58:24
**revisiting (1)**
76:11
**right (67)**
10:18;12:5;13:23;
14:23;15:16,25;16:2,
9,12,17,22;17:2,16;
18:2;20:7,13;22:22;
24:23;29:2,15;

30:13;31:22;32:14;
35:14,20;36:1,22;
39:17,20;40:2,12;
41:3,7;43:25;47:2;
51:4;53:8;57:9,11;
58:3,16;59:12;60:6,
14,16;62:1,12,19;
63:9;17;64:3,3,6;
65:7;66:8,18,19;
71:11,22;75:17;
76:19,21;78:6;79:18,
18;80:14,18
**rights (6)**
16:19;61:12,19;
62:10,21;64:1
**ripe (1)**
22:10
**rise (2)**
10:2;45:2;47:25;
65:4
**risk (1)**
75:12
**Ritz (1)**
38:24
**road (3)**
40:1;61:21;64:2
**ROBERT (2)**
7:9;72:6
**rode (1)**
18:16
**rolling (1)**
61:9
**ROME (1)**
5:8
**room (1)**
11:2
**ROTHSCHILD (6)**
7:12;9:5,6;11:1;
18:5;19:1
**routine (1)**
47:11
**Rule (1)**
44:2
**run (1)**
11:8
**running (1)**
58:5

---

**S**

**Saint (1)**
72:23
**sale (113)**
11:9,16,24;12:7,
10,11;13:7;14:10,16;
19:24;22:15;23:24;
24:4,6,7,10,11,16,19,
20,21,25;25:3,18,20,
25;26:4,6,9,11,14,15,
19;27:3,5,6;28:1,5,6,
13,17;29:4,8,9,16,17,
17,20;30:19,20;31:8,
14,15,25;32:3,4,6,16,

16;33:13;38:8;39:2,
7;40:21;41:4;43:7,
11,12,12,19,20;
44:18;45:3,4,6,8;
46:13,18,24;47:7;
49:18;50:4,11,18,23,
24;51:1,6,7,8,10,12,
15,17;52:4,14,17,18,
24,25;53:11;54:15,
20;56:16;65:16;
66:9;69:1,16,17;
77:4;79:10,16;80:11
**sales (3)**
20:2;33:19;43:24
**salutary (1)**
20:22
**same (6)**
20:22;28:3;30:16,
17;62:18;67:3
**SANDLER (40)**
5:5;35:7,8,9,15;
36:10;37:1,4,6,14,
20;39:15,17,20,22;
40:3,6,13,14;42:6;
43:13;46:8;53:12,13,
15,18;54:2,14,17,22;
55:7,10,12,15,21;
56:2,5,8,12,13
**satisfactory (1)**
74:8
**satisfied (4)**
19:24;40:4;67:13;
68:12
**satisfying (1)**
30:15
**save (1)**
36:22
**saving (1)**
38:4
**saw (1)**
58:12
**saying (7)**
30:25;31:6;34:11,
23;50:23;54:15;71:2
**schedule (4)**
36:6,11,11;38:3
**scheduled (1)**
80:14
**scheduling (2)**
11:12;65:16
**School (1)**
72:18
**science (1)**
72:16
**SCOTT (3)**
5:15;60:17,19
**seated (2)**
10:4;65:5
**second (2)**
24:10;55:12
**Secondly (1)**
32:18
**Section (13)**

20:16;26:3;30:22;
36:5;37:3;43:16,24;
52:3;58:23,25;59:4,
5;76:5
**secured (14)**
12:1;18:9,12;
20:21;21:14;30:11,
15;33:4,24;34:21;
37:9;47:7,19;49:23
**seek (1)**
15:7
**seeking (2)**
15:11;21:11
**seeks (1)**
22:19
**sees (1)**
27:18
**sell (6)**
21:7;24:22;33:10;
43:4;47:19,20
**selling (2)**
27:3;50:20
**send (1)**
64:14
**sends (1)**
50:5
**senior (4)**
22:6;42:11;60:22;
74:25
**sense (4)**
11:21;55:11;80:3;
81:2
**separate (3)**
22:18;32:15;46:15
**separately (2)**
45:6,7
**serve (2)**
19:9;48:17
**served (4)**
12:12;21:2;55:13;
73:1
**service (1)**
54:23
**Services (6)**
8:17;49:4;72:14;
73:6,16;80:1
**serving (1)**
20:18
**set (10)**
11:16;12:6;20:1;
21:20;24:8;32:23;
33:20;36:18;42:14,
15
**sets (1)**
26:5
**settle (1)**
54:19
**settled (1)**
78:4
**settlement (36)**
11:14;27:17;31:5;
34:17,19;35:12,15,
19,20;37:7;42:7,8,8,

13,14,16,18;43:13,
14,17;44:13,15;45:4,
10,12,25,25;46:16,
19;55:17,25;56:2;
65:13;71:1;78:22,24
**settlements (2)**
44:1,2
**seven (1)**
55:1
**seventeen (1)**
76:25
**several (3)**
73:25;77:7,13
**severance (1)**
70:18
**share (1)**
45:16
**sheet (3)**
36:19;42:20,24
**shoehorn (1)**
31:10
**short (2)**
54:8;74:3
**short- (1)**
69:6
**shorten (2)**
41:15;66:15
**shortened (1)**
78:20
**short-term (1)**
69:7
**show (4)**
49:14,15,16,16
**shows (1)**
22:17
**shred (1)**
44:3
**SHULMAN (1)**
8:16
**sic (2)**
10:23;73:4
**side (4)**
23:1,2;48:25;
61:21
**sign (1)**
81:19
**signed (1)**
58:8
**significant (1)**
69:11
**similarly (1)**
79:11
**simple (1)**
55:19
**simultaneously (1)**
69:19
**single (1)**
47:20
**sit (4)**
39:12,24;44:7;
46:10
**sitting (1)**
77:10

situation (2)
31:11;52:7
**six (2)**
14:12;39:6
**six-property (2)**
69:23;71:5
**Skadden (1)**
10:7
**Slipping (1)**
43:17
**small (2)**
59:3,4
**smooth (3)**
75:11;77:18;78:1
**sold (10)**
27:24;28:12,16,
18;29:23;30:1,5,13;
41:9;48:6
**solely (1)**
16:10
**solution (3)**
18:10;66:11,11
**somehow (4)**
25:20;28:13;
34:12;38:9
**someone (2)**
19:3;28:1
**sometimes (1)**
39:8
**somewhere (2)**
10:15;50:5
**soon (1)**
80:17
**sorry (1)**
58:14
**sort (5)**
17:21;31:10;
66:14;69:24;80:15
**sought (1)**
20:10
**sound (9)**
20:1,8,10;26:5;
27:4;37:12;49:14;
52:8,12
**sources (1)**
70:7
**spades (1)**
49:17
**speak (2)**
54:8;62:17
**SPEAKER (1)**
80:22
**specifically (4)**
26:21;32:23;33:9;
50:1
**spent (1)**
18:19
**St (1)**
8:18
**staff (8)**
70:14;74:12,23;
75:5,10;77:14,17,18
**staffing (1)**

74:14
**stakeholders (3)**
19:16;27:8;70:19
**stalking (4)**
12:15;18:17;
30:15;69:17
**stand (2)**
42:6;82:4
**standard (4)**
19:24;20:1;49:14,
17
**standards (2)**
44:5;76:5
**standing (2)**
15:3;50:10
**standpoint (2)**
80:3,4
**stands (1)**
44:7
**STANG (2)**
5:2;35:9
**STANLEY (1)**
5:10
**STARGATT (1)**
7:7
**start (3)**
35:11;40:19;67:17
**started (2)**
29:7;49:13
**stat (1)**
66:25
**State (5)**
67:24;68:3;74:5;
75:7;76:10
**stated (2)**
27:12;45:13
**STATES (30)**
6:18,23,24;7:2;
23:9,11,12;25:12,21,
24;26:1,15,20;27:18;
28:2,10,25;29:3;
31:2;34:20;35:1;
40:18,20;48:5,20,25;
50:11;52:24;73:9,10
**States' (3)**
23:16,21;50:9
**State's (1)**
68:4
**status (1)**
41:20
**stay (1)**
43:6
**stayed (1)**
26:17
**Steering (2)**
5:9,14
**stemming (1)**
29:19
**stems (1)**
65:21
**STEPHEN (1)**
6:9
**steps (1)**

67:14
**still (9)**
15:15;27:17;30:5,
5,8;39:3;48:4;50:16;
77:18
**strategic (2)**
17:24;18:20
**strategy (1)**
22:16
**STRAUSS (1)**
5:13
**strip (1)**
25:4
**stripping (1)**
27:21
**struck (1)**
34:6
**structured (2)**
38:23,24
**stuck (1)**
51:6
**subject (5)**
12:3;36:19;40:3;
47:19,21
**submit (2)**
13:4;44:6
**subordinated (1)**
42:11
**subsequent (1)**
80:19
**subsidiary (1)**
68:16
**substance (1)**
24:14
**substantial (4)**
19:16;23:23;69:9,
24
**substantially (3)**
41:5;49:1;52:5
**successful (2)**
12:16;68:23
**successfully (1)**
74:2
**successor (1)**
70:24
**suddenly (1)**
50:17
**suggest (3)**
44:4;47:24;48:12
**suggested (1)**
58:22
**suggesting (2)**
22:8;52:20
**suggests (1)**
48:13
**SULLIVAN (1)**
8:22
**Super (1)**
60:10
**supplemental (1)**
63:6
**supplied (1)**
57:21

**LCI HOLDING COMPANY, INC., ET AL.**
Case No. 12-13319 (KG)

April 2, 2013

supplies (1)
　77:14
support (7)
　13:1;17:18;20:7;
　46:4;47:17;48:11;
　75:18
suppose (2)
　39:22;55:4
sure (11)
　17:9;44:20;47:4;
　48:4;56:1;58:4;63:2;
　76:1;77:24,25;80:9
surprised (2)
　42:5,6
surprising (1)
　40:19
SUZANNE (1)
　9:3
sweeten (1)
　35:17
Sylvia (1)
　76:4
Systec (1)
　38:21
System (1)
　62:6

**T**

table (2)
　19:4;25:9
tabling (1)
　63:16
TACs (1)
　69:7
tagged (1)
　28:22
tagging (1)
　28:19
Talk (3)
　37:2;54:10;56:8
talked (1)
　78:2
talking (3)
　49:11;58:10;70:17
TARR (1)
　5:10
tat (1)
　35:22
Tax (24)
　6:19;23:10,23;
　25:10,20,21;28:9,11,
　15,17,17,18,19;29:6,
　11;30:1,6,8;32:4;
　47:7;48:10;50:13,21,
　24
TAYLOR (1)
　7:7
team (3)
　73:12;74:2;75:9
telephonic (1)
　66:16
TELEPHONICALLY (5)

5:22;8:13,19;9:5;
　41:21
Temple (1)
　72:16
ten (3)
　64:19,25;73:9
tenant (1)
　38:6
term (10)
　36:8,19;42:19,24;
　46:19;56:5,7;66:2;
　76:5,14
terminate (1)
　44:12
terms (12)
　19:15;26:19;
　36:19;37:12;38:9;
　40:22;42:7,24;
　53:18;55:25;56:2;
　79:9
testify (1)
　68:18;69:15;71:3;
　72:11,12;73:11,24
testimony (3)
　15:17;66:21;68:14
tests (1)
　52:13
Thanks (1)
　16:18
That'll (2)
　64:18,18
theory (1)
　48:2
therefore (1)
　21:7
third (2)
　11:11;67:23
thirty-seven (1)
　72:24
thorough (2)
　17:23;18:7
though (3)
　35:1;41:2;45:2
thought (4)
　10:10;29:13;53:5;
　60:1
thousands (1)
　38:4
three (7)
　11:7;13:19;17:17;
　20:6,8;42:23;74:22
three-party (1)
　65:21
three-way (1)
　70:25
thrilled (1)
　36:13
throughout (3)
　23:17;58:6;73:9
Thursday (5)
　41:25;42:2;66:16;
　74:24;77:17
tie (1)

44:15
times (2)
　36:3;39:9
timing (1)
　54:10
TIMKO (1)
　8:4
tit (1)
　35:22
title (1)
　65:20
today (21)
　10:10,12,21;
　15:19;19:12;35:19;
　39:16,24;40:8,10;
　45:12,19;46:12;
　52:3;54:21;58:21;
　63:11;76:10,25;
　77:10;81:22
today's (4)
　11:6;14:23;21:3;
　41:11
together (4)
　11:8;18:23;19:19;
　56:9
told (5)
　23:5;43:3,3
TOM (3)
　9:4;72:7;75:13
tone (1)
　40:25
Tony (1)
　10:13
took (1)
　46:7
top (1)
　54:18
totally (2)
　43:15;44:17
traffic (1)
　68:4
transacting (1)
　22:15
transaction (23)
　19:6,22;20:23;
　21:16;22:19;26:7;
　27:1,23;47:15,24;
　50:22;65:16,18,20,
　21;66:9,12,23;68:6;
　69:1,19;70:1;80:2
transactions (5)
　21:24;47:23;
　70:23;75:8;78:17
transfer (5)
　28:7;65:18;69:5;
　70:11;75:6
transferred (2)
　70:24;74:2
transfers (1)
　75:8
transition (5)
　20:21;74:25;
　75:11;77:19;78:1

TRAURIG (1)
　5:19
trial (1)
　44:8
trinity (1)
　67:23
TROY (1)
　7:4
true (2)
　33:25;51:22
Trustee (8)
　6:24;40:18,20;
　41:14;42:24;44:14,
　16;45:3
Trustee's (1)
　67:8
try (7)
　18:8;24:4,5;26:9;
　39:10;53:22;79:5
trying (10)
　10:16;31:7,10,24;
　33:10;38:13,14;39:1,
　18;71:19
Tuesday (1)
　41:11
turn (3)
　26:3;65:11;67:8
turnaround (1)
　73:21
Turner (1)
　6:14
turning (1)
　24:14
tweaked (1)
　59:5
twenty (2)
　66:3;73:9
twenty- (1)
　29:11
twenty-four (3)
　25:14;29:6;74:20
twenty-seven (1)
　41:5
twenty-three (3)
　16:25;21:23;50:14
two (12)
　11:8;24:3;32:15;
　43:2;44:17;61:1;
　65:22;66:11,21;
　69:21;74:12;80:11
two-minute (1)
　54:8
type (2)
　26:4;54:4

**U**

ultimately (7)
　12:6,14;36:17;
　61:10,14,18;74:18
uncertainty (2)
　46:5;58:4
uncontested (1)

10:11
under (23)
　14:11,17,24;
　19:24;20:16;21:8,13,
　24;24:3,18;27:5;
　36:5;43:17,19;44:9;
　49:4,14;52:3;61:15;
　64:17;70:18;78:24;
　79:14
Understood (1)
　54:22
undertaken (1)
　19:2
undertaking (2)
　17:22;18:7
undo (1)
　51:8
unfamiliar (1)
　52:5
unfortunately (1)
　48:20
UNIDENTIFIED (1)
　80:22
UNITED (32)
　6:18,23,24;7:2;
　23:9,10,12,16,21;
　25:12,21,24;26:1,15,
　20;27:18;28:2,10,25;
　29:3;31:2;34:20;
　35:1;40:18,20;48:5,
　20,25;50:9,11;52:24;
　73:10
University (2)
　72:16,23
Unless (3)
　35:4;69:18;78:13
unpaid (1)
　22:6
unrelated (1)
　44:17
unsecured (17)
　18:13;19:11;
　21:19;24:1;27:12;
　31:5;32:21;33:2,4;
　34:18;35:13,16;
　36:16;43:2;44:23;
　45:17;53:24
unusual (1)
　52:7
up (18)
　11:16,25;22:17;
　28:16;29:13;30:6;
　36:4,6;38:23,24;
　42:6;44:7;49:9;
　55:13;61:14,20;
　63:14;71:13
upon (2)
　28:13;77:20
use (3)
　36:8;45:9;78:21
using (3)
　21:21;27:14;56:5

## V

**valid (2)**
35:2;51:23
**value (16)**
19:14,16;21:1;
22:16;38:14,15,18,
18;39:1,3,10;47:12,
14;48:14;53:24;54:5
**variety (1)**
23:18
**various (2)**
12:18;36:3
**Varughese (2)**
12:24;17:15
**Varughese's (1)**
13:18
**veiled (1)**
27:14
**vendors (4)**
36:13;38:5;70:6,
19
**version (2)**
56:17;58:8
**versus (1)**
20:19
**vet (1)**
54:18
**vetted (3)**
41:18;44:24;45:6
**viable (1)**
20:20
**Vibra (39)**
7:8;9:4;11:15,17;
18:21;41:14;65:14,
18;66:22,24;67:3,9;
69:20;70:9,11,24;
72:6,14;73:5,7,8,11,
15,19,24;74:5,9,16;
75:2;76:3,6,13,16;
77:4,10,23;78:16;
79:24;80:1
**Vibra's (2)**
67:22;79:14
**Vice (4)**
9:4;72:13;73:1,6
**view (2)**
20:19;71:7
**violates (2)**
30:21;31:9
**violating (1)**
30:24
**virtually (1)**
59:19
**virtue (1)**
36:17
**vision (1)**
73:16
**visit (2)**
77:24;78:4
**visited (2)**
74:11;76:25

**visits (1)**
77:1
**voluntarily (1)**
47:8

## W

**waiting (1)**
60:2
**waiver (1)**
43:8
**Walker (1)**
10:23
**Walsh (1)**
38:22
**WALTER (1)**
8:13
**wants (5)**
37:9;43:13;47:3;
49:24;50:2
**WARN (3)**
69:12,12;70:18
**water (1)**
37:11
**way (8)**
22:3;28:14;37:7;
46:22;52:6;55:4;
63:11;70:1
**Wednesday (4)**
41:10,13;74:23;
77:17
**week (10)**
11:13;12:19;42:2;
66:16;74:20,24;78:3,
3;80:17;81:9
**weekend (3)**
41:25;43:22,23
**weeks (1)**
74:12
**weigh (1)**
55:18
**Welcome (1)**
10:25
**weren't (1)**
17:25
**West (4)**
61:5,12;62:6,9
**what's (8)**
26:13;27:19;
30:14;33:7;39:11;
41:4;50:7,22
**whenever (1)**
36:6
**whereas (1)**
31:3
**Whereupon (1)**
82:5
**whole (1)**
28:16
**WILDMAN (2)**
7:23;62:25
**WILLIAMSON (38)**
6:20;22:20,25;

23:4,5,8,9,15;24:21,
24;25:17;29:2,25;
30:10,13;31:23;
32:15;33:25;35:6;
37:3;46:11;47:3,15,
16;48:8,12;49:19,21;
51:5,11,15,21,25;
52:23;53:3,5,7,10
**Williamson's (1)**
46:25
**wind-down (4)**
31:4;33:2;66:13;
69:4
**Windham (1)**
6:14
**win-win (2)**
79:8,9
**wise (1)**
64:23
**wish (3)**
36:6;75:14;79:20
**wishes (1)**
13:22
**WISLER (7)**
8:8;62:15,17;64:4,
5,6,8
**withdraw (1)**
78:25
**without (5)**
22:15;47:20,21;
51:10;71:2
**witness (4)**
15:8;16:2,10;
68:18
**witnesses (1)**
26:22
**woe (1)**
48:19
**Wonderful (1)**
79:19
**words (1)**
54:24
**work (4)**
29:10;64:18,18;
79:5
**worked (3)**
41:25;46:1;57:24
**working (6)**
14:21;15:1;16:4;
75:1,7;77:18
**works (1)**
60:10
**worth (2)**
51:20,22
**wound (1)**
69:3
**wrong (1)**
65:24

## Y

**years (8)**
21:22,22,23;39:6,

6;44:10;72:24;74:1
**yesterday (2)**
42:4;63:3
**yield (1)**
18:11
**Yohe (2)**
76:2,12
**YOUNG (1)**
7:7

## Z

**Zero (2)**
48:7,7
**ZIEHL (2)**
5:2;35:9
**ZIMAN (110)**
10:5,6,7,7,10,15,
19,23;11:1,4,6,11,19,
23;12:6;13:1,14,21,
23;14:10;16:12,14,
16,23;17:3,13,18,19;
18:3;20:5,14;22:23;
24:15;26:22;37:15;
45:23;46:14,17,21,
25;47:3;56:15,16,20,
23;57:1,3,5,14,17,20,
23;58:4,11,14;59:7,
13,17,18,21,25;60:3,
7,11;64:11,14,17,19,
22,24;65:1,6,7,8,10,
11,18;66:20;67:6,12,
23;68:1,6,9,13;
69:15;71:12,16;
78:13,20;79:2,14,18,
22;80:5,8,11,13,16,
19,24;81:1,5,8,11,14,
18,21,23;82:1

## 1

**10 (2)**
41:12;43:21
**1021 (1)**
43:16
**11 (10)**
20:12,16;21:6,8,
24;24:18;26:8,17,17;
68:21
**1129 (8)**
24:5,8;30:22,24;
31:7;37:3;38:10;
47:6
**1129a (1)**
21:9
**1129b (1)**
21:9
**1146a (2)**
58:23,25
**120 (1)**
47:21
**12th (1)**
12:17

**13th (2)**
12:13,17
**160 (1)**
69:4
**17 (1)**
57:19
**1974 (1)**
72:17
**1976 (1)**
72:17
**1993 (1)**
73:2
**1995 (1)**
73:4
**1999 (1)**
73:2
**1st (2)**
81:10,15

## 2

**2.3 (1)**
36:5
**2.3g (3)**
36:6,17;38:4
**200 (1)**
50:19
**2002 (1)**
72:19
**2004 (1)**
73:7
**2005 (1)**
73:5
**2013 (2)**
42:12;73:19
**211 (1)**
44:11
**23.8 (1)**
25:14

## 3

**3 (5)**
22:17,18;65:11;
76:8,18
**3.5 (2)**
36:19;42:25
**3:15 (1)**
76:12
**300 (1)**
50:20
**34 (2)**
58:10,14
**36 (1)**
58:15
**363 (16)**
20:16;21:8,10;
22:17;24:4;26:3,4,6,
11;27:5;31:10;39:7;
43:24;47:6;49:14;
52:3
**363b (1)**
19:25

**38 (5)**
  35:17;40:23;42:5;
  45:4;58:18
**3rd (1)**
  80:25

## 4

**4,500 (1)**
  19:9
**4:19 (1)**
  65:3
**4:30 (1)**
  64:25
**4:35 (1)**
  65:3
**4:56 (1)**
  82:5
**400 (1)**
  73:20

## 5

**5 (1)**
  43:5
**50,000 (1)**
  50:16
**503b9 (1)**
  48:22
**525 (2)**
  59:4,6
**586 (1)**
  13:17
**587 (1)**
  13:17
**590 (2)**
  13:2,18

## 6

**60-04 (1)**
  43:7

## 7

**7 (4)**
  24:18;26:18;
  31:21;32:2
**798 (1)**
  44:11
**7th (3)**
  80:22,23;81:12

## 9

**9 (2)**
  41:10,12
**9019 (3)**
  44:2,4;54:10